MICHAEL S. MEZA, ESQ., BAR NO: 068366
BRIDGMAN, MORDKIN, GOULD AND SHAPIRO, INC.
17050 Bushard, Ste 200
Fountain Valley, CA 92708
(714) 963 5486

MARY KELLY, BAR NO:
827 Moraga Dr.
Bel Air, CA 90049
(213) 472 7121

Attorneys for Defendant



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,       ) CASE NO: CR 87-422(F)-ER
                                )
                    Plaintiff,  ) NOTICE AND MOTION FOR NEW TRIAL,
                                ) RULE 33, FEDERAL RULES OF
        vs.                     ) CRIMINAL PROCEDURE; JOINDER;
                                ) DECLARATION OF MICHAEL S. MEZA;
JUAN JOSE BERNABE-RAMIREZ,       ) AND POINTS AND AUTHORITIES
et al,                          )
                                )
                   Defendants.  )
--------------------------------) Date:  9/24/90
                                  Time:  1:30 p.m.
                                  Place: Courtroom

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNTIED STATES

OF AMERICA AND ITS ATTORNEY OF RECORD:

        PLEASE TAKE NOTICE that on September 24, 1990, at 1:30

p.m., or as soon thereafter as counsel may be heard in the

courtroom of Edward Rafeedie, United States District Judge,

defendant Juan Jose Bernabe-Ramirez will move this court for an

order granting a new trial in the interest of justice on the

grounds of jury misconduct and that the trial court erred in

denying admission of defendant's Mexican declaration, Defendant's

1

ORIGINAL

Exhibit IIII.

Defendant also joins in Co-Defendant Zuno's Sixth Amendment Motion to Dismiss based upon jury misconduct.

This motion is based upon Rule 33 of the Federal Rules of Criminal Procedure, upon the files and records in this case, upon the points and authorities attached hereto, and upon any further oral or documentary evidence as may be presented at the time of the hearing of this motion.

DATED: August 24, 1990

Respectfully submitted,

BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.

BY: _____
MICHAEL S. MEZA and MARY KELLY
Attorneys for Juan Jose Bernabe-Ramirez

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1326

2

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486    FAX (714) 964-1326

## DECLARATION OF MICHAEL S. MEZA

I, Michael S. Meza, hereby declare:

(1)   That I and Mary Kelly are the attorneys of record for Juan Jose Bernabe-Ramirez, in the case entitled USA v. Bernabe-Ramirez, et al., Case No: CR87-422(F)-ER, which is presently calendared for sentencing on September 24, 1990, before the Honorable Edward Rafeedie, Judge Presiding.  A jury trial was had in the above-entitled matter and on July 30, 1990, the jury returned verdicts of guilty as to defendant Bernabe-Ramirez on Counts 3, 6, and 8.

(2)   This declaration is made in support of defendant's motion for new trial pursuant to Federal Rules of Criminal Procedure, Rule 33.

(3)   On or about August 2, 1990, I was informed that the court conducted an individual voir dire with each juror in the above-entitled matter concerning the introduction of extrinsic material, to wit: newspaper articles about the case, into the deliberation process.  A copy of the reporter's transcript of said proceedings is attached and marked Exhibit "A."

(4)   That one of the jurors, namely:  William Parris, indicated at pages 33 through 36 that some jurors had been exposed to publicity concerning the Matta verdict, rendered on July 26, 1990, and proceeded to discuss said publicity during deliberations on July 27, 1990.  Further, several jurors acknowledged that newspapers were routinely brought into the jury

room during the entire course of the trial and at one point the Matta verdict was discussed prior to the Bernabe-Ramirez verdict. At page 35 Sylvia Lopez was referred to as one of the sources which prompted the Matta discussion. Sylvia Lopez is a news reporter for local television station KNXT, Channel 2.

(5) On August 2, I informed counsel for Zuno and Matta that the court had conducted said proceeding and that a transcript was to be prepared.

(6) On August 3, 1990, counsel for defendant Zuno filed a motion for a new trial in which defendant Bernabe-Ramirez joined. At that time the court denied defendant's joinder for lack of sufficient foundation.

(7) On August 11, 1990, Mary Kelly together with counsel for defendant Zuno interviewed juror William R. Parris. As a result of said interview, a Declaration was signed by Mr. Parris, (a copy of which is attached and marked Exhibit "B.")

(8) On or about May 7, 1990, the day prior to the scheduled date for trial in the above-entitled case, a newspaper article appeared in the L.A. Times (attached hereto and marked Exhibit "C") recounting the history of Operation Leyenda. The article also notes that Hector Berrellez, head of Operation Leyenda, received the Attorney General's Award for Exceptional Heroism.

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

4

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

(9)  On or about May 25, 1990, at a hearing upon motion by the co-defendant Machain to dismiss the indictment, Agent Berrellez testified to his role in arresting co-defendant Alvarez-Machain. On or about May 27, 1990, the L.A. Times published reports that a warrant for the arrest of Agent Berrellez had been issued by the Mexican Government for Agent Berrellez' role in arresting Dr. Alvarez-Machain (attached hereto and marked Exhibit "D").

(10)  Agent Berrellez was the focal witness against defendant Bernabe-Ramirez.  He testified against defendant in late June and July.  As the agent in charge of Operation Leyenda, Agent Berellez assumed an undercover role as a major narcotics trafficker.  He approved and orchestrated a plan whereby a confidential informant, Frederico Castel del Oro, would lure defendant to the United States and unexpectedly meet Agent Berrellez.  Berrellez and defendant met on four occasions, each of which was electronically recorded.  The Government played selected portions of these tapes. One of the selected replays, beamed on a 10 foot high screen, was defendant's assertion that he had deceived Mexican authorities by telling them that he was a "mere servant" for Fonseca.  Agent Berrellez testified to portions which had not been played, offering his interpretation of the conversation, which in many instances was not supported by transcripts of the recordings.

(11)  Defendant testified in his own defense and among other things testified that he was arrested by Mexican

authorities in April 1985. He was questioned and his answers were reduced to a writing in the form of a declaration, a copy of which was marked as defense Exhibit IIII (a copy of which is attached and marked Exhibit "E"), which he identified by its contents, his initials on every page, and his signature at the end.

(12) The above information, concerning jury deliberations, was obtained only after a verdict had been rendered against Mr. Bernabe-Ramirez. Counsel for Bernabe-Ramirez have been diligent in securing said information and could not have known of it prior to the August 2, 1990 hearing.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of August, 1990, at Fountain Valley, California.

_____
MICHAEL S. MEZA

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486  FAX (714) 964-1328

6

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  - - - - - -

4    HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

5                  - - - - - -

6

7    UNITED STATES OF AMERICA,        )
                                      )          **COPY**
8                   PLAINTIFF,        )
                                      )
9              VS.                    )   CASE NO: CR 87-422(F)-ER
                                      )
10   JUAN RAMON MATTA-BALLESTEROS     )
     DEL POZO, RUBEN ZUNO-ARCE,       )
11   JUAN JOSE BERNABE-RAMIREZ,       )
     AND JAVIER VASQUEZ-VELASCO,      )
12                                    )
                 DEFENDANTS.          )
13   _____)

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17         THURSDAY, AUGUST 2, 1990; 1:30 P.M.

18             LOS ANGELES, CALIFORNIA

19

20

21                      JULIE CHURCHILL, CSR
                        OFFICIAL REPORTERS
22                      U.S. DISTRICT COURT, 442-C
                        312 N. SPRING STREET
23                      LOS ANGELES, CA  90012
                        (213) 617-8227

24

25

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF:

        GARY A. FEESS,
        UNITED STATES ATTORNEY
        BY:  MANUEL A. MEDRANO
            JOHN L. CARLTON
        ASSISTANT U.S. ATTORNEYS
        1200 UNITED STATES COURTHOUSE
        312 NORTH SPRING STREET
        LOS ANGELES, CALIFORNIA  90012
        (213) 894-0619/894-6682


    FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

        FEDERAL LITIGATORS GROUP
        BY:  GREGORY NICOLAYSEN, ESQ.
        8530 WILSHIRE BOULEVARD, STE. 404
        BEVERLY HILLS, CALIFORNIA 90211
        (213) 854-5135

ALSO PRESENT:

        MARK KEMPLE, LAW CLERK
        MARCUS BIRD, LAW CLERK
        TIM SAITO, COURT CLERK

3

LOS ANGELES + CALIFORNIA    THURSDAY, AUGUST 2, 1990

+ 1:30 P.M.

(HEARING IN CHAMBERS.)

THE COURT:  HAVE A SEAT.  LET THE RECORD SHOW THE COURT HAS CONVENED IN CHAMBERS WITH COUNSEL ON THE REMAINING DEFENDANT.  THE COUNSEL FOR THE REMAINING DEFENDANT AND COUNSEL FOR THE GOVERNMENT ARE PRESENT.

JUST BEFORE NOON THE REPORTER REPORTED TO ME THAT YESTERDAY WHEN SHE WAS IN THE JURY ROOM SHE OBSERVED A NEWSPAPER WITH, APPARENTLY, A STORY ON THE ZUNO CONVICTION. MAYBE I'LL ASK HER TO TELL YOU EXACTLY WHAT IT WAS SHE OBSERVED.

THE REPORTER:  YOUR HONOR, I CAN'T WRITE AND TALK AT THE SAME TIME.

THE COURT:  CAN YOU TAKE IT OFF THE TAPE?

THE REPORTER:  YES, PROBABLY, IF YOU ALL AGREE --

THE COURT: OKAY.  TELL EVERYBODY WHAT HAPPENED.

(SEE CERTIFIED STATEMENT ATTACHED.)

MR. NICOLAYSEN:  I DISCUSSED THE MATTER THIS MORNING WITH MS. CHURCHILL AND I DISCUSSED MY STRONG PREFERENCE -- AND THAT'S HOW IT WAS BROUGHT TO YOUR ATTENTION.

MS. CHURCHILL MADE IT CLEAR TO ME THAT SHE WANTED SOME GUIDANCE ON HOW TO HANDLE A DILEMMA OF THIS KIND, AND BEFORE BRINGING IT TO YOUR ATTENTION WANTED TO KNOW WHETHER, AS

4

1  A MATTER OF ETHICS, I FELT AS AN OFFICER OF THE COURT THAT THIS

2  CLEARLY HAD TO BE BROUGHT TO THE COURT'S ATTENTION.

3          SHE THOUGHT YES, IT SOUNDS RIGHT TO DO THAT RIGHT

4  AWAY. AND I WAS IN HER OFFICE --

5          THE COURT:  DID SHE CONTACT YOU?

6          MR. NICOLAYSEN:  I THINK I APPROACHED JULIE CHURCHILL

7  AND JULIE ASKED WHAT I THOUGHT, AS A MATTER OF ETHICS, SHOULD

8  BE DONE.  I TOLD HER I THOUGHT IT WAS SERIOUS.  AND WHEN I TOLD

9  HER THAT THIS MORNING, SHE WENT AHEAD AND TRIED TO REACH ME BY

10  PHONE --

11          THE REPORTER:  THAT'S NOT CORRECT, YOUR HONOR.    I

12  WAS REPORTING IN COURT THIS MORNING AND WAS APPROACHED BY A

13  MESSENGER OF MR. NICOLAYSEN'S THAT HE NEEDED TO SEE ME ABOUT

14  SOMETHING RELATED TO THE CASE.

15          THE COURT:  APPARENTLY YOU CALLED --

16          MR. NICOLAYSEN:  I WAS INFORMED BY CYNTHIA PARKER

17  LAST NIGHT.  SHE TOLD ME THAT APPARENTLY IT SEEMED AS THOUGH

18  THERE WAS A PAPER IN THE JURY ROOM AT THE TIME WHEN JULIE

19  CHURCHILL WAS READING THE AGENT REYNOSO TESTIMONY YESTERDAY

20  AFTERNOON.  I WAS STUNNED, FOR OBVIOUS REASONS.

21          SHE SAID SHE REALLY DIDN'T HAVE DETAILS.

22          THE COURT:  DID SHE TELL YOU WHERE SHE LEARNED OF IT?

23          MR. NICOLAYSEN:  I PUT TWO AND TWO TOGETHER AND

24  ASSUMED SHE HAD SPOKEN WITH SOMEBODY; EITHER JULIE OR ANOTHER

25  LAWYER.

5

1      SHE MENTIONED THAT MIKE MEZA HAD LEARNED OF IT, AS

2  WELL, AND I THOUGHT PERHAPS SHE HAD LEARNED OF IT FROM HIM.  MY

3  CONCERN WAS TO FIND OUT DIRECTLY FROM MS. CHURCHILL EXACTLY

4  WHAT WENT ON BEFORE I SAID WE HAD TO BRING IT TO YOUR

5  ATTENTION.

6      MS. CHURCHILL TOLD ME THAT IT WAS AN ARTICLE ON THE

7  CAMARENA CASE THAT SEEMED TO HAVE BEEN READ BY ONE OF THE

8  JURORS.  TO ME THAT WAS CLEARLY A PROBLEM, SO I SAID YOU NEED

9  TO KNOW ABOUT IT.

10     MR. MEDRANO:  WHAT IS TROUBLING IS NOW TWO DEFENSE

11  LAWYERS AND AN INTERPRETER KNOW ABOUT THIS EVEN BEFORE YOU DO

12  TODAY.

13     THE COURT:  THAT'S VERY TROUBLING TO ME AND YOU CAN

14  BET THAT I HAVEN'T BEEN SILENT ON THAT SUBJECT.  THAT DOESN'T

15  CHANGE THE FACT THAT APPARENTLY THAT'S WHAT HAPPENED.

16     MR. MEDRANO:  THERE IS A NOTION OR SOME APPEARANCE OF

17  IMPROPRIETY HERE.  I CAN'T PUT MY FINGER ON IT.

18     THE COURT:  IT'S AN ACTUAL IMPROPRIETY.

19     MR. MEDRANO:  IT'S VERY DISCONCERTING TO US.

20     I UNDERSTAND THAT THE INTERPRETER, CYNTHIA PARKER, IS

21  RIGHT OUTSIDE IN THE COURTROOM HERE.  PERHAPS WE SHOULD ASK HER

22  WHAT IS GOING ON.

23     THE COURT:  WE WILL ASK HER, IF SHE IS HERE.

24     MR. NICOLAYSEN:  WHAT IS IMPORTANT TO KEEP IN MIND IS

25  THE FACT THAT THERE WAS A SERIOUS CONCERN, AS I WAS PICKING IT

6

1   UP, THAT YOUR REPORTER WAS BEING PUT IN A VERY DIFFICULT

2   SITUATION AND WAS SEEKING FEEDBACK ON HOW TO HANDLE THIS IN AN

3   ETHICAL AND PROFESSIONAL MANNER.

4              I PICKED THAT UP VERY CLEARLY AND I DID NOT THINK

5   THAT YOUR REPORTER WAS TRYING TO GO BEHIND THE GOVERNMENT'S

6   BACK OR YOUR BACK, BUT SIMPLY WAS GOING THROUGH A DILEMMA THAT

7   SHE HAD NEVER EXPERIENCED BEFORE.  AND QUITE UNDERSTANDABLY,

8   THESE ARE THE TYPES OF JUDGMENT CALLS THAT REPORTERS DO NOT

9   ORDINARILY MAKE.

10             SO IN COMING TO ME, I FELT SHE WAS ASKING FOR MY

11  FEEDBACK AND WANTED TO GET SOME GUIDANCE ON THIS.  THE MOMENT I

12  MADE IT CLEAR THAT IT CLEARLY HAD TO REACH YOUR ATTENTION,

13  THERE WAS NO THOUGHT ABOUT GOING BEHIND THE GOVERNMENT'S BACK.

14  THAT SIMPLY WAS NOT A CONSIDERATION.  IT WAS CLEAR THAT ONCE IT

15  WAS BROUGHT TO YOUR ATTENTION, THE GOVERNMENT CLEARLY WOULD BE

16  BROUGHT IN.

17             SHE EVEN TRIED TO CALL YOU IMMEDIATELY FROM HER

18  OFFICE BUT COULD NOT GET THROUGH TO YOU SO SHE WENT DOWN TO THE

19  SECOND FLOOR TO SEE YOU.

20             THE COURT:  I DON'T BELIEVE THERE WAS ANY EFFORT TO

21  GO BEHIND THE GOVERNMENT'S BACK.  I THINK IT WAS A VERY GREAT

22  LAPSE OF JUDGMENT ON THE PART OF THE REPORTER, TOTALLY BEYOND

23  MY BELIEF.

24             MR. NICOLAYSEN:   IF I MAY JUST SAY THESE ARE

25  DILEMMAS THAT ARE OBVIOUSLY VERY UNIQUE.  I DON'T WANT TO SEE

7

1  THE REPORTER SUDDENLY BEING HIT WITH THE CRITICISM.  I THINK

2  THE REAL PROBLEM IS, OBVIOUSLY, THE NEWSPAPER IN THE ROOM AND

3  WHY THE MARSHAL ALLOWED THAT TO HAPPEN AND WHY THE JURY ALLOWED

4  IT TO HAPPEN.

5         I DON'T WANT TO SEE US DISTRACTED BECAUSE SHE DECIDED

6  TO ASK A COLLEAGUE FOR ADVICE.

7         THE COURT:  THAT'S FOR COURT TO TAKE CARE OF, THE

8  REPORTER'S CONDUCT IN THIS CASE.

9         IS THIS INTERPRETER OUT THERE?

10         MR. KEMPLE  I DIDN'T SEE HER OUT THERE.  I COULD

11  CHECK IN THE HALLWAY.

12         THE COURT:  GO SEE IF SHE IS OUT THERE.

13         MR. MEDRANO:  THIS IS NOT TO DEPRECATE THE

14  SIGNIFICANCE OF THE ISSUE OF THE NEWSPAPER IN JURY ROOM; THAT'S

15  SOMETHING THAT OBVIOUSLY YOU'LL ADDRESS SHORTLY, IS WHO HAS

16  ACCESS TO THE JURY.

17         HOW MANY PEOPLE HAVE BEEN KNOWING ABOUT THIS KIND OF

18  THING BEFORE YOU WERE ADVISED?

19         THE COURT:  YOU'RE GETTING HYSTERICAL.  NOBODY HAS

20  ACCESS TO THE JURY.  THE ONLY REASON THIS CAME OUT IS BECAUSE

21  THE REPORTER WAS THERE READING A TRANSCRIPT.

22         MR. MEDRANO:  I UNDERSTAND.

23         THE COURT:  THE ONLY PROBLEM IS IT SHOULD HAVE BEEN

24  REPORTED TO ME IMMEDIATELY AND IT WAS NOT.

25         MR. MEDRANO:  YES.

8

1    MR. NICOLAYSEN:  DOESN'T THE COURT FEEL THAT SOME

2    INQUIRY NEEDS TO BE MADE AS TO WHETHER THIS IS -- I DO SHARE

3    MR. MEDRANO'S CONCERNS --

4        MR. MEDRANO:  MAY I JUST INQUIRE, YOUR HONOR.  IT WAS

5    THIS MORNING AT SOME POINT IN TIME TODAY THAT YOU WERE ADVISED?

6        THE COURT:  I WAS ADVISED ALSO THAT MR. MEZA HAD BEEN

7    TOLD AND THAT MR. NICOLAYSEN KNEW AND HAD SUGGESTED THAT SHE

8    TELL THE COURT ABOUT IT.  THAT IS, THE REPORTER.

9        ASSUMING -- WE'LL DEAL WITH HER, IF WE CAN LOCATE

10   HER.  WHAT DO YOU THINK SHOULD BE DONE WITH RESPECT TO THIS

11   PROBLEM?

12       MR. NICOLAYSEN:  I WOULD ASK THAT WE HAVE A HEARING

13   IN WHICH THE JURORS ARE ASKED ABOUT THE NEWSPAPER.  AND I THINK

14   THIS ALSO REFLECTS MR. MEDRANO'S CONCERNS.

15       I THINK WE NEED TO GO BACK IN TIME AND DETERMINE

16   WHETHER OR NOT THIS IS A ONCE ONLY SITUATION OR WHETHER THE

17   JURY HAS HAD SOME KIND OF ONGOING CONTACT WITH THE MEDIA OR

18   NEWSPAPER.  WE MUST PRESERVE THE SANCTITY OF THE PROCESS.

19       I ALSO THINK THAT THE MARSHALS NEED TO BE EXAMINED

20   UNDER OATH IN COURT BY THE COURT TO DETERMINE HOW IT IS THAT

21   THEY FAILED IN THEIR SUPERVISORY DUTIES IN ALLOWING THE

22   NEWSPAPER IN THE ROOM.

23       THE COURT:  I HAVE ALREADY SPOKEN TO THE MARSHAL.  HE

24   APPARENTLY WAS UNAWARE.

25       MR. NICOLAYSEN:  I WOULD RESPECTFULLY SUBMIT THAT IT

9

1   WAS --

2          THE COURT:  HE WAS UNAWARE IT WAS A PROBLEM.

3          MR. NICOLAYSEN:  THAT WOULD BE MY SUGGESTION, BUT I

4   WOULD RESPECTFULLY ASK THAT THIS BE DONE IN OPEN COURT ON THE

5   RECORD.

6          THE COURT:  I WANT TO KEEP IT HERE.  I DON'T KNOW WHY

7   WE SHOULD PUT IT IN OPEN COURT YET.  I DON'T WANT ANY COMMENT

8   ABOUT THIS TO ANYBODY WITH THE PRESS.

9          MR. NICOLAYSEN:  I WON'T SPEAK TO THE PRESS ABOUT

10  THIS.

11         MR. MEDRANO:  I THINK, YOUR HONOR, WE WOULD DISAGREE

12  SLIGHTLY WITH MR. NICOLAYSEN.  I THINK SUCH A BROAD HEARING IS

13  INAPPROPRIATE.

14         A GOOD STARTING POINT THAT THERE HAS BEEN NO

15  MISCONDUCT BY THE JURY IS FOR US TO IDENTIFY THROUGH

16  MS. CHURCHILL WHICH SPECIFIC JUROR HAD THE NEWSPAPER, BECAUSE

17  EVIDENTLY, WE CAN APPROACH IT THROUGH A PARTICULAR JUROR, AND

18  AS A STARTING POINT HAVE YOU TALK TO THAT JUROR INDIVIDUALLY AT

19  THE BEGINNING AND HAVE A SENSE IF SHE WAS THE ONLY ONE AND IF

20  THIS WAS ONE-TIME INCIDENT, AND THEN GO -- AND THEN GO FROM

21  THERE AS TO WHETHER ANY BROADER TYPE OF INQUIRY WAS NECESSARY.

22         I DON'T THINK IT IS NECESSARY TO POLL AND QUESTION

23  EACH AND EVERY JUROR, BUT MAYBE JUST START WITH THE ONE JUROR

24  THAT WE CAN ATTRIBUTE OWNERSHIP OF THE NEWSPAPER.

25         THE COURT:  CAN YOU IDENTIFY WHICH JUROR IT WAS?

10

1    THE REPORTER:  THE BLOND WOMAN WHO SAT IN THE FRONT

2    ROW WITH THE SHORT HAIR.

3    THE COURT:  LINDA OVERHOLT.

4    THE REPORTER:  YOUR HONOR, I THOUGHT IF I CAME DOWN

5    IMMEDIATELY AND REPORTED HER, THE JURY WOULD BE HESITANT TO ASK

6    FOR ANY OTHER READ BACKS WHILE THEY WERE DELIBERATING.

7    THE COURT:  WE'LL GET INTO YOUR PROBLEM LATER.  YOU

8    DON'T HAVE TO DEFEND YOURSELF HERE.

9    MR. KEMPLE:  THE INTERPRETER IS ON HER WAY UP FROM

10   SOME OTHER COURT.

11   MR. MEDRANO:  IN ADDITION TO THOSE PRESENT, MAY WE

12   PASS ON TO MISS CYNTHIA PARKER, THE INTERPRETER, AND MR. MEZA

13   THAT THIS IS NOT TO BE DISCUSSED WITH ANYONE UNLESS YOU'VE MADE

14   SOME RESOLUTION OF IT, AT LEAST?

15   THE COURT:  WE COULD PASS THAT ON TO THOSE

16   INDIVIDUALS, AS WELL AS ANYONE ELSE WHO HAS KNOWLEDGE OF THIS,

17   BECAUSE WE DON'T HAVE ALL THE FACTS YET.

18   MR. NICOLAYSEN:  YOUR HONOR, HOW WOULD THE COURT LIKE

19   TO HANDLE THE NOTIFICATION OF MR. MEDVENE AND STOLAR ON THIS OR

20   DOES THE COURT REGARD THAT AS NOT NECESSARY AT THIS TIME?

21   THE COURT:  I DON'T THINK THAT'S NECESSARY.  THEY'LL

22   HEAR ABOUT IT, I'M SURE, IF THEY HAVEN'T ALREADY.

23   MR. NICOLAYSEN:  TO THE EXTENT --

24   THE COURT:  HAVE YOU TOLD THEM?

25   MR. NICOLAYSEN:  NO, I HAVE NOT.  I WAS GOING TO

11

1    AWAIT YOUR FEEDBACK TODAY.

2          THE COURT:  WHAT I'M CONCERNED ABOUT RIGHT NOW DEALS

3    WITH YOUR CLIENT DURING THE DELIBERATIONS IN HIS CASE AND THAT

4    THIS NEWSPAPER WAS SEEN.

5          THAT'S WHAT I'M MAINLY CONCERNED ABOUT SINCE THE JURY

6    IS STILL OUT ON THAT.

7          MR. NICOLAYSEN:  TO THE EXTENT THERE IS A POSSIBILITY

8    THAT THE JURY HAS BEEN VIOLATING YOUR HONOR'S ADMONITIONS GOING

9    BACK IN TIME, COUNSEL MIGHT WISH TO RAISE THAT WITH THE COURT.

10          THE COURT:  THAT'S POSSIBLE.  THEY'RE FREE TO DO SO.

11          MR. KEMPLE:  DO YOU WANT THE BAILIFFS IN HERE?

12          THE COURT:  I SHOULD TELL YOU -- I FORGOT THIS.

13    AFTER THIS INCIDENT WAS REPORTED TO ME, I HAD THE BAILIFF GO UP

14    AND SEE IF THERE WERE ANY OTHER NEWSPAPERS IN THE JURY ROOM,

15    AND THEY BOUGHT THESE DOWN, MOST OF WHICH ARE TODAY'S.

16          MR. NICOLAYSEN:  IS THAT FROM THE DELIBERATION ROOM?

17          THE COURT:  FROM THE JURY ROOM -- WHICH SHOULD BE

18    MARKED AS AN EXHIBIT.

19          I'M TALKING ABOUT THE JURY ROOM.

20          MR. NICOLAYSEN:  WHERE THEY'RE DELIBERATING?

21          THE COURT:  THAT IS RIGHT.  THERE DOESN'T APPEAR TO

22    BE ANYTHING IN THEM.  ONE IS A JULY 31ST PAPER, YESTERDAY'S,

23    WITH THAT PAGE HAVING BEEN CUT OUT, THE PAGE RELATING TO THE

24    CASE HAS BEEN CUT OUT.

25          MR. KEMPLE:  I HAVE THE INTERPRETER HERE.

12

1          THE COURT:  LET'S TALK TO HER FIRST.

2          (CYNTHIA PARKER ENTERS CHAMBERS.)

3          THE COURT:  STATE YOUR NAME, PLEASE, FOR THE RECORD.

4          MS. PARKER:  CYNTHIA PARKER.

5          THE COURT:  MS. PARKER, I UNDERSTAND THAT YOU LEARNED

6  ABOUT A NEWSPAPER BEING IN THE JURY ROOM.

7          MS. PARKER:  I DID.  THAT'S ALL I LEARNED.

8          THE COURT:  WHEN DID YOU FIRST LEARN THAT?

9          MS. PARKER:   AROUND 11:30.

10         THE COURT:  THIS MORNING?

11         MS. PARKER:  YESTERDAY MORNING.

12         THE COURT:  YESTERDAY MORNING?

13         MS. PARKER:  RIGHT.

14         THE COURT:  WHO DID YOU LEARN IT FROM?

15         MS. PARKER:  IT WAS MENTIONED TO ME IN PASSING BY THE

16  COURT REPORTER.

17         THE COURT:  YOU MEAN MS. CHURCHILL?

18         MS. PARKER:  YES.

19         THE COURT:  DO YOU REMEMBER WHAT SHE SAID TO YOU

20  ABOUT THAT?

21         MS. PARKER:  JUST THAT THERE WAS A NEWSPAPER THERE.

22  AND I DIDN'T THINK ANYTHING OF IT AT THE TIME.  I JUST THOUGHT

23  A NEWSPAPER -- AND THEN AS THE DAY WENT ON, TOWARD THE END OF

24  THE DAY, I THOUGHT THAT'S STRANGE.  WHAT WAS IN THAT NEWSPAPER?

25         I STARTED THINKING -- AND I DIDN'T HAVE THE NEWSPAPER

13

1   YESTERDAY, SO WHEN I GOT HOME AND I LOOKED AT MY NEWSPAPER AND

2   I DID SEE AN ARTICLE ABOUT THIS CASE --

3           THE COURT:  DID YOU KNOW WHAT NEWSPAPER IT WAS?

4           MS. PARKER:  I ASSUMED IT WAS THE L.A. TIMES.  I

5   DIDN'T KNOW THOUGH.

6           THE COURT:  YOU DID NOT KNOW.  YOU'RE TALKING ABOUT

7   THE L.A. TIMES THAT YOU LOOKED AT?

8           MS. PARKER:  RIGHT.  THAT'S WHEN I GOT HOME THAT I

9   LOOKED AT MY NEWSPAPER AND DID REALIZE THERE WAS AN ARTICLE AND

10  IT WAS RIGHT ON THE FRONT PAGE, IN FACT.

11          THE COURT:  THAT RELATED TO MR. ZUNO'S CONVICTION?

12          MS. PARKER:  THAT IS CORRECT.

13          THE COURT:  DID YOU THEN MENTION IT TO SOMEONE ELSE

14  THAT YOU HAD HEARD ABOUT A NEWSPAPER?

15          MS. PARKER:  RIGHT.  TO MR. NICOLAYSEN.

16          THE COURT:  ANYONE ELSE?

17          MS. PARKER:  WELL, BEFORE I WENT HOME, I MENTIONED IT

18  TO ONE OF THE OTHER INTERPRETERS.

19          THE COURT:  WHO WAS THAT?

20          MS. PARKER:  MR. OROSCO.  AND, IN FACT, THERE WAS --

21  HE WAS READING A NEWSPAPER AT THE TIME -- THAT'S WHY I

22  MENTIONED IT TO HIM, BUT HE WASN'T READING THE L.A. TIMES.

23          I SAID THERE WAS A NEWSPAPER -- I THINK I SAID IT IN

24  THE SAME WAY SHE HAD SAID -- AND HE WENT ON HIS ASSIGNMENT AND

25  I WENT ON MINE AND NOTHING ELSE WAS SAID.

14

1          THE COURT:  DO YOU HAVE ANY QUESTIONS?

2          MR. MEDRANO:  MAY WE INQUIRE, YOUR HONOR, IF

3 MS. PARKER TOLD ANYONE OTHER THAN MR. NICOLAYSEN AND MR. OROSCO

4 ABOUT THIS?  ANY FAMILY MEMBER, OTHER INTERPRETER,

5 COLLEAGUE -- WHATEVER?

6          MS. PARKER:  WELL, IN THE -- WHEN I LEFT

7 MS. CHURCHILL'S OFFICE, I WENT DOWN TO LOOK FOR MR. NICOLAYSEN

8 IN THE ATTORNEY ROOM AND HE WASN'T THERE AND MR. MEZA WAS THERE

9 AND I DID MENTION IT TO HIM.

10         THE COURT:  YOU MENTIONED IT TO MR. MEZA?

11         MS. PARKER:  RIGHT.

12         THE COURT:  HE WAS THE FIRST ONE YOU MENTIONED IT TO?

13         MS. PARKER:  RIGHT.  UH-HUH.

14         MR. MEDRANO:  ANYONE ELSE OTHER THAN THOSE THREE?

15         MS. PARKER:  NO.  NO.

16         LATER SOMEONE MENTIONED TO ME THAT SOMETIMES THEY CUT

17 OUT ARTICLES ABOUT THE CASE.  SO THAT'S EVEN MORE REASON WHY I

18 THOUGHT I WOULDN'T SAY ANYTHING ELSE AND, IN FACT, I MENTIONED

19 THAT TO MR. NICOLAYSEN, TOO.

20         THE COURT:  WHAT WAS THIS NOW?

21         MS. PARKER:  IN JURY ROOMS SOMETIMES THEY GIVE THEM

22 THE NEWSPAPER AND CUT OUT THE ARTICLE THAT HAS TO DO WITH THE

23 CASE.  AND I DID MENTION THAT TO MR. NICOLAYSEN AND THAT MAYBE

24 THAT'S WHAT IT WAS, SO I DIDN'T THINK ANYTHING ELSE ABOUT IT.

25         THE COURT:  ANYTHING ELSE?

15

1          MR. MEDRANO:  NO.  NOT BY US, YOUR HONOR.

2          THE COURT:  THANK YOU, MS. PARKER.

3          MR. KEMPLE:  DO YOU WANT THE BAILIFFS?

4          THE COURT:  YES.  BRING THEM IN.

5          WOULD YOU STATE YOUR NAMES FOR THE RECORD, PLEASE?

6          MR. MITCHELL:  CLAY MITCHELL.

7          MS. ASHBRENNER:  JAN C. ASHBRENNER.

8          THE COURT:  YOU WERE THE BAILIFFS IN CHARGE OF THIS

9   JURY; IS THAT RIGHT?

10          BOTH BAILIFFS:  YES, SIR.

11          THE COURT:  IT HAS BEEN REPORTED TO THE COURT THERE

12   WAS A NEWSPAPER IN THERE.  IN FACT, THERE HAVE BEEN THESE

13   NEWSPAPERS YOU FOUND IN THERE TODAY, THIS STACK OF PAPERS.  I

14   ASKED YOU TO GO UP THERE AND SEE IF THERE WERE ANY PAPERS UP

15   THERE AND YOU BROUGHT THESE DOWN.

16          BOTH BAILIFFS:  YES, SIR.

17          THE COURT:  DID YOU SEE THESE GOING INTO THE JURY

18   ROOM?

19          MR. MITCHELL:  NO, SIR.

20          THE COURT:  DID YOU?

21          MS. ASHBRENNER:  NO, SIR.

22          THE COURT:  DID YOU AT ANY TIME SEE THEM GOING IN?

23          MS. ASHBRENNER:  ONE OF THE JURORS HAS BEEN BRINGING

24   CROSSWORD PUZZLES TO ME.  NOW, I HAVEN'T NOTICED HIM TAKING THE

25   PAPER IN.  AT TIMES HE WOULD HAND ME THE INSERT.

16

1          THE COURT:  YOU HAVEN'T SEEN ANY JUROR CARRY A

2  NEWSPAPER INTO THE JURY ROOM?

3          MS. ASHBRENNER:  IF I DID, IT DIDN'T REGISTER WHAT

4  THEY WERE DOING.

5          THE COURT:  YOU HAVEN'T SEEN ANY?

6          MR. MITCHELL:  I DIDN'T REALLY NOTICE WHAT THEY WERE

7  CARRYING IN THEIR HANDS.

8          THE COURT:  I THINK IT SHOULD BE LOOKED FOR.  THERE

9  SHOULD BE NO NEWSPAPERS IN THE JURY ROOM AT ALL AND IT'S UP TO

10 YOU TO SEE THAT THAT IS ENFORCED, THAT THEY DON'T GET ANY.

11         MR. MITCHELL:  SOME OF THE WOMEN ARE CARRYING BAGS

12 AND WE HAVEN'T BEEN LOOKING INTO THEIR BAGS.

13         THE COURT:  YES.  WELL, YOU'VE GOT TO SATISFY

14 YOURSELF THERE ARE NO NEWSPAPERS GOING IN.

15         MR. MITCHELL:  YES, SIR.

16         MS. ASHBRENNER:  SURELY.

17         THE COURT:  ANYTHING ELSE?

18         MR. MEDRANO:  NO, YOUR HONOR.

19         MR. NICOLAYSEN:  YOU HAVE NO WAY OF KNOWING HOW THEY

20 MIGHT HAVE -- HOW MANY JURORS MIGHT HAVE READ ANY ARTICLES

21 WHILE THEY'RE HERE IN THE BUILDING CONCERNING THE CAMARENA

22 CASE?

23         MS. ASHBRENNER:  THEY DON'T TAKE BREAKS, THEY DON'T

24 WANDER THROUGHOUT THE BUILDING OR ANYTHING.  THEY'RE ONLY OUT

25 IN THE HALLWAY, SO UNLESS THEY HAVE READ SOMETHING PRIOR TO

17

1   COMING INTO THE COURTHOUSE --

2         THE COURT:  IS IT A REGULAR PRACTICE FOR ANY OF THE

3   JURORS TO BRING BAGS INTO THE JURY DELIBERATION ROOM?

4         MR. MITCHELL:  THEIR PERSONAL BAGS THAT THEY BRING

5   FROM HOME.  WE DON'T -- WE HAVE NEVER WORKED A JURY ROOM; WE

6   DON'T KNOW WHAT THE COMMON PRACTICE IS.

7         MR. NICOLAYSEN:  THANK YOU.

8         MR. MITCHELL:  IS THAT ALL, YOUR HONOR?

9         THE COURT:  HOW IS IT THAT YOU'RE WORKING ON THIS

10  JURY?  WERE YOU ASSIGNED TO DO THAT BY THE PROTECTIVE SERVICE?

11  HOW IS IT THAT -- YOU WERE BROUGHT IN FROM OUTSIDE TO DO THIS;

12  WEREN'T YOU?

13        MR. MITCHELL:  WE WERE PICKED OUT OF THE OFFICE, YES.

14        THE COURT:  ARE YOU ASSIGNED TO THE LOCAL OFFICE?

15        MR. MITCHELL:  YES, SIR.

16        MS. ASHBRENNER:  YES, SIR.

17        THE COURT:  OH.  YOU'RE ALL RIGHT.  WE HAD A TALK AT

18  THE BEGINNING, I REMEMBER, BEFORE -- WHEN THE JURY WENT OUT --

19  YOU AND I -- AND YOU ALSO -- WE DIDN'T TALK ABOUT NEWSPAPERS,

20  THOUGH, DID WE?

21        MR. MITCHELL:  NO, SIR.

22        THE COURT:  MAYBE WE SHOULD HAVE.

23        ALL RIGHT.  THANK YOU.

24        THE COURT:  WELL, I THINK WE SHOULD BRING IN THIS

25  JUROR NUMBER 6.  ASK THE BAILIFF TO SEND HER DOWN, PLEASE.

18

1    MR. NICOLAYSEN:  IS THIS SOMETHING THE COURT WANTS TO

2    HANDLE OUTSIDE THE PRESENCE OF COUNSEL SINCE THERE IS STILL A

3    DEFENDANT?

4    MR. MEDRANO:  WE WOULD ASK TO BE PRESENT AND LET YOU

5    HANDLE IT.

6    THE COURT:  I DON'T KNOW THAT THAT MAKES ANY

7    DIFFERENCE.  I THINK YOU NEED TO BE PRESENT.  I WANT YOU TO

8    HEAR WHAT SHE HAS TO SAY AND TO ASK ANY QUESTIONS YOU MIGHT

9    WANT.

10   MAYBE IT WOULD BE BETTER IF YOU FELLOWS SAT OVER

11   THERE AND -- NOT LIKE AN INQUISITION.  SIT OVER THERE.

12   (COUNSEL MOVE TO ANOTHER LOCATION IN CHAMBERS.)

13   MR. NICOLAYSEN:  MY CONCERN WAS I DIDN'T WANT US TO

14   PUT HER ON THE DEFENSIVE.

15   THE COURT:  I WANT TO KNOW IF YOU HAVE ANY QUESTIONS.

16   YOU MIGHT GIVE A NOTE TO MY LAW CLERK IF YOU HAVE ANY QUESTIONS

17   THAT YOU WISH TO PURSUE AND HE'LL GIVE IT TO ME.

18   MR. NICOLAYSEN:  THANK YOU.

19   THE COURT:  WHAT IS HER NAME?  OVERHOLT?

20   MR. CARLTON:  LINDA OVERHOLT.

21   THE SECRETARY:  THAT'S THE JUDGE, THE ONE THAT

22   MR. MEZA IS IN FRONT OF.

23   THE COURT:  I DON'T NEED HIM ANYMORE.  I THINK WE CAN

24   DISPENSE WITH HIS PRESENCE.

25   (BRIEF INTERRUPTION FOR TELEPHONE CALL)

19

1      (JUROR ENTERS CHAMBERS)

2      THE COURT:  MRS. OVERHOLT?

3      MS. OVERHOLT:  YES.

4      THE COURT:  I'VE BROUGHT YOU DOWN HERE TO ASK YOU

5  ABOUT THIS NEWSPAPER THAT YOU HAD IN THE JURY ROOM.

6      IT HAS BEEN REPORTED TO THE COURT THAT YOU WERE

7  READING A NEWSPAPER THERE THAT CONTAINED AN ARTICLE ABOUT THIS

8  CASE YESTERDAY.

9      NOW, WHAT ABOUT THAT?  IS THAT TRUE?

10     MRS. OVERHOLT:  NO.  WE HAVE HAD NEWSPAPERS IN THE

11  COURTROOM (SIC) ALL ALONG.

12     THE COURT:  YOU MEAN THE JURY ROOM?

13     MRS. OVERHOLT:  IN THE JURY ROOM.  THE PEOPLE WHO

14  COME IN EARLY GENERALLY BRING THEM IN AND PASS THEM AROUND.

15  AND WHEN I GET THERE, I GENERALLY START WITH THE "VIEW"

16  SECTION.  THAT'S WHAT I READ FIRST.

17     THE COURT:  DO THESE NEWSPAPERS CONTAIN STORIES ABOUT

18  THIS CASE?

19     MRS. OVERHOLT:  SOME OF THEM HAVE.  AND IF THEY DO, I

20  JUST DON'T READ THEM.

21     THE COURT:  DID YOU READ A STORY YESTERDAY ABOUT THIS

22  CASE?

23     MRS. OVERHOLT:  YESTERDAY WAS THE STORY ABOUT THE

24  RESULTS OF THE DECISION ON MR. ZUNO.

25     THE COURT:  DID YOU READ THAT?

20

1        MRS. OVERHOLT:  (SHAKING HEAD.)

2        THE COURT:  YOU'RE NOT ANSWERING NOW.

3        MRS. OVERHOLT:  NO.  NO.  I'M SORRY.  NO, I DID NOT.

4        THE COURT:  YOU DID NOT READ IT?

5        MRS. OVERHOLT:  NO.

6        THE COURT:  HAVE YOU EVER READ ANY ARTICLE ABOUT THIS

7  CASE SINCE YOU HAVE BEEN A JUROR?

8        MRS. OVERHOLT:  NO.  EVEN IF I HAVE BEEN LOOKING AT

9  THE PAPER, IF IT SAYS -- IF I STARTED TO READ SOMETHING, IF IT

10  SAYS "CAMARENA", I PUT IT AWAY.

11        AT HOME MY HUSBAND HAS BEEN CUTTING THE ARTICLES OUT

12  AND HE HAS THEM ALL IN A FILE FOLDER FOR ME SO WHEN I GET DONE,

13  I CAN READ THEM ALL BECAUSE, OF COURSE, I'M INTERESTED IN WHAT

14  THE PAPERS HAVE TO SAY.

15        THE COURT:  WELL, OF COURSE, I'M -- I DON'T KNOW HOW

16  MANY TIMES I'VE REMINDED THE JURORS --

17        MRS. OVERHOLT:  JUST ABOUT EVERY TIME.

18        THE COURT:  AND DO YOU THINK, IN GENERAL, THE JURORS

19  HAVE ABIDED BY MY INSTRUCTION?

20        MRS. OVERHOLT:  I DO, YES.  I KNOW WE ALL HEARD THE

21  FIRST DECISION WHEN WE WERE DEALING WITH MR. MATTA WHILE WE

22  WERE GOING HOME ON THE RADIO.  THAT WAS ON JUST ALMOST

23  IMMEDIATELY.

24        BUT AFTER I REALIZED WHAT IT WAS THEY WERE TALKING

25  ABOUT, I TURNED IT OFF.  THEN ONE OF THE OTHER JURORS RIDES

21

1   HOME WITH ME -- OR SHE DID AT THAT TIME --

2           THE COURT:  WHICH ONE IS THAT?

3           MRS. OVERHOLT:  DENISE MC DANIELS.  AND SHE'S NUMBER

4   8, I THINK, OR 9.  WE BOTH LIVE IN FULLERTON.

5           THE COURT:  COUNSEL, DO YOU HAVE ANY OTHER QUESTIONS

6   YOU WISH TO ASK ME OR HAVE ME ASK MRS. OVERHOLT?

7           MR. MEDRANO:  WE DON'T, YOUR HONOR.  NOT THE

8   GOVERNMENT.

9           MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

10          THE COURT:  MRS. OVERHOLT, I'D LIKE YOU TO RETURN TO

11  THE JURY ROOM AND I DON'T WANT YOU TO DISCUSS WITH ANY MEMBER

12  OF THE JURY WHAT TOOK PLACE HERE.

13          MRS. OVERHOLT:  I CAN'T TELL THEM WHY YOU CALLED ME

14  DOWN?

15          THE COURT:  NO, YOU CAN'T.

16          MRS. OVERHOLT:  OKAY.  I'LL TELL THEM YOU SAID SO.

17          THE COURT:  THANK YOU.

18          MR. KEMPLE:  SHALL I ESCORT THE JUROR THROUGH THE

19  COURTROOM OR BACK OUT THROUGH THE HALL?

20          THE COURT:  BACK THROUGH THE COURTROOM AND UPSTAIRS.

21          THANK YOU, MRS. OVERHOLT.

22          MRS. OVERHOLT:  UH-HUH.

23          (JUROR EXCUSED.)

24          THE COURT:  WELL, WHAT NEXT, GENTLEMEN?

25          MR. NICOLAYSEN:  FOR THE RECORD, YOUR HONOR, IT

22

1   APPEARS AS THOUGH THERE MIGHT BE JUST A SLIGHT DISCREPANCY

2   BETWEEN WHAT YOUR REPORTER OBSERVED AND WHAT MRS. OVERHOLT

3   ADVISED THE COURT.

4           I JUST SAY THAT FOR THE RECORD, AND IT CONCERNS ME

5   ENOUGH TO BRING IT TO YOUR ATTENTION.  IT DID SEEM TO ME AT THE

6   TIME I LEARNED OF THIS FROM TALKING TO YOUR REPORTER THAT THERE

7   WAS A GOOD FAITH BASIS FOR BELIEVING THAT THE JUROR MIGHT HAVE

8   BEEN ACTUALLY READING THAT ARTICLE ON CAMARENA.

9           AND I ACKNOWLEDGE WHAT THE JUROR HAS TOLD COURT, SO I

10  WOULD HAVE --

11          MR. CARLTON:  I BELIEVE MS. CHURCHILL HAD SAID TODAY

12  EARLIER THAT SHE COULDN'T TELL WHETHER THE JUROR WAS READING.

13          MR. NICOLAYSEN:  MAYBE IT IS MY ERROR.

14          DO YOU THINK IT WOULD BE PRODUCTIVE TO ADMONISH THE

15  JURY COLLECTIVELY AGAIN AT THIS POINT IN TIME?

16          THE COURT:  I'D BE VERY GLAD TO DO THAT.

17          MR. NICOLAYSEN:  THEY MIGHT BELIEVE THAT JUST BECAUSE

18  ONE CASE IS FINISHED, THAT THAT THING NO LONGER APPLIES.

19          THE COURT:  THAT COULD BE, YES.  I WANT THEM TO

20  UNDERSTAND THAT IT DOES APPLY.

21          MR. NICOLAYSEN:  ON BEHALF OF MY CLIENT, I WOULD

22  RESPECTFULLY MOVE THAT WE BRING THE JURY DOWN AND HAVE THE

23  COURT PROVIDE THE STANDARD ADMONITIONS, JUST TO MAKE IT CLEAR

24  THAT THIS IS JUST AS FORMAL AS IT HAS BEEN ALL ALONG.

25          THE COURT:  I WOULD BE GLAD TO DO THAT.

23

1    MR. MEDRANO:  THAT'S FINE WITH US, YOUR HONOR.

2    THE COURT:  LET'S DO THAT THEN.

3    MR. MEDRANO:  ANY THOUGHTS, YOUR HONOR?  MAYBE IT'S

4    MOOT NOW, IN LIGHT OF THE FACT YOU'LL BE ADMONISHING THEM

5    AGAIN.  DO WE NEED TO REACH OUT AND CONTACT MR. MEZA OR THE

6    SECOND INTERPRETER NOT TO DISCUSS THIS WITH THE PRESS, IN

7    PARTICULAR?

8    THE COURT:  I THINK IT WOULD BE A GOOD IDEA.  IF I

9    COULD IMPOSE UPON MR. NICOLAYSEN, BECAUSE HE HAS WORKED CLOSELY

10   WITH MR. OROSCO AND MR. MEZA; WOULD YOU DO THAT?

11   MR. NICOLAYSEN:  I WOULD BE GLAD TO DO THAT.

12   MR. MEDRANO:  WE CAN TAKE IT UPON OURSELVES TO BRING

13   IN MR. MEZA.

14   THE COURT:  I CAN BRING THEM IN HERE AND DIRECT THEM

15   MYSELF.  THAT IS MY INTENTION, THAT THIS MATTER NOT BE

16   DISCUSSED.

17   MR. MEDRANO:  WE WOULD PREFER THAT, YOUR HONOR.

18   PERHAPS IF THEY COULD INFORMALLY JUST MEET WITH YOU AND BE

19   ADMONISHED BY YOU --

20   THE COURT:  MR. MEZA IS BEFORE THIS JUDGE WHO CALLED

21   ME.  THE JUDGE WAS CALLING TO SEE IF -- I FIRST TOLD MY STAFF

22   TO GET MEZA HERE, BUT SINCE WE LEARNED THROUGH MS. PARKER HOW

23   HE LEARNED OF THE MATTER AND THROUGH THE REPORTER, THEN THAT'S

24   THE ONLY REASON I WANTED HIM HERE.

25   MR. NICOLAYSEN:  I BELIEVE CYNTHIA PARKER IS

24

1   AVAILABLE AT THE INTERPRETER'S EXTENSION DOWNSTAIRS, WHICH IS

2   4307.

3           MR. MEDRANO:  AS IS MR. OROSCO.

4           THE COURT:  SEE IF COULD YOU GET THAT INTERPRETER ON

5   THE PHONE.  43 WHAT?

6           MR. NICOLAYSEN:  4307.

7           THE COURT:  I WANT TO SEE SPEAK WITH CYNTHIA PARKER

8   AND JOSE OROSCO ON THE PHONE.

9           MR. MEDRANO:  WOULD IT BE POSSIBLE, PERHAPS, TO HAVE

10  YOUR SECRETARY CALL MR. MEZA, JUDGE, AGAIN TO HAVE -- TO LEAVE

11  A MESSAGE, PERHAPS, TO HAVE MR. MEZA DROP BY AND SEE YOU AFTER

12  HE GETS OUT OF COURT TODAY, OR AT HIS CONVENIENCE?

13          PERHAPS HE WILL TALK TO YOU TELEPHONICALLY, AT A

14  MINIMUM.

15          THE COURT:  WE'LL LEAVE A MESSAGE WITH HIS OFFICE OR

16  BEEPER OR SOMEPLACE.

17          MR. MEDRANO:  THANK YOU, YOUR HONOR.

18          MR. KEMPLE:  HERE'S MS. PARKER.

19          (CYNTHIA PARKER ENTERS CHAMBERS.)

20          THE COURT:  I WANT YOU NOT TO DISCUSS THIS WITH

21  ANYONE, WHAT HAPPENED HERE TODAY OR ANYTHING ABOUT THIS MATTER.

22          MS. PARKER:  ABSOLUTELY.

23          THE COURT:   NO PRESS OR NO ONE ELSE; ALL RIGHT?

24          MS. PARKER:  VERY WELL.

25          THE COURT:  THANK YOU.

25

1    WELL, THEN LET'S BRING THE JURY DOWN.

2    MR. CARLTON:  DID YOU WANT THE OTHER ONE ON THE

3    PHONE?

4    THE SECRETARY:  I'M GETTING HIM.  HE REPLACED HER, SO

5    SHE'S GETTING HIM AND HE'LL BE ON THE PHONE IN JUST A MOMENT.

6    MR. NICOLAYSEN:  FOR THE RECORD, YOUR HONOR, I WOULD

7    ASK THAT THE COURT, IN ADMONISHING THE JURY, ASK THE JURY

8    COLLECTIVELY WHETHER ANYONE HAS NOT COMPLIED WITH THE COURT'S

9    ONGOING ADMONITION AND HAS READ ANY ARTICLES ON THE CAMARENA

10   CASE.

11   I REALIZE THAT PUTS JURORS ON THE DEFENSIVE --

12   THE COURT:  I DON'T LIKE TO DO THAT IN OPEN COURT.

13   IF YOU WANT TO DO THAT, WE'LL DO IT INDIVIDUALLY.

14   MR. NICOLAYSEN:  I CERTAINLY FEEL, AS COUNSEL --

15   THE COURT:  EVEN IF THEY HAD, I'M NOT SURE THAT THAT

16   IS NECESSARY.  MOST OF THESE ARTICLES THAT HAVE APPEARED THAT I

17   HAVE SEEN ARE BASICALLY REPORTING WHAT TOOK PLACE IN COURT.

18   MR. NICOLAYSEN:  I'M NOT INCLINED TO AGREE WITH THAT

19   CHARACTERIZATION -- AT LEAST WITH THE L.A. TIMES.  THERE SEEMS

20   TO BE A FAIR AMOUNT OF SELECTIVE REPORTING AND EMPHASIS ON

21   CERTAIN TESTIMONY; AND OCCASIONALLY, CERTAIN INACCURACIES.

22   I WOULD ASK THAT THERE BE SOME INQUIRY.

23   THE COURT:  I'M NOT GOING TO DO IT IN OPEN COURT.

24   MR. MEDRANO:  ON THAT POINT, YOUR HONOR, JUST SO YOU

25   KNOW WHAT OUR POSITION IS, MAYBE WE CAN DO IT IN OPEN COURT.

26

1  AND THEN IF ANYBODY HAS, WE'LL TALK TO THEM INDIVIDUALLY.

2         THE COURT:  I'M NOT SO SURE THAT THAT IS NECESSARY IN

3  LIGHT OF THE SHOWING WE HAVE HAD THUS FAR.

4         MRS. OVERHOLT ASSURED YOU THAT SHE HAS NOT READ

5  ANYTHING.  SHE HAS ASSURED YOU THAT AS FAR AS SHE KNOWS, NO ONE

6  ELSE HAS READ ANYTHING ABOUT THAT CASE.  I'M NOT SO SURE THERE

7  HAS BEEN ANY MINIMUM SHOWING TO EMBARK ON THIS TYPE OF EFFORT

8  TO TALK TO EVERYONE INDIVIDUALLY, BUT THAT'S BASICALLY OUR

9  POSITION, FOR WHAT IT IS WORTH, YOUR HONOR.

10        THE COURT:  WELL, I THINK WE'LL DO IT THE OTHER WAY.

11  OF COURSE, THAT MAKES IT PUBLIC THEN.

12        MR. MEDRANO:  THEN WE PREFER IT BE DONE IN CHAMBERS.

13        THE COURT:  TO EXCLUDE THE PUBLIC FROM THE COURTROOM

14  WOULD BE THE APPROPRIATE THING TO DO.

15        IT MAKES IT PUBLIC TO THE EXTENT THAT THE OTHER

16  JURORS WILL NOW BE ASKED WHY MRS. OVERHOLT WAS BROUGHT DOWN TO

17  CHAMBERS, BUT WE DON'T NEED TO MADE THE COURTROOM AVAILABLE TO

18  THE MEDIA OR THE PUBLIC FOR PURPOSES OF THIS INQUIRY.

19        I THINK THE ONLY WAY TO HANDLE IT IS TO BRING THEM

20  DOWN ONE AT A TIME.

21        MR. NICOLAYSEN:  TO CHAMBERS?

22        THE COURT:  YES.  I THINK THAT'S THE BEST WAY.

23        MR. CARLTON:  VERY WELL, YOUR HONOR.

24        MR. NICOLAYSEN:  THANK YOU.  I APPRECIATE THE COURT

25  TAKING THE TIME.

27

1    THE COURT:  YOU GENTLEMEN CAN SIT OVER THERE.  IF YOU

2  HAVE ANY QUESTIONS, I'LL ASK YOU IF YOU HAVE ANY QUESTIONS.

3    WE'RE GOING TO START WITH JUROR NUMBER ONE THERE.

4    I THINK WE'LL MAKE A TRANSCRIPT OF THESE PROCEEDINGS

5  AND HAVE IT AVAILABLE FOR ALL OTHER COUNSEL IN THIS CASE.

6    (JUROR ENTERS CHAMBERS)

7    THE COURT:  THIS IS MYRTLE HINES.  COME IN, MS.

8  HINES.  HAVE A SEAT THERE, WON'T YOU?

9    I JUST WANT TO ASK YOU A FEW QUESTIONS.

10    WOULD YOU STATE YOUR NAME FOR THE RECORD, JUST SO

11  WE'LL HAVE IT?

12    MS. HINES:  MYRTLE HINES.

13    THE COURT:  MS. HINES, IT HAS BEEN REPORTED TO THE

14  COURT THAT THERE WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY

15  CONTAINING A STORY THAT RELATED TO THIS CASE.

16    DID YOU HAPPEN TO SEE IT BY ANY CHANCE?

17    MS. HINES:  DID I SEE A NEWSPAPER IN OUR SECTION OR

18  DID I LOOK AT AN ARTICLE OR WHAT?

19    THE COURT:  DID YOU SEE A NEWSPAPER IN THE JURY ROOM

20  YESTERDAY?

21    MS. HINES:  I NOTICED THAT SOME OF THE JURORS DID

22  HAVE NEWSPAPERS.  THEY BRING THEM IN WITH THEM IN THE MORNING.

23    THE COURT:  DID YOU, YOURSELF -- HAVE YOU DURING THE

24  TIME OF THIS TRIAL READ ANY ARTICLE IN ANY NEWSPAPER AT ANY

25  TIME ABOUT THIS CASE?

28

1    MS. HINES:  NO, I HAVEN'T.

2    THE COURT:  YOU HAVEN'T.  YOU HAVE AVOIDED DOING THAT

3    BECAUSE OF THE COURT'S INSTRUCTION?

4    MS. HINES:  EXACTLY, SIR.

5    THE COURT:  AND YOU HAVE NOT DONE THAT IN THE JURY

6    ROOM?

7    MS. HINES:  NO, I HAVE NOT.  I DID LOOK AT THE SPORTS

8    SECTION, THOUGH.

9    THE COURT:  THAT'S PERMISSIBLE.  BUT IT WON'T BE ANY

10   MORE BECAUSE WE ARE NOT GOING TO LET NEWSPAPERS INTO THE JURY

11   ROOM.  THEY SHOULD NOT BE IN THERE BECAUSE OF THE APPEARANCE OF

12   IT.

13   MS. HINES:  OKAY.

14   THE COURT:  ALL RIGHT.  COUNSEL, DO YOU WISH TO HAVE

15   ME ASK MS. HINES ANYTHING ELSE?

16   MR. NICOLAYSEN:  NOTHING, YOUR HONOR.  THANK YOU.

17   THE COURT:  PLEASE RETURN TO THE JURY ROOM AND DON'T

18   TELL THE OTHER JURORS WHAT THIS WAS ABOUT.  WE'RE GOING TO TALK

19   TO EACH ONE OF THEM INDIVIDUALLY ANYWAY.

20   MS. HINES:  ALL RIGHT, SIR.

21   THE COURT:  THANK YOU VERY MUCH.

22   THE SECRETARY:  THE OTHER INTERPRETER, JOSE OROSCO,

23   IS ON THE LINE.

24   (THE JUDGE SPEAKING ON THE TELEPHONE)

25   THE COURT:  JOSE, MS. PARKER HAS TOLD US ABOUT THIS

29

1    NEWSPAPER IN THE JURY ROOM THAT SHE TOLD YOU ABOUT.  I JUST

2    WANT TO TELL YOU THAT YOU'RE NOT TO DISCUSS THAT WITH ANYONE.

3    NO NEWSPAPER PEOPLE, NOBODY ELSE.  OKAY?  ALL RIGHT.

4              MR. MEDRANO:  THANK YOU.

5              (JUROR ENTERS CHAMBERS)

6              THE COURT:  MR. WEST, COME IN.  HOW ARE YOU, SIR?

7              MR. WEST:  PRETTY GOOD.

8              THE COURT:  HAVE A SEAT, WON'T YOU?

9              MR. WEST, IT HAS BEEN REPORTED TO THE COURT --

10   INCIDENTALLY, YOU'RE JOHN WEST; IS THAT CORRECT, FOR THE

11   RECORD?

12             MR. WEST:  YES.

13             THE COURT:  IT HAS BEEN REPORTED TO THE COURT ABOUT

14   NEWSPAPERS BEING IN THE -- ONE, IN PARTICULAR, WAS OBSERVED IN

15   THE JURY ROOM YESTERDAY, WHICH CONTAINED A STORY ABOUT THIS

16   CASE.

17             MR. WEST:  YES.

18             THE COURT:  WHAT I WANTED TO ASK YOU IS WHETHER OR

19   NOT YOU, YOURSELF, HAVE READ ANY ARTICLES THAT RELATED TO THIS

20   CASE DURING THE TIME THAT THE JURY HAD BEEN DELIBERATING?

21             MR. WEST:  THROUGH THE ENTIRE CASE?

22             THE COURT:  YES.

23             MR. WEST:  NO, SIR.

24             THE COURT:  YOU HAVE NOT?

25             MR. WEST:  NO.

30

1    THE COURT:  YOU HAVE COMPLIED WITH THE COURT'S ORDER

2  IN THAT RESPECT; IS THAT RIGHT?

3    MR. WEST:  YES.

4    THE COURT:  ANY QUESTIONS, COUNSEL?

5    MR. MEDRANO:  NO, YOUR HONOR. THANK YOU.

6    MR. NICOLAYSEN:  ONLY WHETHER MR. WEST OBSERVED ANY

7  OF THE JURORS READING AN ARTICLE YESTERDAY IN THE JURY ROOM

8  CONCERNING THIS CASE.

9    MR. WEST:  NO.

10    THE COURT:  DID YOU OBSERVE ANYONE?

11    MR. WEST:  NO.

12    THE COURT:  YOU DID NOT?

13    MR. WEST:  NO.

14    THE COURT:  IS IT YOUR IMPRESSION THAT THE JURORS ARE

15  LIVING UP TO THAT ORDER BY THE COURT?

16    MR. WEST:  YES, SIR.

17    THE COURT:  ALL RIGHT, SIR.  THANK YOU.

18    ALL RIGHT.  I'LL ASK YOU NOT TO DISCUSS WHAT TOOK

19  PLACE HERE WITH THE OTHER JURORS.  WE ARE GOING TO TALK TO THEM

20  EACH INDIVIDUALLY ANYWAY.

21    MR. WEST:  THANK YOU, YOUR HONOR.

22    MR. NICOLAYSEN:  WOULD IT MAKE SENSE TO BRING THEM

23  DOWN AS A GROUP AND HAVE THEM WAIT IN YOUR RECEIVING LOUNGE?

24    THE COURT:  THERE IS NOT ENOUGH ROOM.

25    (JUROR ENTERS CHAMBERS.)

31

1    THE COURT:  COME IN, MR. THOMPSON.  HOW ARE YOU?

2    MR. THOMPSON:  JUST FINE.

3    THE COURT:  HAVE A SEAT THERE, WON'T YOU?

4    MR. THOMPSON:  ALL RIGHT.

5    THE COURT:  NATHANIAN THOMPSON?

6    MR. THOMPSON:  RIGHT.

7    THE COURT:   MR. THOMPSON, THE REASON I CALLED YOU

8    DOWN HERE IS BECAUSE IT HAS BEEN REPORTED TO THE COURT THAT

9    THERE WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY WITH A STORY

10   ABOUT THIS CASE AND I WANT TO KNOW IF YOU READ ANY ARTICLE

11   ABOUT THIS CASE?

12   MR. THOMPSON:  NO, I DON'T READ THE PAPERS.

13   THE COURT:  YOU DON'T READ THE PAPER AT ALL?

14   MR. THOMPSON:  ONLY THE SPORTS.

15   THE COURT:  ONLY THE SPORTS?

16   MR. THOMPSON:  YEP.

17   THE COURT:  SO YOU HAVE NOT READ ANY ARTICLE ABOUT

18   THIS CASE IN THE JURY ROOM?

19   MR. THOMPSON:  NO, I HAVE NOT.

20   THE COURT:  ALL RIGHT.  ANY QUESTIONS?

21   MR. MEDRANO:  NO, YOUR HONOR.

22   MR. NICOLAYSEN:  NO, YOUR HONOR.  THANK YOU.

23   THE COURT:  ALL RIGHT, MR. THOMPSON.  I APPRECIATE

24   YOUR COMING DOWN.  DON'T DISCUSS WHAT TOOK PLACE HERE WITH THE

25   OTHER JURORS.  WE'RE GOING TO TALK TO EACH OF THEM

32

1   INDIVIDUALLY.

2          MR. THOMPSON:  ALL RIGHT.

3          THE COURT:  THANK YOU, SIR.

4          MR. NICOLAYSEN:  I WOULD ASK IF THE COURT COULD, AS A

5   STANDARD QUESTION, ASK IF THEY HAVE -- HE OR SHE -- OBSERVED

6   ANYONE ELSE READING ARTICLES ON THIS CASE.

7          (JUROR ENTERS CHAMBERS)

8          THE COURT:  MR. MARQUEZ, COME IN.  HAVE A SEAT THERE,

9   WON'T YOU?

10          THIS IS JUROR FRANK MARQUEZ.  MR. MARQUEZ, IT HAS

11   BEEN REPORTED TO THE COURT THAT THERE WAS A NEWSPAPER IN THE

12   JURY ROOM YESTERDAY CONTAINING AN ARTICLE RELATING TO THIS

13   CASE.

14          WERE YOU AWARE OF THAT?

15          MR. MARQUEZ:  I KNOW THERE WAS NEWSPAPERS, BUT I

16   DON'T READ IT.  I READ THE SPORTS AND THAT'S ABOUT IT.

17          THE COURT:  YOU DID NOT READ ANY ARTICLE RELATING TO

18   THIS CASE?

19          MR. MARQUEZ:  THAT'S NOT MY PAPER.  I JUST GET

20   WHATEVER IS LEFT -- THE SPORTS PAGE.

21          THE COURT:  DID YOU SEE ANYONE ELSE READING ANY

22   ARTICLE RELATING TO THIS CASE?

23          MR. MARQUEZ:  I DIDN'T SEE NOBODY READING IT.  LIKE I

24   SAID, WE TAKE BREAKS EVERY HOUR, A FIVE-MINUTE BREAK, AND WE

25   JUST SKIM THROUGH THE SPORTS PAGE.

33

1      THE COURT:  SO YOU, YOURSELF, HAVE NOT READ ANYTHING

2  ABOUT THIS CASE AT ANY TIME; IS THAT RIGHT?

3      MR. MARQUEZ:   NO.  NO.

4      THE COURT:  YOU KNOW IT IS STILL THE RULE.  EVEN

5  THOUGH SOME OF THE CASE IS OVER WITH, NO ONE IS TO READ

6  ANYTHING ABOUT THE CASE.

7      MR. MARQUEZ:  I UNDERSTAND.

8      THE COURT:  ALL RIGHT, SIR.

9      ANYTHING FURTHER?

10     MR. MEDRANO:  NOTHING, YOUR HONOR.

11     THE COURT:  THAT'S ALL WE NEED, MR. MARQUEZ.  DON'T

12  DISCUSS IT WITH THE OTHER JURORS.  WE'RE GOING TO TALK TO EACH

13  OF THEM ANYWAY.

14     MR. MARQUEZ:  RIGHT.

15     THE COURT:  THANK YOU.

16     (JUROR ENTERS CHAMBERS)

17     THE COURT:  MR. PARRIS.  COME IN AND SIT DOWN, WON'T

18  YOU?  THIS IS JUROR WILLIAM PARRIS.

19     MR. PARRIS, IT HAS BEEN REPORTED TO THE COURT THAT IN

20  THE JURY ROOM YESTERDAY THERE WAS A NEWSPAPER CONTAINING AN

21  ARTICLE RELATING TO THIS CASE.

22     DID YOU SEE THAT NEWSPAPER BY ANY CHANCE?

23     MR. PARRIS:  I SAW THE NEWSPAPER, YES, SIR.

24     THE COURT:  DID YOU READ THE ARTICLE?

25     MR. PARRIS:  NO, SIR.

34

1    THE COURT:  DID YOU SEE ANYONE ELSE READ THE ARTICLE?

2    MR. PARRIS:  NOT THE ARTICLE, NO.

3    THE COURT:  IS IT YOUR IMPRESSION THAT THE JURORS ARE

4    COMPLYING WITH THE COURT'S ORDER ABOUT NOT READING ANYTHING

5    RELATING TO THIS CASE?

6    MR. PARRIS:  IT IS MY IMPRESSION THAT THERE ARE

7    JURORS WHO HAVE READ THE NEWSPAPER.  IT APPEARS TO ME -- IT IS

8    NOT STATED THAT ANYONE GETS UP AND SAYS "I READ THE NEWSPAPER

9    AND THIS IS WHAT IT SAYS", BUT IN THE PAST ON A NUMBER OF

10   OCCASIONS, THERE SEEMED TO BE DISCUSSIONS ABOUT THINGS THAT

11   APPEAR TO HAVE COME FROM SOMEPLACE OTHER THAN WHAT WE HEARD.

12   AND WHETHER IT CAME FROM THE NEWS OR THE NEWSPAPER, I

13   COULDN'T SAY, BUT I HAVE TO SAY THAT I FEEL THAT SOME JURORS

14   SOMEHOW -- WHETHER IT IS BEING TOLD TO THEM BY SOMEBODY OR

15   SOMETHING -- THERE IS INFORMATION BEING BROUGHT IN, YES.

16   THE COURT:  WHAT KIND OF INFORMATION?

17   MR. PARRIS:  IT JUST SEEMS LIKE WHATEVER WE'VE DONE,

18   ESPECIALLY AFTER THE -- AFTER WE HAVE GIVEN OUR VERDICTS, THERE

19   IS A LOT OF DISCUSSION ABOUT THAT THE NEXT DAY.

20   THE COURT:  WHAT KIND OF DISCUSSION?

21   MR. PARRIS:  THERE WAS DISCUSSION ABOUT THE JURORS

22   BEING STUPID AND THAT THE MEDIA THOUGHT THAT THE JURORS WERE

23   STUPID, AND THAT WAS STATED AND WE HAD A DISCUSSION ABOUT THAT.

24   THE COURT:  WHAT WAS SAID ABOUT IT?

25   MR. PARRIS:  IT WAS -- I BELIEVE ONE PERSON STATED

35

1   THAT SYLVIA LOPEZ HAD MADE A COMMENT THAT WE WERE STUPID OR

2   CONFUSED OR SOMETHING LIKE THAT.

3           THE COURT:  WHO'S SYLVIA LOPEZ?  DO YOU UNDERSTAND

4   WHO THAT IS?

5           MR. PARRIS:  I DON'T HAVE A TELEVISION AT MY HOUSE SO

6   I DON'T KNOW WHO SHE WAS, BUT THAT WAS ASKED.  AND SHE SAID SHE

7   WAS A NEWS REPORTER ON THE T.V.

8           THE COURT:  WELL, WERE YOU IN ANY WAY AFFECTED IN THE

9   WAY YOU HAVE MADE YOUR DECISIONS IN THIS CASE BY ANY SUCH

10  DISCUSSIONS?

11          MR. PARRIS: THE ONLY WAY I WAS AFFECTED IS I WENT

12  BACK AND READ THE INSTRUCTIONS AGAIN TO SEE IF I HAVE, IN

13  FACT -- IF I HAD BEEN STUPID.

14          AND WAS I AFFECTED IN MY DECISION; NO, I DON'T THINK

15  I WAS.

16          THE COURT:  YOU MADE YOUR DECISION BASED ON YOUR

17  CONSCIENTIOUS BELIEF THAT THEY WERE THE RIGHT DECISION?

18          MR. PARRIS:  ABSOLUTELY.  ABSOLUTELY.

19          THE COURT:  DO YOU THINK THAT'S THE CASE WITH THE

20  OTHER JURORS, AS WELL?

21          MR. PARRIS:  I THINK SO.  IF ANYTHING, THE

22  CONVERSATION MADE EVERYONE JUST KIND OF SLOW DOWN AND GO BACK.

23  LIKE I SAID, WE REREAD THE INSTRUCTIONS AGAIN AND WE DISCUSSED

24  THE INSTRUCTIONS A LITTLE BIT CLEARER.

25          WE DON'T SEE ANY REASON WHY WE'RE STUPID.  IT SEEMS

36

1    WE DID THE RIGHT THING AND THEN WE WENT ON.

2              THE COURT:  OF COURSE.  THAT'S RIGHT, SIR.

3              ANY QUESTIONS HERE?

4              MR. MEDRANO:  NO, YOUR HONOR.  THANK YOU.

5              THE COURT:  ALL RIGHT, MR. PARRIS.  THANK YOU VERY

6    MUCH.

7              MR. NICOLAYSEN:  I WANTED TO JUST ASK -- I HAD A

8    QUESTION FOR YOUR CLERK.

9              THE COURT:  JUST A MOMENT.

10             (PAPER HANDED TO THE JUDGE.)

11             THE COURT:  DO YOU BELIEVE ANY OF THE JURORS HAVE

12   BEEN INFLUENCED -- BECAUSE OF INFORMATION -- INFLUENCED TO VOTE

13   IN A CERTAIN WAY BECAUSE OF INFORMATION BROUGHT IN FROM THE

14   OUTSIDE?

15             MR. PARRIS:  NO, I DON'T.

16             THE COURT:  ALL RIGHT, SIR.  THANK YOU.

17             MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

18             (JUROR ENTERS CHAMBERS)

19             THE COURT:  COME IN, MR. ESPINOZA.  PLEASE SIT DOWN

20   THERE, WON'T YOU, MR. ESPINOZA.

21             I CALLED YOU HERE TO ASK YOU ABOUT A REPORT THAT THE

22   COURT RECEIVED THAT THERE WAS A NEWSPAPER IN THE JURY ROOM

23   YESTERDAY WHICH CONTAINED A STORY ABOUT THIS CASE.

24             I WANTED TO KNOW IF YOU HAD -- DID YOU, YOURSELF, SEE

25   IT?

37

1    MR. ESPINOZA:  NO, I DIDN'T.

2    THE COURT:  DID YOU READ ANY STORY YOURSELF IN THE

3  JURY ROOM ABOUT THIS CASE?

4    MR. ESPINOZA:  NO, I DIDN'T.

5    THE COURT:  DO YOU KNOW -- DID YOU SEE ANY OTHER

6  JUROR READING ANYTHING ABOUT THIS CASE?

7    MR. ESPINOZA:  NO.

8    THE COURT:  IS IT YOUR GENERAL IMPRESSION THAT THE

9  JURORS ARE AVOIDING READING AND LISTENING TO ANYTHING ABOUT THE

10  CASE?

11    MR. ESPINOZA:  I THINK THEY ARE.

12    THE COURT:  YOU THINK THEY ARE?

13    MR. ESPINOZA:  THAT'S MY OPINION.

14    THE COURT:  ALL RIGHT.  AND YOU, YOURSELF, HAVE NOT?

15  YOU FOLLOWED THE COURT'S INSTRUCTION IN THAT REGARD; IS THAT

16  RIGHT?

17    MR. ESPINOZA:  YES, I HAVE.  I MEAN I AM ONE OF THE

18  PEOPLE THAT BRINGS IN A NEWSPAPER IN THE MORNING, BUT I WAS

19  NEVER UNDER THE IMPRESSION THEY WERE NOT ALLOWED IN THE ROOM.

20    WE DON'T READ THE ARTICLES -- ANYTHING THAT PERTAINS

21  TO THE TRIAL.  WE STAY AWAY FROM THAT, BUT I WAS NEVER UNDER

22  THE IMPRESSION THAT WE WERE ALLOWED NOT TO BRING THEM IN.

23    THE COURT:  THAT'S OUR FAULT, NOT YOURS.

24    MR. ESPINOZA:  WE ALWAYS HAD BROUGHT THEM IN.

25    THE COURT:  DURING THE TRIAL?

38

1        MR. ESPINOZA:  YES, AND WE WOULD READ -- LIKE NOW

2   THEY GO IN THERE, IT'S BASICALLY NOBODY READS THEM BECAUSE AS

3   SOON AS EVERYBODY IS IN THERE, WE START DELIBERATING AND NOBODY

4   HAS TIME TO, BECAUSE BASICALLY WE REALLY DON'T STOP ENOUGH FOR

5   ANYBODY TO EVEN READ THE NEWSPAPER IN THERE.

6        THE COURT:  DO YOU BELIEVE ANY INFORMATION ABOUT THE

7   CASE FROM SOURCES OTHER THAN THE TRIAL HAVE BEEN CONSIDERED

8   DURING THE DELIBERATION?

9        DO YOU UNDERSTAND WHAT I MEAN BY THAT QUESTION?  IT

10  IS NOT A VERY GOOD QUESTION.

11       MR. ESPINOZA:  FROM OTHER PEOPLE?

12       THE COURT:  IS IT YOUR IMPRESSION THAT THE JURY IS

13  BASING IT'S CONSIDERATION ON OTHER INFORMATION BESIDES THE

14  EVIDENCE -- BESIDES THE EVIDENCE IN THE CASE?

15       MR. ESPINOZA:  NO, NO, NO.

16       THE COURT:  STRICTLY ON THE EVIDENCE?

17       MR. ESPINOZA:  NO.  THAT'S ALL WE ARE CONSIDERING.  I

18  THINK WE'VE DONE A GOOD JOB OF IT MYSELF.  THAT'S MY OPINION.

19       THE COURT:  I THINK YOU HAVE BEEN VERY DILIGENT.

20       MR. ESPINOZA:  I THINK WE HAVE GIVEN EVERYBODY MORE

21  THAN FAIR CHANCE, AND THAT'S MY HONEST OPINION.  I DON'T -- I

22  WOULD HOPE SOMEBODY WOULD DO THE SAME FOR ME IF I WAS EVER IN

23  THE SITUATION.

24       THE COURT:  WE APPRECIATE THAT.  THANK YOU.

25       MR. NICOLAYSEN:  MAY WE ASK THAT SAME QUESTION,

40

1  THE COURT:  IS IT YOUR IMPRESSION THE JURY HAS

2  FAITHFULLY FOLLOWED THE COURT'S INSTRUCTION?

3  MR. WOOD:  AS FAR AS I KNOW.  NOBODY IS TELLING ME IF

4  THEY HAVEN'T.

5  THE COURT:  IS THERE ANY INFORMATION THAT HAS COME TO

6  THE JURY FROM SOURCES OTHER THAN EVIDENCE THAT YOU BELIEVE HAS

7  BEEN CONSIDERED IN THIS CASE?

8  MR. WOOD:  NO, NOTHING.  WE ARE SCRUTINIZING

9  EVERYTHING.  I'LL PUT IT THAT WAY.  WE'VE REALLY TAKEN A LOT OF

10  TIME AND PRO AND CON IT BACK AND FORTH.  WE HAVE LOOKED AT

11  EVERY PIECE A MILLION TIMES, I'D SAY, BECAUSE -- LIKE WE SAY,

12  THIS IS --

13  THE COURT:  DON'T THINK WE DON'T APPRECIATE THAT.  WE

14  KNOW YOU'RE WORKING VERY HARD UP THERE BECAUSE OF THE LENGTH OF

15  THE DELIBERATIONS.

16  I'M GOING TO HAVE SOMETHING TO SAY TO YOU ALL ABOUT

17  THAT EVENTUALLY, BUT THANK YOU VERY MUCH, MR. WOOD.

18  (JUROR ENTERS CHAMBERS)

19  THE COURT:  MS. DOLAN, COME ON IN.

20  MS. DOLAN:  HI.

21  THE COURT:  COME IN AND HAVE A SEAT THERE, WON'T YOU.

22  MS. DOLAN:  THANK YOU.

23  THE COURT:  I JUST WANT TO ASK YOU A FEW QUESTIONS

24  BECAUSE OF SOMETHING THAT WAS REPORTED TO THE COURT YESTERDAY

25  THAT THERE WAS A NEWSPAPER IN THE JURY ROOM THAT CONTAINED A

41

1   STORY RELATING TO THIS CASE.

2              AND I'M TRYING TO FIND OUT, IF ANY -- IF YOU KNOW

3   WHETHER ANYONE IN THE JURY ROOM HAS READ THAT STORY OR WHETHER

4   YOU, YOURSELF, HAVE READ IT.

5              MS. DOLAN:  I DON'T BELIEVE ANYONE READ IT.  I KNOW I

6   DIDN'T AND I DIDN'T SEE ANYONE READING IT, BUT --

7              THE COURT:  WE'RE GOING TO MAKE SURE THERE IS NO

8   DOUBT, BECAUSE WE ARE NOT GOING TO LET NEWSPAPERS IN THERE.  I

9   WASN'T AWARE THEY WERE GOING IN THERE.  THEY SHOULD NOT HAVE

10  BEEN.  THERE SHOULDN'T HAVE BEEN ANY NEWSPAPERS, BECAUSE IT

11  DOESN'T LOOK RIGHT.

12             IS IT YOUR IMPRESSION THAT THE JURORS HAVE LIVED UP

13  TO THE INSTRUCTIONS THAT THE COURT HAS GIVEN NOT TO READ ABOUT

14  THE CASE?

15             MS. DOLAN:  THAT'S A DIFFICULT QUESTION.  I'LL TELL

16  YOU THE TRUTH:  I BELIEVE THAT SOME PEOPLE HAVE READ DIFFERENT

17  ARTICLES --

18             THE COURT:  YOU DO?

19             MS. DOLAN:  -- SINCE WE STARTED DELIBERATION.

20             THE COURT:  WHAT MAKES YOU SAY THAT?

21             MS. DOLAN:  THERE WAS SOME DISCUSSION IN THE JURY

22  ROOM.

23             THE COURT:  ABOUT THE ARTICLES?

24             MS. DOLAN:  ON FRIDAY.

25             THE COURT:  IS THIS THE ONLY TIME THERE HAS BEEN ANY

42

1   DISCUSSION?   CAN YOU TELL ME THE NATURE OF THE DISCUSSION?

2        MS. DOLAN:   THAT MR. STOLAR HAD SAID SOME THINGS

3   ABOUT THE JURY, THAT WE WERE CONFUSED.

4        THE COURT:   AND THAT CAUSED SOME CONCERN TO THE

5   JURORS?

6        SOMEBODY HAD HEARD THAT ON THE TELEVISION OR

7   SOMETHING?

8        MS. DOLAN:   I DON'T KNOW IF IT WAS TELEVISION OR THE

9   NEWSPAPER.   I DON'T RECALL HOW THEY CAME TO THAT PIECE OF

10  INFORMATION.

11       THE COURT:   WHAT RESULTED FROM THAT THEN?

12       MS. DOLAN:   WE SPENT SOME TIME TALKING ABOUT IT.   AND

13  AS THE FOREPERSON, I TOOK THE LEAD AND I SAID THAT THAT IS

14  HISTORY.   LET'S GET TO WORK, IT DOESN'T MATTER WHAT ANYBODY

15  THINKS, AND THEN WE WENT BACK TO DELIBERATION.

16       THE COURT:   DO YOU THINK THE JURY'S DELIBERATION

17  BECAME MORE SCRUPULOUS AND METICULOUS AFTER THAT BECAUSE OF

18  THAT DISCUSSION?

19       MS. DOLAN:   NO.   I DON'T THINK WE COULD WORK ANY

20  HARDER THAN WE HAD BEEN PRIOR TO THAT POINT -- OR SINCE.

21       THE COURT:   LET ME ASK YOU:   DO YOU THINK THAT ANY

22  JUROR HAS BEEN INFLUENCED BY ANY INFORMATION OBTAINED FROM

23  OUTSIDE THE COURT OTHER THAN WHAT IS OBTAINED THROUGH EVIDENCE?

24       MS. DOLAN:   NO, I DON'T BELIEVE SO.

25       THE COURT:   OKAY.   THANK YOU.   YOU'RE GOING A GOOD

43

1   JOB OF LEADING THE JURY AND WE APPRECIATE THE TIME AND EFFORT

2   THAT YOU'VE ALL PUT IN UP THERE.

3          THANK YOU.

4          MS. DOLAN:  THANK YOU.

5          (JUROR EXCUSED.)

6          MR. NICOLAYSEN:   IF I MAY, YOUR HONOR -- AND I SAY

7   THIS WITH GREAT RESPECT TO THE COURT -- I WOULD ASK THAT NO

8   JUROR BE COMPLIMENTED FOR THE JOB THEY'RE DOING, ONLY BECAUSE

9   IT MIGHT SUGGEST THAT THE GUILTY VERDICTS --

10          THE COURT:  COUNSEL, I DON'T NEED THAT.

11          (JUROR ENTERS THE CHAMBERS)

12          THE COURT:  MS. MC DANIELS?

13      MS. MC DANIELS:  YES.

14          THE COURT:  HAVE A SEAT, WON'T YOU.

15          IT WAS REPORTED TO THE COURT THIS MORNING THAT THERE

16   WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY CONTAINING A STORY

17   THAT PERTAINED TO THIS CASE.

18          MS. MC DANIELS:  YES.

19          THE COURT:  AND I WANT TO FIND OUT IF YOU HAD SEEN IT

20   YOURSELF?

21          MS. MC DANIELS:  DUANE AND BOB BRING PAPERS IN EVERY

22   MORNING AND THEY TELL ME -- IF AN ARTICLE IS THERE, I FOLD IT

23   UP AND PUT IT IN MY PURSE.  I TAKE IT HOME AND HAND IT TO MY

24   SON AND HE CUTS IT OUT ON PUTS IT ON HIS DESK, AND AT THE END

25   OF THE TRIAL, I TOLD HIM I WOULD GO WITH HIM AND READ THE

44

1   ARTICLES, SO --

2          THE COURT:  YOU HAVE NOT READ ANYTHING?

3          MS. MC DANIELS:  I HAVEN'T READ IT, NO.

4          THE COURT:  HAVE YOU SEEN ANY ONE ELSE READ ANY

5   ARTICLES?

6          MS. MC DANIELS:  NO.

7          THE COURT:  DO YOU FEEL THAT ANYONE HAS BEEN

8   INFLUENCED BY SOMETHING THEY MAY HAVE READ OR SEEN OUTSIDE THE

9   COURTROOM?

10          MS. MC DANIELS:  NO.

11          THE COURT:  DO YOU BELIEVE THAT THE JURY IS

12   CONCENTRATING AND DECIDING THIS CASE ON THE EVIDENCE IN THE

13   CASE AND THE LAW?

14          MS. MC DANIELS:  YES, I DO.

15          THE COURT:  ALL RIGHT.  THANK YOU.

16          WE HAVE TWO TO GO.

17          (JUROR ENTERS CHAMBERS)

18          MS. FREDERICK:  GOOD AFTERNOON, JUDGE.  HOW ARE YOU?

19          THE COURT:  HELLO, MS. FREDERICK.  HOW ARE YOU?

20          MS. FREDERICK:  JUST FINE, JUDGE.  THANK YOU.

21          THE COURT:  I'M JUST GOING TO KEEP YOU A MINUTE.  I

22   WANT TO ASK YOU A FEW QUESTIONS.

23          IT WAS REPORTED TO THE COURT THAT THERE WAS A

24   NEWSPAPER IN THE JURY ROOM YESTERDAY THAT CONTAINED AN ARTICLE

25   RELATING TO THIS CASE, AND I WANTED TO KNOW IF YOU HAD READ IT.

45

1    MS. FREDERICK:  NO, SIR.

2    THE COURT:  DO YOU KNOW OF ANYONE ELSE WHO HAD READ

3    IT?

4    MS. FREDERICK:  NO, SIR.

5    THE COURT:  DO YOU BELIEVE THE JURY HAS TRIED TO

6    AVOID READING ANYTHING ABOUT THIS CASE?

7    MS. FREDERICK:  I CERTAINLY DO.  I SURE DO.  I KNOW I

8    HAVE.

9    THE COURT:  AND DO YOU THINK THE JURY IN ANY WAY HAS

10   BEEN INFLUENCED BY ANYTHING ANYBODY HAS HEARD OUTSIDE THE

11   COURTROOM, OUTSIDE OF THE EVIDENCE IN THE CASE?

12   MS. FREDERICK:  NO, I REALLY DON'T.  NOBODY HAS SAID

13   ANYTHING TO ME, AT LEAST IN MY PRESENCE.  I HAVE HEARD NOTHING.

14   THE COURT:  THANK YOU VERY MUCH.

15   MS. FREDERICK:  YOUR VERY WELCOME.

16   (JUROR ENTERS CHAMBERS)

17   THE COURT:  COME IN, MRS. MC LANE.

18   MRS. MC LANE:  HELLO.

19   THE COURT:  HOW ARE YOU?  PLEASE HAVE A SEAT THERE,

20   WON'T YOU?

21   THIS IS IRENE MC LANE.

22   I WANT TO ASK YOU A COUPLE OF QUESTIONS,

23   MRS. MC LANE.  IT WAS REPORTED TO THE COURT YESTERDAY THAT

24   THERE WAS A NEWSPAPER UP IN THE JURY ROOM CONTAINING AN ARTICLE

25   RELATING TO THIS CASE, AND I WANTED TO KNOW IF YOU HAD READ IT

46

1    YOURSELF?

2            MRS. MC LANE:  OH, NO.

3            THE COURT:  DID YOU SEE ANYONE ELSE READ SUCH AN

4    ARTICLE?

5            MRS. MC LANE:  NO.

6            THE COURT:  DO YOU BELIEVE THE JURORS HAVE AVOIDED

7    READING ANYTHING ABOUT THIS CASE IN ACCORDANCE WITH THE

8    INSTRUCTIONS OF THE COURT?

9            MRS. MC LANE:  I HAVE NEVER SEEN THAT THEY HAD.

10   THERE ARE NEWSPAPERS ON THE DESK -- ON THE TABLE, AND THEY'D

11   SAY, "WELL, YOU CAN'T READ THIS ARTICLE."

12           THE COURT:  THAT HAS BEEN OPENLY DISCUSSED?

13           MRS. MC LANE:  ABSOLUTELY.  "WE CANNOT READ THIS

14   ARTICLE."

15           THE COURT:  DO YOU THINK THAT THE JURY HAS BEEN

16   INFLUENCED IN ANY WAY BY ANYTHING BROUGHT IN FROM THE OUTSIDE;

17   THAT IS, OTHER THAN EVIDENCE IN THE CASE THAT WAS PRESENTED AT

18   THE TRIAL?

19           MRS. MC LANE:  NO, I -- NO, I HAVEN'T.  I HAVEN'T

20   SEEN ANYTHING.

21           THE COURT:  ALL RIGHT.  WELL, THANK YOU.

22           (JUROR EXCUSED.)

23           THE COURT:  WELL, COUNSEL, YOU'VE HEARD IT.

24           MR. NICOLAYSEN:  YOUR HONOR, AT THIS TIME I WOULD

25   SIMPLY ASK THAT THERE BE CLOSER SUPERVISION, PERHAPS, IN THE

47

1   REMAINING STAGE OF THE DELIBERATIONS.

2           THE COURT:  WHAT DO YOU MEAN BY THAT?

3           MR. NICOLAYSEN:  THE BAILIFFS PERHAPS SHOULD MAKE AN

4   EFFORT TO BE MORE OBSERVANT THAN PERHAPS THEY HAVE BEEN ALL

5   ALONG, JUST FOR SAKE OF --

6           THE COURT:  THERE ARE NOT GOING TO BE ANY NEWSPAPERS

7   IN THAT JURY ROOM, YOU CAN BET ON THAT.

8           MR. NICOLAYSEN:  THAT'S THE APPROPRIATE RULING, AND I

9   THANK THE COURT FOR IT.  I WOULD JUST ASK THAT THE BAILIFFS BE

10   REMINDED TO REMEMBER THEIR SUPERVISORY DUTIES.

11           THE COURT:  I'M GOING TO PROBABLY CONVENE THE JURY

12   TONIGHT AND TELL THEM SO COLLECTIVELY BEFORE THEY ADJOURN.

13           ALL RIGHT.

14           MR. NICOLAYSEN:   AT THIS TIME, I WOULD THANK THE

15   COURT VERY MUCH FOR TAKING THE TIME TO CONDUCT THE INQUIRY.  I

16   THINK IT WAS PRODUCTIVE.  I THINK A REPEATED ADMONITION BEFORE

17   RECESS IS APPROPRIATE, AND LET'S JUST TRUST THAT WE HAVE DONE

18   WHAT WE CAN TO MONITOR THE SITUATION.

19           THE COURT:  THIS IS A VERY CONSCIENTIOUS JURY, IN MY

20   VIEW, AND IT'S UNFORTUNATE THAT MR. STOLAR HAS SUCH A BIG MOUTH

21   AND HAS SUCH A PENCHANT FOR GETTING IN FRONT OF THE T.V.

22   CAMERA.  I PUT THAT IN THE RECORD SO HE CAN READ IT.

23           HE'S THE REASON I MADE THAT ORDER, BECAUSE IN MY

24   VIEW, HE'S NOT CONDUCTING HIMSELF RESPONSIBLY.  IT APPEARS THAT

25   THAT DISCUSSION ON THE PART OF THE JURY THAT THEY HAVE

48

1    DISCUSSED SOME OF THE CRITICAL THINGS THAT HE HAS SAID ABOUT

2    THEM HAS APPARENTLY ENHANCED THEIR SCRUPULOUSNESS ABOUT THIS

3    CASE AND PROBABLY WORKED TO THE BEST INTEREST OF YOUR CLIENT.

4         SO ON THE BASIS OF WHAT I'VE HEARD, I THINK THAT WE

5    JUST SHOULD GO ON AND SEE WHAT HAPPENS.

6         MR. NICOLAYSEN:  JUST SO THE RECORD IS PROPERLY

7    PRESERVED, MAY I ASK THAT THE STACK OF PAPERS ON YOUR

8    CONFERENCE TABLE BE MARKED AS AN EXHIBIT AND MAINTAINED.

9         THE COURT:  THEY WILL BE, AND THEY'LL BE MARKED AS AN

10   EXHIBIT -- THESE NEWSPAPERS -- AND YOU'RE FREE TO LOOK AT THEM,

11   IF YOU WANT.  THEY'LL BE MARKED AS AN EXHIBIT.

12        MR. NICOLAYSEN:  AND PRESERVED IN THE RECORD.

13        THE COURT:  AND PRESERVED AS PART OF THE RECORD FOR

14   THE COURT BUT MARKED FOR IDENTIFICATION ONLY.

15        MR. MEDRANO:  THANK YOU, YOUR HONOR.

16        MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

17        MR. MEDRANO:  MAY WE TAKE JUST A COUPLE MINUTES TO

18   EXAMINE THESE?

19        THE COURT:  DO IT OUTSIDE OR SOMEPLACE.

20        (WHICH WERE ALL THE PROCEEDINGS HAD IN THE

21   ABOVE-ENTITLED MATTER AT THE DATE AND TIME AFORESAID.)

22                    ---0---

     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
23   STENOGRAPHIC RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
     MATTER.

24   _Julie A. Churchill_          DATED: _August 4, 1990_

25   JULIE A. CHURCHILL, CSR NO. 6155

49

## CERTIFIED STATEMENT OF COURT REPORTER

I CERTIFY THAT WHEN I ATTEMPTED TO USE THE TAPE TO TRANSCRIBE THE OFF-THE-RECORD PORTION WHERE I DESCRIBED WHAT I SAW IN THE JURY ROOM, I LEARNED THAT THE TAPE MACHINE DID NOT OPERATE FOR THE ENTIRE PROCEEDING.

TO THE BEST OF MY RECOLLECTION, IN SUBSTANCE, THIS IS WHAT I REPORTED TO THE JUDGE, COUNSEL AND LAW CLERKS PRESENT IN CHAMBERS.

"WHEN I WENT UPSTAIRS YESTERDAY TO READ BACK THE REQUESTED TESTIMONY OF ABEL REYNOSO, I NOTICED A PAPER ON THE TABLE IN FRONT OF THE JURORS.

IT WAS OPENED TO THE PAGE OF THE ARTICLE ABOUT THE CASE WHICH HAD THE ARTIST'S SKETCH AND SOMETHING ABOUT "CAMARENA" HEADLINED ABOVE THE SKETCH.

THE JUROR PUT THE PAPER DOWN AS SOON AS I WALKED IN THE ROOM TO READ BACK THE TESTIMONY, AND SHE MAY HAVE ONLY BEEN LOOKING AT THE SKETCH RATHER THAN READING THE ARTICLE.  I COULDN'T TELL BECAUSE SHE ONLY HAD IT IN HER HANDS FOR A SECOND AFTER I ENTERED THE ROOM."

-o0o-

*Julie A. Churchill*     *August 4, 1990*

JULIE A. CHURCHILL, C.S.R. DATED:

DECLARATION OF WILLIAM R. PARRIS

1

2

3        I, the undersigned, William R. Parris, make this

4  following declaration voluntarily, and of my own free will.  No

5  promises, threats or inducements of any kind have been made to me

6  by any person or persons to make this declaration, and I make this

7  declaration for the sole purpose of recording and documenting the

8  facts it contains.

9

10       I declare that I have personal knowledge of the facts set

11  forth below and if called as a witness I could and would testify

12  competently thereto as follows:

13

14       1.   I was one of the jurors who returned guilty verdicts

15  against Juan Ramon Matta-Ballesteros Del Pozo, Ruben Zuno-Arce,

16  Juan Jose Bernabe-Ramires, and Javier Vasquez-Velasco, in their

17  trial in United States District Court at Los Angeles, California

18  that took place during May, June, July and the early part of

19  August, 1990.

20

21       2.   Local newspapers, including the _Los Angeles Times_

22  were in the jury room daily throughout the trial and jury

23  deliberations.  Some of the jurors skimmed the headlines about the

24  Camarena case on a daily basis in the jury room.

25

26       3.   During deliberations and prior to rendering

27  verdicts, other members of the jury discussed information from

28  newspapers and other media sources, as well as other matters that

to the best of my knowledge were not admitted into evidence at

trial:

        (a)  The <u>Los Angeles Times</u> article on our Matta

verdict was read by a number of jurors and the contents of the

article were discussed in detail.   One juror, Myrtle Hines,

reminded the others on at least two occasions that the jurors were

not supposed to look at newspapers, watch TV or listen to the

radio.   On one of these occasions, another juror said that one of

the United States Marshals had stated that the jurors could read

newspaper articles after the Matta verdict.   On another occasion,

several jurors said words to the effect that they had the newspaper

at home anyway so having newspapers in the jury room really didn't

matter.

       Juror John West said the government was happy about the

Matta verdict.   In the course of this discussion, a number of

jurors talked about the fact that defense attorney Martin Stolar,

the defense counsel for Matta, had reportedly described the jury's

verdicts against Matta as inconsistent.   Juror Joanne Frederick

said that she had heard local television reporter Sylvia Lopes say

their verdicts were inconsistent. I felt, along with other members

of the jury, that what was being said by the news media was that

the jurors were stupid.   The jury spent an entire morning session

discussing our being upset by these news reports and our respective

negative reactions and personal opinions regarding the news reports

concerning the Matta verdict.

(b)  That defendant Matta-Ballesteros was a "drug kingpin" and that he had previously been convicted and was already serving a life sentence.  I believe juror John West informed us of these facts.  This information influenced how I, and I believe how other members of the jury, viewed Matta and the other defendants during our deliberations.

(c)  That there had been an earlier trial dealing with the Camarena case and three prior defendants had already been convicted and sentenced.

(d)  That there existed strained relations between the United States and Mexican governments over the Camarena case and the whole Camarena situation.

(e)  A doctor from Mexico, Doctor Machain, who was involved in the Camarena situation, had been abducted in Mexico and brought to the United States and that his abduction was facilitated by United States DEA Agent Hector Berrelles.

(f)  That the Mexican government was seeking to extradite Agent Berrelles to stand trial in Mexico because of the abduction, and that a high-ranking representative of the United States government had said publicly that he thought this was a retaliatory act by the Mexican government for the action the United States government was taking in the Camarena case and against the defendants on which the jury was deliberating.

3

(g)   Because of our understanding of the Mexican government's attempt to extradite and arrest Agent Berrelles, he was viewed by me, and I believe by other members of the jury, as a United States hero, and after we heard of the Mexican government's attempt to extradite and arrest him, we actually looked for Agent Berrelles in court on a daily basis to make sure he was safe.  If Agent Berrelles was not present during a trial day, jurors would express concern that he might have been kidnapped.   We also discussed that the Mexican government was trying to punish Agent Berrelles and that the present Mexican government was neither happy nor cooperative with the prosecution of the four defendants against whom we returned guilty verdicts.

(h)   The jury also relied on other information and matters outside the record, such as juror Frank Marquez telling us that he had learned from his parents that one of the meanings of "leyenda," which was the name given to the investigative operation that DEA Agent Berrelles headed, meant a fairy tale or a story about an heroic figure, in Spanish.

(i)   In our consideration of the Zuno house sale and rental agreement regarding 881 Lope de Vega, we discussed (and then deliberated about) what the exchange rate was of pesos to the dollar, despite the fact that no exchange rate had been presented at trial or introduced into evidence.  Jurors Robert Espinosa and Linda Overholt, and I believe one other juror, each stated the various exchange rates with which they were familiar based on personal experiences in Mexico.  Juror Linda Overholt, the day

4

1    after this discussion, came in and said she took a ratio of 2,200

2    pesos to the United States dollar and worked out the conversion

3    between pesos to dollars on her home calculator.  Based on their

4    exchange rate, she furnished us with what she said was the

5    approximate amount the house had been sold for as $2,000 and the

6    amount the house had been rented for was $10 or $20 per month.  The

7    jury used these calculations as fact and on that basis the jury

8    concluded the sale and rental agreements were phony.

9

10         (j)  In terms of witness David Macias, a number of

11    jurors said he should not be believed because defendant Zuno had

12    bought his testimony by agreeing to take care of his family.

13

14         (k)  There was discussion among the jurors to the

15    effect that corruption in Mexico was common and defendant Zuno's

16    political connections enabled him to "buy" the phone records that

17    were offered in evidence as well as any other evidence introduced

18    by Zuno's defense such that the evidence presented by Zuno's

19    defense was for purposes of our deliberations, unreliable.

20

21         (l)  The jury also discussed that Zuno had an

22    ownership interest in Primavera Park.

23

24       4.   I believe the conduct of the Marshals had an

25    influence on the deliberations of the jury.

26

27       5.   Examples of what I refer to in paragraph 4 above

28    are:

(a)   Two Marshals, "Nancy" and "Clay," were assigned to the jury.   Throughout jury deliberations, they came into the jury room in the morning and shared with the jurors coffee and whatever food the jurors brought for the day.   In addition, Clay and Nancy were in and out of the deliberation room at rest breaks getting coffee for themselves and talking with us.   We frequently took breaks, and on some days we took breaks on an hourly basis. I felt very close to Nancy and Clay and I perceived that other jurors felt the same way.   On some occasions when Nancy and Clay were present, the jury room contained charts and boards with verdict vote tallies and notations prepared by the jury of evidence the jury was considering.   These charts and boards were in plain view during the occasions when the Marshals were in the jury deliberation room.

(b)   One of the jurors reported to other jurors that one of the Marshals had said it was okay for the jurors to read newspaper accounts of the trial after they had returned their verdict on Matta.

(c)   When the jury went to lunch, not only Nancy and Clay went with us, but four additional United States Marshals accompanied the jury.   We all ate together and engaged in casual conversation.

(d)   At one point, while he was with the jury, the Marshal named Clay told jury members that he shouldn't serve on a jury because he would only be able to vote one way.

6

(e)   On a daily basis, an Asian-American Marshal at the Main Street level of the courthouse asked me and some of the other jurors, I believe, as we entered the building, if the jury were going to return a verdict that day.  I felt annoyed by such continual inquiries.

(f)   Following the Zuno verdict, the Marshal named Clay said it would be better if as a jury we hurried up and returned the final verdict as against defendant Vasques-Velasco, so the Marshals could provide better security to all the defendants as certain of them had received death threats.

(g)   The same Marshals that were protecting us were also assigned to take defendants back and forth to the courtroom. We as jurors were taken out of the courthouse via a back elevator and a route adjacent to the Marshal's lockup area.  One time I observed defendant Bernabe-Ramirez in handcuffs in the hallway near the lockup.  I also heard Marshals Nancy and Clay saying things like, "I have been working since 3:00 a.m. transporting defendants from the M.D.C. to the courthouse."

6.   The jury discussed the fact that the defendants should have taken the witness stand to testify as to what they did or did not do and that each defendant had the burden to tell the jury where he was at the time of the events in question.  In the jury deliberations, I believe the jury placed the burden on each defendant to present evidence and to prove his innocence, rather than placing the burden of proof upon the government.

7

7.    During the jury selection, and before either of us had been selected as jurors, I overheard Peggy Dolan, who was later elected the jury foreperson, state to another prospective juror that she did not understand why they would want her on this jury because she thought all of the defendants were guilty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in the County of Los Angeles, State of California on the __15__ day of August, 1990.

*William R. Parris*

**A4**   MONDAY, MAY 7, 1990 /OC

# Camarena Case Spotlight on L.A. Unit's Tactics

**■ Drugs:** Agents have gone undercover to lure targets into the U.S.; some suspects have been snatched out of Mexico and delivered to U.S. authorities.

**By PAUL LIEBERMAN**
TIMES STAFF WRITER

From the start, the investigation into the murder of Enrique (Kiki) Camarena was an emotional mission for his fellow agents in the U.S. Drug Enforcement Administration.

Camarena hadn't been shot in a drug raid—an accepted occupational hazard. He had been snatched off the streets of Guadalajara, Mexico, while headed for a lunch date with his wife. Then he was tortured for 30 hours.

"What's more, the Mexican government seemed "anxious to close this matter as quickly as possible," recalled former DEA Administrator John C. Lawn. "It was, 'OK, the body has been returned to you. The case is closed.'

"It was infuriating."

Five years later, the Camarena case continues to be an open sore between the United States and its southern neighbor. The central issue now, however, is not so much who killed the agent, but the steps used by an elite Los Angeles-based DEA unit to bring his killers to justice in the United States.

Composed mostly of Latino agents with experience in the deadly drug wars of Mexico, the unit has used virtually every tactic available to law enforcement to gets its hands on key suspects.

The agents have gone undercover to lure some of their targets into the United States—and into confessions. They have paid more than $800,000 to shadowy informants, one of whom is reputed to have killed between 35 and 50 people while working for the Mexican government.

And, in three incidents that prompted diplomatic outcries, suspects have fallen into U.S. custody after being spirited out of their home countries.

In recent weeks, Mexican officials have made a cause celebre of the kidnaping of Dr. Humberto Alvarez Machain, a Guadalajara gynecologist who allegedly revived Camarena so his torturers could question him further. In a plot hatched by a former Mexican policeman working as a DEA operative, the doctor was seized in his office April 2 and flown to waiting agents in El Paso.

Mexican officials, defense attorneys and some international law experts complain that, in its zeal to avenge a fellow agent's murder, the DEA's nine-member "Operation Leyenda" task force has become a lawbreaker itself, a "rogue" unit whose espionage-like methods make the United States vulnerable to like-minded retaliation.

"The fight against drug trafficking cannot be used as a pretext for violating the law nor the territory of another country," Mexican President Carlos Salinas de Gortari declared after the latest abduction.

But a DEA official said the unit has no intention of letting up.

"The mission is simple," he said. "Track down and eliminate all persons involved in the kidnap, torture and murder."

□

Many police investigations get code names. In the Camarena case, it came by mistake.

An informant reported hearing drug suspects talk about "El Leyenda," and DEA agents thought that meant "the lawman," Camarena. In fact, the suspects were talking about "the legend," another drug dealer. But the name stuck.

Assigned full time to the task force are eight agents and a civilian intelligence analyst—nearly 10% of the DEA's manpower in Los Angeles—along with a supervising agent in Washington.

Heading the unit in Los Angeles is Hector Berrellez, an agent who knew well the risks Camarena had faced.

A Vietnam veteran originally from Arizona, Berrellez was in the middle of the longest gunfight in DEA history while stationed in the Mexican coastal city of Mazatlan.

On March 17, 1988, he and two other agents joined 15 Mexican federal police in a raid on a remote marijuana ranch. They were greeted by workmen with automatic rifles and pinned down for more than five hours. At one point, Berrellez crawled from behind a car to pull a wounded federal to safety.

They had 20,000 rounds shot at them before Mexican soldiers came to the rescue, recalled another agent.

Berrellez was given the U.S. Attorney General's Award for Exceptional Heroism.

"Most of the [Leyenda] agents have worked in Mexico and they know the ground rules down there," said the colleague. "When they walk down the corridor, you can see these are focused people. You would not want to mess with them."

But a law enforcement clearinghouse warned last week that one group may be very willing to mess with them. According to a memo prepared by the El Paso Intelligence Center, which shares data on drug smuggling among 10 federal

**Please see DEA, A54**

A24   MONDAY, MAY 7, 1990 /OC

LOS ANGELES TIMES

# DEA: Tactics Questioned

**Continued from A4**

agencies, a "hit squad" of 20 people may be en route from Guadalajara to seek revenge for the abduction of the doctor. The vigilantes were believed to be holed up at a ranch in the Mexican border city of Mexicali, armed with AK-47s and preparing to "take the war to L.A.," the memo said.

Cornelius Dougherty, a DEA spokesman in Washington, said precautionary measures were being taken but emphasized that the memo contained only "raw intelligence."

☐

DEA agents come into the job knowing it is one of riskiest in law enforcement.

The 3,000 agents, stationed throughout the United States and 44 other countries, are involved in two shootings a week on average.

"We've had a number of agents killed throughout the world, but most of the times it hasn't been so sinister," Ralph B. Lochridge, a DEA spokesman in Los Angeles, once explained.

Camarena's torturers had tape recorded his February, 1985, interrogation and copies were recovered from a drug trafficker's home in Mexico.

"They tortured him, slowly, slowly, slowly," said Antonio Garate Bustamante, the DEA operative who claimed credit for the Guadalajara doctor's recent abduction. "They asked him questions that they didn't even want the answer to."

Unlike most murder cases, where there may be one or two suspects, the DEA suspected the list of conspirators against Camarena was long—possibly extending to associates of Mexico's then-President Miguel de la Madrid.

A federal grand jury was convened in Los Angeles in 1986 to consider U.S. charges in Camarena's murder. But there was a major stumbling block. Virtually all of the suspects were Mexicans. And, despite a 1978 extradition treaty with the United States, Mexico traditionally has refused to turn over its own citizens, insisting that any criminal proceedings be brought at home. Getting suspects to trial would not be routine.

☐

The first indictment was still two years off when Rene Martin Verdugo Urquidez was delivered into U.S. custody. Verdugo was driving in the resort of San Felipe on Jan. 24, 1986, when a car skidded into his path. Six men, four of them State Judicial Police officers, descended on him.

## CAMARENA CASE SUSPECTS IN U.S. CUSTODY

*Of 19 men indicted in Los Angeles for the 1985 torture-murder of DEA agent Enrique (Kiki) Camarena, eight are in U.S. custody. Three have been convicted and five are awaiting trial.*

### WHERE THEY WERE SEIZED



**1. Jesus Felix Gutierrez:** Tracked through several countries then arrested by a surveillance team Christmas Eve, 1986, in El Monte. Sentenced to 10 years in prison.




**2. Raul Lopez Alvarez:** Arrested Oct. 26, 1987, at a Montebello restaurant after meeting with undercover DEA agents posing as drug dealers. Sentenced to life plus 240 years in prison.

**3. Juan Jose Bernabe Ramirez:** Arrested July 27, 1989, in Los Angeles, after meetings with undercover agents, shortly before he was to fly to his home in Guadalajara. Awaiting trial.

**4. Javier Vasquez Velasco:** Arrested Oct. 12, 1989, in downtown Los Angeles. Awaiting trial.

**5. Dr. Humberto Alvarez Machain:** Kidnaped April 2, from his Guadalajara office, then flown to waiting DEA agents in El Paso, Tex. Awaiting trial.



**6. Ruben Zuno Arce:** Brother-in-law of former Mexican President Luis Echeverria, arrested Aug. 9, 1989, at San Antonio, Tex. supermarket. Awaiting trial.



**7. Rene Martin Verdugo Urquidez:** Abducted Jan. 24, 1986, in San Felipe, Mexico, then pushed through the border fence into the U.S. near Calexico. Sentenced to life plus 240 years in prison.



**8. Juan Ramon Matta Ballesteros:** Forced April 5, 1988, onto an airliner in Honduras and taken to the Dominican Republic, where authorities splitted him aboard a jet to Puerto Rico. Arrested over U.S. air space. Awaiting trial.

According to court documents, Verdugo was "handcuffed, blindfolded and placed in the back seat of an automobile," then driven to the U.S. border and pushed through a hole in the fence.

A spokesman for the U.S. Marshal's Service said its agents "just happened" to be waiting on the other side of the fence.

A top lieutenant to Mexican drug lord Rafael Caro Quintero, Verdugo was held on marijuana smuggling charges. More importantly, perhaps, authorities also were convinced he had been in the Guadalajara house where Camarena died.

Calling it an "illegal kidnaping," Mexican prosecutors indicted the six Mexicans who seized Verdugo. But they had disappeared.

Court records show the men were paid a total of $32,000 so they could move to the United States under special visas.

"They said they were paid 'expenses' because they had to leave the country," complained Verdugo's San Diego attorney, Michael Pancer. "Our information was they were paid to do the kidnaping. . . .

"If a drug lord paid them to break the law, we call it a bribe."

But even if Pancer proved the DEA conspired in the abduction, that would not have been grounds to free Verdugo.

U.S. Supreme Court rulings going back a century have held that it does not matter how international fugitives wind up in American courts as long as the apprehension does not involve torture that "shocks the conscience."

For reasons of diplomacy, however, U.S. agents are not supposed to act unilaterally on foreign turf. The only exception was outlined in a controversial Justice Department memo last June 21, which said the

President could order the seizure of terrorists without a host government's consent.

"If U.S. citizens are going to take actions in another country, [that country's] officials should know in advance and give their concurrence," said former DEA Administrator Lawn. "We are there as a guest."

Lawn noted, however, that the Camarena abductions were not carried out by DEA agents, but by "law enforcement counterparts" in other countries who offered their

Please see DEA, A25

# DEA: Tactics of L.A. Unit Criticized

Continued from A24

help—apparently without alerting higher-ups.

"As a result of that type of cooperation, the politicians within that country may become angered," he said. "We have to sit back and let the rhetorical furor settle and continue to do our business. . . ."

The first indictment was unsealed on Jan. 6, 1988. Of nine defendants, three were in U.S. custody—Verdugo and two others nabbed by Operation Leyenda.

The unit traced Jesus Felix Gutierrez, who, who was suspected of sheltering Caro Quintero at a ranch in Costa Rica after the Camarena killing, through Chile, Argentina, Brazil and Colombia. The agents finally caught him on Christmas Eve, 1986, emerging from a house near Los Angeles—apparently trying to visit family in the area.

Falling next into DEA hands was Raul Lopez Alvarez, a former Mexican policeman whose boasts of helping torture Camarena were videotaped—after he came to California to meet a member of the unit posing as someone who wanted a U.S. Customs agent killed for $10,000.

"They lured him here," Lopez's attorney complained after he was arrested Oct. 28, 1987, at a Montebello restaurant.

Assistant U.S. Atty. Roel Campos called it "one heck of a job" by the agents.

Six months later, the capture of another suspect set off riots.

One of the most notorious drug traffickers in the world, Juan Ramon Matta Ballesteros had gained sanctuary in his native Honduras, whose constitution prohibits extradition of citizens. But to prod action, U.S. authorities reportedly threatened to name Honduran military officers tied to the drug trade.

On April 5, 1988, local police raided Matta's home and hustled him on a plane to the Dominican Republic—without a passport. Dominican authorities ordered him expelled for entering their country illegally and forced him aboard an airliner to Puerto Rico. When that plane entered U.S. airspace, federal marshals were waiting on board to arrest him.

More than 2,000 protesters stormed the U.S. Consulate in Honduras, chanting "Matta yes! Gringos no!" Five people died in clashes with troops.

□

The Salinas administration took power in Mexico in December, 1988, offering hope of greater co-operation in fighting drug trafficking. There was a surge of Mexican prosecutions for Camarena's killing, particularly for Caro Quintero and his men.

Nevertheless, U.S. officials still saw no prospects of winning extradition of other influential suspects in Mexico.

Three alleged conspirators were snared by Operation Leyenda during 1989, but all either lived in the United States or came across the border voluntarily. One of them, Ruben Zuno Arce, the 59-year-old brother-in-law of former Mexican President Luis Echeverria, was detained as a "material witness" after he flew from Mexico to San Antonio on a business trip.

Then, with the arrival of 1990, relations between the United States and Mexico deteriorated.

In January, Mexican officials were infuriated by "Drug Wars," a NBC television mini-series on the Camarena case that portrayed their government as corrupt.

That same month, a new indictment was issued in Los Angeles, bringing to 19 the number of defendants. The new ones included the former police chief of the Mexican federal police.

In March, the Bush Administration announced that data from U.S. spy satellites showed the Mexican marijuana crop was 10 times larger than previously thought. Mexican officials called the contention inaccurate and irresponsible.

It was amid such tension that Dr. Humberto Alvarez Machain received unwelcomed visitors at his office April 2.

At first, a DEA spokesman in Washington denied reports that there was a $100,000 reward for Alvarez. But Assistant U.S. Atty. Manuel Medrano, the lead Camarena case prosecutor, later admitted such bounties were common knowledge where it counted.

"The U.S. has had standing offers in Mexico . . . that's been on the streets in Guadalajara for some time," he said.

Garate, a former Mexican policeman, said he arranged the abduction over the phone from Los Angeles, getting 10 men in his home country, including "a few honest cops," to seize the doctor and deliver him to El Paso—where Berrellez and two other agents arrested him.

Since then, the barrage of condemnation from Mexico has not ceased, with one official terming the incident a "sort of invasion" by the United States.

Last Thursday, President Bush pledged to "eliminate the misunderstanding," but Mexican officials continued on the attack. Already demanding the arrest of Garate, they now proposed that 41 Mexican drug police be stationed in the United States—matching the number of DEA agents in Mexico.

Experts in international law say the reaction illustrates the diplomatic risks of tactics such as the abduction.

"I'm worried about reciprocal action on the part of countries like Mexico, Colombia and various terrorist states like Iran, Libya, Syria," said Abraham Abramovsky, director of the International Criminal Law Center at Fordham University. "I would hate to see a situation where they abduct one of our nationals and say . . . 'Look what you did.'"

But Robert Friedlander, an attorney for the Senate Foreign Relations Committee, said such bold actions may be necessary as a "last resort."

"It's sending a message to the other bad guys . . . that the long arm of American justice is going to reach you," Friedlander said.

"These guys not only put agents at risk, they murder and torture them. . . . Until or unless we have a greater success on the terrorism front, and the narcotics front, the business of grabbing people from time to time is going to continue."

Garate, who has worked closely with Operation Leyenda, would not rule out further abductions in the Camarena case.

Sitting in his apartment, semiautomatic weapons at the ready and two phones ringing with calls from contacts back in Mexico, Garate said officials in his home country cannot understand the DEA's obsession with one agent's death.

"The Mexican attorney general said that 42 [Mexican] agents were killed in the line of duty. . . . You lost an agent and we lost 42."

"They'll show the families of the dead [Mexican] agents, who say, 'We're so proud,'" Garate continued, shaking his head. "But I would like to know how many people who killed them have been arrested."

Garate said the Operation Leyenda task force is investigating a second physician who may have helped in the torture of Camarena.

"He hasn't been indicted yet. I hope he will. Then I will look for him."

Times staff writers Henry Weinstein in Los Angeles and Patrick McDonnell in San Diego contributed to this story.

39

1    PERHAPS REWORDED, TO EACH OF THE REMAINING JURORS?

2         (JUROR ENTERS CHAMBERS)

3         THE COURT:  COME IN, SIR.  MR. WOOD?

4         MR. WOOD:  RIGHT.  HAVE A SEAT, WON'T YOU, MR. WOOD?

5    WE ARE NOT GOING TO KEEP YOU LONG.

6         IT WAS REPORTED TO THE COURT YESTERDAY THAT THERE WAS

7    A NEWSPAPER IN THE JURY ROOM CONTAINING AN ARTICLE RELATING TO

8    THIS CASE.

9         MR. WOOD:  THERE HAS BEEN A NEWSPAPER IN THERE EVERY

10   DAY, YOUR HONOR.  I READ THE NEWSPAPER.  I READ THE BUSINESS

11   SECTION AND THE "VIEW" EVERY MORNING.  I BUY A PAPER BECAUSE

12   I'VE GOT A LOT OF STOCKS, AND THE ONLY WAY I CAN KEEP UP ON

13   THEM IS WHAT IS GOING ON IN THE NEWSPAPER.

14        I HAVE READ, YOU KNOW, THE PAPER, BUT THAT'S JUST

15   THE TWO SECTIONS I READ OUT OF IT EVERY DAY IS THE BUSINESS

16   SECTION AND "VIEW" SECTION.

17        THE COURT:  YOU PERSONALLY HAVE NOT READ ANYTHING

18   ABOUT THIS CASE?

19        MR. WOOD:   NO, NOT ON THE CAMARENA CASE.

20        THE COURT:  ARE YOU AWARE OF ANYONE ELSE HAVING DONE

21   SO?

22        MR. WOOD:  NOT THAT I KNOW OF.  IF I SEE IT, I JUST

23   GO ON TO THE NEXT PAGE.  IF YOU'RE LOOKING AT THE NEWSPAPER --

24   THERE IS ALWAYS SOMETHING IN THE NEWSPAPER -- YOU -- WHAT DID

25   YOU TELL US?  IF YOU SEE IT, JUST PASS IT.  THAT'S WHAT I DID.

LOS ANGELES TIMES

A20   SUNDAY, MAY 27, 1990  * *

# Mexico Reportedly to Seek Extradition of DEA Official

*From Associated Press*

MEXICO CITY—Mexico will seek the arrest and extradition of a Drug Enforcement Administration official for his role in the abduction of a Mexican physician facing trial in the death of a U.S. drug agent, according to news reports.

Mexico City newspapers reported Saturday that the attorney general's office will seek the extradition of DEA supervisor Hector Berrellez, for alleged involvement in the kidnaping of Dr. Humberto Alvarez Machain. The physician faces trial for alleged participation in the 1985 slaying of DEA agent Enrique Camarena.

Berrellez testified Friday at a federal hearing in Los Angeles that up to $50,000 was authorized for the capture of Alvarez. He said that DEA Deputy Director Pete Gruden knew of the plan.

The seizure of the doctor from his office has caused tension between the U.S. and Mexican governments. Mexico has demanded his return, saying his delivery to the United States violated Mexican sovereignty.

Alvarez, a Guadalajara gynecologist, was arrested April 3 after being taken to El Paso to face charges that he administered drugs to Camarena during the kidnaping, torture and murder of the drug agent and his pilot.

DEA spokesman Frank Shults in Washington denied that the government offered a reward for the people who captured Alvarez, saying the $50,000 payment was for "services." He said it could have covered such things as rental of the plane that flew Alvarez to El Paso.

Former Mexican police officer Antonio Garate Bustamante, who is wanted by the Mexican government, testified he paid $20,000 in DEA money to the people who captured Alvarez, and was continuing to pay their expenses.

Garate said he arranged for the doctor to be brought across the border with the approval of DEA officials. He said he found friends who would do the job without advance payment.

"I told them that no money would be provided up front, and they would have no assistance from the DEA," he said. "Whatever they were doing they were doing on their own."

The attorney general's office said Friday that it would present formal accusations against Berrellez and Garate in a Mexico City district court, according to news reports. After obtaining warrants, it will present the accusations to the Foreign Ministry to seek the official's extradition, the newspapers said.

Mexican officials call Garate the "connection" between DEA officials and the Mexicans who abducted Alvarez, the news reports said.

On April 28, the attorney general's office announced the arrest of six people for alleged involvement in Alvarez's capture.

President Carlos Salinas de Gortari said Friday that the abduction "does not help in the fight against drug smuggling."

Speaking in the northern state of Chihuahua, Salinas said that the U.S. and Mexican governments should conduct themselves with mutual respect.

Testimony at the trial of three other men in 1988 showed that Camarena was tortured and interrogated by drug lords. Prosecutors maintain Alvarez gave Camarena drugs to revive him for additional torture before his slaying.

The drug lords reportedly were angered because Camarena's undercover work had led U.S. and Mexican authorities to a desert marijuana plantation, where they seized 10,000 tons of the drug worth billions of dollars.

CASE NO. CR87-422(F)ER
USA
VS. Caro-Quintero
DEFENDANT'S EXHIBIT ___ LTT
DATE 7-5-90 ___ IDEN.
DATE ___ EVID.
BY ___
AO 386A   Deputy Clerk   (21)

E.

IIII

(3448)

A.I. 2507/85.
HOJA XXXIII.

- - - En la Ciudad de México, Distrito Federal, siendo las - -
nueve horas con treinta minutos del día día diez de abril de
mil novecientos ochenta y cinco, presente ante el Suscrito - -
Licenciado ERNESTO CASTILLO SANTILLANA, Agente del Ministe-
rio Público Federal, quién actúa con testigos de asistencia que
al final firman el C. JUAN HERNAN RAMIREZ a quién en este ac-
to se le exhorta para que se conduzca con verdad, en la presen
te diligencia haciéndole saber las penas en que incurren los -
que declaran con falsedad, por sus generales dice: ser de vein
ticinco años, casado, originario de la Ciudad de Guadalajara, -
Jalisco con domicilio en las calles de Josefa Ortiz de Domingu
ez 1969, Sector Libertad en esta Ciudad y protestado que es re
gir se conduce con verdad, sobre los hechos MANIFIESTA: - - -
DECLARACION: - - - - - - - - - - - - - - - - - - - - - - - -

- - - En este momento el Agente del Ministerio Público Federal,
le hace saber al dicente el derecho de nombrar a un defensor -
particular, persona de su confianza en los términos del - - -
artículo 128 del Código Federal de Procedimientos Penales que e
en este momento no ejerce el derecho de nombrarlo ante el Juez
que de la haya resuelto por lo que MANIFIESTA: - - - - - - - -

- - - Que teniendo conocimiento del motivo de su detención el d
la vez manifiesta que fué detenido en la Ciudad de Puerto Vall
ta Jalisco el día ocho de abril del año en curso aproximadamen
te a las 21.00 horas junto con otras 23 ó 24 personas de traba
jo en la casa y oficina del señor ERNESTO FONSECA, misma que se
encuentra ubicada frente al Hotel Posadilias Sheraton, de los -
ocupantes que fueron detenidos junto con el dicente y recuerda
é identifica a RAFAEL PEREZ AVELINO, persona que sabe era - - -
escolta o guardaespaldas del señor FONSECA, asimismo reconoce -
e identifica a JORGE GODOY quién también desempeña el puesto -
de escolta, chofer y guardaespaldas del señor ERNESTO FONSECA,
además reconoce a JOSE GONZALEZ PONCES, persona que recientemen
te había sido dado de baja de la Policía Judicial del Estado de
Jalisco y que probablemente había sido contratado para desempe
ñar el puesto de guardaespaldas, que el d... vez se dió cuenta
en la casa detenido que en la casa propiedad de su patrón - - -
había instalado, mucha lujo, es decir armas de grueso calibre -
de las que había aprendido por el Ejército, granada y varias fus

(3449)

armada sin poder precisar el número total en virtud de que
éstas se encontraban e. la recámara de su patron ERNESTO —
FONSECA y solamente las vio de pasada cuando subió hacer el
aseo de la habitación, asimismo pudo darse cuenta de que —
varios compañeros suyos portaban armas sin poder precisar-
su calibre, ya que las traían fajadas en la cintura y de —
entre las personas que portaban estas armas, no puede men-
cionar el nombre de todas ellas, ya que como lo manifestó-
con anterioridad sólo reconoce además de su patrón ERNESTO
FONSECA a tres personas más de los cuales ya mencionó sus —
nombres, de estas personas se dió cuenta que portaban armas
— de forma permanente RAMIRO PEREZ, JORGE GODOY, que el motivo
por el cual el dicente se encontraba en la casa de Puerto —
Vallarta Jalisco propiedad de su patron, se debe a que él—
presta sus servicios como mozo en diferentes casas, propie-
— dad de su patron señor ERNESTO FONSECA y que concretamente
él puede mencionar tres de estas residencias, a las cuales lo-
— cales llega a realizar oficios y que se encuentran ubicadas en la —
— Ciudad de Guadalajara Jalisco en los siguientes domicilios:
— una de ellas se encuentra ubicada en el Providencia-
Racket, Club estos conocido como Club Libañés, la segunda—
— casa se encuentra ubicada en la calle de Aztecas sin recor-
dar el número, pero para una mayor identificación se encuen
— tra enfrente de atras de lo Oateos MARGARITA, la tercera de
— ellas se ubica en la misma calle de Aztecas a dos cuadras de-
— la caseta de policía de colonia San Javier, que un fracciona-
— miento Residencial como me dijo anteriormente, se llama —
— Colinas de San Javier, que el dicente llegó a la Ciudad de—
— Puerto Vallarta Jalisco, el día cuatro de abril aproximadamente
— a las diez de la mañana junto con los otros, 22 ó 23 compañeros
— que lo acompañaban que llegaron por el declarante las nueve día
— aproximadamente a las cuatro de la mañana, que bien compañeros-
— de él, mismos que trabajan para ERNESTO FONSECA fungían por el-
— je de la voz y lo recogieron de una de las casas que tenía a su
— cargo con vigilancia, que es la que se encuentra ubicada en la
— calle de Aztecas, a un costado de la caseta de vigilancia; que —
— la cuatro de abril lo recogieron era conducida por RAMIRO—
— PEREZ AGUILAR; que, his vez, que se encontró dentro de la caja
— neta, RAMIRO PEREZ le comento que lo necesitaba su patrón ante-
referido. —— Para ello, para su trabajo. De su casa se trasladaron

#2 - DE LA A.P. 2567/85.
DECLARACION DE JUAN JOSE BERNAL RAMIREZ

-.-.- de la calle Vallarta, en donde se dió cuenta de que
en este mismo gasolinera se encontraba su patrón el señor
ERNESTO FONSECA, en un carro Gran Marquis de color obscuro
acompañado de otras personas de los cuales no pudo recono-
cer a ninguno ya que como lo ha manifestado únicamente cono-
cía a través de ellos, asimismo en la mencionada gasolinera -
se encontraba otros dos camionetas una de las cuales era de
la marca Ford Cuglin y otra Ford Carri-oll, y se percató de
que en el interior de las mismas se encontraba se dice se
percató de que en la camioneta Cuglin iban aproximadamente
cinco personas y que era conducida por una persona de la -
cual no sabe el nombre pero que al parecer es miembro de -
alguna Corporación Policiaca, en la camioneta Carri-olt iban
ocho gentes aproximadamente y que no pudo darse cuenta quién
era el conductor dado que esta se encontraba un poco alejada
de donde él estaba, asimismo pudo darse cuenta que en la
camioneta en la cual parece a recoger, al de la voz, iban en la
parte delantera dos armas de alto poder de las conocidas como
cuerno de chivo, que la razón que le dió RAMIRO PEREZ ARELLANO
cuando estaba del viaje de que se iban a regresaron más de -
vacaciones a Puerto Vallarta, pero que el de la voz desde un
principio y por razones que remitía hasta ovbio estaba -
enterado de por el motivo del viaje era para que se pudie-
conocer de la persecución policiaca su patrón ERNESTO FONSECA
y que al día es de su conocimiento de que todas las personas que
acompañaban a su patrón incluyéndose el de la voz iban para -
proteger la vida y la seguridad de su patrón ERNESTO FONSECA.

- - - Que, el motivo por el cual sabe que había una persecución
policiaca de diferentes Corporaciones, se debía a que su -
patrón ERNESTO FONSECA se dedica al cultivo, siembra, compra
venta y tráfico de estupefacientes, además de que por platica
que tenía entre sus compañeros de otro nivel se pudo dar -
cuenta de que su patrón estaba emiseriado y había participado
en alguna forma en el encuentro y muerte del Agente del DEA
CAMARENA y del piloto Mexicano de apellido ZAVALA, continua -
diciendo el de la voz que le anterior le consta en virtud de
que el día diez de marzo del presente año llegó al domicilio



3451

37

- - - que se encontraba cuidando el de la voz el señor ERNESTO FONSECA y el señor LEPE que dicho domicilio se encuentra en la calle de Aztecas a dos cuadras de la caseta de vigilancia. En el mencionado domicilio y mientras su patron el señor ERNESTO FONSECA subia a sus habitaciones el señor de Apellido Lepe le pregunto al de la voz que era lo que estaba leyendo, manifestandole que estaba leyendo el Informador de la Ciudad de Guadalajara, el asunto relativo a la muerte y desaparición aclara a la desaparición del agente del DEA, CAMARENA, contestandole él señor LEPE que toda eran puras jaladas, ya que él es el que lo había secuestrado junto con otros compañeros habiéndolo puesto a disposición de RAFAEL CARO QUINTERO, y habiéndoselo entregado a ésta persona personalmente. Asimismo le consta al de la voz que su patron ERNESTO FONSECA es adicto a las drogas, ya que los cigarrillos que fumaba éste eran de forma muy especial, ya que la punta se encontraba enroscada y antes de fumarselos los pasaba por encima de la llama del encendedor tomando esto cigarrillos el color cafe aproximadamente a la mitad de su tamaño - - -Que en relación a las personas que visitaban a su patron ERNESTO FONSECA, eran en su gran mayoria gente del rumbo de Sinaloa ya que el acento que tenian al habla y era propio de esta Región, asimismo el de la voz pudo darse cuenta de que en unas tres ocasiones RAFAEL CARO QUINTERO visito a su patron ignorando cual ó cuales eran los asuntos tratados, que el lugar donde se encontraron tanto su patron como RAFAEL CARO QUINTERO fué la casa ubicada en la calle de Aztecas, atrás de las Suites MARGARITA, qué los vehículos que utilizaron para trasladarse a Puerto Vallarta tres son propiedad de su patron y uno de ellos al que identifica como la camioneta Carri-olt de color café pertenece a una de las personas que fueron detenidas junto con el dicente y que vino de la Ciudad de Mexicali, Baja California. Que en este acto el de la voz desea manifestar que teniendo a la vista la declaración vertida ante la Policia Judicial Federal, con fecha nueve de abril del año en curso, y habiéndosele dado lectura a la misma la ratifica, en todas y cada una de sus partes por contener la verdad de los hechos y reconoce como suya la firma que aparece al calce y al margen -

3452

380.

AV. PREVIA No. 2567/85.
— 3 —

..de la misma por haber sido puesta de su puño y letra y -
ser la que utiliza tanto en sus asuntos públicos como priva-
dos; Que es todo lo que tiene que declarar previa lectura
de lo vertido lo ratifica firmando al calce y al margen PA
RA constancia. — — — — — — D A M O S   F E — — — — —

EL DECLARANTE                          EL AGTE. DEL MIN. PUB. FED.
JUAN BERNAL GUTIREZ.                    LIC. ERNESTO SANTILLANAS.

T. DE A.                                T. DE A.
MARIO ERASMO PEREZ LOPEZ.               ELODIA CRUZ OROZCO.





CASE NO. CR 87-422(?) ER

USA

VS. Caro-Quintero

DEFENDANT'S EXHIBIT D[illegible]

DATE 7-5-90 IDEN.

DATE ________ EVID.

BY ________ Deputy Clerk

AO 386A C Bernate

(5)

**United States**
**District Court**
**Central District of California**
OFFICE OF THE CLERK

*IIII-1*

Leonard A. Brosnan
Clerk

### COURT INTERPRETER SERVICES

### DECLARATION OF INTERPRETER

I, the undersigned, say:  I am a Spanish/English and English/Spanish Official Court Interpreter certified by the Administrative Office of the United States Courts and I have translated the attached document(s) from Spanish into English. I declare, under penalty of perjury, that to the best of my abilities and belief, this is a true and correct translation of the Spanish language text.

### SPECIFIC DESCRIPTION OF DOCUMENT(S)

*Preliminary Proceedings*
*File No. 2567/85*

Executed this *27th* day of *June*, 19*90*, at Los Angeles, California.

*Corinne I. Edelson*

Name of Interpreter (PRINT)

*Corinne I. Edelson*

Signature of Interpreter

Re:
Case No.:
Ordered by:
No. of pgs.:

U.S. COURTHOUSE, RM. G-8 • LOS ANGELES, CALIFORNIA 90012

Government
    Official
    Seal

Attorney General's
Office
    Of the
    Republic

Pr:   inary Proceedings

File No. 2567/85

- - - In the City of Mexico, Federal District, at 9:30
hours of the 20th day of April 1985, before the undersigned
Deputy Attorney General of the Federal Public Ministry,
assigned to this case for this proceedings, the attendant
witnesses are present and will sign this document upon
the conclusion of this preliminary proceedings, at the
bottom of the prosecution's witness' statement, as part
of the record.  Citizen Juan Bernabe Ramirez, who has been
exhorted to tell the truth in the matter now pending befpre
the court, and having been advised of the penalties that
are incurred by anyone who gives false statements under
affirmation to tell the truth, he states:  That he is 26
years of age, married, from the City of Guadalajara, Jalis-
co, his address is: Calle Josefa Ortiz de Dominguez No.
1969, Sector Libertad, in Guadalajara, and following his
affirmation to tell the truth regarding the facts of this
matter, he states:

ON THE RECORD------------------------------------------------

    At this time the Deputy for the Federal Public
Ministry, advises the witness of his right to designate an
attorney of his choise, or a person he trusts to represent
him, as provided in Article 128 of the Penal Code of
Federal Procedures. At this particular time the witness
reserves his right to designate an attorney before the
presiding judge, and as to the facts, he states:

    That he is cognizant of the reason for his detention,
he further indicates that he was detained in the City of
Puerto Vallarta, Jalisco, on the 8th day of April 1985,
at approximately 2400 hours along with 23 to 24 other

ind__duals who worked in the __use which is the pro-
perty of Mr. ERNESTO FONSECA, which is located in front
of the Bugambilias Sheraton,- among the others who were
also detained with him, the witness remembers and identifies
a RAMIRO PEREZ ARELLANO, whom he knows as an escort or
bodyguard for Mr. FONSECA, he likewise identifies a JORGE
GODOY, who also held a position as an escort, chauffeur,
or bodyguard with ERNESTO FONSECA; he also identifies a
GUADALUPE TORRES, who had recently been fired from the
State Judicial Police Force of Jalisco, and who was proba-
bly hired as a bodyguard too.  That he noticed prior to
his detention, that the house which was the property of
his boss, was full of "long weapons", meaning high caliber
weapons, the kind that is reserved for the army, navy and
air force, he was unable to give a precise figure in this
regard, due to the fact that these were kept in his em-
ployer ERNESTO FONSECA'S bedroom, and he only had occasion
to see them when he went upstairs to clean the room; he
also noticed that several of his co-workers carried weapons
but was unable to determine the caliber, because they
carried their weapon in its holster at their waist, he is
unable to recall all of their names, since as he stated
before, he only knows his boss, ERNESTO FONSECA, and about
three others whom he already named.  The individuals he
noticed were carrying weapons constantly, were RAMIRO
PEREZ AND JORGE GODOY, Further, that the witness was in
that house because he performs the cleaning duties of
several houses that belong to his boss, ERNESTO FONSECA,
that he can mention three of those houses, which his boss
called offices, and which are located in the City of

Gu[...] ajara, at the following [...]resses:  The first one
is located in the Providencia RAcket Club, formerly known
as the "Club Libanes"; the second one is on Calle Azteca,
the witness is unable to recall the number, however; for
better identification, this house is located exactly behind
the Margarita Suites; the third house is located on the
same street, two blocks away from the police booth, in
Colonias Don Javier, which is the residential area known as
Colinas de San Javier; That he had arrived to Puerto Vallar
ta on the 4th day of April, approximately at 10:00 a.m.
together with the other 23 or 24 co-workers who worked for
ERNESTO FONSECA, who had picked him up at around 4:00 a.m.,
that said co-workers picked him up at one of the houses in
which he worked as a night watchman, the house located on
Calle Aztecas; two blocks from the police booth,- That the
station wagon that picked him up was driven by RAMIRO PEREZ
ARELLANO and that once he was inside the station wagon,
RAMIRO PEREZ, told him that the boss, referring to FONSECA
wanted him for a job.  From that house they proceeded to a
gas station on Calle Vallarta, Where he saw that his boss,
ERNESTO FONSECA, was there in a GRAND MARQUIS, dark in
color, accompanied by other persons whom he does not know;
at that same gas station, two other station wagons were
parked, a Ford Station wagon and a Ford carry-all.  He then
saw that inside the station wagon, there were approximately
five people and that the person who was driving, the wit-
ness is unable to recall the name, appeared to be a member
of law enforcement; in the Ford carry-all saw approximately
eight people but he could not tell who was driving because
they were some distance away from him; he also noticed
that inside the station wagon he was picked up in, high

po\ weapons were being car\_\_\_ \_\_\_ the kind that is called
banana type magazine clip guns:  That the reason RAMIRO
PEREZ ARELLANO, gave him for this trip, was that they were
going to spend a few days vacation in Puerto Vallarta,
but that he, from the begining and for obvious reasons, was
certain that the real reason for the trip was so that
ERNESTO FONSECA, could hide from the police, and that he
was also conscious of the fact that all persons accompany-
ing his boss, himself included, were taken along to protect
the life and safety of his boss, ERNESTO FONSECA.

That the reason he knew the police of various law
enforcement agencies were after his boss, was in effect
due to the fact that ERNESTO FONSECA, was involved in the
harvesting, planting, buying, selling and trafficking of
drugs, aside from the fact that thru conversations held by
his co-workers, whom he overheard, he could make out that
was involved and had participated in some way in the kid-
napping and death of an agent of DEA - CAMARENA- and of a
Mexican pilot named ZAVALA.  He goes on to say that he
states all of the above based on what transpired on the
20th day of March 1985, FONSECA and Mr.LEPE, came to the
house he watched, located on Calle Aztecas, and that while
going up the stairs to his bedroom Mr. LEPE. asked him
what he was reading,- the witness replied that he was rea-
ding the newspaper "El informador de Guadalajara", about
the death and disappearance of the DEA agent CAMARENA, Mr.
LEPE, then told the witness that all of it was nothing but
sheer lies, that he had been the one who had kidnapped
CAMARENA, aided by others and that he had placed CAMARENA,
at the disposal of RAFAEL CARO QUINTERO,-That he personal-
ly turned him over to him.  He also states that he is

aware that his boss, ERNESTO FONSECA, is addicted to drugs.
That the cigarrettes he smoked were of a very special kind,
that the cigarrettes were all curled at the tip and before
smoking them, he would hold them up to a lighter and heat
them.- the cigarrettes were a brown color and are half the
size of the regular cigarrettes.

That with regard to the people who visited his boss,
ERNESTO FONSECA, the majority were people from the Sinaloa
area, he could tell because of their accent which is dis-
tinctly from that area; also, that on three occasions
RAFAEL CARO QUINTERO, visited his boss, but that he is
unaware of what or which matters were discussed; that the
place where his boss and CARO QUINTERO, would meet at, was
the house located on Calle Aztecas, behind the Margarita
Suites.- That the vehicles utilized to travel to Puerto
VALLARTA, three of which are the property of his boss; that
one of the station wagons, the brown carry-all, belonged to
to one of the individuals who was arrested along with the
rest of them, but that this person came from Mexicali, Baja
California.

That at this moment, he states:  That He has in front
of him the statement given by him to the Federal Judicial
Police Department on the 9th day of April 1985, and that
after having its contents been read, he ratifies teach each
of its parts and in its entirety as being true and correct
and recognizes the signature as being his own, as it appea
in the margin and at the bottom of his statement in this
document, indicating that this the signature he uses in al
his public and private matters, and that this all he has to
state.

Government
Official
Seal

Attorney General's
    Office
    of the
    Republic

Preliminary Proceedings
File No. 2567/85

After having the contents of this statement been

read, he ratifies same by placing his signature in the

margin of and at the bottom of this document on record.---

We hereby certify-------------------------------------------

| THE DEPONENT | DEPUTY ATTORNEY GENERAL |
| | FED. PUB. MINISTRY |
| JUAN BERNABE RAMIREZ | ERNESTO SANTILLANAS, ESQ. |
| Rubric | Rubric |

| ATTENDANT WITNESS | ATTENDANT WITNESS |
| MARIO ERASMO PEREZ LOPEZ | ELODIA CRUZ OROZCO |
| Rubric | Rubric |

POINTS AND AUTHORITIES

JURY MISCONDUCT

Federal Rules of Criminal Procedure, Rule 33, provides in pertinent part:

> "The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . And a motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, . . . . "

Newly discovered evidence which will support a motion for new trial need not go to the merits of the case. Motions founded upon after discovered evidence affecting the integrity of the jury's verdict has been treated as based upon newly discovered evidence within the meaning of the rule. Holmes v United States, 284 F2d 716, 720 (4th Cir. 1966), Rubenstein v. United States 222 F2d 638 (10th Cir.)

When it appears that a jury has received extra judicial information a presumption of prejudice is created, the Government then has the burden of rebutting said presumption. The presumption of prejudice can be rebutted only by a showing that the information the jury received was harmless. The Government has a heavy burden in establishing that no prejudice resulted from the jury's receipt of extrinsic material. United States v. Littlefield, 752 F2d 1429 (9th Cir. 1985).

7

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

1    With the respect to the procedure employed a District

2    Court must make findings of fact at two separate levels.   First,

3    the District Court must find the basic, or subsidiary, facts.

4    For example the nature, content, and extent of the extra judicial

5    contact.   Based on its findings of subsidiary facts, the District

6    Court must then make the ultimate factual determination, that is

7    whether the contact likely influenced jury impartiality.   United

8    States v. Vasquez, 597 F2d 192 (9th Cir. 1979).

9

10   The court must conduct an inquiry into the prejudicial

11   potential of the extraneous material on the average juror.

12   Therefore, objective facts become the focus of the inquiry.

13   Courts have considered relevant the following:   (1) Whether the

14   extrinsic material was actually received, and if so, how; (2) the

15   length of time it was available to the jury; (3) The extent to

16   which the jury discussed and considered it; (4) Whether the

17   extrinsic material was introduced before a verdict was reached,

18   and if so, at what point in the deliberations it was introduced;

19   and (5) any other matters which bear on the issues of the

20   reasonable possibility of whether the introduction of extrinsic

21   material affected the jury.   Bayramoglu v. Estelle 806 F2d 880,

22   887 (9th Cir. 1976).

23

24   The ABA minimum standards, following the case of Parker v.

25   Gladden (1966) 385 U.S. 363, 17 Law Ed 2d 420, provides that,

26   subject to the limitation against inquiry into jurors mental

27   processes, "A jurors testimony or affidavit shall be received

28   when it concerns (i) whether matters not in evidence came to the

8

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486  FAX (714) 964-1328

attention of one or more jurors, under circumstances which would
violate the defendant's Constitutional right to be confronted
with the witnesses against him; or (ii) any other misconduct for
which the jurisdiction permits jurors to impeach their verdict."

Of all the areas of juror misconduct the area which most
directly impacts upon defendant Bernabe-Ramirez is the fact that
some of the jurors were reading newspaper articles concerning
current events surrounding the case. More specifically these
jurors were aware, early on in the case, that Agent Berrellez,
was subject to arrest by Mexican law enforcement. This
information could only have been obtained through media accounts.
In addition, the media had portrayed Agent Berrellez as a hero.
In fact, Agent Berrellez' public stature as a hero and concern
for his safety was adopted by these jurors to the extent every
time Agent Berrellez failed to appear in court these jurors
worried that he had been abducted by Mexican law enforcement. In
the jurors' mind Agent Berrellez was not only a heroic but a
sympathetic figure, who, as the focal witness against defendant,
possessed extra-ordinary, if not unassailable credibility. The
defense was certainly unaware of Agent Berrellez' elevated status
and, therefore, had no opportunity to overcome his media enhanced
credibility. In effect, whatever Agent Berrellez told the jury
they would believe. Any defense effort to the contrary, was
pre-empted. Had the jurors followed the court's admonition to
refrain from media coverage of the case the defendants attack on
Agent Berrellez' credibility and Leyenda tactics would have been
heard by unprejudiced minds.

9

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

Defendant's_Mexican_Confession,_Defense_Exhibit_IIII

Denial of evidence favorable to the defendant which results in prejudice to the defendant is a proper subject of a motion for a new trial. Wynn_v._United_States 395 F2d 621 (D.C. Cir. 1967). Defendant's Exhibit marked for identification as "IIII" was sought to be introduced by defendant, through his direct testimony at trial. Defendant's IIII is a statement (hereinafter referred to as defendant's Mexican declaration) given to the Mexican law enforcement authorities who arrested defendant in April of 1985. Said statement among other things acknowledges that defendant worked for Ernesto Fonseca as a bodyguard, knew that Fonseca was involved in narcotics activity, identified various properties owned by Fonseca, and acknowledged that he accompanied Fonseca to Puerto Vallarta as a result of Fonseca's involvement in agent Camarena's abduction and homicide.

The prosecution, in its case in chief, sought to establish through agent Berrellez that defendant had deceived the arresting Mexican authorities, and thereby gained his freedom, by posing as a "mere servant." In fact, Agent Berrellez testified that defendant had lied to his Mexican interrogators by denying knowledge of Fonseca's narcotics activity, that Fonseca was involved in the Camarena matter, that he provided addresses to Fonseca's properties, or that he was a bodyguard. During cross examination defendant attempted to establish that Agent Berrellez was familiar with defendant's Mexican declaration and, therefore, was aware that defendant's statements concerning being a "mere servant" were in fact false. The trial court denied defendant's

attempts to introduce defendant's Mexican declaration through Agent Berrellez' testimony.

Defendant then attempted during his case in chief to introduce his Mexican declaration through the introduction of the actual statement, to wit: Defendant's Exhibit IIII. Defendant testified and laid a proper foundation for said exhibit. However, when defendant sought the admission of Exhibit IIII said admission was denied on the basis that the court had previously ruled on the matter during Agent Berrellez' testimony.

The reasons which might have supported the denial of further inquiry during the Government's case in chief were inapplicable in seeking the admission of said evidence during defendant's case in chief.

The defendant's Mexican declaration is admissible under any one of three theories pursuant to Federal Rules of Evidence, either Rule 801(d)(B), or Rule 803(24), or Rule 106.

Generally speaking, a witness cannot be corroborated on direct or redirect examination or rebuttal by proof of prior statements consistent with his in court testimony. However, under certain circumstances the probative value of a prior consistent statement clearly warrants introduction. Rule 801(d)(1)(B) provides that a prior consistent statement of a declarant testifying at trial subject to cross examination concerning the statement is admissible when offered to "rebut an

11

express or implied charge against him of recent fabrication, improper influence or motive." See Breneman v. Kennecott Corp 799 F2d 470, at 473 (9th Cir. 1986). Thus to rebut an express or implied charge that the witness is motivated or has been influenced to testify falsely or that his testimony is a recent fabrication, evidence is admissible that he told the same story before the motive or influence came into existence or before the time of the alleged fabrication. United States v. Feldman, 711 F2d 758 at 766 (7th Cir. 1983). The prior consistent statement is defined as not hearsay, and thus is admitted as substantive evidence. See Advisory Committee's Note to Rule 801(d)(1)(B). See also United States v. Quinto, 582 F2d 224 (2nd Cir. 1978), and United States v. Herring, 582 F2d 535 (10th Cir. 1978).

Rule 803 (24) provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness;

(24) Other exceptions. Statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

12

of justice will best be served by admission of the statement into evidence. However, the statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

In the present case it was the Government who provided defendant's Mexican declaration several months prior to trial. It was Agent Berrellez who testified that when he in his undercover capacity, interviewed defendant in July of 1989, he was familiar with defendant's Mexican declaration.

Defendant's Mexican declaration was evidence of a material fact, namely, that he had not portrayed himself as a "mere servant" to the Mexican authorities. The evidence in the Mexican declaration is clearly probative on the issue of whether defendant portrayed himself as a "mere servant" to the Mexican authorities. The interests of justice would be served by the admission of defendant's Mexican declaration to the extent that the Government portrayed to the jury that defendant lied in his representations to the Mexican authorities. The Government knew all the while that defendant had never portrayed himself to the Mexican authorities as a "mere servant."

13

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486  FAX (714) 964-1328

BRIDGMAN, MORDKIN, GOULD, AND SHAPIRO, INC.
17050 BUSHARD STREET, SUITE 200, FOUNTAIN VALLEY, CA 92708
(714) 963-5486   FAX (714) 964-1328

Lastly, Rule_106 provides:

> "When a writing or recorded statement
> or part thereof is introduced by a party,
> an adverse party may require the
> introduction at the time of any other
> part or any other writing or recorded
> statement which ought in fairness be
> considered contemporaneously with it."

The rule recognizes that misleading impressions can be created by taking matters out of context. The Government in its case in chief attempted to portray defendant's statement to Mexican enforcement as a lie, namely, that defendant secured his freedom from Mexican law enforcement because he portrayed himself as a "mere servant." The Government further contended that defendant was attempting to pull the wool over the eyes of this jury in the same manner as he successfully pulled it over the eyes of the Mexican authorities. It is clear that Agent Berrellez was fully aware of defendant's Mexican declaration and that in fact defendant did not attempt to deceive Mexican law enforcement but rather gave an accurate view, consistent with his testimony at trial, of his association with Ernesto Fonseca. In disallowing the admission of defendant's Mexican declaration the jury was left only with the Government's version of the facts, namely, that defendant had lied to the Mexican authorities concerning his involvement with Fonseca and was deceiving the jury just as he had the Mexican authorities.

14

CONCLUSION

Therefore, for the above-stated reasons defendant respectfully requests that this court grant his motion for a new trial.

DATED:  August 24, 1990

Respectfully submitted

BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.

BY: _____
MICHAEL S. MEZA and MARY KELLY
Attorneys for Defendant Bernabe-Ramirez

15