IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - - - -

*FILED*

*SEP 25 2 3 AM '90*

# Title 28
# Copy

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| PLAINTIFF, | ) |
| VS. | ) CASE NO:  CR 87-422(F)-ER |
| JUAN RAMON MATTA-BALLESTEROS, DEL POZO, RUBEN ZUNO-ARCE, JUAN JOSE BERNABE-RAMIREZ, AND JAVIER VASQUEZ-VELASCO, | ) |
| DEFENDANTS. | ) VOLUME 6 |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, MAY 23, 1990

LOS ANGELES, CALIFORNIA

JULIE CHURCHILL, CSR
SUSAN A. LEE, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 626-6353
(213) 617-8227

*ENTERED ON COURTRAN*

*SEP 2 5 1990*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF:

        GARY A. FEESS,
        UNITED STATES ATTORNEY
        BY:  MANUEL A. MEDRANO
            JOHN L. CARLTON
        ASSISTANT U.S. ATTORNEYS
        1200 UNITED STATES COURTHOUSE
        312 NORTH SPRING STREET
        LOS ANGELES, CALIFORNIA  90012
        (213) 894-0619/894-6682

    FOR DEFENDANT JUAN RAMON MATTA-BALLESTEROS DEL POZO:

        MARTIN R. STOLAR
        MICHAEL J. BURNS, ESQ.
        ADOLFO Z. AGUILAR, ESQ.
        ATTORNEYS AT LAW
        351 NORTH BROADWAY, 4TH FLOOR
        NEW YORK, NEW YORK  10013
        (212) 219-1919; (213) 855-8888 EXT. 314

    FOR DEFENDANT RUBEN ZUNO-ARCE:

        MITCHELL, SILBERBERG & KNUPP
        BY:  EDWARD M. MEDVENE, ESQ.
            DONALD DI NICOLA, ESQ.
            JAMES BLANCARTE, ESQ.
        11377 WEST OLYMPIC BOULEVARD
        LOS ANGELES, CALIFORNIA  90064-1683
        (213) 312-3150

    FOR DEFENDANT JUAN JOSE BERNABE-RAMIREZ:

        MARY KELLY
        ATTORNEY AT LAW
        827 MORAGA DRIVE
        BEL AIR, CALIFORNIA   90049
        (213) 472-7121
            AND
        BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.
        BY:  MICHAEL S. MEZA, ESQ.
        17050 BUSHARD STREET, STE. 200
        FOUNTAIN VALLEY, CALIFORNIA  92708
        (714) 898-0461; (213) 924-6606

APPEARANCES (CONTINUED):

          FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

                    FEDERAL LITIGATORS GROUP
                    BY:  GREGORY NICOLAYSEN, ESQ.
                    8530 WILSHIRE BOULEVARD, STE. 404
                    BEVERLY HILLS, CALIFORNIA 90211
                    (213) 854-5135

ALSO PRESENT:

                    DOUGLAS KUEHL, SPEC.AGT., D.E.A.

                    SPANISH INTERPRETERS

6-4

1       LOS ANGELES + CALIFORNIA    WEDNESDAY, MAY 23, 1990

2                    + 9:30 A.M.

3

4       (JURY NOT PRESENT.)

5       THE COURT:  I WANT TO MAKE RULINGS ON THESE MOTIONS

6  THAT YOU RAISED AT THE CLOSE OF YESTERDAY'S SESSION.

7       I NOTE THE GOVERNMENT HAS NOT FILED ANY OPPOSITION TO

8  THIS MOTION.  IN THE FUTURE, I WANT YOU TO FILE SOMETHING ON

9  THESE MOTIONS.  THERE IS NO REASON WHY WE HAVE TO DO YOUR WORK

10  FOR YOU.

11       MR. MEDRANO:  WE APOLOGIZE FOR THAT, YOUR HONOR.

12       THE COURT:  THAT IS GROUNDS FOR GRANTING THE MOTION

13  IN AND OF ITSELF.

14       MR. MEDRANO:  WE AGREE, YOUR HONOR.  IT WAS AN

15  OVERSIGHT.  IT WILL NOT HAPPEN AGAIN.  INVARIABLY WE TRY ALWAYS

16  TO FILE AND PREPARE OPPOSITIONS AS SOON AS POSSIBLE.

17       THE COURT:  ALL RIGHT.  NOW, I'VE GIVEN DUE

18  CONSIDERATION TO THIS MOTION, DEFENDANT MATTA'S MOTION IN

19  LIMINE TO EXCLUDE CERTAIN EVIDENCE.  AND THE COURT HAS

20  CONCLUDED THAT EVIDENCE OF THE FOLLOWING THINGS ARE ADMISSIBLE

21  IN THIS CASE.

22       THE EVIDENCE OF THE MURDER OF WALKER, THE MURDER OF

23  RADELAT, THE KIDNAPPING AND MURDER OF ZAVALA, THE SHOOTING OF

24  THE CONFIDENTIAL INFORMANT ON SEPTEMBER 30TH -- THAT IS THIS

25  WITNESS -- AND THE MACHINE GUNNING OF THE D.E.A. AGENT'S CAR.

1          RULING 404(B) PROHIBITS THE USE OF AN INDIVIDUAL'S

2    PRIOR ACTS AS A MEANS TO ESTABLISH THAT INDIVIDUAL'S CHARACTER

3    IN ORDER TO SHOW SUBSEQUENT ACTION AND CONFORMITY THEREWITH.

4    I'M NOT SURE THAT THAT IS WHAT WE HAVE HERE AT ALL.

5          THE GOVERNMENT HAS INDICATED IT DOES NOT SEEK TO

6    INTRODUCE THE BAD ACTS OF OTHERS TO ESTABLISH THE CHARACTER OF

7    THE DEFENDANT.  THE COURT DOES NOT SEE HOW THE BAD ACTS OF

8    OTHER PERSONS CAN ESTABLISH THE BAD CHARACTER OF THE DEFENDANT.

9          THIS EVIDENCE IS ADMISSIBLE UNDER AT LEAST THREE

10   THEORIES.  FIRST, IT IS ADMISSIBLE TO PROVE THE EXISTENCE OF AN

11   ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY; NAMELY, THE

12   OPERATION OF A NARCOTICS CARTEL.  THE INDICTMENT NEED NOT

13   ALLEGE ALL THE ACTS OF RACKETEERING ACTIVITY SOUGHT TO BE

14   PROVED AT TRIAL.

15         FURTHER, THE ACTS TO WHICH THIS WITNESS IS LIKELY TO

16   TESTIFY ARE ALLEGED IN THE GENERAL ALLEGATIONS OF THE

17   INDICTMENT.

18         SECOND, THIS ACTIVITY IS ADMISSIBLE TO PROVE THE

19   MOTIVE OR INTENT ELEMENTS OF THE OFFENSES CHARGED AGAINST THE

20   DEFENDANT.  SECTION 1959 REQUIRES THAT THE ALLEGED VIOLENT ACT

21   BE TAKEN TO GAIN ENTRANCE TO OR FURTHER ONE'S POSITION IN THE

22   ENTERPRISE.

23         THE EVIDENCE SOUGHT TO BE PRODUCED IS RELEVANT TO

24   ESTABLISH THAT THE ENTERPRISE WAS ENGAGED IN A CAMPAIGN TO

25   RETALIATE AGAINST THE D.E.A.  THE CAMPAIGN IS RELEVANT TO

6-6

1    ESTABLISH THE REQUISITE MOTIVES OF THE DEFENDANTS IN

2    UNDERTAKING THE ALLEGED VIOLENT ACTS.

3         THE DEFENDANTS ARE ALSO CHARGED WITH KIDNAP AND

4    INTERROGATION OF A FEDERAL AGENT ON ACCOUNT OF HIS OFFICIAL

5    DUTIES.  AGAIN, THE ENTERPRISE CAMPAIGN IS RELEVANT TO

6    ESTABLISH THAT THE DEFENDANTS WERE MOTIVATED TO KIDNAP CAMARENA

7    ON ACCOUNT OF CAMARENA'S ACTIVITIES BEING ANTAGONISTIC TO THE

8    ENTERPRISE.

9         FINALLY, THE COURT VIEWS THIS EVIDENCE AS ADMISSIBLE

10   TO ESTABLISH A SCHEME OR PLAN, WHICH IS ALLEGED IN THE

11   INDICTMENT.  THE COURT DOES NOT FIND THAT THE PROBATIVE VALUE

12   OF THIS EVIDENCE WOULD BE OUTWEIGHED BY ITS PREJUDICIAL IMPACT.

13   SO IT IS THE COURT'S VIEW THAT THIS EVIDENCE SHOULD BE

14   ADMITTED.

15        NOW, WITH RESPECT TO -- THIS MOTION CONTAINED A

16   MOTION TO EXCLUDE FOR MR. MATTA EVIDENCE OF BERNABE'S ACCESSORY

17   AFTER THE FACT WITH RESPECT TO CARO'S EXIT FROM GUADALAJARA,

18   ARREST OF CARO IN COSTA RICA, THE CRIMES DISCUSSED AND PLANNED

19   BY BERNABE IN JULY OF 1989.  I'M NOT SURE WHAT ALL THIS REFERS

20   TO, BUT MR. BERNABE IS THE ONLY PERSON CHARGED WITH THE CRIME

21   OF ACCESSORY AFTER THE FACT.  ANY EVIDENCE THAT WOULD BE

22   PRESENTED TO ESTABLISH THAT CHARGE COULD NOT -- WOULD BE

23   LIMITED, WOULD IT NOT, TO THE DEFENDANT WHO IS CHARGED WITH

24   BEING AN ACCESSORY AFTER THE FACT?

25        MR. CARLTON:  THAT'S ABSOLUTELY CORRECT, YOUR HONOR,

6-7

1   YES.

2           THE COURT:  AND WOULD BE LIMITED TO THAT COUNT,

3   RIGHT?

4           MR. CARLTON:  THAT IS CORRECT.

5           THE COURT:  NOW, COUNT TEN IN THIS INDICTMENT DOES

6   NOT CHARGE ANY OF THESE DEFENDANTS, SO I ASSUME WE ARE NOT

7   GOING TO HEAR ANY EVIDENCE ON THAT, ARE WE?

8           MR. CARLTON:  THAT'S ALSO CORRECT.

9           THE COURT:  WHAT ABOUT THE ARREST OF CARO IN COSTA

10  RICA?  ARE YOU GOING TO GO THROUGH ALL OF THAT IN THIS TRIAL?

11          MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

12          (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

13          MR. MEDRANO:  YOUR HONOR, IT'S OUR INTENT TO PRESENT

14  A VERY ABBREVIATED PRESENTATION OF CARO'S ARREST IN COSTA RICA,

15  JUST TO PLAY OUT THE CHRONOLOGY IN TERMS OF HIS ATTENDANCE IN

16  GUADALAJARA, HIS FLIGHT AT THE AIRPORT, AND ULTIMATE ARREST IN

17  COSTA RICA.

18          THE COURT:  IF THE DEFENDANT HERE IS CHARGED WITH

19  BEING AN ACCESSORY AFTER THE FACT ASSISTING IN THE ESCAPE, IT

20  SEEMS TO ME THAT THE THE EVIDENCE THAT IS MATERIAL TO THE

21  CHARGE.

22          MR. MEDRANO:  THAT IS CORRECT, YOUR HONOR, AND UNLIKE

23  THE FIRST TRIAL WHERE ONE OF THE DEFENDANTS ACTUALLY HELPED

24  TAKE CARO TO COSTA RICA, WE'LL NOT PRESENT THAT FULL-BLOWN

25  EVIDENCE, BUT IN A MORE ABBREVIATED FORM.  BUT IT WILL COME IN

6-8

1   FOR THAT REASON.

2           THE COURT:   THAT, OF COURSE, WILL BE ONLY AS TO THAT

3   DEFENDANT.

4           MR. CARLTON:   YOUR HONOR, ONE ADDITIONAL POINT.

5   THERE WAS SOME JEWELRY, SOME IDENTIFYING JEWELRY FOUND WITH

6   CARO IN COSTA RICA THAT HAS SOME RELEVANCE TO THE BALANCES OF

7   THE CASE.   BUT IT IS BASICALLY JUST THE FACT OF THE JEWELRY

8   THAT WOULD HAVE RELEVANCE TO TESTIMONY BY OTHER WITNESSES -- OR

9   ONE WITNESS, I SHOULD SAY.   IT RELATES TO THAT WITNESS.

10          THE COURT:   WHAT DOES THAT HAVE TO DO WITH THE CASE?

11  SOME JEWELRY WAS SEIZED?   SOME JEWELRY BELONGING TO CARO

12  QUINTERO WAS SEIZED AFTER HIS ARREST?

13          MR. CARLTON:   YES.   YES, IT WAS, YOUR HONOR.

14          THE COURT:   WHAT DOES THAT HAVE TO DO WITH THIS CASE?

15  HAS ALREADY BEEN DESCRIBED AS WEARING JEWELRY AND SO FORTH.

16          MR. CARLTON:   WELL, IT IS A PARTICULAR PIECE OF

17  JEWELRY AND THE PARTICULAR DESCRIPTION OF THE JEWELRY WILL HAVE

18  BEARING ON THE CREDIBILITY OF ANOTHER WITNESS, YOUR HONOR.

19          THE COURT:   WELL, ALL RIGHT.   IF THERE IS ANY

20  OBJECTION TO IT, IT MAY BY MADE AT THAT TIME.

21          NOW, THIS MORNING THE COUNSEL FOR JAVIER VASQUEZ

22  FILED A MOTION RELATING TO THE TESTIMONY OF DR. FELIPE RADELAT.

23  HAVE YOU SEEN IT?

24          MR. MEDRANO:   WE JUST GOT IT THIS MORNING.   YES.

25          THE COURT:   HE STATES IN HERE THAT CERTAIN DENTAL

6-9

1    TESTS AND EXAMINATIONS WERE MADE AND THEY HAVE NOT BEEN

2    PROVIDED; IS THAT CORRECT?

3              MR. MEDRANO:  I HAD JUST ADVISED MR. NICOLAYSEN, YOUR

4    HONOR, THAT DR. RADELAT, WHO IDENTIFIES THE REMAINS OF HIS SON

5    IN THE GUADALAJARA MORGUE AFTER THE DISCOVERY OF THE BODIES,

6    MADE A CURSORY IDENTIFICATION.  HE GENERATED NO WRITTEN

7    REPORTS, YOUR HONOR.  I DON'T HAVE ANY.  I'M NOT AWARE OF ANY.

8    IF I DID, I WOULD HAVE GIVEN IT TO MR. NICOLAYSEN.

9              THE COURT:  WAS HIS IDENTIFICATION BASED ON A DENTAL

10   EXAMINATION?

11             MR. MEDRANO:  THAT'S A PART OF THE I.D.   THE OTHER

12   PART OF THE I.D. IS OTHER INJURIES, CHILDHOOD TYPE INJURIES

13   THAT HIS SON HAD SUFFERED.  AND HE'S GOING TO BE ABLE TO SAY

14   THAT THOSE INJURIES WERE ON THE REMAINS THAT HE IDENTIFIED.  WE

15   HAVE NO REPORTS.

16             THE COURT:  THERE ARE NO REPORTS THAT HE PREPARED?

17             MR. MEDRANO:  I'M NOT AWARE OF ANY, YOUR HONOR, NO.

18             MR. NICOLAYSEN:  WELL, YOUR HONOR, AS THE COURT

19   KNOWS, THE STATUTE ALSO COVERS TEST RESULTS, NOT SIMPLY

20   REPORTS.

21             MR. MEDRANO:  THERE ARE NO TESTS RESULTS EITHER, MR.

22   NICOLAYSEN.

23             MR. NICOLAYSEN:  I FIND THAT SOMEWHAT INCONCEIVABLE

24   THAT IF THERE IS GOING TO BE EXPERT TESTIMONY ABOUT DENTAL

25   ANALYSIS --

6-10

1    THE COURT:  COUNSEL, THIS IS NOT A PERSON WHO IS AN

2    EXPERT, IT'S A FATHER OF THE DECEASED.

3    MR. NICOLAYSEN:  I WOULD SUBMIT THERE HAS TO BE

4    EXPERT QUALIFICATIONS TO TESTIFY ABOUT A TYPE OF EXAMINATION

5    THAT REQUIRES EXPERT CREDENTIALS.

6    THE COURT:  IT DEPENDS ON WHAT OPINION IS SOLICITED.

7    IF IT REQUIRES AN EXPERT OPINION.  IF THE WITNESS

8    SIMPLY TESTIFIES TO THINGS THAT HE OBSERVED THAT HE KNOWS

9    ABOUT, I'M NOT CERTAIN THAT THAT WOULD REQUIRE AN EXPERT

10   OPINION.

11   MR. NICOLAYSEN:  MY OBJECTION IN THE MOTION IS

12   LIMITED TO THE TESTIMONY THAT WOULD PERTAIN TO DENTAL

13   EXAMINATIONS, NOT TO HIS PERSONAL KNOWLEDGE.

14   THE COURT:  GIVEN THE FACT THAT THERE ARE NO REPORTS,

15   THE GOVERNMENT STATES THAT I HAVE TO DENY THIS MOTION.  THERE

16   IS NOTHING TO BE GIVEN TO YOU OR NOTHING HAS BEEN WITHHELD FROM

17   YOU.

18   MR. NICOLAYSEN:  VERY WELL.  I WILL RESERVE MY

19   OBJECTION UNTIL THE TIME OF TESTIMONY AS TO FOUNDATION, YOUR

20   HONOR.

21   THE COURT:  YES.  ALL RIGHT.  NOW, YOU ALSO FILED A

22   MOTION REGARDING EVIDENCE OF PERSONAL OR FAMILY HISTORY.  IS

23   THIS SOMETHING THAT IS GOING TO BE REFERRED TO IN THIS CASE BY

24   ANY WITNESS?

25   MR. MEDRANO:  I'M SORRY, YOUR HONOR.  I'M TRYING TO

6-11

1    FIND THAT MOTION BY MR. NICOLAYSEN AT THIS TIME.  WE RECEIVED

2    THAT THIS MORNING AT COUNSEL TABLE AS WELL.

3            THE COURT:  ACCORDING TO THE MOTION, IT REGARDS THE

4    NICKNAME OF THE VASQUEZ VELASCO FAMILY, QUOTE:  "TIERRA LIBRE",

5    END QUOTE.  COUNSEL SAID THAT SHOULD BE EXCLUDED.

6            ARE YOU INTENDING TO MAKE ANY REFERENCE OR IS ANY

7    WITNESS INTENDING TO MAKE ANY REFERENCE TO THAT IN CONNECTION

8    WITH PRESENTING EVIDENCE AGAINST THIS DEFENDANT?

9            MR. MEDRANO:  THERE WILL BE, YOUR HONOR.  AND LET ME

10   STATE THE GROUND WHY IT SHOULD BE ADMISSIBLE.  FIRST OF ALL, IN

11   DISCOVERY WEEKS AND WEEKS BEFORE THE COMMENCEMENT OF TRIAL,

12   MR. NICOLAYSEN WAS AWARE THAT THAT NICKNAME EXISTED FOR HIS

13   CLIENT'S FAMILY, YET WE GET THIS MOTION ON TODAY.  2

14           SECOND OF ALL, YOUR HONOR, THERE ARE AT LEAST TWO

15   WITNESSES WHO KNOW THIS FAMILY OF BROTHERS OF WHICH DEFENDANT

16   JAVIER VASQUEZ IS A MEMBER.  THEY ARE REFERRED TO -- BESIDES BY

17   THEIR LAST NAME VASQUEZ -- BUT ALSO AS THE TIERRA LIBRE

18   BROTHERS.

19           THAT DOES NOT CARRY -- UNLIKE MR. NICOLAYSEN'S

20   PROPOSITION IN HIS PAPERS, YOUR HONOR, ANY SUGGESTION OR NOTION

21   OF CRIMINALITY.

22           ON THE OTHER HAND -- RATHER, ALL IT SUGGESTS IS THAT

23   IT IS A WAY OF IDENTIFYING THE BROTHERS, BECAUSE THEY WERE

24   ALWAYS TRAVELING AROUND IN A PACK OR TOGETHER, YOUR HONOR.  AND

25   THAT FACT IS VERY SIGNIFICANT AS PART OF OUR PROOF, BECAUSE

6-12

1   THESE BROTHERS TRAVELED TOGETHER.  AND JAVIER VASQUEZ, ONE OF

2   THE DEFENDANTS, WAS ALWAYS IN THAT PACK OF BROTHERS.

3        BUT IT CARRIES NO SUGGESTION OR NOTION OF

4   CRIMINALITY.  AT CLOSING ARGUMENT, WE'LL NOT SUGGEST THAT AT

5   ALL, BUT IT'S A WAY FOR OUR TWO WITNESSES, FOR THE BASIS OF THE

6   GOVERNMENT'S CASE AS TO THE RADELAT WALKER MURDERS, TO BE ABLE

7   TO IDENTIFY WHO THESE BROTHERS ARE.

8        SO, THEY'VE USED HTE NAME VASQUEZ AND TIERRA LIBRA

9   BROTHERS INTERCHANGEABLY, AS YOU WILL SEE FROM THEIR TESTIMONY

10  AT TRIAL.

11       FINALLY, YOUR HONOR, JUST SO YOU'LL KNOW, TIERRA

12  LIBRA, LITERALLY TRANSLATED, MEANS FREE LANDS -- OR PERHAPS THE

13  COURT INTERPRETERS HERE CAN GIVE ME A BETTER --

14       THE COURT:  WELL, THAT'S MY INTERPRETATION.

15       MR. MEDRANO:  IT JUST MEANS FREE LAND, YOUR HONOR.

16  IT DOESN'T SAY THUGS OR MURDERERS OR ANYTHING ABSURD; IT JUST

17  MEANS FREE LAND.  SO THAT DOES NOT SUGGEST ANY PREJUDICIAL

18  NOMENCLATURE ATTACHED TO IT, YOUR HONOR.

19       MR. NICOLAYSEN:  YOUR HONOR, I THINK THE BOTTOM LINE

20  HERE IS THAT WHAT MAY SEEM AS A BENIGN NICKNAME IN ONE CONTEXT

21  BECOMES A HIGHLY INCRIMINATING AND EVEN SINISTER NICKNAME IN

22  THE CONTEXT OF THIS PROSECUTION.

23       IT DOES MEAN FREE LAND.  IT WAS A NICKNAME GIVEN TO

24  THE ELDEST BROTHER SOMETIME AOG, BUT IN THE FRAMEWORK OF THIS

25  CASE, IT IS GOING TO BE ATTRIBUTED TO MY CLIENT FOR THE PURPOSE

6-13

1   OF IMPLYING --

2          THE COURT:  WHY IS IT SO SINISTER IF IT IS ATTRIBUTED

3   TO YOUR CLIENT THAT THE FAMILY WAS KNOWN AS TIERRA LIBRES?

4          MR. NICOLAYSEN:  FIRST OF ALL, THE MOST IMPORTANT

5   INCRIMINATING ASPECT OF IT IS THE TRIAL WILL SHOW THIS --

6   WHETHER IT COMES OUT IN THE GOVERNMENT'S CASE, OR IF HAS TO

7   COME OUT IN THE DEFENSE, DEPENDING ON YOUR RULING TODAY -- THAT

8   NAME WAS CREATED FOR ONE BROTHER, NOT FOR MY CLIENT.

9          AND THAT ONE BROTHER WAS KNOWN FOR HIS ACTIVE

10  CRIMINAL BEHAVIOR, SO THE NAME TIERRA LIBRE BECAME ASSOCIATED

11  WITH THE CRIMINAL BEHAVIOR AND REPUTATION OF THAT BROTHER.

12  THERE IS NO QUESTION THAT THAT NAME CARRIES A CRIMINAL

13  CONNOTATION.  AND I'M CONCERNED BECAUSE THERE IS NO PROBATIVE

14  NEED.

15         THE COURT:  YOU THINK IT CARRIES A CRIMINAL

16  CONNOTATION TO THE JURY?

17         MR. NICOLAYSEN:  IT DEPENDS ON HOW THE GOVERNMENT

18  PRESENTS IT, BUT I DON'T THINK WE CAN AVOID IT.

19         THE COURT:  HERE IS THE WAY WE'LL HANDLE THIS.  A

20  DEFENDANT SHOULD NOT BE CONTAMINATED BY REFERENCE TO HIS

21  FAMILY'S REPUTATION.

22         IF THIS EVIDENCE HAS SOME SPECIFIC PURPOSE OF

23  IDENTIFICATION OR SOMETHING THAT PARTICULARLY RELATES TO THIS

24  DEFENDANT, IT WOULD BE PERMISSIBLE.  OTHERWISE, IT SHOULD NOT

25  BE REFERRED TO.

6-14

1          MR. MEDRANO:  I AGREE, YOUR HONOR.  IT WILL NOT BE

2    PRESENTED OTHER THAN FOR PURPOSES OF IDENTIFICATION.  THAT'S

3    OUR INTENT.

4          MR. NICOLAYSEN:   YOUR HONOR, THEN I WOULD ASK AT

5    THIS TIME THAT THE COURT GIVE THE JURY EITHER THE ADMONISHMENT

6    OR LIMITING INSTRUCTION SO THE JURY DOES NOT MISAPPLY THE

7    REFERENCE TO THAT NAME.

8          THE COURT:  YOU ASKED, YOU PREPARE IT AND I'LL

9    CONSIDER IT, BECAUSE I CAN'T CONCEIVE OF WHAT I WOULD TELL THE

10   JURY ABOUT THIS.  I THINK IT'S MUCH ADO ABOUT NOTHING.

11         MR. NICOLAYSEN:  IF IT IS MUCH ADO ABOUT NOTHING, I

12   WOULD SUGGEST WE ERR ON THE SIDE OF SAFETY AND EXCLUDE IT ALL

13   TOGETHER.  IT'S NOT GOING TO LIMIT THE GOVERNMENT'S CASE ONE

14   BIT, BUT IT DOES --

15         THE COURT:  I HAVE INDICATED WHAT MY RULING IS.

16   UNLESS IT IS PERTINENT TO SOME FACT IN THIS CASE, IT WILL NOT

17   COME IN.

18         MR. STOLAR:  MAY I BE HEARD BRIEFLY, TO GO BACK TO

19   THE UNCHANGED CRIMES?

20         THE COURT:  I HEARD YOUR ARGUMENT ON IT YESTERDAY.

21         MR. STOLAR:  NO.  I'M ASKING THE COURT — TO REMIND

22   THE COURT — TO GIVE A LIMITING INSTRUCTION WITH RESPECT TO THE

23   THREE HOMICIDES WITH WHICH MR. MATTA IS NOT CHARGED; THAT

24   WHENEVER ANY EVIDENCE IS PUT ON WITH RESPECT TO THAT, WALKER

25   RADELAT AND ZAVALA, THAT EVIDENCE WITH RESPECT TO THAT, THAT

1     THE JURY BE GIVEN A LIMITING INSTRUCTION THAT IT IS NOT

2     APPLICABLE TO MATTA.

3              THE COURT:  IT IS APPLICABLE.  YOU DIDN'T HEAR WHAT I

4     SAID.

5              MR. STOLAR:  HE'S NOT CHARGED WITH ANY OF THOSE THREE

6     HOMICIDES.

7              THE COURT:  I UNDERSTAND THAT, BUT I HAVE SAID THAT

8     THERE ARE AT LEAST THREE THEORIES THAT THESE ARE ADMISSIBLE

9     AGAINST ALL DEFENDANTS.

10             IT IS ADMISSIBLE TO PROVE THE EXISTENCE OF AN

11    ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY WITH WHICH YOUR

12    CLIENT IS CHARGED.

13             IT IS ADMISSIBLE TO PROVE THE MOTIVE OR INTENT

14    ELEMENTS OF THE CHARGE AGAINST THE DEFENDANT.

15             AND FINALLY, THE COURT -- IT IS ADMISSIBLE TO

16    ESTABLISH A SCHEME OR PLAN, WHICH IS ALLEGED IN THE INDICTMENT.

17             SO THERE WILL NOT BE ANY LIMITING INSTRUCTION, BUT

18    THIS EVIDENCE I THINK CAN RECEIVED ON THE SAME FOOTING AS

19    EVIDENCE OF STATEMENTS THAT I HAVE RECEIVED PREVIOUSLY,

20    PROVISIONALLY AND SUBJECT TO A MOTION TO STRIKE, IF THE

21    DEFENDANTS ARE NOT CONNECTED TO THE ENTERPRISE IN THE WAY THEY

22    ARE REQUIRED TO BE.

23             MR. STOLAR:  I RESPECTFULLY DISAGREE WITH THE COURT.

24    I THINK THAT'S WHAT CREATES THE PREJUDICE AGAINST MR. MATTA BY

25    BRINGING HIM INTO A TRIAL WHERE THERE ARE THREE OTHER HOMICIDES

6-16

1   WITH WHICH HE'S NOT CHARGED.

2         IN ANY EVENT, THERE IS ANOTHER THING I WANT TO POINT

3   OUT TO YOU.  THE MACHINE GUNNING OF AGENT KNAPP'S CAR IS ON A

4   SLIGHTLY DIFFERENT FOOTING THAN THE CURRENTWITNESS'S TESTIMONY.

5   THERE IS NO EVIDENCE ANYPLACE AS TO WHO DID THAT, WHETHER IT

6   WAS SOMEBODY CONNECTED WITH THE GUADALAJARA NARCOTICS CARTEL OR

7   NOT.  WE HAVE ABSOLUTELY NO EVIDENCE AS TO WHO MACHINE GUNNED

8   THAT CAR.

9         THERE ARE NO EYE WITNESSES, THERE IS NO INDICATION OF

10  WHETHER IT WAS ONE OF THESE DEFENDANTS OR SOMEBODY ELSE.  IT IS

11  JUST AN EVENT OUT THERE WITH NO CONNECTION WHATSOEVER, LIKE

12  THIS WITNESS HAS CONNECTION, THROUGH THE STATEMENTS THAT ARE

13  MADE BY THE PERSON THAT SHOT HIM.

14        SO THAT STANDS ON A DIFFERENT FOOTING THAN ALL THE

15  OTHER UNCHARGED CRIMES THAT WE ARE SPEAKING ABOUT, BECAUSE WE

16  DON'T KNOW WHO DID IT.

17        THE COURT:  WHAT ABOUT THAT?  WHO DID IT?

18        MR. CARLTON:  THE EVIDENCE WILL SHOW THAT MR. KNAPP

19  WAS THE AGENT IN THE GUADALAJARA OFFICE WHO WAS IN CHARGE OF AN

20  INVESTIGATION FOCUSED SPECIFICALLY AT MR. MATTA AND MR. MIGUEL

21  FELIX GALLARDO.

22        AND IN THE COURSE OF THIS INVESTIGATION, HE USED THIS

23  CAR TO CONDUCT SURVEILLANCE ON FELIX GALLARDO, ONE OF THE RING

24  LEADERS OF THE CARTEL.  HE WAS SPOTTED IN THAT CAR BY

25  BODYGUARDS FOR FELIX, WHO RAN HIM DOWN AND DEMANDED TO KNOW

6-17

1    WHAT HE WAS DOING IN THE AREA OF FELIX'S OFFICE.

2              NOW, HE ALSO USED THIS CAR GOING BACK AND FORTH ON AN

3    ALMOST DAILY BASIS TO PICK UP WIRE TAP TAPES CONCERNING FELIX

4    GALLARDO AND MATTA.  AND IT WAS THIS SAME CAR THAT WAS THEN

5    MACHINE GUNNED IN FRONT OF HIS HOUSE, LESS THAN TWO WEEKS AFTER

6    MR. GARCIA BUENO WAS SHOT, IN A MANNER THAT MR. KNAPP WILL

7    TESTIFY APPEARED TO HAVE BEEN PROFESSIONALLY DONE.  AND HE TOOK

8    IT AS A WARNING, A VERY PARTICULAR PATTERN OF MACHINE GUNNING,

9    ALL THE BULLET CASINGS WERE CLEANED UP, THE POLICE ARRIVED IN A

10   MATTER OF MINUTES.

11             THE COURT:  YOU'RE NOT ANSWERING THE QUESTION.  THAT

12   STANDS ON A DIFFERENT FOOTING THAN THIS WITNESS TELLING US WHO

13   SHOT HIM.

14             WE DON'T KNOW WHO SHOT UP THIS CAR; IS THAT RIGHT?

15   YOU'RE ASKING THE JURY TO JUMP TO THE CONCLUSION THAT IT WAS

16   SOMETHING CONNECTED TO THESE DEFENDANTS.

17             MR. CARLTON:  WE'RE NOT ASKING THE JURY TO JUMP TO A

18   CONCLUSION, YOUR HONOR, BUT WE WILL SAY THAT EVIDENCE GOES TO

19   THE WEIGHT THAT THE JURY WISHES TO GIVE TO THIS RATHER THAN TO

20   ITS ADMISSIBILITY.

21             WE BELIEVE THE EVIDENCE IS SUFFICIENT TO SUPPORT A

22   FINDING BY THE JURY AS TO WHO DID THIS, AND THAT THE JURY

23   SHOULD BE ALLOWED TO MAKE THAT DETERMINATION.

24             THE COURT:  THAT'S ENOUGH ARGUMENT.  I'M GOING TO

25   ORDER THIS EVIDENCE EXCLUDED, BECAUSE IT STANDS ON A DIFFERENT

6-18

1    FOOTING THAN EVIDENCE TO BE PRESENTED BY THIS WITNESS.

2         NOW, WE HAVE LOST 35 MINUTES OF TRIAL TIME, AND I

3    WANT TO TELL YOU WHY WE HAVE.  NUMBER ONE IS BECAUSE COUNSEL,

4    ALTHOUGH YOU HAD FILED THAT MOTION, YOU DIDN'T ASK THE COURT

5    FOR A RULING ON IT UNTIL THE WITNESS WAS ABOUT TO BE ASKED THE

6    CRITICAL QUESTION.  IT WOULD HAVE BEEN VERY HELPFUL IF YOU HAD

7    SAID IN THE MORNING THIS WITNESS IS COMING ON, WE HAVE A MOTION

8    PENDING REGARDING THIS, AND WE WOULD HAVE THEN HAD AN ANSWER

9    BEFORE THAT TIME.

10        THE SECOND REASON WE HAVE HAD THIS DELAY IS BECAUSE

11   THE GOVERNMENT DID NOT RESPOND TO THIS MOTION.  SO I AM -- I

12   WANT TO ELIMINATE DELAYS IN THIS TRIAL, AND I WANT YOU TO

13   RESPOND TO THESE MOTIONS IN THE FUTURE.

14        NOW, WE'LL BRING THE JURY IN AND CONTINUE THE

15   EXAMINATION OF THIS WITNESS.

16        MR. STOLAR:  THE RECORD SHOULD REFLECT THE ABSENCE OF

17   MR. BURNS THIS MORNING.  HE'S OUT DOING SOME WORK.

18        THE COURT:  OKAY.  ALL OTHER COUNSEL ARE PRESENT AND

19   ALL DEFENDANTS ARE PRESENT.

20        (BRIEF INTERRUPTION.)

21        (JURY PRESENT.)

22        THE COURT:  GOOD MORNING.

23        THE JURY:  GOOD MORNING, YOUR HONOR.

24        THE COURT:  COUNSEL, YOU MAY CONTINUE YOUR

25   EXAMINATION OF THIS WITNESS.

6-19

1          MR. CARLTON:  THANK YOU, YOUR HONOR.

2

3     CESARIO GARCIA BUENO + PLAINTIFFS WITNESS, PREVIOUSLY SWORN

4                    DIRECT EXAMINATION +

5  BY MR. CARLTON:

6  Q.   MR. GARCIA BUENO, I BELIEVE WHEN WE LEFT OFF YESTERDAY YOU

7  WERE DESCRIBING WHAT HAPPENED AS YOU WAITED FOR MR. ZENDAJAS TO

8  MEET YOU AT MENOLA'S BAR.

9          DID HE EVENTUALLY ARRIVE AT THE BAR?

10  Q.   YES, SIR, HE DID SHOW UP ABOUT 6:15 OR 6:30.

11  Q.   WHAT WERE YOU DOING WHEN HE ARRIVED?

12  A.   I WAS CHATTING WITH A FRIEND.

13  Q.   WHAT DID MR. ZENDAJAS DO WHEN HE ARRIVED?

14  A.   HE WALKED UP BEHIND ME AND HE IMMEDIATELY SHOT ME IN THE

15  BACK.

16  Q.   DID YOU FALL TO THE GROUND?

17  A.   YES.  I FELL TO THE GROUND AFTER THE SECOND SHOT.

18  Q.   DID YOU HEAR MR. ZENDAJAS SAY SOMETHING?

19  A.   HE SAID, "YOU'RE GOING TO DIE BECAUSE YOU'RE A SNITCH."

20  Q.   DID HE CONTINUE TO SHOOT YOU?

21  A.   YES.  HE SHOT UNTIL HE RAN OUT.  HE SHOT FIVE TIMES, THEN

22  HE SHOT AT THE TELEPHONE THAT WAS ON THE BAR AND HIS LAST SHOT

23  WAS FOR ME.

24  Q.   DID HE THEN LEAVE?

25  A.   YES.  HE RAN WITH THE OTHER TWO PEOPLE THAT WERE WITH HIM.

6-20

1   Q.   MR. GARCIA BUENO, PRIOR TO THIS TIME HAD YOU BEEN

2   COOPERATING WITH ANY LAW ENFORCEMENT AGENCY OTHER THAN THE

3   D.E.A.?

4   A.   NO, SIR.

5   Q.   WERE YOU TAKEN TO A HOSPITAL?

6   A.   YES.  I WAS TAKEN IN AN AMBULANCE TO THE GUADALAJARA CIVIL

7   HOSPITAL.

8   Q.   AND WERE YOU EVENTUALLY FLOWN TO THE UNITED STATES?

9   A.   YES.  FIRST I WAS TAKEN TO THE MEXICAN MEXICANO HOSPITAL

10   BY MY FAMILY.

11   Q.   AND THEN WHERE WERE YOU TAKEN?

12   A.   AFTER THAT, I WAS TAKEN TO THE SCRIPPS CLINIC IN LA JOLLA.

13   Q.   MR. GARCIA BUENO, ARE YOU PERMANANTLY DISABLED AS A RESULT

14   OF THAT SHOOTING?

15   A.   YES, SIR.

16   Q.   ARE YOU PRESENTLY RECEIVING WORKERS' COMPENSATION

17   BENEFITS?

18   A.   YES, SIR.

19   Q.   HOW MUCH ARE YOU RECEIVING?

20   A.   $2,300 EVERY 28 DAYS.

21   Q.   AND ARE YOU AWARE OF THE AMOUNT OF MONEY THAT YOU WERE

22   PAID BY THE D.E.A., THE TOTAL AMOUNT?

23   A.   APPROXIMATELY.

24   Q.   HOW MUCH?

25   A.   INCLUDING THE MONEY THAT I RECEIVED FOR THE JOB IN TEXAS

1    AND OTHERWISE, I HAVE RECEIVED A TOTAL OF APPROXIMATELY

2    $195,000, AND IT ALSO WAS TO PAY SOME HOSPITAL BILLS THAT WERE

3    OUTSTANDING BECAUSE I NO LONGER HAD ANY PERSONAL MONEY TO PAY

4    THEM.

5    Q.    WAS PART OF THE MONEY THAT WAS PAID TO YOU A REWARD?

6    A.    YES.  $150,000.

7    Q.    WHAT WAS THAT A REWARD FOR?

8    A.    FOR THE MONEY THAT THE GOVERNMENT SEIZED IN TEXAS.

9    Q.    DO YOU KNOW HOW MUCH MONEY THAT WAS?

10   A.    $11,700,000.

11   Q.    AND WHOSE MONEY WAS THAT?

12          MS. KELLY:  OBJECTION, YOUR HONOR.  LACK OF

13   FOUNDATION.

14          THE COURT:  SUSTAINED.

15   BY MR. CARLTON:

16   Q.    WAS THAT MONEY SEIZED AS A RESULT OF YOUR EFFORTS IN THE

17   INVESTIGATION OF JUAN JOSE QUINTERO PAYAN?

18   A.    THAT IS CORRECT, SIR.

19          MR. CARLTON:  MAY I HAVE A MOMENT, YOUR HONOR?

20          (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

21          MR. CARLTON:  NOTHING FURTHER.

22          THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

23

24                     CROSS-EXAMINATION +

25   BY MR. STOLAR:

6-22

1    Q.   GOOD MORNING, SIR.

2    A.   GOOD MORNING.

3    A.   IF I'M CORRECT, IF I UNDERSTOOD YOU CORRECTLY, ALMOST --

4    OR A GOOD DEAL OF THE WORK THAT YOU DID WITH AGENT CAMARENA IN

5    1984 DEALT WITH THE QUINTERO FAMILY; IS THAT RIGHT?

6    A.   YES, SIR.

7    Q.   WOULD IT BE ALMOST EXCLUSIVELY THE QUINTERO FAMILY THAT

8    YOU PROVIDED INFORMATION ON?

9    A.   70 PERCENT.

10   Q.   70 PERCENT.   AND HOW LONG BEFORE YOU WERE SHOT WAS IT

11   THAT YOU HAD ASKED MR. ZENDAJAS TO GET YOU SOME INFORMATION ON

12   THE QUINTERO FAMILY?

13   A.   I SAW HIM ABOUT FIVE TIMES DURING TWO MONTHS.

14        AND THE LAST TWO TIMES I SAW HIM WAS WHEN I

15   SPECIFICALLY ASKED HIM FOR THE ADDRESSES.

16        THE OTHER INFORMATION THAT I OBTAINED FROM HIM WAS

17   WITHOUT MY ASKING FOR IT, JUST LETTING HIM TALK.

18   Q.   OKAY.   HOW LONG BEFORE YOU WERE SHOT WAS THE LAST TIME YOU

19   SAW HIM?

20   A.   MR. ZENDAJAS?

21   Q.   YES.

22   A.   THE DAY BEFORE HE SHOT ME.

23   Q.   AT THE TIME THAT HE SHOT YOU, DID HE INDICATE IT WAS

24   BECAUSE YOU WERE A SNITCH ABOUT THE QUINTERO FAMILY; THAT THAT

25   WAS THE REASON?

6-23

1    A.    NO, ONLY BECAUSE I WAS WORKING FOR THE D.E.A.; THAT I WAS

2    A SNITCH.

3    Q.    YOU WERE TOLD, WEREN'T YOU, THAT HE HAD BEEN ORDERED BY

4    QUINTERO OR THE QUINTERO FAMILY TO SHOOT YOU?

5    A.    NO.   NOBODY SAID THAT TO ME.

6    Q.    DO YOU REMEMBER WHEN AGENT CAMARENA CAME TO VISIT YOU IN

7    THE HOSPITAL?

8    A.    YES, SIR.

9    Q.    DID HE TELL YOU THAT WHEN HE CAME TO VISIT YOU?

10   A.    THE FIRST TIME TO VISIT ME, I WAS JUST COMING OUT OF A

11   COMA.  HE DIDN'T SAY ANYTHING TO ME EXCEPT THAT EVERYTHING WAS

12   BEING TAKEN CARE OF, THAT I SHOULDN'T WORRY.

13          I THOUGHT THAT I WAS STILL IN GUADALAJARA.

14   Q.    BUT HE ALSO CAME TO VISIT YOU ANOTHER TIME WHEN YOU WERE

15   FEELING BETTER, DIDN'T HE?

16   A.    YES, ABOUT ONE MONTH PRIOR TO HIS KIDNAPPING.

17   Q.    AND DIDN'T HE TELL YOU ON THAT OCCASION THAT THE QUINTERO

18   FAMILY HAD ORDERED ZENDAJAS TO KILL YOU?

19          MR. CARLTON:  OBJECTION, YOUR HONOR.  THIS IS HEARSAY

20   AS TO WHAT AGENT CAMARENA SAID.

21          THE COURT:  SUSTAINED.

22   BY MR. STOLAR:

23   Q.    DO YOU KNOW HOW LONG IT WAS BEFORE YOU WERE SHOT THAT THE

24   $13,000,000 -- I'M SORRY, $11,700,000 WAS FROZEN IN THE TEXAS

25   BANK ACCOUNTS?

6-24

1    A.    THEY HAD BEEN FROZEN ABOUT THREE MONTHS PRIOR, BUT THE

2    PROCEEDINGS WERE NOT OVER WITH UNTIL AFTER I WAS SHOT.

3    Q.    ALL RIGHT.    THAT IS, THE FORFEITURE PROCEEDINGS WERE NOT

4    COMPLETED, BUT THE ACCOUNT HAD BEEN FROZEN ALREADY?

5    A.    YES.    THAT IS CORRECT, SIR.

6    Q.    AS ONE LAWYER TO ANOTHER, YOU UNDERSTAND THAT MEANS THEY

7    STARTED TO TAKE THE MONEY AND THEN THEY COMPLETED TAKING THE

8    MONEY LATER.

9              ALL RIGHT.    THANK YOU, SIR.

10             THE COURT:    ANY OTHER QUESTIONS FOR THIS WITNESS?

11             MR. MEZA:    YES, YOUR HONOR, JUST ONE AREA THAT IS

12   JUST A LITTLE BIT OUTSIDE THE SCOPE.

13

14                    CROSS-EXAMINATION +

15   BY MR. MEZA:

16   Q.    MR. GARCIA BUENO, DO YOU KNOW AN AUTHOR BY THE NAME OF

17   ELAINE SHANNON?

18   A.    YES, SIR.

19   Q.    AND DID SHE INTERVIEW YOU SOME TIME AGO?

20   A.    JUST ONCE.    I SPOKE WITH HER FOR ABOUT HALF AN HOUR.

21   Q.    AND DID SHE TALK TO YOU ABOUT ERNESTO FONSECA OR DID YOU

22   TALK TO HER ABOUT ERNESTO FONSECA?

23   A.    NO, SHE SPOKE MORE SPECIFICALLY ABOUT MY FRIENDSHIP WITH

24   KIKI AND MY RELATIONSHIP WITH HIM.

25             WHEN SHE SPOKE WITH ME SHE HAD ALREADY FINISHED HER

6-25

1    BOOK.

2    Q.    I SEE.  OKAY.

3    Q.    DID YOU DISCUSS D.F.S. AGENTS AT ALL WITH HER?

4    A.    WE DID COMMENT ON IT.

5    Q.    DID YOU TELL HER THAT ALL OF ERNESTO FONSECA'S BODYGUARDS

6    WERE D.F.S. AGENTS?

7    A.    SHE ASKED ME IN AN AFFIRMATIVE MANNER WHETHER I KNEW THAT

8    ALL THE DRIVERS AND ALL THE BODYGUARDS BELONGED TO THE D.F.S.

9    AND I SAID YES, AND SHE ALREADY KNEW THAT.

10            MR. MEZA:  ALL RIGHT.  THANK YOU VERY MUCH.

11            THE COURT:  ANY OTHER QUESTIONS FOR THIS WITNESS?

12            MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

13            THE COURT:  REDIRECT?

14            MR. CARLTON:  NOTHING, YOUR HONOR.

15            THE COURT:  ALL RIGHT.  THE WITNESS MAY BE EXCUSED.

16            WITNESS EXCUSED.)

17            THE COURT:  ALL RIGHT. CALL YOUR NEXT WITNESS.

18            MR. CARLTON:  THE GOVERNMENT CALLS THOMAS GOMEZ.

19

20            THOMAS GOMEZ + PLAINTIFFS WITNESS, SWORN

21

22            THE CLERK:  FOR THE RECORD, SIR, IF YOU WOULD PLEASE

23    STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

24            THE WITNESS:  THOMAS GOMEZ, G O M E Z.

25    /

6-26

1                          DIRECT EXAMINATION +

2    BY MR. CARLTON:

3    Q.    MR. GOMEZ, WHAT IS YOUR PRESENT EMPLOYMENT?

4    A.    SPECIAL AGENT WITH THE DRUG ENFORCEMENT ADMINISTRATION.

5    Q.    HOW LONG HAVE YOU BEEN EMPLOYED BY THE D.E.A.?

6    A.    APPROXIMATELY 15 YEARS.

7    Q.    DID YOU HAVE ANY PRIOR LAW ENFORCEMENT EXPERIENCE?

8    A.    YES, SIR.  I HAD EIGHT YEARS AS A TUCSON, ARIZONA

9    POLICEMAN.

10   Q.    WHAT IS YOUR PRESENT ASSIGNMENT?

11   A.    AGENT IN CHARGE OF THE D.E.A. OFFICE IN HERMOSILLO,

12   MEXICO.

13   Q.    AND HOW LONG HAVE YOU BEEN EMPLOYED IN THAT POSITION?

14   A.    A LITTLE OVER A YEAR.

15   Q.    DRAWING YOUR ATTENTION TO NOVEMBER OF 1984, WHERE WERE YOU

16   ASSIGNED THE BEGINNING OF 1984?

17   A.    AT THAT TIME I WAS A SPECIAL AGENT IN TUCSON.  I WAS IN

18   GUADALAJARA, JALISCO, MEXICO ON A TEMPORARY ASSIGNMENT.

19   Q.    WHEN DID YOU BEGIN YOUR TEMPORARY ASSIGNMENT IN

20   GUADALAJARA?

21   A.    IT WAS OCTOBER 14TH, 1984.

22   Q.    HOW LONG DID YOU REMAIN IN GUADALAJARA?

23   A.    ONE MONTH.

24   Q.    UNTIL NOVEMBER 14TH?

25   A.    YES, SIR.

1    Q.    WHAT WAS YOUR ASSIGNMENT IN GUADALAJARA?

2    A.    MY ASSIGNMENT WAS TO FOLLOW, PHOTOGRAPH AND RECORD CERTAIN

3    INDIVIDUALS IN GUADALAJARA.  MIGUEL ANGEL FELIX GALLARDO,

4    RAFAEL CARO QUINTERO, ERNESTO FONSECA, RAMON MATTA BALLESTEROS.

5          I RECEIVED A BRIEFING IN MEXICO CITY AND WAS SENT TO

6    GUADALAJARA TO FOLLOW AND PHOTOGRAPH THEIR ASSOCIATES AND THOSE

7    INDIVIDUALS AND REPORT ANY RADIO TRANSMISSIONS THAT THEY MADE

8    DURING OUR SURVEILLANCE.

9    Q.    WERE THERE ANY PARTICULAR LOCATIONS IN GUADALAJARA WHICH

10   YOU WERE TO PAY SPECIAL ATTENTION TO?

11   A.    YES, SIR.   IN PARTICULAR, THE RESTAURANT CALLED LA

12   LANGOSTA, A MOTEL CALLED MOTEL LAS AMERICAS, REAL SUITES, AND A

13   COMMUNICATIONS CENTER.

14          IT WAS A HOUSE WITH A LARGE ANTENNA IN GUADALAJARA,

15   IN THE NEIGHBORHOOD AREA.

16   Q.    DID YOU HAVE ANY PARTICULAR ASSIGNMENT TO THE GUADALAJARA

17   AIRPORT?

18   A.    YES, SIR.   THAT WAS ANOTHER AREA THAT WE CONCENTRATED ON

19   WAS TWO HANGARS THAT HAD THE NAME CESSNA ABOVE THE HANGARS.

20          AND THEY BELONGED TO MIGUEL ANGEL FELIX GALLARDO AND

21   RAFAEL CARO QUINTERO.

22   Q.    DURING THE MONTH THAT YOU SPENT IN GUADALAJARA IN 1984,

23   DID YOU SPEND MOST OF YOUR TIME SURVEILLING THOSE LOCATIONS YOU

24   JUST DESCRIBED?

25   A.    YES, SIR.  ON A DAILY BASIS, MYSELF AND MY PARTNER WOULD

6-28

1    TRAVEL TO THOSE AREAS, PHOTOGRAPH THEM, HANG AROUND AND LOOK AT

2    WHAT WAS GOING ON.

3    Q.   NOW, IN THE COURSE OF YOUR ACTIVITIES IN THE MONTH THAT

4    YOU WERE IN GUADALAJARA, DID YOU EVER SEE AN INDIVIDUAL NAMED

5    MIGUEL FELIX ANGEL GALLARDO -- MIGUEL ANGEL FELIX GALLARDO?

6    I'M SORRY.

7    A.   YES, SIR, I DID.

8    Q.   ON HOW MANY OCCASIONS DID YOU SEE THAT INDIVIDUAL?

9    A.   I SAW HIM A TOTAL OF THREE TIMES DURING MY STAY IN

10   GUADALAJARA.

11   Q.   WHEN WAS THE FIRST OCCASION THAT YOU SAW HIM?

12   A.   THE FIRST OCCASION WAS APPROXIMATELY THE FIRST WEEK I

13   ARRIVED THERE.  I WAS IN A CESSNA 210 AIRPLANE WITH AN

14   INDIVIDUAL NAMED ALFREDO ZAVALA AND SPECIAL AGENT ENRIQUE

15   CAMARENA.

16             AS WE WERE TAXIING OUT OF THE AIRPORT, A SMALL JET

17   WAS TAXIING IN THE OPPOSITE DIRECTION AND WE PASSED EACH OTHER.

18   AND FELIX GALLARDO WAS THE -- ON THE RIGHT FRONT SEAT OF THAT

19   JET, AND WE MADE EYEBALL-TO-EYEBALL CONTACT DURING THAT

20   PASSING -- TAXIING AT THE AIRPORT.

21   Q.   MR. GOMEZ, I WOULD ASK YOU TO LOOK TO YOUR RIGHT TO THE

22   PHOTOGRAPH ON THE EASEL THERE, WHICH IS GOVERNMENT EXHIBIT 15.

23             DO YOU RECOGNIZE THAT INDIVIDUAL?

24   A.   YES, SIR, I DO.

25   Q.   WHO IS THAT?

1   A.   THAT IS MIGUEL ANGEL FELIX GALLARDO.

2   Q.   IS THAT THE SAME INDIVIDUAL THAT YOU SAW IN THE JET THAT

3   YOU JUST DESCRIBED?

4   A.   YES, SIR.

5   Q.   WHEN WAS THE NEXT OCCASION THAT YOU SAW FELIX?

6   A.   AT THIS COMMUNICATION CENTER THAT I TESTIFIED TO, I WAS

7   DRIVING BY AND HE WAS GETTING OUT OF A CAR WITH OTHER

8   INDIVIDUALS?  I SAW HIM ALIGHT FROM THAT VEHICLE AND ENTER THE

9   COMMUNICATION CENTER.

10   Q.   WHEN WAS THE THIRD OCCASION?

11   A.   THE THIRD OCCASION WAS NOVEMBER 14TH, 1984, IN FRONT OF

12   THE CESSNA HANGAR AT THE GUADALAJARA JALISCO AIRPORT.

13        I WAS DRIVING A RENTED CAR IN FRONT OF HIS HANGAR,

14   AND HE WAS APPROXIMATELY FIVE FEET TO MY LEFT, OBSERVING AS I

15   WAS DRIVING BY.

16   Q.   WHAT WAS YOUR PURPOSE IN BEING AT THE AIRPORT ON THAT

17   OCCASION?

18   A.   THAT MORNING I HAD INSTRUCTED THE OTHER AGENT TO

19   PHOTOGRAPH THE INTERIOR OF THE HANGAR AS I DROVE BY VERY

20   SLOWLY.

21        ALL OF OUR ATTENTION WAS TO OUR RIGHT, AS THE HANGAR

22   WAS TO OUR RIGHT.  I FELT SOMETHING ON MY LEFT.

23        AS THE AGENT WAS PHOTOGRAPHING, FELIX WAS WATCHING

24   OUR ACTIVITY.  AGAIN, HE WAS STANDING THERE AND WE SPOTTED HIM

25   AT THE LAST MOMENT.

6-30

1    Q.   ABOUT HOW FAR WAS HE FROM YOUR CAR?

2    A.   APPROXIMATELY FIVE FEET.

3    Q.   DID YOU DO ANYTHING UPON SEEING HIM?

4    A.   I IMMEDIATELY ALERTED THE OTHER AGENT, AND I OBSERVED

5    FELIX RUN INTO THE HANGAR BEHIND MY CAR.

6         AT THAT TIME I ACCELERATED AT A FASTER PACE AWAY FROM

7    THE HANGARS.  AND A BLACK CHEVROLET WITH TWO INDIVIDUALS IN IT

8    IMMEDIATELY CAME OUT OF THE HANGAR AND IMMEDIATELY STARTED

9    FOLLOWING US.

10   Q.   NOW, DID YOU SEE ANYTHING IN THE HANGAR BEFORE YOU

11   ACCELERATED AWAY FROM THE AREA?

12   A.   YES.  I SAW SEVERAL INDIVIDUALS MEANDERING INSIDE,

13   STANDING.  THERE WAS, I BELIEVE, AN AEROCOMMANDER, THERE WAS A

14   SMALLER CESSNA AIRCRAFT, THERE WAS A GRAND MARQUIS WITH A TRUNK

15   UP THAT I HAD SEEN FELIX GALLARDO ALIGHT FROM AT THE

16   COMMUNICATIONS CENTER.

17        AND THEN, OF COURSE, THE BLACK CHEVROLET THAT LEFT

18   THE HANGAR.

19   Q.   WHERE DID YOU GO IN LEAVING THIS AREA?

20   A.   I DROVE TO THE PUBLIC INTERNATIONAL AIRPORT IN

21   GUADALAJARA.  AND AT THAT POINT, I DECIDED TO EVADE OR AVOID A

22   CONFRONTATION WITH THE INDIVIDUALS FOLLOWING US --

23   Q.   EXCUSE ME.  I'M SORRY TO INTERRUPT YOU.

24   A.   -- DRIVING AT A HIGH RATE OF SPEED AWAY FROM THE HANGARS.

25        AND HIS CAR ALSO ACCELERATED AT A HIGH RATE AND

6-31

1   FOLLOWED US INTO THE INTERNATIONAL AIRPORT.  AT THAT POINT I

2   DECIDED TO GO INSIDE AND WAIT UNTIL THEY LEFT SO I COULD GET

3   BACK IN MY CAR AND GO BACK TO GUADALAJARA.

4   Q.   HOW MANY INDIVIDUALS DID YOU SEE IN THE BLACK CHEVROLET?

5   A.   THERE WERE TWO IN THE BLACK CHEVROLET.

6   Q.   WHAT WAS THE NAME OF THE OTHER AGENT WHO WAS WITH YOU?

7   A.   SPECIAL AGENT HECTOR SANCHEZ.

8   Q.   WERE YOU CONCERNED ABOUT A CONFRONTATION WITH THE

9   INDIVIDUALS IN THE CHEVROLET?

10          THE COURT:  YES, SIR.

11          MR. MEZA:  OBJECTION, YOUR HONOR, ASKED AND ANSWERED.

12          THE COURT:  OVERRULED.

13   BY MR. CARLTON:

14   Q.   WHY WAS THAT?

15          MR. STOLAR:  OBJECTION; NO BASIS -- IT IS IRRELEVANT

16   WHAT HIS CONCERNS WERE.

17          THE COURT:  SUSTAINED.

18   BY MR. CARLTON:

19   Q.   WELL, YOU WENT INTO -- DID YOU GO INTO THE INTERNATIONAL

20   TERMINAL?

21   A.   YES, SIR.

22   Q.   DID AGENT SANCHEZ GO WITH YOU?

23   A.   YES, SIR.

24   Q.   WHY DID YOU DO THAT?

25   A.   WE WALKED AROUND THE AIRPORT AND WENT UP TO THE SECOND

6-32

1   STORY AREA OF THE AIRPORT AND WALKED AROUND SOME SHOPS.

2           APPROXIMATELY 20 MINUTES LATER WE WENT BACK TO THE

3   CAR.  AT THAT POINT I REMEMBER STICKING THE KEY INTO THE DOOR,

4   AND I HEARD AN ENGINE CRANK UP, AND LOOKED OVER AND IT WAS THE

5   SAME INDIVIDUALS IN THE BLACK CHEVROLET.  THEY WERE PARKED TWO

6   CAR SPACES AHEAD OF US.

7           I ALSO NOTICED THE MARQUIS, A GOLD MARQUIS THAT

8   BELONGED TO FELIX TO THE RIGHT OF US.  AGAIN, TWO INDIVIDUALS

9   IN IT.  AND AGAIN, I DIDN'T FEEL IT WAS SAFE TO LEAVE.  THE

10  MOST PRUDENT ACT, I FELT, WAS TO GO BACK INTO THE TERMINAL

11  WHERE THERE WERE A LOT OF PEOPLE AND BLEND IN WITH ALL THE

12  PEOPLE.

13          SO, AGAIN, WE IMMEDIATELY LEFT THE CAR AND WENT

14  INSIDE THE TERMINAL.

15  Q.   WHAT DID YOU DO WHEN YOU GOT INSIDE THE TERMINAL?

16  A.   WE MAINTAINED SURVEILLANCE OF THE PEOPLE UNTIL THESE TWO

17  VEHICLES, THESE FOUR -- THERE WERE NOW FOUR MEN.  AND AT THAT

18  POINT I OBSERVED THE TWO INDIVIDUALS IN THE GRAND MARQUIS GET

19  OUT OF THE CAR AND APPROACH THE TERMINAL.

20          AT THAT POINT I INSTRUCTED AGENT SANCHEZ TO CALL THE

21  CONSULATE AND ADVISE THEM OF A POTENTIAL CONFRONTATION THAT

22  MIGHT OCCUR THERE.  AND THE CONSULATE DISPATCHED THE MEXICAN

23  FEDERAL JUDICIAL POLICE TO COME AND ESCORT US OUT OF THE

24  AIRPORT.

25  Q.   DID YOU NOTICE WHETHER THE INDIVIDUALS IN THESE CARS THAT

6-33

1   CAME INTO THE TERMINAL WERE ARMED?

2   A.   YES, I DID.

3   Q.   WHAT DID YOU SEE?

4   A.   THEY WERE ARMED.  THEY HAD LARGE BULGES UNDER THEIR SUIT

5   COATS.  THEY WERE OBVIOUSLY HOLDING ON TO THEM.  I HAD SEEN

6   THIS SCENARIO WITH THE COMMUNICATION CENTER WHEN FELIX HAD

7   ALIGHTED FROM HIS CAR.  SO IT WAS OBVIOUS THAT WE WERE

8   CONFRONTED WITH ARMED MEN.

9   Q.   WHAT DID YOU DO WHILE WAITING FOR THE --

10        MR. NICOLAYSEN:  YOUR HONOR, I OBJECT TO THIS WHOLE

11   LINE OF QUESTIONING AS BEING IRRELEVANT.  IT HAS NOTHING TO DO

12   WITH MY CLIENT AND I MOVE TO STRIKE.

13        MS. KELLY:  YOUR HONOR, ALSO THERE IS NO FOUNDATION

14   FOR THE CONCLUSION THAT THE MEN WERE ARMED.

15        THE COURT:  WHAT IS THE PURPOSE OF THIS TESTIMONY?

16        MR. CARLTON:  THE PURPOSE, YOUR HONOR, IS TO

17   DEMONSTRATE THAT MIGUEL ANGEL FELIX GALLARDO, ONE OF THE

18   LEADERS OF THE CARTEL, WAS AWARE OF D.E.A. SURVEILLANCE IN

19   NOVEMBER OF 1984 AND ENGAGED IN INTIMIDATING ACTIONS IN ORDER

20   TO DEFLECT THAT.

21        THE COURT:  THE EVIDENCE MAY BE RECEIVED FOR THAT

22   PURPOSE.

23   BY MR. CARLTON:

24   Q.

25   Q.   WHAT DID DO YOU WHILE WAITING FOR ASSISTANCE TO ARRIVE?

6-34

1    A.    AGAIN, WE KEPT MOVING AROUND.  THESE INDIVIDUALS KEPT

2    FOLLOWING US, AND WE WOULD HANG AROUND IN POCKETS OF PEOPLE

3    HANGING AROUND THE AIRPORT, AND AVOIDING -- STAYING AWAY FROM

4    THEM, AND THEY KEPT FOLLOWING US -- AND AVOIDING AN UP-CLOSE,

5    PERSONAL CONFRONTATION.

6    Q.    DID ASSISTANCE EVENTUALLY ARRIVE?

7    A.    ABSOLUTELY.  APPROXIMATELY 11 AGENTS FROM THE MEXICAN

8    FEDERAL JUDICIAL POLICE AND THREE D.E.A. PEOPLE AND KIKI

9    CAMARENA AND AN INDIVIDUAL NAMED WALLACE AND ALAN BACHELIER,

10   AGENTS OF THE D.E.A.

11         THEY ARRIVED AND THE MEXICAN FEDS INSTRUCTED HECTOR

12   AND ME TO GET INSIDE.  THEY FORMED A CIRCLE.  THEY WERE ARMED

13   WITH SHOTGUNS AT HIGH PORT.  THEY CIRCLED US AND SAID WHEN WE

14   GOT TO OUR CAR, THEY WOULD GET IN FRONT AND BACK OF US AND

15   ESCORT US TO THEIR COMANDANCIA.

16         WE DID THAT.  THEY FORMED A CIRCLE, WE GOT IN THE

17   MIDDLE OF THE CIRCLE, AND THEY WALKED US OUT OF THE TERMINAL

18   INTO OUR CAR, AND THEN ESCORTED US OUT ON TO THE HIGHWAY.

19   Q.    DID YOU NOTICE WHETHER THE INDIVIDUALS WHO HAD BEEN

20   FOLLOWING YOU WATCHED AS WITH YOU WERE ESCORTED OUT?

21   A.    YES.  THEY APPROACHED AND THEY GOT A REAL GOOD LOOK AT US.

22   THEY CAME UP REAL CLOSE BUT THEY STOPPED SHORT.  I GAVE THEM AN

23   INTERNATIONAL HAND SIGN AND WE WALKED OUT.

24         (COURTROOM LAUGHTER.)

25   Q.    WAS AGENT CAMARENA WITH YOU AS YOU WERE ESCORTED OUT OF

1   THE AIRPORT?

2   A.   YES, SIR.

3        MR. CARLTON:  NOTHING FURTHER.

4        THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS, BUT

5   LEAVE THAT SUBJECT ALONE, THE SIGN.

6        (COURTROOM LAUGHTER.)

7        MR. STOLAR:  THAT WAS GOING TO BE THE SUBJECT -- ALL

8   I WANTED TO ASK HIM.  WHAT; S  O  S?

9

10                  CROSS-EXAMINATION +

11   BY MR. STOLAR:

12   Q.   IT IS YOUR PRACTICE AS A SPECIAL AGENT TO WRITE UP REPORTS

13   OF YOUR ACTIVITIES, PARTICULARLY WHEN YOU'RE DOING A

14   SURVEILLANCE; IS IT NOT?

15   A.   IT DEPENDS; IT IS NOT CARTE BLANCHE.  IF THE SITUATION

16   DICTATES, ONE WILL WRITE A REPORT.  SOMETIMES NOT.

17   Q.   YOU INDICATED YOU SAW FELIX GALLARDO ON NOVEMBER THE 14TH

18   AT THE AIRPORT AND YOU WROTE A REPORT CONCERNING THAT; DID YOU

19   NOT?

20   A.   YES, I WROTE A MEMORANDUM.

21   Q.   OKAY.  WHAT ABOUT THE OTHER TWO TIMES YOU SAY YOU SAW

22   FELIX GALLARDO?  DID YOU WRITE A SUMMARY OF WHERE YOU SAW HIM

23   AND UNDER WHAT CIRCUMSTANCES?

24   A.   NO.  SANCHEZ AND I -- I BELIEVE SANCHEZ MIGHT HAVE BEEN

25   KEEPING NOTES, BUT IT WAS MORE OF A LONG-TERM SURVEILLANCE.

6-36

1    AND THEN AT THE END OF THE SURVEILLANCE, WE WOULD DO A

2    COMPREHENSIVE REPORT.

3    Q.    THAT YOU PARTICIPATED IN WRITING?

4    A.    AT THE END OF OUR TOUR, WE WOULD WRITE A REPORT.

5    Q.    DID YOU DO SUCH A REPORT?

6    A.    OUR TOUR WAS CUT SHORT, SO WE NEVER DID GET TO MAKE THAT

7    COMPREHENSIVE REPORT.

8    Q.    THE PHOTOGRAPHS THAT YOU TOOK, DID YOU GET A PHOTOGRAPH OF

9    FELIX GALLARDO AT THE AIRPORT?

10   A.    THE PHOTOGRAPHS THAT HECTOR TOOK, I DON'T KNOW WHAT

11   HAPPENED TO THEM.

12   Q.    DID YOU SEE THE INTERIOR OF THE HANGAR WHERE YOU SAW A JET

13   AND AN AEROCOMMANDER?

14   A.    YES, SIR.

15   Q.    DID YOU SEE THE TAIL NUMBERS ON EITHER THE JET OR THE

16   AEROCOMMANDER?

17   A.    NO, SIR.  MY ATTENTION WASN'T THAT DETAILED WHERE I WOULD

18   NOTE THE TAIL NUMBERS DURING THAT PARTICULAR PASS.

19   Q.    DO YOU KNOW OR DO YOU HAVE ANY RECOLLECTION WHETHER THE

20   TAIL NUMBERS BEGAN WITH AN N OR BEGAN WITH AN X?

21   A.    TO THE BEST OF MY RECOLLECTION, THEY WERE BOTH AT

22   DIFFERENT TIMES BOTH N'S AND X'S.

23   Q.    I UNDERSTAND THAT, BUT THESE TWO PLANES YOU SAW ON

24   NOVEMBER 14TH, DO YOU HAVE ANY RECOLLECTION WHETHER THEY WERE

25   N'S OR X'S?

6-37

1    A.    I DON'T RECALL.

2    Q.    DID YOU, YOURSELF, TAKE ANY PICTURES OF FELIX GALLARDO?

3    A.    NO, SIR.

4    Q.    DID YOU TAKE ANY PICTURES OF FONSECA?

5    A.    NO, I DIDN'T TAKE PHOTOGRAPHS.  I WAS THE DRIVER AND MY

6    PARTNER WOULD TAKE THE PICTURES.

7    Q.    SANCHEZ WAS THE PHOTOGRAPHER OF THE CREW?

8    A.    YES, SIR.

9    Q.    DO YOU KNOW WHETHER HE TOOK PICTURES OF CARO?

10    A.    NO.  TO MY KNOWLEDGE, HE DID NOT.  WE DIDN'T HAVE THAT

11    OPPORTUNITY TO PHOTOGRAPH HIM.

12    Q.    HOW ABOUT PICTURES OF FONSECA?

13    A.    NO, SIR.

14    Q.    PICTURES OF MATTA?

15    A.    NO, SIR.

16    Q.    YOU NEVER TOOK A PICTURE OF MATTA?

17    A.    NO, SIR.

18    Q.    IN ALL THE TIME WERE DOING SURVEILLANCE, LIKE OVER A MONTH

19    FROM OCTOBER 14 TO NOVEMBER 14, YOU TOOK NO PICTURES OF MATTA?

20    A.    NEVER.

21         MR. STOLAR:  I HAVE NOTHING ELSE THEN.  THANK YOU.

22

23                     CROSS-EXAMINATION +

24    BY MR. NICOLAYSEN:

25    Q.    AGENT GOMEZ, I BELIEVE YOU MENTIONED ON DIRECT THE NAME LA

6-38

1    LANGOSTA.  DID I HEAR YOU CORRECTLY?

2    A.    NO, SIR.

3    Q.    YOU DID NOT?

4    A.    NO, I DID NOT.

5            MR. NICOLAYSEN:  MY APOLOGIES.  THANK YOU.

6            THE COURT:  ANY OTHER QUESTIONS?

7            MS. KELLY:  BRIEFLY, YOUR HONOR.

8

9                        CROSS-EXAMINATION +

10   BY MS. KELLY:

11   Q.    GOOD AFTERNOON, AGENT.

12   A.    GOOD MORNING.

13   Q.    GOOD MORNING.  I'M SORRY.

14           DID YOU CONSIDER THIS EVENT AT THE AIRPORT TO BE IN

15   THE NATURE OF AN ASSAULT?

16   A.    I'M SORRY?

17   Q.    DID YOU CONSIDER THIS EVENT THAT YOU HAVE BEEN DESCRIBING

18   TO BE THE IN THE NATURE OF AN ASSAULT?

19   A.    IT DIDN'T GET THAT FAR.  IF WE WOULD HAVE ALLOWED IT AND

20   MADE THE CONFRONTATION, I THINK IT WOULD HAVE BEEN VERY

21   OBVIOUSLY SOME KIND OF AN ASSAULT.

22   Q.    DID YOU MAKE A DETAILED REPORT ABOUT THE CIRCUMSTANCES

23   SURROUNDING THESE EVENTS?

24   A.    NO, I DRAFTED A MEMORANDUM AND IT WAS VERY GENERAL.

25   Q.    AND YOU DIDN'T INCLUDE ANY OF THE DESCRIPTIONS THAT YOU

6-39

1    MADE TODAY ABOUT THE EYE CONTACT AND FOLLOWING YOU INTO THE

2    AIRPORT?

3    A.    NO. I MENTIONED THAT I CONFRONTED -- THAT WE HAD FELIX

4    GALLARDO TO OUR LEFT, AND THAT TYPE OF THING.

5    Q.    DID YOU MENTION THAT THE MEN WERE ARMED?

6    A.    NO, MA'AM.

7    Q.    AND THESE EVENTS ALL OCCURRED SOMETIME AGO, RIGHT?

8    A.    THEY HAPPENED NOVEMBER 14, 1984.

9    Q.    AND THE PURPOSE OF WRITING THE MEMORANDUM IS TO RECALL THE

10   EVENT LATER ON; ISN'T IT?

11   A.    NO, MA'AM, NOT NECESSARILY.  IT WAS SOMETHING THAT WAS

12   REQUESTED OF ME.  AGAIN, WE WERE TO DO A COMPREHENSIVE

13   SURVEILLANCE OR OUR OBSERVATIONS IN GUADALAJARA  OF THESE

14   PEOPLE.

15        THE MEMO, MA'AM, WAS PUT TOGETHER AT SOMEBODY'S

16   REQUEST; IT WASN'T A TYPICAL INVESTIGATIVE REPORT THAT I WOULD

17   AUTHOR.

18   Q.   IS IT THE POLICY OF THE D.E.A., THOUGH, TO REQUIRE REPORTS

19   BEING WRITTEN ON CONFRONTATIONS SUCH AS THE NATURE THAT YOU

20   HAVE DESCRIBED?

21   A.    NO, AGAIN, THAT'S A VERY AMBIGUOUS AREA.  IF AN AGENT

22   FEELS HE HAS TO WRITE A REPORT, IT IS NOT MANDATED, IT IS NOT

23   ABSOLUTE.  IT DEPENDS ON WHAT IS HAPPENING AND WHERE AND WHAT

24   YOU'RE DOING.  IT IS NOT AN ABSOLUTE.

25   Q.    ALL RIGHT.  THANK YOU.

1          MR. NICOLAYSEN:   YOUR HONOR, WITH THE COURT'S

2     PERMISSION, I WOULD ASK THAT THE COURT REPORTER BE ALLOWED TO

3     LOOK AT THE VERY BEGINNING OF THIS AGENT'S DIRECT EXAMINATION

4     TO CONFIRM THAT HE DID MENTION THE LA LANGOSTA RESTAURANT.  HE

5     SEEMS NOT TO RECALL THAT NOW.

6          THE COURT:  I DON'T RECALL IT EITHER.

7          THE WITNESS:  I'M SORRY.  I DID MENTION THE LA

8     LANGOSTA RESTAURANT.  I THOUGHT YOU HAD MENTIONED AN

9     INDIVIDUAL'S NAME, MAGOSTA.  I MISUNDERSTOOD YOU.

10          MR. NICOLAYSEN:  THANK YOU, AGENT GOMEZ, FOR

11     CLARIFYING THAT.   DID YOU HAVE ANY PARTICULAR ASSIGNMENTS

12     WHILE YOU WERE IN GUADALAJARA SPECIFICALLY IN REGARD TO THE LA

13     LANGOSTA RESTAURANT?

14     A.    YES, SIR.

15     Q.    COULD YOU TELL US WHAT THEY WERE?

16     A.    THE LA LANGOSTA RESTAURANT WAS OWNED BY AN INDIVIDUAL

17     NAMED COCHI LOCO AND MANUEL SALCIDO UZETA.  AND THE TRAFFICKERS

18     THAT I MENTIONED ALL CONGREGATED THERE AND IT WAS A HAUNT OR

19     HANGOUT OF THEIRS.

20     Q.    AND OVER WHAT TIME PERIOD DID YOU PARTICIPATE IN ANY

21     INVESTIGATION REGARDING THAT RESTAURANT?

22     A.    DURING THAT MONTH THAT I WAS THERE, WE WOULD GO IN THERE

23     AND EAT LUNCH AND ATTEMPT TO SIT NEXT TO THESE TRAFFICKERS.

24     Q.    WHAT MONTH WAS THAT; COULD YOU TELL US?

25     A.    YES.  I REMEMBER FROM OCTOBER 14, 1984 TO NOVEMBER 14,

6-41

1    1984.

2    Q.    WERE THE TRAFFICKERS CUSTOMARILY THERE DURING THE NOON

3    HOUR?

4    A.    WE NEVER DID REALLY MAKE CONTACT WITH THE TRAFFICKERS

5    THROUGH THAT MONTH.   THE TIME WE ATE LUNCH, ONE TIME, THERE WAS

6    A LARGE TABLE WITH WELL-DRESSED INDIVIDUALS THAT WE FELT WERE

7    TRAFFICKERS, BUT WE WERE VERY DISCREET, AND WHEN WE SAT NEXT TO

8    THEM, THEY MOVED AWAY.

9    Q.    DID YOU DRESS IN A SOMEWHAT INNOCUOUS ATTIRE SO YOU

10   LOOKED LIKE GENERAL MEMBERS OF THE PUBLIC?

11   A.    WE WORE JEANS AND SPORT SHIRTS, THAT TYPE OF THING.   IT

12   WAS NOTHING OSTENTATIOUS.   WE TRIED TO BLEND IN WITH PEOPLE

13   THERE.

14   Q.    BLEND IN LIKE THE TOURIST COMMUNITY THERE IN GUADALAJARA?

15   A.    PARDON SIR?

16   Q.    BLEND IN WITH THE TOURIST COMMUNITY THERE IN GUADALAJARA?

17   A.    JUST GENERALLY WITH PEOPLE.

18   Q.    WAS IT THE PRACTICE OF THE D.E.A. TO ATTEMPT TO PENETRATE

19   THE NARCOTICS COMMUNITY BY GOING INTO THAT RESTAURANT AND BEING

20   IN THE CROWD OF TRAFFICKERS, IF YOU WILL, THERE?

21   A.    NO, SIR.

22   Q.    WHAT WAS THE PARTICULAR INVESTIGATIVE POLICY REGARDING THE

23   LA LANGOSTA RESTAURANT?

24         WHAT WERE YOUR PARTICULAR INSTRUCTIONS?

25   A.    THE INSTRUCTIONS WERE TO STAY OUT OF THE PLACE.

6-42

Q.    WHY WERE YOU THERE?

A.    WANTING TO GET CLOSER TO THE TRAFFICKERS AND MAYBE GET

SOME OVERHEARDS (SIC).

Q.    WERE YOU ACTING IN A MANNER THAT WAS INCONSISTENT WITH

YOUR D.E.A. DIRECTIVES BY BEING THERE; IS THAT WHAT YOU'RE

TELLING US?

A.    IT WAS MORE OF A WARNING TO STAY OUT OF THERE, THAT IT WAS

A DANGEROUS PLACE TO GO.  IF WE WERE FOUND OUT TO BE D.E.A., WE

MIGHT BE IN DANGER THERE, SO IT WAS MORE OF A WARNING AND AN

ADVISEMENT TO STAY OUT OF THE PLACE.

Q.    WHO ADVISED YOU?

A.    THE SPECIAL AGENT IN CHARGE IN GUADALAJARA AT THAT TIME,

JAMES KUYKENDALL.  KIKI CAMARENA ADVISED US TO STAY OUT OF

THERE.

Q.    AND WOULD IT BE FAIR TO SAY THAT FOR SOME PERIOD OF TIME

THE LA LANGOSTA RESTAURANT WAS UNDER D.E.A. SURVEILLANCE?

A.    OBVIOUSLY, WHILE WE WERE THERE DURING THAT MONTH, WE WENT

FREQUENT.

Q.    WERE YOU AWARE OF D.E.A. SURVEILLANCE OF THAT RESTAURANT

BEFORE NOVEMBER OF '84 WHEN YOU GOT INVOLVED?

A.    NO, SIR.

Q.    WERE YOU AWARE OF D.E.A. SURVEILLANCE PAST NOVEMBER OF

'84; THAT IS, INTO DECEMBER OF '84 AND INTO JANUARY OF '85?

A.    I'M NOT AWARE OF THAT.

Q.    ARE YOU AWARE OF A LA LANGOSTA FILE, AS SUCH, WHICH

6-43

1    CONTAINED INVESTIGATIVE REPORTS OF THE D.E.A.'S EFFORTS TO

2    PENETRATE THAT RESTAURANT, IF YOU WILL?

3    A.    I'M NOT AWARE OF SUCH A FILE.

4    Q.    WERE PHOTOGRAPHS TAKEN OF PEOPLE COMING IN AND OUT OF THE

5    RESTAURANT, TO YOUR KNOWLEDGE?

6          MR. CARLTON:  OBJECTION, YOUR HONOR.  THIS ISN'T A

7    DISCOVERY PROCEEDING; THAT'S IRRELEVANT.

8          THE COURT:  YES, SUSTAINED.

9    BY MR. NICOLAYSEN:

10   Q.    WERE THE NAMES JOHN WALKER AND ALBERTO RADELAT FAMILIAR TO

11   YOU OR, TO YOUR KNOWLEDGE, TO ANYONE ELSE IN THE D.E.A. PRIOR

12   TO JANUARY 30, 1985?

13   A.    I'M NOT AWARE OF THOSE NAMES PRIOR.  DURING OUR STAY

14   THERE, WE WERE NOT AWARE OF THOSE INDIVIDUALS.

15   Q.    YOU VIRTUALLY NEVER SAW MY CLIENT, JAVIER VASQUEZ, AT THE

16   LA LANGOSTA RESTAURANT; DID YOU?

17   A.    I HAVE NO RECALL IF HE WAS THERE OR NOT.

18         MR. NICOLAYSEN:  THANK YOU.

19         THE COURT:  ANY REDIRECT EXAMINATION?

20         MR. CARLTON:  VERY QUICKLY, YOUR HONOR.

21

22                    REDIRECT EXAMINATION +

23   BY MR. CARLTON:

24   Q.    AGENT GOMEZ, YOU TESTIFIED THAT YOUR STAY IN GUADALAJARA

25   WAS CUT SHORT.  WHY WAS THAT?

6-44

1          MR. STOLAR:  OBJECTION.  RELEVANCE.

2          THE COURT:  SUSTAINED.

3          MR. CARLTON:  WHEN DID YOU LEAVE GUADALAJARA?

4          THE COURT:  THAT HAS BEEN ASKED AND ANSWERED.

5          MR. CARLTON:  THANK YOU.  NOTHING FURTHER.

6          THE COURT:  YOU MAY STEP DOWN.

7          THE WITNESS:  THANK YOU, YOUR HONOR.

8          (WITNESS EXCUSED.)

9          THE COURT:  CALL YOUR NEXT WITNESS.

10         MR. MEDRANO:  MAY WE HAVE JUST ONE MOMENT, YOUR

11   HONOR?

12         (WITNESS SUMMONED TO THE COURTROOM.)

13         MR. MEDRANO:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

14   WOULD CALL TO THE STAND DR. FELIPE RADELAT.

15

16      FELIPE ALBERTO RADELAT, M.D., + PLAINTIFFS WITNESS, SWORN

17

18         THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

19   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

20         THE WITNESS:  MY LAST NAME IS RADELAT.  MY FULL NAME

21   IS FELIPE ALBERTO RADELAT.

22         THE COURT:  WILL YOU SPELL YOUR LAST NAME, PLEASE.

23         THE WITNESS:  R A D E L A T.

24                DIRECT EXAMINATION +

25   BY MR. MEDRANO:

6-45

1    Q.    GOOD MORNING, SIR.  WHAT IS YOUR PROFESSION?

2    A.    I'M A MEDICAL DOCTOR, SIR.

3    Q.    WHAT TYPE OF MEDICAL DOCTOR ARE YOU, SPECIFICALLY?

4    A.    FAMILY PRACTICE.

5    Q.    HOW OLD ARE YOU, DR. RADELAT?

6    A.    73.

7    Q.    WERE YOU BORN IN THE UNITED STATES?

8    A.    NO, I WAS BORN IN CUBA.

9    Q.    WHEN DID YOU COME TO THE UNITED STATES?

10   A.    LAST TIME I WAS -- IN AUGUST 1960.

11   Q.    HOW LONG HAVE YOU BEEN A MEDICAL DOCTOR, DR. RADELAT?

12   A.    SINCE 1943.

13   Q.    ARE YOU A UNITED STATES CITIZEN?

14   A.    YES, I DO (SIC).

15   Q.    MARRIED?

16   A.    YES, I DO (SIC).

17   Q.    CHILDREN?

18   A.    I HAVE TWO CHILDREN NOW.

19   Q.    AND THEIR AGES?

20   A.    35, 25.

21   Q.    ALBERTO RADELAT; WAS HE YOUR SON?

22   A.    HE WAS.

23   Q.    IS HE DECEASED NOW?

24   A.    HE IS.

25   Q.    WHAT STATE DO YOU CURRENTLY RESIDE IN, DR. RADELAT?

6-46

1    A.    PARDON ME?

2    Q.    WHAT STATE DO YOU CURRENTLY RESIDE IN?

3    A.    (NO RESPONSE.)

4    Q.    WHAT STATE?

5          THE COURT:  WHERE DO YOU LIVE?

6          THE WITNESS:   OH, I LIVE IN TEXAS.  I'M SORRY, I

7    DIDN'T UNDERSTAND.

8    BY MR. MEDRANO:

9    Q.    DR. RADELAT, YOU SHOULD HAVE IN FRONT OF YOU, SIR, A

10   PHOTOGRAPH IDENTIFIED AS GOVERNMENT EXHIBIT 46.

11         DO YOU SEE THAT, SIR?

12   A.    YES.

13   Q.    COULD I ASK YOU TO HOLD IT UP FOR THE JURY AND IDENTIFY --

14         THE COURT:  JUST A MOMENT.

15         MR. MEDRANO:  RATHER -- FIRST --

16         THE COURT:  JUST A MOMENT.

17         MR. MEDRANO:  PUT IT DOWN FIRST, AND JUST IDENTIFY IT

18   FOR US, IF YOU CAN.

19         THE WITNESS:  THIS IS ALBERTO RADELAT, MY OLDEST SON,

20   WHO'S DECEASED NOW.

21         MR. MEDRANO:  YOUR HONOR, WE SEEK ITS ADMISSION AT

22   THIS TIME.

23         THE COURT:  IT MAY BE RECEIVED.  IT IS NOT NECESSARY

24   TO HOLD IT UP.

25         MR. MEDRANO:  THANK YOU, YOUR HONOR.  YOU CAN PUT

6 – 47

1    THAT DOWN, DOCTOR.  THANK YOU.

2    BY MR. MEDRANO:

3    Q.   IN JANUARY OF '85 -- STRIKE THAT.

4              IN DECEMBER OF '84, DR. RADELAT, WAS ALBERTO, YOUR

5    SON, STILL LIVING?

6    A.   YES, HE WAS.

7    Q.   AND AT THAT TIME, WHAT WAS HIS APPROXIMATE AGE?

8    A.   HE WAS 32.

9    Q.   IN DECEMBER OF 1984, WHAT WAS HIS IMMIGRATION STATUS IN

10   THE UNITED STATES?

11   A.   HE WAS A LEGAL RESIDENT.

12   Q.   A LEGAL RESIDENT ALIEN?

13   A.   YES.

14   Q.   I'D LIKE TO DIRECT YOUR ATTENTION TO DECEMBER OF 1984,

15   DR. RADELAT.

16              MR. NICOLAYSEN:  I WANT TO POSE AN OBJECTION TO THE

17   ANSWER AS LACKING FOUNDATION.  THERE IS NO FOUNDATION FOR THE

18   RESPONSE THAT HE WAS A LEGAL RESIDENT ALIEN.

19              THE COURT:  OVERRULED.

20   BY MR. MEDRANO:

21   Q.   I'D LIKE TO DIRECT YOUR ATTENTION, DR. RADELAT, TO

22   DECEMBER OF 1984.

23              WHERE WAS ALBERTO RADELAT IN THE MONTH OF DECEMBER

24   1984?

25   A.   HE WAS IN FORT WORTH, TEXAS.

6-48

1    Q.    AT ANY POINT DOES HE LEAVE FORT WORTH, TEXAS?

2    A.    YES.  ON DECEMBER 29, HE TRAVELED TO MEXICO.

3    Q.    WHERE IN MEXICO?

4    A.    GUADALAJARA.

5    Q.    FOR WHAT PURPOSE?

6    A.    HE WAS ON VACATION.

7    Q.    DID ALBERTO -- STRIKE THAT.

8          WAS ALBERTO RADELAT A PHOTOGRAPHER?

9    A.    HE WAS.

10   Q.    HAVE YOU HEARD THE NAME JOHN WALKER, DR. RADELAT?

11   A.    YES, I DID.

12   Q.    WHEN ALBERTO RADELAT WENT TO GUADALAJARA, WHO WAS HE GOING

13   TO STAY WITH?

14   A.    HE WAS GOING TO STAY WITH JOHN WALKER, WHO WAS HIS FRIEND.

15   THEY BOTH LIKED PHOTOGRAPHY, AND THEY HAD BEEN FRIENDS FOR SOME

16   TIME, ESPECIALLY IN PHOTOGRAPHY.

17   Q.    LET ME DIRECT YOUR ATTENTION NOW TO THE LATTER PART OF

18   JANUARY OF 1985.  DO YOU HAVE ANY CONTACT WITH ALBERTO THE

19   LATTER PART AFTER JANUARY '85?

20   A.    YES.  HE USED TO CALL PERIODICALLY WHEN HE WAS IN MEXICO,

21   GUADALAJARA.  AND ON JANUARY 29TH, HE CALLED MY OFFERS AND HE

22   SPOKE TO MY SECRETARY, AND I WASN'T IN THE OFFICE AT THAT

23   MOMENT.

24          AND SINCE I WASN'T THERE, HE PROMISED TO CALL BACK

25   AGAIN LATER, BY HE DID.

6-49

1   Q.   WHEN HE DID, DID YOU TALK TO HIM?

2   A.   THE PURPOSE OF HIS CALL WAS BECAUSE HE WAS CALLING ON THE

3   31ST, COMING HOME, AND HE WANTED THAT I GO TO PICK HIM UP AT

4   THE AIRPORT.

5   Q.   WHAT DID YOU SAY TO ALBERTO WHEN YOU LEARNED THIS?

6   A.   PARDON ME?

7   Q.   WHAT DID YOU REPLY TO ALBERTO?

8   A.   I EXPLAINED TO HIM THAT I WAS GOING TO BE AN EXPERT

9   WITNESS IN LAS VEGAS, NEVADA.  IF YOU WANT THAT I EXPLAIN WHY I

10  WAS GOING TO BE IT, I DO IT.

11  Q.   THAT'S NOT NECESSARY, BUT WERE YOU GOING TO TESTIFY IN AN

12  UNRELATED PROCEEDING?

13  A.   AS AN EXPERT WITNESS, AS A DOCTOR.

14  Q.   IN A CIVIL CASE?

15  A.   CIVIL CASE.

16  Q.   SO IN LIGHT OF THAT INFORMATION, WHAT DID YOU TELL ALBERTO

17  RADELAT?

18  A.   I TOLD HIM THAT I WAS TRAVELING AROUND THE 10TH, THE NEXT

19  DAY, TO LAS VEGAS, NEVADA.  AND I WAS GOING TO BE IN COURT THE

20  31ST.  I WAS COMING BACK THE 1ST.

21  Q.   OF FEBRUARY?

22  A.   OF FEBRUARY.  AND THAT IF HE COULD, POSTPONE THE TRIP

23  UNTIL THE FOLLOWING DAY, SO HE AGREED.  AND THAT WAS ALL.  WE

24  WERE GOING TO MEET HIM AT THE AIRPORT ON FEBRUARY 1ST.

25  Q.   DO YOU GO TO LAS VEGAS, DOCTOR?

6-50

1   A.   WE DID.

2   Q.   YOU SAY "WE".  WHO WENT WITH YOU?

3   A.   MY WIFE WENT WITH ME.

4   Q.   DID YOU EVENTUALLY RETURN TO FORT WORTH, TEXAS?

5   A.   WE RETURN ON THE 1ST, IN THE MORNING.  AS A MATTER OF

6   FACT, I TOOK AN EARLY FLIGHT SO I WOULD BE EARLY IN THE

7   DALLAS-FT. WORTH AIRPORT TO MEET ALBERTO THAT WAS COMING BACK

8   FROM MEXICO IN AN AIRPLANE THEY FLY.

9   Q.   DID YOU GO TO MEET THE PLANE THAT YOU EXPECTED ALBERTO TO

10  COME IN ON?

11  A.   YES, WE DID.

12  Q.   WHAT HAPPENED?

13  A.   WELL, HE WASN'T IN THAT PLANE.  AND AFTER ALL THE

14  PASSENGERS CAME OUT, HE DIDN'T COME OUT, SO I SAW THE CREW

15  COMING OUT AND I TALKED TO THEM.

16        I ASKED FOR HIM, AND THEY SAID THERE WAS NOBODY ELSE

17  ON THE AIRPLANE, AND WOULD I GIVE THE NAME?  AND THEY SAID

18  THERE WAS NO SUCH A PERSON ON THE PLANE.

19  Q.   THIS IS FEBRUARY 1, 1985?

20  A.   FEBRUARY 1, 1985, CORRECT.

21  Q.   WHAT IS THE NEXT THING THAT YOU DO, DR. RADELAT?

22  A.   PARDON ME?

23  Q.   WHAT IS THE NEXT THING THAT YOU DO, DR. RADELAT?

24  A.   THE MAIN THINGS I DID WAS CALLING GUADALAJARA TO THE

25  TELEPHONE OF A LADY NAMED ELVIRA SANCHEZ.

6-51

1    Q.    WHO WAS ELVIRA SANCHEZ?

2    A.    ELVIRA SANCHEZ WAS THE LANDLORD OF JOHN WALKER.  JOHN

3    WALKER DIDN'T HAVE A TELEPHONE IN HIS HOUSE SO HE USED ELVIRA

4    SANCHEZ'S TELEPHONE.

5         SOMETIME -- I DON'T REMEMBER -- WE GOT ALBERT, AND

6    THEN ELVIRA SANCHEZ TO THE PHONE THROUGH ALBERT.

7         SO WE CALL HER AND SHE EXPLAIN TO US THAT ALBERT AND

8    JOHN WENT OUT ON THE 30TH, THE NIGHT OF THE 30TH, BECAUSE

9    ALBERT WAS COMING BACK THE NEXT DAY, AND HE WAS TREATING HIM

10   WITH DINNER, A GOOD DINNER, GOOD RESTAURANT IN GUADALAJARA.

11   BUT THEY DIDN'T COME BACK.

12   Q.    THEY DIDN'T COME BACK FROM DINNER?

13   A.    NO.

14   Q.    ON JANUARY 30?

15   A.    THEY DIDN'T COME BACK.  AND SHE SAY THAT SHE WENT TO

16   SLEEP, AND THEN LATER,  AROUND 9:00 OR 9:30, SHE DIDN'T HEAR

17   THEM COMING.

18        MR. NICOLAYSEN:  I OBJECT TO THIS ENTIRE ANSWER AS

19   LACKING FOUNDATION AND TOTALLY BEING BASED ON HEARSAY, THE

20   STATEMENTS OF MISS SANCHEZ.

21        THE COURT:  THE OBJECTION IS SUSTAINED.

22        MR. NICOLAYSEN:  I MOVE TO STRIKE.

23        MR. MEDRANO:  WITH YOUR PERMISSION, YOUR HONOR,

24   OFFERED FOR STATE OF MIND, IF NOT -- SIMPLY NOT HEARSAY PURPOSE

25   TO INDICATE WHAT THE WITNESS DOES AFTER HE'S ADVISED OF THIS.

6-52

1          THE COURT:  I THINK YOU CAN GET INTO THAT WITHOUT

2    GOING INTO THIS CONVERSATION.  THE CONVERSATION IS STRICKEN.

3    THE JURY WILL DISREGARD IT.  ASK THE WITNESS WHAT HE DID.

4          MR. MEDRANO:  VERY WELL, YOUR HONOR.

5    BY MR. MEDRANO:

6    Q.   WHAT IS THE NEXT THING THAT YOU DO, DR. RADELAT, AFTER

7    SPEAKING TO ELVIRA SANCHEZ?

8    A.   WAIT AND CALL AGAIN.  I WAS CALLING EVERY DAY TO FIND OUT

9    IF THEY HAD COME BACK, AND ALWAYS WAS THE SAME NEGATIVE ANSWER.

10   Q.   UP TO WHAT TIME --WELL, STRIKE THAT.

11          DO YOU MAKE THESE CALLS FREQUENTLY?

12   A.   EVERY DAY.

13   Q.   DO YOU SPEAK TO ELVIRA SANCHEZ?

14   A.   YES, I DID.

15   Q.   UP TO WHEN DO YOU CONTAIN MAKING THESE PHONE CALLS, DR.

16   RADELAT?

17   A.   PARDON ME?

18   Q.   UP TO WHAT DATE DO YOU CONTINUE MAKING THESE TELEPHONE

19   CALLS?

20   A.   AROUND THE 7TH, I WAS ALREADY WORRIED ABOUT (SIC), AND

21   ALSO IT WAS PUBLISHED IN PAPER, THE DISAPPEARANCE OF D.E.A.

22   CAMARENA.  SO I GOT REALLY CONCERNED ABOUT.

23          SO I DECIDED TO GO TO MEXICO MYSELF, BUT MY WIFE

24   WANTED TO GO WITH ME AND I DIDN'T WANT SHE GO WITH ME, SO I

25   START DELAYING THAT.  AT THE END, I HAD TO LET HER COME WITH

6-53

1    ME, AND I FLEW TO MEXICO, TO GUADALAJARA, ON FEBRUARY 14TH.

2    Q.    WHY DID YOU NOT WANT -- WHAT IS YOUR WIFE'S NAME, DR.

3    RADELAT?

4    A.    ANA.

5    Q.    WHY DID YOU NOT WANT HER TO GO WITH YOU AT THE BEGINNING?

6    A.    BECAUSE I HAVE A BAD FEELING THAT SOMETHING HAD HAPPENED.

7    AND AFTER THE NEWS ABOUT THE DISAPPEARANCE OF THE D.E.A.

8    CAMARENA, I THOUGHT SOMETHING WAS GOING ON AND I WAS -- I

9    DIDN'T WANT TO EXPOSE HER TO SOMETHING.

10   Q.    DR. RADELAT, YOU'RE FLUENT IN SPANISH; ARE YOU NOT?

11   A.    I AM.

12   Q.    ALBERTO RADELAT, WAS HE FLUENT IN SPANISH?

13   A.    HE WAS ALSO FLUENT IN SPANISH.

14   Q.    WHAT IS THE NEXT THING YOU DO IN GUADALAJARA ON FEBRUARY

15   14?

16   A.    FIRST THING, I WENT TO HOTEL.  FROM THERE, I TOOK A TAXI

17   AND GO TO ELVIRA SANCHEZ'S HOUSE.

18   Q.    DO YOU EVER CONVERSE -- WITHOUT TELLING ME WHAT ELVIRA

19   SANCHEZ SAYS, DO YOU SPEAK WITH HER?

20   A.    YES, I SPOKE TO HER, AND SHE YOU TOLD ME --

21   Q.    LET ME STOP YOU.  DID YOU SPEAK TO HER ABOUT ALBERTO

22   RADELAT?

23   A.    EXACTLY.

24   Q.    NOW, AT ANY POINT DO YOU HAVE AN OPPORTUNITY TO EXAMINE

25   ANYTHING WHEN YOU WERE AT THE HOUSE OF ELVIRA SANCHEZ?

6-54

1    A.    LET ME EXPLAIN TO YOU.  WHEN WE ARE DOWN THERE, ELVIRA

2    SANCHEZ TOLD US THAT THAT DAY --

3             MR. NICOLAYSEN:  YOUR HONOR, I OBJECT.  THERE MAY BE

4    HEARSAY IN HERE, AND I WOULD ASK THE COURT TO CAUTION THE

5    WITNESS.

6             THE COURT:  THE QUESTION WAS:  DID YOU HAVE AN

7    OPPORTUNITY TO INSPECT ANYTHING AT THE HOUSE?

8             THE WITNESS:  YES, I DID.

9    BY MR. MEDRANO:

10   Q.    IF YOU COULD JUST ANSWER THAT QUESTION, DR. RADELAT.

11   A.    I WENT TO THE APARTMENT WHERE JOHN WALKER USED TO LIVE AND

12   EXAMINED EVERYTHING THERE.  IT WAS A JAR OF PEANUT BUTTER,

13   STILL OPEN, A CUP OF COFFEE HALFWAY, AND SOMETHING THAT THE

14   PEOPLE THAT WERE THERE LEFT WITH THE PURPOSE OF COMING BACK

15   SOON.  AND THAT --

16            THE COURT:  JUST A MOMENT.  ASK A QUESTION.

17            MR. MEDRANO:  THANK YOU, YOUR HONOR.

18   BY MR. MEDRANO:

19   Q.    DO YOU SEE IN THIS ROOM ANY ITEMS THAT BELONG TO ALBERTO

20   RADELAT?

21   A.    YES.  IN THE ROOM THAT ALBERTO WAS STAYING, ON THE BED

22   THERE WAS A SUITCASE WITH ALL HIS BELONGINGS, VERY WELL

23   ARRANGED.

24   Q.    DID YOU RECOGNIZE THE SUITCASE AS ALBERTO'S?

25   A.    I RECOGNIZE THE SUITCASE, YES.

6-55

1    Q.    WHAT ELSE DO YOU FIND?

2    A.    I FOUND HIS DRIVER LICENSE, ANOTHER I.D. CARD, SOME MONEY,

3    MEXICAN MONEY.  I DON'T REMEMBER ANYTHING ELSE.

4    Q.    DID YOU FIND IN THOSE POSSESSIONS ANY AIRPLANE TICKETS?

5    A.    YES.  THERE WAS AN AIRLINE TICKET, YES.

6    Q.    CAN I DIRECT YOU -- UNDER THE PHOTOGRAPH, WOULD YOU PLEASE

7    LOOK AT GOVERNMENT EXHIBIT 47, DR. RADELAT.

8         COULD YOU TELL US WHAT THAT IS, SIR?

9    A.    THAT IS THE AIRLINE TICKET OF MEXICANA AIRLINES, BELONGING

10   TO ALBERTO, MY SON.  BUT HE NEVER USED IT TO RETURN.

11         MR. MEDRANO:  YOU MAY PUT THAT DOWN.  YOUR HONOR, WE

12   SEEK ITS ADMISSION AT THIS TIME.

13         THE COURT:  THAT MAY BE RECEIVED.

14         (EXHIBIT # 47 RECEIVED IN EVIDENCE.)

15   BY MR. MEDRANO:

16   Q.    DR. RADELAT, WHAT IS THE NEXT THING THAT YOU DO?

17   A.    THE NEXT THING I DID WAS THE NEXT DAY, I WENT TO THE U.S.

18   CONSULATE TO FIND OUT WHAT WAS HAPPENING.

19   Q.    THIS WAS FEBRUARY 15TH, SIR?

20   A.    FEBRUARY 15.

21   Q.    AND --

22   A.    '85.

23   Q.    AND DO YOU MEET AT THE CONSULATE WITH MY REPRESENTATIVE OF

24   THE U.S. CONSUL?

25   A.    YES, I MET A *GEORGE GOLDSTEIN, WAS ONE OF THE U.S.

6-56

1    CONSUL.

2    Q.    THIS IS *GEORGE CHURCHILL?

3    A    GEORGE GOLDSTEIN.

4    Q.    AFTER MEETING WITH *GEORGE CHURCHILL, DO YOU MAKE ANY

5    ATTEMPTS TO LOCATE ALBERTO RADELAT?

6    A.    THEY RECOMMENDED ME TO GO TO THE POLICE DEPARTMENT AND

7    NOTIFY OF THE DISAPPEARANCE OF ALBERTO, MY SON, AND ALSO HIS

8    FRIEND, JOHN WALKER.

9    Q.    DO YOU DO SO?

10   A.    I DID SO.

11   Q.    DID YOU EVER FILE A MISSING PERSONS REPORT?

12   A.    YES.

13   Q.    WHEN IN GUADALAJARA, DR. RADELAT, DID YOU SEARCH ANY

14   PARTICULAR AREAS TO LOOK FOR ALBERTO?

15   A.    YES, I DID.

16   Q.    TELL US WHAT?

17   A.    WELL, I WENT TO THE RESTAURANTS, AND THERE WAS A REPORT

18   ABOUT A TAXI DRIVER SAW TWO AMERICANS GOING TO A RESTAURANT

19   CALLED *CARAMBAS -- GREEN.

20          MR. NICOLAYSEN:  OBJECTION.

21          THE WITNESS:  -- *GREEN.

22          MR. NICOLAYSEN:   YOUR HONOR, THAT'S HEARSAY.  NO

23   HEARSAY EXCEPTION WOULD BE RELEVANT TO THIS TESTIMONY.

24          THE COURT:  THE QUESTION WAS DID YOU SEARCH SOME

25   PLACE?

6-57

1          THE WITNESS:  I DID SEARCH.

2    BY MR. MEDRANO:

3    Q.   JUST TELL US WHERE YOU SEARCHED, DR. RADELAT.

4    A.   I SEARCHED IN THE AREA WHERE THE RESTAURANTS ARE AND THE

5    BEST PLACES IN GUADALAJARA.  THERE IS AN --

6          THE COURT:  YOU HAVE ANSWERED THE QUESTION.  JUST A

7    MOMENT.

8          WAS THERE SOME OTHER PLACE THAT YOU SEARCHED?

9          THE WITNESS:  WELL, THERE WAS OTHER PLACES, BUT

10   MOSTLY IN THE SAME AREA.  RESTAURANTS AND PLACE WHERE YOUNG

11   PEOPLE GO.

12   BY MR. MEDRANO:

13   Q.   DR. RADELAT, DID YOU EVER SEARCH THE JAILS FOR ALBERTO?

14   A.   PARDON ME?

15   Q.   THE JAILS?

16   A.   YES.  WELL, I VISIT WITH THE ATTORNEY GENERAL OF THE STATE

17   OF JALISCO ON THE 17TH, FEBRUARY 17.

18         THE COURT:  WELL, THE QUESTION WAS DID YOU EVER VISIT

19   THE JAILS?

20         THE WITNESS:  I WAS SAYING THAT JUST TO GO TO THE

21   AREA, BECAUSE HE WAS SUGGEST TO ME AND HE ALLOWED TO ME TO GO

22   TO THE JAILS IN GUADALAJARA.

23         I VISIT ABOUT SEVEN JAILS, WITH THE POSSIBILITY THEY

24   WERE ARRESTED OR SOMETHING LIKE THAT.

25   BY MR. MEDRANO:

6-58

1   Q.   AT NONE OF THE LOCATIONS WHERE YOU LOOKED, DR. RADELAT,

2   YOU NEVER FOUND ALBERTO?

3   A.   NO.

4   Q.   FROM FEBRUARY 14, WHEN YOU ARRIVED IN GUADALAJARA, TO THE

5   END OF FEBRUARY, ARE YOU IN GUADALAJARA THAT WHOLE TIME?

6   A.   I WAS IN GUADALAJARA THE WHOLE TIME.

7   Q.   DURING THIS ENTIRE TIME, DR. RADELAT, WERE YOU INVOLVED IN

8   THESE EFFORTS TO ATTEMPT TO LOCATE YOUR SON?

9   A.   YES, I DID.  I VISIT --

10           THE COURT:  YOU'VE ANSWERED THE QUESTION.

11           THE WITNESS:  OKAY.

12   BY MR. MEDRANO:

13   Q.   DO YOU EVER TRAVEL OUTSIDE OF GUADALAJARA IN YOUR

14   CONTINUING EFFORTS, DR. RADELAT?

15   A.   YES.  ON FEBRUARY 28TH, I WENT TO IRAPUATO IN THE STATE OF

16   GUADALAJARA.

17   Q.   FOR WHAT PURPOSE?

18   A.   JUST TO HAVE SOME HELP.  I HAVE SOME KNOWLEDGE OF PEOPLE,

19   AND WE MEET IN THAT PLACE WHO MAYBE COULD HELP ME.

20   Q.   WERE YOU TRYING AT THIS TIME TO RECRUIT ASSISTANCE?

21   A.   ABSOLUTELY.

22   Q.   BESIDES IRAPUATO, DID YOU EVER GO TO MEXICO CITY?

23   A.   YES, I DID.

24   Q.   THE APPROXIMATE DATE FOR THAT WOULD BE?

25   A.   AROUND MARCH THE 3RD.

6-59

1    Q.    DID YOU GO TO MEXICO CITY FOR THE SAME PURPOSE?

2    A.    FOR THE SAME PURPOSE.

3    Q.    TO RECRUIT ASSISTANCE?

4    A.    ABSOLUTELY, YES.

5    Q.    TO YOUR KNOWLEDGE, SIR -- STRIKE THAT.

6          IN THE MONTH OF MARCH, DR. RADELAT, DO YOU EVER LEAVE

7    MEXICO?

8    A.    YES, I DID, AROUND THE MIDDLE OF MARCH.

9    Q.    WHERE DO YOU GO?

10   A.    I CAME BACK TO FORT WORTH, TEXAS.

11   Q.    FOR WHAT PURPOSE?

12   A.    TO GET MONEY.  I WAS GETTING SHORT OF MONEY.

13   Q.    AFTER GETTING MONEY --

14   A.    I WENT BACK TO MEXICO.

15   Q.    THE ENTIRE MONTH OF MARCH OF 1985, ARE YOU INVOLVED IN

16   EFFORTS TO LOCATE ALBERTO IN MEXICO?

17   A.    PARDON ME?

18   Q.    THE ENTIRE MONTH OF MARCH OF 1985, ARE YOU INVOLVED IN

19   EFFORTS TO LOCATE ALBERTO?

20   A.    YES, I DID (SIC).

21   Q.    THE ENTIRE MONTH OF APRIL OF 1985, ARE YOU INVOLVED IN

22   SIMILAR EFFORTS?

23   A.    YES, I DID (SIC).

24   Q.    THE ENTIRE MONTH OF MAY 1985, SIR, THE SAME EFFORTS?

25   A.    YES, I DID.

6-60

1   Q.   I'D LIKE TO DIRECT YOUR ATTENTION TO JUNE OF 1985, DR.

2   RADELAT.

3        WERE YOU STILL IN MEXICO LOOKING FOR ALBERTO THE

4   FIRST HALF OF THE MONTH OF JUNE OF 1985?

5   A.   YES, I WAS.

6   Q.   JUNE 17TH, 1985, WHERE ARE YOU ON THAT DATE?

7   A.   I WAS IN HOTEL IN MEXICO CITY.

8   Q.   WHY WERE YOU IN MEXICO CITY ON JUNE 17TH?

9   A.   AFTER I LEFT GUADALAJARA AT THE END OF MARCH, I WENT TO

10  MEXICO CITY AND SPENT ALL THE TIME THERE, OF COURSE, COMING

11  BACK AND FORTH TO GUADALAJARA.

12       BUT IN MEXICO CITY, I HAVE MORE CONNECTIONS AND I WAS

13  TRYING TO GET SOME HELP FROM THE AUTHORITIES DOWN THERE.

14  Q.   DOES ANYTHING UNUSUAL HAPPEN ON JUNE 17TH, DR. RADELAT?

15  A.   ON JUNE 17TH, I GOT A CALL FROM LARRY LANE, THE GENERAL

16  COUNSEL IN THE EMBASSY, THE U.S. EMBASSY.

17       AND HE YOU TOLD ME THAT I SHOULD GO TO GUADALAJARA

18  BECAUSE THEY HAVE FOUND TWO BODIES, BODIES THAT HAVE BEEN -- HE

19  HAD BEEN TOLD THAT THEY WERE ALBERTO RADELAT, MY SON, AND JOHN

20  WALKER.

21       MR. NICOLAYSEN:  OBJECTION.  HEARSAY, YOUR HONOR.

22       THE COURT:  HE'S EXPLAINING WHAT HE WAS TOLD, NOT FOR

23  THE PURPOSE OF THE TRUTH OF IT.

24       MR. MEDRANO:  THAT IS CORRECT, YOUR HONOR.  NOT

25  OFFERED FOR TRUTH, NO, AT THIS POINT.

6-61

1    MR. NICOLAYSEN:  I WOULD JUST ASK THAT THE JURY BE SO

2  ADVISED ON THAT.

3    THE COURT:  THIS IS TO EXPLAIN THE WITNESS'S CONDUCT.

4  WHAT HE WAS TOLD CANNOT BE ACCEPTED AS TRUE; THAT IS NOT WHY

5  IT'S OFFERED.  IT IS OFFERED SIMPLY TO, PERHAPS, DESCRIBE WHAT

6  HE DID AFTER.

7  BY MR. MEDRANO:

8  Q.   ARE YOU ASKED TO GO TO GUADALAJARA?

9  A.   PARDON ME?

10 Q.   ARE YOU ASKED TO GO TO GUADALAJARA?

11 A.   YES, I WAS ASKED.

12 Q.   DO YOU DO SO, DR. RADELAT?

13 A.   I DID.

14 Q.   DOES ANYBODY GO WITH YOU?

15 A.   MY WIFE AND MRS. STEVE WALKER, JOHN WALKER'S WIFE, AND

16 JOHN WALKER'S MOTHER, FLORENCE WALKER.

17 Q.   HOW DO YOU GET FROM MEXICO CITY TO GUADALAJARA?

18 A.   BY PLANE.

19 Q.   WHEN YOU ARRIVE IN GUADALAJARA, DO YOU GO ANYPLACE?

20 A.   FIRST, I GO TO THE HOUSE OF ELVIRA SANCHEZ, AND LEFT

21 THERE --

22    THE COURT:  YOU HAVE ANSWERED THE QUESTION, SIR.

23 BY MR. MEDRANO:

24 Q.   WHAT IS THE NEXT THING YOU DO, DR. RADELAT?

25 A.   NEXT, I WENT TO THE MORGUE.

6-62

1    Q.   WHO GOES TO THE MORGUE WITH YOU?

2    A.   MY WIFE AND EVE SANTINI WALKER.

3    Q.   THE THREE OF YOU?

4    A.   PARDON ME?

5    Q.   THREE OF YOU?

6    A.   YES.  YES, SIR.

7    Q.   WHAT HAPPENS WHEN YOU GET TO THE MORGUE?

8    A.   WELL, I WALK IN THE DOOR.  THERE WAS A LOCK, AND I KEEP

9    GOING, KNOWING -- ME, MYSELF A DOCTOR, MORE OR LESS I WOULD

10   KNOW WHERE THE CADAVERS ARE.

11           SO I WENT TO A BIG SALON THAT HAS SEVERAL METAL

12   TABLES.  AND AT THAT MOMENT, THERE WAS A FEMALE MEXICAN DOCTOR

13   PERFORMING AN AUTOPSY.

14   Q.   ON A BODY OF A MAN?

15   A.   ON A BODY OF A MAN, YES.

16   Q.   THESE METAL TABLES, DR. RADELAT, ARE THEY SIDE BY SIDE OR

17   PARALLEL?

18   A.   PARALLEL, YES.

19   Q.   WHEN YOU ENTER, DO YOU FIND ANY BODIES OR REMAINS ON THESE

20   PARALLEL TABLES?

21   A.   YES, THERE WAS TWO TABLES; ONE PARALLEL, ONE SIDE BY SIDE,

22   AND ON ONE TABLE WAS THE REMAINS OF ONE PERSON, AND THE NEXT

23   ONE, ABOUT ONE AND A HALF YARDS AWAY, WAS THE REMAINS OF

24   ANOTHER PERSON.

25   Q.   WERE YOU ABLE TO IDENTIFY THE REMAINS OF EITHER OF THOSE

6-63

1    TWO METAL TABLES AS THOSE OF ALBERTO RADELAT?

2    A.    THE VERY FIRST ONE --

3            THE COURT:  JUST A MOMENT.  LET'S STOP THE WITNESS

4    WHEN HE HAS ANSWERED THE QUESTION.

5            MR. MEDRANO:  I'LL DO SO, YOUR HONOR.

6    BY MR. MEDRANO:

7    Q.    WERE YOU ABLE TO IDENTIFY, DR. RADELAT --

8    A.    YES, I WAS.

9    Q.    LET ME JUST ASK YOU, RESPECTFULLY, SIR, JUST TO ANSWER THE

10   QUESTION THAT I ASK YOU, OKAY?

11           THANK YOU.

12           ARE YOU ABLE TO IDENTIFY EITHER OF THOSE TWO REMAINS

13   AS THAT OF OUR SON, ALBERTO RADELAT?

14   A.    YES, I DID.

15   Q.    COULD YOU EXPLAIN TO US CAREFULLY HOW IT IS THAT YOU ARE

16   ABLE TO IDENTIFY THE REMAINING OF ALBERTO RADELAT?

17   A.    WELL, I HAVE THE DENTAL RECORDS, AND THEY MATCH PERFECTLY.

18           ALSO --

19           MR. NICOLAYSEN:   YOUR HONOR, I'M GOING TO OBJECT ON

20   THE GROUNDS THAT THIS PARTICULAR WITNESS HAS NOT BEEN QUALIFIED

21   AS AN EXPERT.  THERE IS A LACK OF FOUNDATION AS TO ANY DENTAL

22   EXAMINATION.

23           THE COURT:  YES.  THE OBJECTION IS SUSTAINED AND THAT

24   ANSWER WILL BE STRICKEN.

25   BY MR. MEDRANO:

6-64

1  Q.   DR. RADELAT, ARE THERE OTHER WAYS FOR YOU TO IDENTIFY THE

2  REMAINS OF ALBERTO?

3  A.   YES, SIR.

4  Q.   CAN YOU TELL US, PLEASE?

5  A.   WELL, MY SON, ALBERTO, HE WAS INVOLVED IN AN AUTOMOBILE

6  ACCIDENT A YEAR BEFORE.  HE FRACTURED HIS JAW, AND HE HAD TO

7  HAVE SURGERY FOR THAT, AND A WIRE WAS PLACED TO PUT TOGETHER

8  THE BONES.  THE FRACTURE WAS THERE AND THE WIRE WAS THERE.

9        ALSO, WHEN HE WAS A YOUNGSTER, HE FRACTURED HIS

10  RADIUS ON HIS WRIST, AND THE CALLUS OF THE FRACTURE WAS THERE.

11  Q.   IN TERMS OF THE SIZE OR HEIGHT OF THE REMAINS, DO YOU HAVE

12  ANY VIEW ON THAT AS TO WHETHER OR NOT THESE WERE COMPATIBLE

13  WITH THE REMAINS OF ALBERTO RADELAT?

14  A.   YES.  ALBERTO WAS FIVE FEET AND SEVEN-AND-A-HALF INCHES,

15  AND MORE OR LESS THAT WAS EXACTLY THE SIZE OF THESE REMAINS.

16  Q.   IN YOUR PRACTICE, DR. RADELAT, HAVE YOU HAD AN OPPORTUNITY

17  TO EXAMINE DENTAL REPORTS?

18  A.   OF COURSE.

19  Q.   AND IN YOUR PRACTICE, HAVE YOU HAD AN OPPORTUNITY TO

20  COMPARE X-RAYS OF DENTAL RECORDS WITH THE ACTUAL PATIENT?

21  A.   I HAVE PARTICIPATED IN MANY AUTOPSIES WHEN I WAS IN

22  HAVANA, CUBA.

23  Q.   WHEN YOU WENT TO THE MORGUE IN GUADALAJARA, DID YOU HAVE A

24  SET OF X-RAYS OF THE DENTAL WORK FOR ALBERTO RADELAT?

25  A.   YES, I DID.

6-65

1    Q.    AND WITH THESE X-RAYS, WERE YOU ABLE TO MAKE ANY

2    COMPARISON, ON THE BASIS OF YOUR EXPERIENCE, WITH THE REMAINS

3    THAT YOU FOUND ON THAT TABLE?

4    A.    YES, I DID.

5            MR. NICOLAYSEN:  YOUR HONOR, I'M GOING TO OBJECT

6    AGAIN.  I DON'T WANT TO MAKE ARGUMENT IN THE PRESENCE OF THE

7    JURY.

8            THE COURT:  JUST OBJECT AND STATE YOUR OBJECTION.

9            MR. NICOLAYSEN:   AGAIN, LACK OF FOUNDATION AND

10   NONDISCLOSURE OF DOCUMENTS DURING THE COURSE OF DISCOVERY.

11   THIS IS ALL MATERIAL.

12           THE COURT:  THE OBJECTION IS SUSTAINED.

13           MR. MEDRANO:  I'LL MOVE ON, YOUR HONOR.  THANK YOU.

14   BY MR. MEDRANO:

15   Q.    WHEN YOU EXAMINED THE REMAINS THAT YOU BELIEVED TO BE

16   ALBERTO'S, DID YOU LOOK AT THE SKULL AREA, AS WELL?

17   A.    PARDON ME?

18   Q.    WHEN YOU EXAMINED THE REMAINS OF ALBERTO, DID YOU LOOK OR

19   EXAMINE THE SKULL AREA, AS WELL?

20   A.    YES, I DID.

21   Q.    DID YOU SEE ANYTHING UNUSUAL THERE?

22   A.    NO, I DIDN'T.

23   Q.    DID YOU FIND ANY TYPE OF -- STRIKE THAT.

24           DID FIND ANY -- I'LL MOVE ON.  THANK YOU.

25           DID YOU HAVE AN OPPORTUNITY TO EXAMINE, DR. RADELAT,

6-66

1   THE PERSONAL REMAINS OF ALBERTO RADELAT?

2   A.   YES, I DID.

3   Q.   COULD YOU DESCRIBE FOR US WHAT IT IS THAT YOU OBSERVED.

4        THE PERSONAL BELONGINGS -- I'M SORRY, I MISSPOKE.

5   THE PERSONAL BELONGINGS IS WHAT I MEANT.

6   A.   THERE WAS A PLAID SHIRT.

7   Q.   A PLAID SHIRT?

8   A.   YES.  AND THERE WAS A BLUEJEANS.

9   Q.   THE PLAID SHIRT -- DO YOU KNOW THE MAKER OR WHERE THIS

10  CAME FROM?

11  A.   IT WAS MADE BY NIEMAN MARCUS.

12  Q.   DID YOU RECOGNIZE THAT SHIRT AS ALBERTO'S?

13  A.   THAT WAS A CHRISTMAS GIST FROM MY YOUNGEST SON TO ALBERTO

14  FOR CHRISTMAS.

15  Q.   WHAT ELSE DID YOU IDENTIFY, IF ANYTHING?

16  A.   THERE WAS A PAIR OF COWBOY BOOTS, SHARK SKIN, THAT I GAVE

17  HIM ON THAT CHRISTMAS, TOO.

18  Q.   AND THERE WAS A BLUEJEANS.

19  Q.   WERE THE SIZE OR LENGTH OF THE JEANS --

20  A.   THAT WAS BELONG TO HIM, YES.  MY WIFE RECOGNIZED IT AS

21  THE SAME ONES.

22        MR. NICOLAYSEN:  OBJECTION, YOUR HONOR, TO TESTIMONY

23  ABOUT SOMEONE ELSE'S PERCEPTION.

24        THE COURT:  SUSTAINED.  STRIKE THE ANSWER.

25  BY MR. MEDRANO:

6-67

1   Q.   THE SIZE OR LENGTH OF THE JEANS, WAS THAT COMPATIBLE WITH

2   THE FIVE FOOT, SEVEN-AND-A-HALF INCH HEIGHT FRAME OF THE

3   REMAINS?

4   A.   CORRECT.

5   Q.   ANY JEWELRY OR PERSONAL ITEMS THAT YOU WERE ABLE TO

6   OBSERVE?

7   A.   YES.  THERE WAS A PLASTIC WATCH OR CHEAP WATCH THAT HE WAS

8   WEARING THE DAY HE LEFT, BECAUSE HE HAS A GOOD WATCH, BUT HE

9   DON'T WANT TO TAKE THE GOOD ONE ON THE TRIP.

10  Q.   WERE YOU ABLE TO IDENTIFY THIS CHEAP, PLASTIC WATCH?

11  A.   YES, IT'S ONE OF THOSE WATCH THAT COST $10 OR SO,

12  SOMETHING LIKE THAT.  SIMPLE.

13  Q.   CAN I ASK YOU TO LOOK AT GOVERNMENT EXHIBIT 48-C, WHICH IS

14  IN FRONT OF YOU, DR. RADELAT?

15          MR. NICOLAYSEN:  YOUR HONOR, I'M GOING TO OBJECT ON

16  CHAIN OF CUSTODY GROUNDS.  THERE HASN'T BEEN A FOUNDATION LAID

17  AS TO THE WATCH THAT WAS IN THE MORGUE AND THE WATCH THAT IS

18  PRESENT IN COURT TODAY, WHICH IS A FOUNDATIONAL ISSUE THAT I

19  THINK MUST PRECEDE ANY IDENTIFICATION HERE.

20          MR. MEDRANO:  THIS WITNESS CAN IDENTIFY IT HERE, YOUR

21  HONOR.

22          THE COURT:  OVERRULED.

23  BY MR. MEDRANO:

24  Q.   DO YOU SEE 48-C, DR. RADELAT?  THE YELLOW TAG HAS THE

25  EXHIBIT NUMBER.

16

6-68

1           (BRIEF PAUSE.)

2           I BELIEVE YOU WENT RIGHT PAST IT ACCIDENTALLY.

3           THE CLERK:  DID YOU SAY 48-C OR 49-C, COUNSEL?

4           THE COURT:  48-C.

5           MR. MEDRANO:  THAT'S 49-C.  I APOLOGIZE.

6           THE WITNESS:  THAT'S IT 49-C.

7    BY MR. MEDRANO:

8    Q.  THANK YOU, DR. RADELAT.  ARE YOU ABLE TO IDENTIFY WHAT

9    49-C IS?

10   A.  YES.  THIS IS A PLASTIC WATCH THAT BELONG -- THIS IS THE

11   PLASTIC WATCH THAT MY SON WAS WEARING WHEN HE LEFT FORT WORTH.

12   Q.  NOW, THERE SHOULD BE ALSO -- LOOK AT 40 -- PERHAPS 49-B.

13   IS THAT IN FRONT OF YOU, AS WELL?

14   A.  49-B.

15   Q.  COULD YOU TELL US WHAT THAT IS?

16   A.  THIS IS A PICTURE OF SOME OF THE THINGS THAT WERE

17   BELONGING TO ALBERTO THAT WERE FOUND ON HIS BODY.

18           THERE IS THIS WATCH, THERE IS GOLD CHAINS AND SOME

19   MEDALS THAT HE WAS WEARING THAT WAS A GIFT FROM HIS MOTHER.

20   Q.  DO YOU RECOGNIZE THAT GOLD CHAIN?

21   A.  I BEG YOUR PARDON?

22   Q.  CAN YOU RECOGNIZE THAT GOLD CHAIN?

23   A.  OF COURSE, I RECOGNIZE THAT.

24           THERE IS SOME MEXICAN MONEY, AND THERE A NECKLACE OR

25   BEADS, AND ONE OF THOSE LUBRICANT FOR THE LIPS.

6-69

1          MR. MEDRANO:  THANK YOU.  YOU CAN PUT THAT DOWN,

2    DR. RADELAT.

3          YOUR HONOR, WE SEEK THE ADMISSION OF 49-B AND -C.

4          THE COURT:  THAT MAY BE RECEIVED.

5          (EXHIBIT 49-B AND C # RECEIVED IN EVIDENCE.)

6    BY MR. MEDRANO:

7    Q    DR. RADELAT, YOU MENTIONED THAT THERE WAS A TABLE OF

8    REMAINS ADJACENT TO ALBERTO'S; IS THAT CORRECT?

9    A    YES, INDEED.

10   Q    DID YOU EVER HAVE AN OPPORTUNITY TO MAKE A CURSORY

11   EXAMINATION OF THOSE REMAINS?

12   A    PARDON ME?

13   Q    DID YOU HAVE AN OPPORTUNITY TO MAKE AN EXAMINATION OF THE

14   SECOND SET OF REMAINS?

15   A    OH, THE SECOND SET?  YES, I DID.

16   Q    AND WAS THERE ANYTHING UNUSUAL -- DID YOU HAVE A CHANCE TO

17   LOOK AT THE SKULL FROM THE SECOND SET OF REMAINS?

18   A    YES, I DID.

19   Q    ANYTHING UNUSUAL ABOUT THAT?

20   A    THERE WAS A BIG HOLE ABOUT FIVE TO SIX CENTIMETERS

21   DIAMETER, WITH IRREGULAR EDGES.

22          MR. NICOLAYSEN:  OBJECTION.  LACK OF FOUNDATION.  NO

23   EXPERT QUALIFICATION TO DO AUTOPSIES.

24          THE COURT:  OVERRULED.

25          THE WITNESS:  CONTINUE?

6-70

BY MR. MEDRANO:

Q    NO.   JUST HOLD ON A MINUTE DOCTOR.   THANK YOU.

      DR. RADELAT, IS THERE ANY QUESTION IN YOUR MIND THAT
THE REMAINS THAT YOU WERE ABLE TO IDENTIFY AS ALBERTO'S WERE IN
FACT THOSE OF ALBERTO RADELAT, YOUR SON?

A    ABSOLUTELY 100 PERCENT, THAT WAS MY SON.

Q    DR. RADELAT, WHERE -- -- STRIKE THAT.

      DID YOU EVER HAVE AN OPPORTUNITY TO VISIT THE GRAVE
SITE WHERE THE REMAINS WERE FOUND?

A    YES, I DID.

Q    WHERE DID YOU GO FOR THIS?

      MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.  THAT ASSUMES
A FACT NOT IN EVIDENCE, WHICH IS THE SO-CALLED GRAVE SITE WHERE
THE BODIES WERE FOUND.

      THE COURT:  SUSTAINED.

BY MR. MEDRANO:

Q    DR. RADELAT, WHERE WAS ALBERTO RADELAT EVENTUALLY BURIED?

A    PARDON ME?

Q    WHERE WAS YOUR SON ALBERTO BURIED?

A    NOW?

Q    YES, SIR.

A    IN FORT WORTH, TEXAS.

      MR. MEDRANO:  YOUR HONOR, MAY I HAVE JUST ONE MOMENT?

      (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

BY MR. MEDRANO:

6-71

1    Q    DR. RADELAT, AT ABOUT THE TIME THAT YOU EXAMINED THE

2    REMAINS IN THE MORGUE, DID YOU EVER MAKE A REQUEST OF THE

3    MEXICAN OFFICIALS TO SEE THE LOCATION WHERE THE REMAINS HAD

4    BEEN FOUND?

5            MR. NICOLAYSEN:  OBJECTION.  ASSUMES A FACT NOT IN

6    EVIDENCE:  A LOCATION WHERE THE REMAINS HAD BEEN FOUND.  NO ONE

7    HAS TESTIFIED TO THAT.

8            THE COURT:  OVERRULED.  HE MAY ANSWER.

9            THE WITNESS:  YES, I DID.

10   BY MR. MEDRANO:

11   Q    AND AFTER MAKING THAT REQUEST, SIR, WERE YOU EVER TAKEN ANY

12   PLACE?

13   A    I WAS.

14   Q    WHERE WERE YOU TAKEN TO?

15   A    PARDON ME?

16   Q    WHERE WERE YOU TAKEN TO?

17   A    BY WHOM?

18   Q    WHERE WERE YOU TAKEN TO?

19   A    OH.  I WAS TAKEN TO A REMOTE PLACE CLOSE TO GUADALAJARA,

20   IT'S ABOUT 12 MILES.  IT'S CALLED PARQUE LA PRIMAVERA.

21   Q    WHO GOES WITH YOU TO THIS REMOTE SITE?

22   A    MY WIFE; MY DAUGHTER; EVE (PHONETIC) WALKER, WHICH IS JOHN

23   WALKER'S WIFE; FLORENCE WALKER, JOHN WALKER'S MOTHER; AND I.

24   Q    AT FIRST -- I'M SORRY.  I DIDN'T MEAN TO CUT YOU OFF.

25            WAS THERE ANYBODY ELSE?

1  A    THERE WAS TWO POLICEMEN IN PLAINCLOTHES.  THEY WERE

2  BELONGING TO THE INTERPOL, ON THE D.E.A. -- THE CHIEF OF THE

3  INTERPOL OF MEXICO, WHOSE NAME WAS FLORENTINO VENTURA.

4  Q    WHEN YOU ARRIVE AT LA PRIMAVERA PARK, DO YOU OBSERVE

5  ANYTHING THERE?

6  A    YES.  THERE WAS A BIG HOLE ABOUT FOUR INCHES WIDE AND -- I

7  MEAN, FOUR FEET WIDE AND SIX TO SIX AND A HALF FEET DEEP.

8       MR. MEDRANO:  YOUR HONOR, THAT CONCLUDES THE DIRECT

9  EXAMINATION.

10      MR. NICOLAYSEN:  MAY WE HAVE A SHORT MORNING RECESS,

11 YOUR HONOR??

12      THE COURT:  PARDON?

13      MR. NICOLAYSEN:  MAY WE HAVE A SHORT MORNING RECESS?

14 I KNOW I HAVE THE CONCURRENCE OF MY CO-COUNSEL ON THAT, AS

15 WELL.

16      THE COURT:  WELL, WE'LL TAKE A SHORT RECESS, FOR ABOUT

17 10 MINUTES.

18      THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN RECESS.

19      (BRIEF RECESS.)

20      (JURY PRESENT:)

21      THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

22      MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

23                    CROSS-EXAMINATION +

24 BY MR. NICOLAYSEN:

25 Q    GOOD MORNING, DR. RADELAT.

1   A    GOOD MORNING.

2   Q    YOU TOLD US ABOUT YOUR THREE MONTHS DOWN IN MEXICO IN 1985,

3   AND I WANT TO DIRECT YOUR ATTENTION TO JUNE 17TH OF 85, THE

4   DATE THAT YOU TOLD US ON DIRECT EXAMINATION YOU HAD VIEWED THE

5   TWO DEAD BODIES.

6        DO YOU RECALL TELLING US ABOUT THAT?

7   A    PARDON ME?

8   Q    DO YOU RECALL TELLING US ABOUT THE VISIT TO THE GRAVE SITE?

9   A    YES, I REMEMBER.

10  Q    WAS THAT ON JUNE 17TH?  DO YOU RECALL THE SPECIFIC DATE?

11  A    NO, I DIDN'T VISIT THE GRAVE ON THE 17TH.  I VISITED THE

12  GRAVE ON THE 20TH.

13  Q    CAN YOU RECALL THE FIRST DATE THAT YOU VISITED WITH

14  FLORENTINO VENTURA, THE COMANDANTE OF INTERPOL?

15  A    I DON'T REMEMBER EXACTLY THE DATE.  BUT IT WAS, I WOULD

16  SAY, AT THE END OF APRIL, 85.

17  Q    END OF APRIL OF 85?

18  A    NOT NECESSARILY.  LATE APRIL, BUT ON THE 20TH OR SOMETHING;

19  MAYBE THE 24TH.  I DON'T REMEMBER EXACTLY.

20  Q    AND ON JUNE 20TH OF 85, WHEN YOU WENT TO SEE THIS AREA IN

21  PRIMAVERA PARK, WAS FLORENTINO VENTURA WITH YOU THERE AT THAT

22  TIME?

23  A    NO.  NO, SIR.

24  Q    DID YOU HAPPEN TO MEET WITH FLORENTINO VENTURA ANY TIME IN

25  THE MONTH OF JUNE 85?  DO YOU RECALL?

6-74

1    A    NO, I DID NOT.

2    Q    DID THERE EVER COME A TIME WHEN YOU AND FLORENTINO VENTURA

3    DISCUSSED THE MEXICAN INVESTIGATION OF THIS LA LANGOSTA MATTER?

4    A    COULD YOU REPHRASE THAT AGAIN?

5    Q    DURING THEIR MEETINGS WITH FLORENTINO VENTURA -- DO YOU

6    HAVE THAT IN MIND, THE MEETINGS WITH COMMANDER VENTURA?

7    A    ARE YOU TALKING ABOUT MY FIRST MEETING WITH HIM?

8    Q    LET'S DO IT STEP BY STEP.

9         YOUR FIRST MEETING WITH COMMANDER VENTURA WAS IN APRIL

10   OF 85; IS THAT YOUR BEST RECOLLECTION?

11   A    RIGHT, YES.

12   Q    DID HE AT THAT TIME DISCUSS WITH YOU THE MEXICAN

13   GOVERNMENT'S INVESTIGATION INTO THE LA LANGOSTA INCIDENT?

14   A    PARDON ME, BUT I DON'T QUITE UNDERSTAND YOUR QUESTION.

15   Q    DID YOU EVER BECOME AWARE AT ANY TIME WHILE YOU WERE DOWN

16   IN MEXICO --

17        THE COURT:  CAN YOU DESCRIBE THE CONVERSATION YOU HAD

18   WITH MR. VENTURA?

19   A    VENTURA?  OH, YES.

20        MR. MEDRANO:  OBJECTION.  HEARSAY, YOUR HONOR, TO ALL

21   OF THIS PORTION.

22        MR. NICOLAYSEN:  I WAS TRYING TO KEEP IT NARROW, YOUR

23   HONOR; BUT I AGREE.  LET'S BROADEN IT AND ASK THE WITNESS TO

24   TELL US GENERALLY.

25        THE COURT:  IF HE CAN RECALL THE CONVERSATION, HE MAY

1    RELATE IT.

2            YOU MAY RELATE THE CONVERSATION YOU HAD WITH HIM ON

3    THE FIRST OCCASION.

4    BY MR. NICOLAYSEN:

5    Q    CAN YOU TELL US ABOUT THAT FIRST MEETING WITH MR. VENTURA?

6    A    WELL, HE ASKED ME, WHAT WAS MY PROBLEM.  SO I EXPLAINED HIM

7    WHAT HAPPENED, THE DISAPPEARANCE OF MY SON AND HIS FRIEND, JOHN

8    WALKER, AND THAT I HAD BEEN KNOCKING AT MANY, MANY DOORS IN

9    MEXICO CITY TO GET HELP.

10            THE COURT:  NOW YOU CAN ASK HIM ABOUT THAT SPECIAL

11    SUBJECT IF HE DISCUSSED IT.

12    BY MR. NICOLAYSEN:

13    Q    NOW, WHILE YOU WERE HAVING THIS DISCUSSION WITH COMMANDER

14    VENTURA, DID YOU DISCUSS --

15    A    WHAT'S THIS WORD THAT HE SAYS?  I DON'T UNDERSTAND THAT

16    WORD.  I'M SORRY.

17    Q    DID YOU DISCUSS, DID YOU TALK ABOUT?

18    A    OH, OKAY.  (LAUGHTER.)  IS THAT A LEGAL WORD?  I NEVER

19    HEARD IT BEFORE.

20            MR. NICOLAYSEN:  LET ME JUST -- IF I MAY, YOUR HONOR,

21    IT MIGHT BE MORE HELPFUL IF WE USE AN INTERPRETER.  I DON'T

22    MEAN THAT IN ANY --

23            THE COURT:  JUST GO AHEAD, COUNSEL.  HE'S DOING FINE.

24            MR. NICOLAYSEN:  ALL RIGHT.

25    Q    DR. RADELAT, KEEP STOPPING ME IF YOU DON'T UNDERSTAND MY

6-76

1    QUESTIONS.

2              DID YOU AND COMMANDER VENTURA TALK ABOUT ANY EFFORTS

3    BY THE MEXICO POLICE TO FIND THE PEOPLE WHO DID THIS LA

4    LANGOSTA INCIDENT?

5    A    WELL, THE IMPRESSION THAT I HAVE FROM COMANDANTE VENTURA --

6    Q    I'M NOT ASKING YOU ABOUT YOUR IMPRESSION, SIR.  I'M ASKING

7    YOU WHETHER YOU ACTUALLY TALKED ABOUT IT.

8              CAN YOU RECALL?

9    A    I DON'T REMEMBER HAVING TALKED ABOUT ANYTHING, BUT

10   MENTIONING WHAT HAPPENED TO US AND I WAS LOOKING FOR HELP,

11   SPECIFICALLY.

12   Q    DID YOU -- WHILE YOU WERE DOWN IN MEXICO, DO YOU RECALL

13   HAVING PREPARED ANY NOTES REGARDING PEOPLE WHOSE NAMES WERE

14   GIVEN TO YOU REGARDING WHAT HAPPENED AT LA LANGOSTA?

15   A    YES, SIR.

16             MR. NICOLAYSEN:  YOUR HONOR, WITH THE COURT'S

17   PERMISSION WOULD I ASK THAT THE WITNESS BE SHOWN A DOCUMENT

18   CONSISTING OF SIX PAGES THAT I WOULD MARK AS DEFENSE EXHIBIT A.

19             THE COURT:  HAVE YOU SHOWN IT TO COUNSEL?

20             MR. NICOLAYSEN:  YES.  IT'S FROM THE GOVERNMENT, IN

21   FACT, YOUR HONOR.

22             MAY I HAND IT TO THE CLERK?

23             THE COURT:  IT MAY BE MARKED.

24             THE CLERK:  B, COUNSEL.

25             MR. NICOLAYSEN:  DEFENSE B?

6-77

1          THE CLERK:  B.

2          (EXHIBIT B # MARKED FOR IDENTIFICATION.)

3          THE COURT:  (EXAMINES EXHIBIT.)  ALL RIGHT.

4          (EXHIBIT PLACED BEFORE WITNESS, WHO EXAMINES SAME.)

5    BY MR. NICOLAYSEN:

6    Q   DR. RADELAT, I'M HANDING YOU A SIX-PAGE DOCUMENT THAT HAS

7    BEEN MARKED AS DEFENSE EXHIBIT B.  DO YOU RECOGNIZE THE

8    HANDWRITING ON THESE SHEETS OF PAPER?

9    A   YES, I DO.

10   Q   IS THAT YOUR HANDWRITING?

11   A   YES.

12   Q   AND DID YOU WRITE THESE SHEETS THAT YOU'RE LOOKING AT NOW

13   WHILE YOU WERE DOWN IN MEXICO, BACK IN 1985?

14   A   YES, I DID.  NOW THAT I SEE IT, I REMEMBER.

15          THE COURT:  YOU'VE ANSWERED THE QUESTION, SIR.

16          MR. NICOLAYSEN:  I'M SORRY.  I DIDN'T HEAR THAT, YOUR

17   HONOR.

18          THE COURT:  I SAID HE'S ANSWERED THE QUESTION.

19   BY MR. NICOLAYSEN:

20   Q   CAN YOU TELL US THE SOURCE OF THE INFORMATION ON THESE

21   SHEETS?

22   A   NEWSPAPERS.

23   Q   STRICTLY NEWSPAPERS?

24   A   YES.

25   Q   AND DID YOU EVER SPEAK WITH ANY POLICE OFFICIALS REGARDING

6-78

1   ANY OF THE NAMES THAT ARE LISTED ON THESE SHEETS?

2   A   NO, I DID NOT.

3   Q   AND CAN YOU TELL US, TO THE BEST OF YOUR RECOLLECTION, WHEN

4   WAS IT THAT YOU GOT THIS INFORMATION FROM THE NEWSPAPERS?   DO

5   YOU RECALL?

6   A   I DON'T RECALL EXACTLY, NO.

7   Q   DO YOU RECALL, SIR, WHETHER COMMANDER VENTURA MENTIONED TO

8   YOU WHILE YOU WERE DOWN IN MEXICO THAT HE HAD INTERROGATED SOME

9   SUSPECTS ON THIS LA LANGOSTA MATTER?

10      MR. MEDRANO:  OBJECTION.  THIS IS CLEARLY HEARSAY,

11   YOUR HONOR.

12      THE COURT:  SUSTAINED.

13   BY MR. NICOLAYSEN:

14   Q   DID ANY OF THIS INFORMATION -- AS YOU SIT HERE TODAY

15   THINKING ABOUT THIS, CAN YOU RECALL IF ANY OF THE INFORMATION

16   ON THESE SHEETS CAME FROM ANY POLICE OFFICIALS?

17      MR. MEDRANO:  OBJECTION.  ASKED AND ANSWERED.

18      THE COURT:  WELL, THE WITNESS MAY ANSWER.

19      THE WITNESS:  WELL, AS I SAY, IT CAME FROM NEWSPAPERS.

20      MR. NICOLAYSEN:  I HAVE NOTHING FURTHER.  THANK YOU,

21   DR. RADELAT.

22      THE COURT:  ANY OTHER DEFENSE COUNSEL WISH TO

23   CROSS-EXAMINE THE WITNESS?

24      DEFENSE COUNSEL:  NO, YOUR HONOR.

25      THE COURT:  ANY REDIRECT?

6-79

1          MR. MEDRANO:  NO REDIRECT, YOUR HONOR.

2          THE COURT:  ALL RIGHT, SIR.  YOU MAY STEP DOWN.

3          CALL YOUR NEXT WITNESS.

4          MR. MEDRANO:  YOUR HONOR, AT THIS TIME, THE GOVERNMENT

5   WILL CALL MARY EVELYN WALKER TO THE STAND.

6          (WITNESS SUMMONED TO COURTROOM.)

7          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

8

9          MARY EVELYN WALKER + PLAINTIFF'S WITNESS, SWORN

10

11         THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

12  NAME FOR RECORD AND SPELL YOUR LAST NAME.

13         THE WITNESS:  MARY EVELYN WALKER, W  A  L  K  E  R.

14                 DIRECT EXAMINATION +

15  BY MR. MEDRANO:

16  Q    GOOD MORNING, MRS. WALKER.  MR. WALKER, WHAT STATE DO YOU

17  CURRENTLY RESIDE IN?

18  A    TEXAS.

19  Q    WHAT IS YOUR PROFESSION AT THIS TIME?

20  A    I'M A TEACHER.

21  Q    YOUR AGE, MRS. WALKER?

22  A    I'M 44.

23  Q    DID YOU KNOW A MAN BY THE NAME OF JOHN WALKER?

24  A    HE WAS MY HUSBAND.

25  Q    IS HE NOW DECEASED?

6-80

1    A    YES, HE IS.

2    Q    DO YOU HAVE ANY CHILDREN?

3    A    WE HAVE TWO DAUGHTERS.

4    Q    AND THERE AGES, APPROXIMATELY?

5    A    THEY'RE 15 AND 13.

6    Q    WHEN DID YOU AND JOHN WALKER GET MARRIED, MRS. WALKER?

7    A    DECEMBER 20TH OF 1972.

8    Q    I WANT TO DIRECT YOUR ATTENTION TO 1983.  AT THAT TIME, WAS

9    JOHN WALKER STILL LIVING?

10   A    YES.

11   Q    AND YOU WERE MARRIED?

12   A    YES.

13   Q    WHERE DID YOU RESIDE AT THAT TIME, IN 83?

14   A    WE LIVED IN ST. PAUL.

15   Q    MINNESOTA?

16   A    YES, MINNESOTA.

17   Q    IN 1983, WHAT WERE YOU DOING AT THAT TIME?  WERE YOU

18   EMPLOYED?

19   A    I WAS A STUDENT AT THE UNIVERSITY OF MINNESOTA, AND MY

20   HUSBAND WAS TAKING GRADUATE COURSES IN PHOTOGRAPHY AND ALSO

21   WORKING IN A PHOTO LAB.

22   Q    JOHN WALKER, HAD HE EVER SERVED IN THE MILITARY?

23   A    YES, SIR.  HE WAS IN THE MARINE CORPS AND HE WAS IN

24   VIETNAM.

25   Q    DO YOU KNOW WHEN IT WAS HE SERVED IN VIETNAM, MRS. WALKER?

6-81

1  A    HE WAS THERE IN 68 AND I BELIEVE PART OF 69.

2  Q    WHEN HE WAS THERE, IN WHAT CAPACITY WAS HE THERE?   WHAT WAS

3  HIS JOB OR ASSIGNMENT?

4  A    HE WAS A MACHINE GUNNER.

5  Q    DURING HIS COURSE OF SERVICE IN THE MILITARY, DID HE EVER

6  SUSTAIN ANY TYPE OF WOUND OR INJURY?

7  A    YES.  HE STEPPED ON A LAND MINE WHEN HE WAS IN VIETNAM AND

8  HE WAS SEVERELY INJURED.  HE WAS MEDIVAC'D FROM VIETNAM.

9  Q    AFTER THAT, DID HE UNDERGO REHABILITATION?

10  A    YES.  HE WAS -- HE WAS VERY SERIOUSLY INJURED.  HE WAS

11  EVENTUALLY TAKEN TO GREAT LAKES NAVAL HOSPITAL, AND HE WAS

12  THERE FOR ABOUT 10 MONTHS, AND HE HAD SEVEN OPERATIONS DURING

13  THAT TIME IN AN ATTEMPT TO SAVE HIS LEGS, WHICH THEY WERE ABLE

14  TO DO.

15  Q    WAS HE ULTIMATELY ABLE TO WALK AGAIN?

16  A    YES.  BY THE TIME HE LEFT THE HOSPITAL, HE COULD WALK ON

17  CRUTCHES, AND THEN LATER WITH A CANE; AND THEN LATER, HE WAS

18  ABLE TO WALK WITHOUT ASSISTANCE.

19  Q    WHEN HE WAS ABLE TO ULTIMATELY, AFTER HIS REHABILITATION,

20  TO WALK, WAS THERE ANY NOTICEABLE LIMP OR GAIT WHEN HE DID SO?

21  A    YES, THERE WAS.  HE HAD NERVE DAMAGE TO HIS FOOT THAT

22  CAUSED HIS TOES TO CRAMP UP AND HE WALKED WITH AN UNUSUAL GAIT,

23  BECAUSE HE DIDN'T ROCK OFF HIS FOOT; RATHER HE TWISTED OFF OF

24  HIS HEEL.  IT WASN'T REAL NOTICEABLE EXCEPT WHEN HE WAS TIRED,

25  AND THEN HE COULDN'T WALK PROPERLY.

6-82

1    Q    ULTIMATELY, WAS HE DISABLED AFTER THIS INJURY?

2    A    EXCUSE ME?

3    Q    WAS HE DISABLED?

4    A    WAS HE DISABLED?  YES, HE WAS.  THEY RETIRED HIM FROM THE

5    SERVICE WITH A 50 PERCENT DISABILITY.

6    Q    DID HE RECEIVE ANY TYPE OF COMMENDATION?

7    A    HE RECEIVED TWO PURPLE HEARTS WITH COMMENDATIONS AND OTHER

8    MEDALS, THAT I'M NOT SURE EXACTLY WHAT THEY WERE.

9    Q    THE LATTER PART OF 1983, WERE YOU STILL, MA'AM, IN ST.

10   PAUL, MINNESOTA?

11   A    YES, WE WERE.

12   Q    AT ANY TIME, DO YOU AND YOUR FAMILY LEAVE ST. PAUL,

13   MINNESOTA?

14   A    I GRADUATED IN JUNE OF THAT YEAR.  AND IN NOVEMBER, RIGHT

15   AFTER THANKSGIVING, WE MOVED -- WE WENT TO MEXICO.

16   Q    WHY DID YOU GO TO MEXICO, MRS. WALKER?

17   A    MY HUSBAND HAD BEEN WORKING ON A NOVEL.  HE WAS A REPORTER,

18   AND HE HAD BEEN WORKING ON A NOVEL FOR SOME TIME BUT HAD HAD A

19   LOT OF TROUBLE FINDING THE TIME TO COMPLETE THE WORK.

20         AND SO WE -- AT ABOUT THAT SAME TIME, THE PESO HAD

21   BEEN ALLOWED TO FLOAT IN RELATION TO THE DOLLAR, SO THAT IT WAS

22   VERY INEXPENSIVE IN DOLLAR TERMS TO LIVE IN MEXICO.

23         SO WE DECIDED -- AND AS A TEACHER, I ALSO HAD A STRONG

24   INTEREST IN LEARNING SPANISH, BECAUSE I KNEW THAT THERE WAS A

25   HIGH DEMAND FOR BILINGUAL TEACHERS IN THE UNITED STATES.

6-83

1              SO THAT THAT WAS OUR MOTIVATION FOR GOING.

2    Q    SO IS IT YOUR ENTIRE FAMILY, INCLUDING YOUR TWO CHILDREN,

3    THAT GO TO MEXICO?

4    A    OH, YES.

5    Q    WHERE DO YOU GO FIRST IN NOVEMBER OF 83?

6    A    WE WENT FIRST TO CUERNAVACA.

7    Q    ANYWHERE AFTER THAT?

8    A    FROM CUERNAVACA, WE WENT TO DURANGO, AND -- WE HAD FRIENDS

9    THERE, AND WE SPENT THE MONTH OF DECEMBER IN DURANGO.

10             AND THEN -- AND THOUGHT THAT WE MIGHT STAY, BECAUSE IT

11   WAS A SMALL, QUIET TOWN AND JOHN LIKED IT, AND I DID AS WELL.

12             BUT THERE WAS ONLY ONE AMERICAN SCHOOL THERE, AND WHEN

13   THE DIRECTOR RETURNED FROM CHRISTMAS VACATION, HE SAID THAT

14   THEY WERE BOUND BY THEIR CHARTER ONLY TO ACCEPT SO MANY

15   STUDENTS, AND THEY WERE AT THEIR LIMIT AND THEY COULD NOT ADMIT

16   OUR DAUGHTERS FOR THE NEXT TERM.

17   Q    DID YOU THEN MAKE A DECISION TO LEAVE DURANGO, MEXICO?

18   A    YES.

19   Q    WHERE DO YOU GO TO?

20   A    WE WENT TO GUADALAJARA BECAUSE THE SCHOOL DIRECTOR

21   SUGGESTED THAT WE GO THERE.

22   Q    SO ABOUT WHAT'S THE TIME FRAME NOW THAT YOU AND YOUR FAMILY

23   ARRIVE IN GUADALAJARA, MEXICO?

24   A    IT WAS ON MY BIRTHDAY, SO I REMEMBER.  IT WAS JANUARY 10TH

25   OF 84.

6-84

1   Q   IN JANUARY 1984, DO YOU COMMENCE TO TAKE SPANISH CLASSES?

2   A   YES.  I WENT TO THE CULTURAL INSTITUTE IN GUADALAJARA AND

3   TOOK INTENSIVE SPANISH.

4   Q   DOES JOHN WALKER COMMENCE WORKING ON HIS NOVEL?

5   A   NIGHT AND DAY, YES.

6   Q   WHAT KIND OF NOVEL WAS IT?

7   A   IT WAS FICTIONAL NOVEL, A MURDER MYSTERY.

8   Q   AND IN 1984 WHAT WAS THE AGE OF JOHN WALKER, MRS. WALKER?

9   A   IN 84 HE WAS 35.

10   Q   LET ME DIRECT YOUR ATTENTION NOW TO ABOUT APRIL OF 1984.

11   AT THAT TIME, DO YOU EVER LEAVE THE REPUBLIC OF MEXICO?

12   A   I DIDN'T IN APRIL, BUT MY HUSBAND DID.

13   Q   AND WHERE DOES HE GO TO?

14   A   HE WENT TO MINNESOTA TO VISIT WITH HIS MOTHER AND TO --

15   HE'D BEEN WORK ON HIS BOOK AND HE HAD A NUMBER OF FACTUAL

16   PROBLEMS THAT HE COULDN'T WORK OUT IN HIS IMAGINATION, SO HE

17   WANTED TO GO TO THE STATES AND SPEND SOME TIME IN LIBRARIES

18   DOING RESEARCH.

19   Q   AND HOW LONG WAS HE GONE WHEN HE LEFT IN APRIL OF 1984?

20   A   ABOUT A MONTH.

21   Q   AND YOU AND THE GIRLS REMAINED BEHIND IN GUADALAJARA?

22   A   YES.  BY THAT TIME I WAS TEACHING AT THE CULTURAL

23   INSTITUTE, IN ADDITION TO TAKING COURSES.

24   Q   DOES JOHN WALKER COME BACK TO GUADALAJARA AFTER HIS

25   ONE-MONTH RESEARCH PERIOD?

1    A    YES.

2    Q    AND ABOUT WHAT TIME IS IT -- STRIKE THAT.

3         WHAT'S THE TIME FRAME WHEN HE REJOINED YOU IN

4    GUADALAJARA?

5    A    WELL, HE WAS -- HE WAS GONE BASICALLY DURING THE EASTER

6    BREAK.  HE LEFT IN APRIL AND HE WAS GONE FOR ABOUT FOUR WEEKS.

7    Q    THEN HE REJOINS YOU?

8    A    YES.

9    Q    AND AT THIS TIME, AGAIN, YOU'RE TEACHING?

10    A    I WAS TEACHING ENGLISH AT THE CULTURAL INSTITUTE, YES.

11    Q    LATER IN 1984, DID YOU EVER LEAVE THE REPUBLIC OF MEXICO?

12    A    YES.  MY TWO DAUGHTERS AND I RETURNED TO THE UNITED STATES

13    IN AUGUST.

14    Q    WHERE DID YOU RETURN TO?

15    A    MINNESOTA.

16    Q    HOW COME?

17    A    WELL, THE SCHOOLS THERE THAT THEY WERE -- AT LEAST THAT WE

18    WERE ABLE TO AFFORD, I DIDN'T FEEL OFFERED THE KIDS AN ADEQUATE

19    EDUCATION.  AND WE KNEW WE WOULDN'T BE THERE OVER THE COURSE OF

20    ANOTHER SCHOOL YEAR, AND I DIDN'T WANT TO MOVE THEM AGAIN IN

21    THE MIDDLE OF A SCHOOL YEAR.

22    Q    WHEN YOU AND THE GIRLS GO TO ST. PAUL, DOES JOHN WALKER

23    REMAIN BEHIND IN GUADALAJARA?

24    A    YES, HE DID.

25    Q    DOES HE CONTINUE WORKING ON HIS MURDER MYSTERY?

1    A    YES.

2    Q    WHEN YOU AND YOUR FAMILY WERE TOGETHER -- STRIKE THAT.

3        WHEN YOU, JOHN AND THE GIRLS WERE TOGETHER IN 84 IN

4    GUADALAJARA, WERE YOU THERE LEGALLY, IN TERMS OF YOUR

5    IMMIGRATION STATUS, IN THE REPUBLIC OF MEXICO?

6    A    OH, YES.  WE WERE ON A TOURIST VISA, SIX-MONTH TOURIST

7    VISA.  AND WHEN I STARTED WORKING AT THE CULTURAL INSTITUTE,

8    THEY BEGAN THE PROCESS OF APPLICATION FOR THE APPROPRIATE

9    PERMITS TO ALLOW ME TO WORK.

10    Q    WHEN YOU AND YOUR DAUGHTERS RETURN IN AUGUST OF 84 TO THE

11    U.S., IS JOHN STILL OPERATING ON THE THE TOURIST VISA IN

12    MEXICO?

13    A    YES.

14    Q    DO YOU KNOW WHEN THAT TOURIST VISA WAS GOING TO EXPIRE,

15    MRS. WALKER?

16    A    IN THE MIDDLE OF FEBRUARY.

17    Q    OF WHAT YEAR?

18    A    OF 85.

19    Q    LET ME DIRECT YOUR ATTENTION NOW TO JANUARY OF 1985.  AT

20    ANY POINT, DO YOU EVER RECEIVE ANY CONTACT OR CORRESPONDENCE

21    FROM JOHN WALKER?

22    A    YES.  WE CALLED EACH OTHER, BUT INFREQUENTLY, BECAUSE IT'S

23    PROHIBITIVELY EXPENSIVE; AND WE RECEIVED LETTERS AND WROTE TO

24    HIM, AS WELL.

25    Q    MRS. WALKER, IF I CAN ASK YOU TO MOVE THE MICROPHONE TO

6-87

1   YOUR LEFT SEVERAL INCHES?

2   A    LIKE THAT?

3   Q    MAYBE JUST A TAD MORE.

4   A    OKAY.  IS THAT ALL RIGHT?

5   Q    THAT'S PERFECT.  YOU DON'T HAVE TO SPEAK DIRECTLY INTO IT.

6   A    OKAY

7   Q    THANK YOU VERY MUCH.

8        LET ME DIRECT YOU TO FEBRUARY OF 1985.  BY THE MIDDLE

9   OF FEBRUARY OF 1985, HAD YOU HEARD AGAIN FROM JOHN WALKER IN

10  ANY FORM OR MANNER?

11  A    YES.  THE GIRLS AND I RECEIVED A LETTER ABOUT THE 28TH, THE

12  END OF JANUARY, OR THE 1ST OF FEBRUARY.

13  Q    IN THE MONTH OF FEBRUARY 1985, WHAT HAPPENS?

14  A    ON FEBRUARY 14TH, I GOT A CALL FROM THE STATE DEPARTMENT

15  AND A LADY BY THE NAME OF SALLY GOLDBERG, AND SHE TOLD ME THAT

16  MY HUSBAND HAD BEEN REPORTED MISSING IN GUADALAJARA.

17  Q    THE FOLLOWING DAY, FEBRUARY 15, DID YOU HAVE ANY FURTHER

18  CONTACT WITH ANY REPRESENTATIVE OF THE UNITED STATES GOVERNMENT

19  WITH REGARD TO JOHN WALKER?

20  A    I CALLED THE NEXT DAY.  I CALLED THE CONSULATE IN

21  GUADALAJARA AND I SPOKE WITH A VICE CONSUL BY THE NAME OF JOY

22  CHURCHILL, AND I ASKED HER WHAT SHE KNEW ABOUT JOHN'S

23  DISAPPEARANCE AND WHAT EFFORTS WERE BEING MADE TO FIND HIM.

24  Q    DO YOU AT THIS TIME, IN YOUR CONVERSATION WITH JOY

25  CHURCHILL, GIVE HER PERMISSION OR AUTHORIZATION TO DO ANYTHING?

6-88

1    A    YES.  I SUGGESTED THAT WE HAD A JOINT CHECKING ACCOUNT WITH

2    BANAMEX IN PLAZA (WHISPERS), GUADALAJARA.  AND I SUGGESTED TO

3    HER THAT SHE CHECK THAT ACCOUNT AND SEE IF ANY WITHDRAWALS HAD

4    BEEN MADE THAT MIGHT SUGGEST THAT -- THEY WERE SAYING TO ME,

5    "WELL, MAYBE YOUR HUSBAND JUST WENT TO THE BEACH."  I DIDN'T

6    THINK THAT WAS LIKELY, BUT HE CERTAINLY WOULD HAVE HAD TO TAKE

7    MONEY OUT OF THE ACCOUNT TO DO THAT.

8         AND I TOLD HER THAT IT WAS JOINT ACCOUNT, AND I GAVE

9    HER THE NUMBERS AND TOLD HER THAT I WOULD GIVE HER MY

10   PERMISSION, IN WRITTEN FORM OR WHATEVER SHE NEEDED TO CHECK THE

11   ACCOUNT.

12        AND BECAUSE I'D BEEN TOLD OUR CAR WAS MISSING, I ALSO

13   GAVE HER A DESCRIPTION OF THE LICENSE NUMBER OF THAT CAR AND

14   SENT AN ENVELOPE WITH PICTURES OF MY HUSBAND TO THE CONSULATE.

15   Q    MRS. WALKER, THE REMAINDER OF FEBRUARY OF 1985, DID YOU

16   CONTINUE HAVING CONTACT WITH U.S. GOVERNMENT OFFICIALS WITH

17   REGARD TO THE DISAPPEARANCE OF JOHN WALKER?

18   A    YES.  I WAS IN ALMOST DAILY CONTACT -- WELL, DAILY CONTACT,

19   REALLY -- WITH PEOPLE IN THE STATE DEPARTMENT AND ALSO MADE

20   FREQUENT CALLS TO THE CONSULATE IN GUADALAJARA.

21        AND I CONTACTED MY SENATORS AND MY CONGRESSMEN TO

22   ENLIST THEIR AID.  AND THEY WERE -- THEY WOULD REQUEST

23   INFORMATION AND RECEIVE THAT INITIALLY BY WIRE AND THEN CALL ME

24   AND READ THE CONTENTS AND THEN LATER SEND ME A COPY OF THE

25   WIRE.

6-89

1  Q    DO YOU EVER TRAVEL TO GUADALAJARA YOURSELF?

2  A    YES.  IN THE FIRST WEEK OF MARCH -- IT WAS, I THINK, MARCH

3  3RD -- I WENT TO GUADALAJARA.

4  Q    FOR WHAT PURPOSE, MRS. WALKER?

5  A    TO FIND OUT WHAT HAPPENED TO DO MY HUSBAND.  I MEAN, TO DO

6  WHAT I COULD TO FIND OUT.

7  Q    IN THE MONTH OF MARCH OF 1985, ARE YOU INVOLVED, IN

8  GUADALAJARA, IN EFFORTS TO LOCATE JOHN WALKER?

9  A    YES.  I --

10  Q    WELL, LET ME JUST ASK YOU A QUESTION.

11  A    YES.

12  Q    IN THE MONTH OF APRIL 1985, ARE YOU INVOLVED IN EFFORTS TO

13  LOCATE JOHN?

14  A    YES.

15  Q    MAY OF 1985?

16  A    YES.

17  Q    WHEN YOU ARE IN MEXICO, DID YOU EVER MEET A MAN BY THE NAME

18  OF DR. FELIPE RADELAT?

19  A    YES, I DID.

20         MR. MEDRANO:  YOUR HONOR, WITH THE COURT'S PERMISSION,

21  THE AREA I'M ABOUT TO GET INTO MIGHT NECESSITATE A RECESS AT

22  SOME POINT.

23         MIGHT WE, JUST FOR TODAY, BREAK ABOUT A FEW MINUTES

24  EARLY BEFORE LUNCH AND THEN START UP WITH THIS PORTION AFTER

25  THE LUNCH HOUR, YOUR HONOR?

6-90

1   THE COURT:  ALL RIGHT.  WE'LL TAKE OUR NOON RECESS AT

2   THIS TIME AND RECONVENE AT 1:30.

3   MR. MEDRANO:  THANK YOU, YOUR HONOR.

4   THE CLERK:  PLEASE RISE.

5   THE COURT:  THE JURY MAY BE EXCUSED.  YOU MAY STEP

6   DOWN.

7   (JURY ABSENT:)

8   THE CLERK:  YOU MAY BE SEATED.

9   THE COURT:  NOW, COUNSEL, WHAT IS IT THAT YOU'RE ABOUT

10  TO GET INTO?

11  MR. MEDRANO:  THE IDENTIFICATION BY MRS. WALKER OF THE

12  REMAINS OF JOHN WALKER, YOUR HONOR.  AND HAVING DISCUSSED THIS

13  WITH MRS. WALKER ALREADY, I'M AWARE THAT SHE MAY GET RATHER

14  EMOTIONAL.

15  AND I THOUGHT IT MIGHT BE BEST TO JUST GO THROUGH THAT

16  ENTIRE PORTION TOGETHER, BECAUSE ONCE WE START INTO IT, IT

17  WOULD HAVE REQUIRED, POSSIBLY, A RECESS; SO I THOUGHT, TO SAVE

18  EVERYBODY TIME, THAT WE MIGHT JUST START WITH THAT AFTER LUNCH.

19  THE COURT:  ALL RIGHT.

20  MR. MEDRANO:  THANK YOU, YOUR HONOR.

21  MR. STOLAR:  I JUST THINK THAT THE COURT SHOULD BE

22  AWARE THAT, AT LEAST ACCORDING TO WHAT THE GOVERNMENT SAYS, WE

23  ARE WAY AHEAD OF SCHEDULE IN TERMS OF WHAT WE DETERMINED TO BE

24  THE PROGRESS OF THE CASE.

25  THE COURT:  I'M NOT SURPRISED.  THAT'S THAT WAY IT

6-91

1    SHOULD BE.

2           COURTROOM:  (LAUGHTER.)

3           THE COURT:  ALL RIGHT.  THANK YOU.

4           THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN RECESS.

5           (NOON RECESS.)

6                          ---0---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6-92

1          LOS ANGELES + CALIFORNIA, WEDNESDAY, MAY 23, 1990

2                          + 1:30 P.M.

3          (JURY ABSENT:)

4          THE COURT:  LET THE RECORD SHOW THE COURT IS CONVENING

5  OUTSIDE THE PRESENCE OF THE JURY; ALL THE DEFENDANTS AND

6  COUNSEL ARE PRESENT.

7          MR. MEDRANO:  YOUR HONOR, I JUST WANTED TO BRING

8  SOMETHING TO THE ATTENTION OF THE COURT.  I'VE ALREADY ADVISED

9  DEFENSE COUNSEL, BUT I THOUGHT YOU SHOULD BE COGNIZANT OF THIS,

10  AS WELL.

11          AT OUR NOON LUNCH RECESS TODAY, YOUR HONOR, I WENT TO

12  THE FOURTH FLOOR TO GET THE OBLIGATORY FOURTH FLOOR SNACK-BAR

13  SANDWICH, AND THEN I WENT TO THE BACK OF THE ELEVATOR TO WAIT

14  FOR AN ELEVATOR TO THE 14TH FLOOR.  I NOTICED THAT THERE WERE

15  TWO WOMEN IN CLOSE PROXIMITY TO ME, BUT I DIDN'T LOOK AT THEM,

16  NOR DID I GET A GOOD LOOK AT THEM.

17          THEN ONE OF THEM, ONE OF THE WOMEN THAT I -- STARTS

18  TALKING TO ME AND TELLS ME THAT SHE HAS A QUESTION FOR ME.  I

19  TURN AROUND AND I SEE THE JUROR TAGS.  AND SHE LOOKED FAMILIAR.

20  SHE LOOKED LIKE ONE OF OUR JURORS.

21          I TOLD HERE -- I ASKED HER IF SHE WAS ONE OF THE

22  JURORS ON THE CASE.  SHE SAID SHE WAS, AND I TOLD HER, "I CAN'T

23  TALK TO YOU."

24          SHE PAUSED, I THINK; AND THEN I REITERATED THAT I WAS

25  NOT ALLOWED TO TALK TO HER, AND I SAID, "I'M SORRY."  AND THEN

6-93

1    SHE PAUSED AGAIN AND THEN SHE GOT INTO THE ELEVATOR WITH A

2    SECOND JUROR, WHO I REALLY DIDN'T GET A GOOD LOOK AT.  I THINK

3    SHE ALSO WAS ON THE JURY, THE SECOND PERSON.

4          THE SECOND WOMAN I DIDN'T SEE, BUT THE FIRST ONE I CAN

5    DEFINITELY IDENTIFY.  IT WAS -- MAY I POINT TO THE CHAIR, YOUR

6    HONOR?  I FORGOT WHICH SEAT NUMBER IT IS.

7          THE COURT:  YES.

8          MR. MEDRANO:  I THINK IT'S ALTERNATE 5, RIGHT HERE,

9    YOUR HONOR.  IT'S A WOMAN.

10         THE COURT:  YES.  THAT WOULD BE ALTERNATE 5.

11         MR. MEDRANO:  YES.  AND SHE WAS THE ONE WHO ADDRESSED

12   ME AND THE ONE I DIRECTED MY REPLIES TO.

13         SO I'VE ADVISED DEFENSE COUNSEL AND I JUST WANTED TO

14   ADVISE THE COURT THAT I IMMEDIATELY TOLD HER I COULDN'T TALK TO

15   HER, AND THAT WAS THE EXTENT OF OUR DISCUSSION.  SO I JUST

16   WANTED TO TELL YOU.

17         THE COURT:  ALL RIGHT.  COUNSEL, DO YOU BELIEVE

18   ANYTHING SHOULD BE DONE ABOUT THIS OTHER THAN TO INSTRUCT THE

19   JURORS THAT THEY SHOULD NOT ATTEMPT TO COMMUNICATE WITH ANY

20   COUNSEL INVOLVED IN THIS CASE?

21         MR. MEDVENE:  WE WOULD RESPECTFULLY ASK IF YOUR HONOR,

22   AT AN APPROPRIATE TIME, MIGHT SEE THE JUROR AND ASK HER WHAT

23   SHE WANTED TO TALK ABOUT, AND THAT WOULD BE THE EXTENT OF THE

24   QUESTIONING, SO WE CAN GET SOME IDEA ABOUT WHAT THE CONTACT WAS

25   ABOUT.

6-94

1          WE APPRECIATE VERY MUCH MR. MEDRANO TELLING US ABOUT

2     WHAT HAPPENED.

3          MR. MEDRANO:  WE WOULD OPPOSE THAT, YOUR HONOR,

4     BECAUSE -- (SHRUGS SHOULDERS.)  WE HAVE NO IDEA WHAT WAS ON HER

5     MIND.  ARGUABLY IT GOES TO JURY DELIBERATION.

6          SO I THINK JUST THE ADMONITION TO THE JURY THAT THEY

7     SHOULD NOT ADDRESS ANY OF THE COUNCIL OR WITNESSES OR READ ANY

8     NEWSPAPER REPORTS OR WHATEVER, I THINK THAT WOULD BE ADEQUATE.

9          THE COURT:  I THINK THAT WOULD BE ADEQUATE.  I DON'T

10    WANT TO GET INTO SOMETHING THAT IS NOT A PROBLEM AT THE PRESENT

11    TIME.

12          WE HAVE NO WAY OF KNOWING WHAT THIS JUROR WANTED, BUT

13    I THINK AN INSTRUCTION TO THESE JURORS THAT THEY NOT SPEAK WITH

14    ANY COUNSEL OR ANYONE ELSE IS SUFFICIENT.

15          THIS IS OUR FIFTH ALTERNATE.  SHE'S NOT LIKELY TO BE A

16    MEMBER OF THIS JURY, IN ANY EVENT.  SO I THINK THAT WE'LL JUST

17    HANDLE IT BY INSTRUCTION.

18          ALL RIGHT.  LET'S BRING THE JURY IN, PLEASE.

19          THE CLERK:  PLEASE RISE.

20          MR. MEDRANO:  YOUR HONOR, WE'RE OUT OF CUPS.  CAN I

21    TAKE ONE OF THOSE OVER THERE, QUICKLY, BEFORE THE JURY COMES

22    OUT?

23          THE COURT:  YES.

24          MR. MEDRANO:  THANK YOU.

25          (JURY PRESENT:)

1          THE CLERK:  YOU MAY BE SEATED.

2          THE COURT:  YOU MAY CONTINUE.

3          MR. MEDRANO:  THANK YOU, YOUR HONOR.

4

5     MARY EVELYN WALKER + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6

7                   DIRECT EXAMINATION + (RESUMED)

8  BY MR. MEDRANO:

9  Q   MRS. WALKER, BETWEEN MARCH OF 1985 AND JUNE OF 1985, WERE

10 YOU INVOLVED IN EFFORTS TO TRY TO LOCATE JOHN WALKER?

11 A   YES, I WAS.

12 Q   CAN I ASK YOU TO MOVE THE MICROPHONE JUST A TAD CLOSER TO

13 YOU.

14 A   (COMPLIES.)

15 Q   THANK YOU.  AS PART OF THOSE EFFORTS, DID YOU SPEND

16 SIGNIFICANT PERIODS OF TIME IN MEXICO?

17 A   YES.

18 Q   WHAT CITIES IN PARTICULAR?

19 A   IN GUADALAJARA AND MEXICO CITY; MOSTLY GUADALAJARA.

20          THE REPORTER:  YOUR HONOR, MAY WE HAVE THE MICROPHONE

21 JUST A TINY BIT CLOSER?

22          THE COURT:  WE DON'T WANT IT TOO CLOSE, BECAUSE WE'LL

23 GET THE FEEDBACK.

24          JUST PLEASE TRY TO SPEAK UP A LITTLE.

25          THE WITNESS:  YES, SIR.

6-96

BY MR. MEDRANO:

Q    DIRECTING YOUR ATTENTION TO THE MIDDLE OF JUNE 1985, MRS. WALKER, WHERE WERE YOU AT THAT TIME?

A    IN THE MIDDLE OF JUNE OF 85?  I WAS -- YOU MEAN AROUND JUNE 15TH?  I WAS IN MEXICO CITY.

Q    WHY WERE YOU IN MEXICO CITY?

A    WE HAD ARRANGED THROUGH AMBASSADOR GAVIN TO HAVE MEETINGS WITH THE THEN MEXICO ATTORNEY GENERAL AND OTHER GOVERNMENT OFFICIALS.

Q    WHAT HAPPENS IN MEXICO CITY?

A    WE ARRIVED FOR THE MEETINGS AND WE WERE TOLD THAT WE WOULD NEED TO WAIT A COUPLE OF DAYS BECAUSE THERE WERE DEVELOPMENTS.

Q    WHAT'S THE NEXT THING THAT HAPPENS?

A    THE MEETINGS WERE RESCHEDULED.  THEY WERE SUPPOSED TO BE ON THE 15TH.  THEY WERE RESCHEDULED FOR THE 18TH.

AS WE WERE LEAVING OUR HOTEL TO GO TO THE FIRST OF THE MEETINGS, WE WERE STOPPED AT THE HOTEL DESK IN THE LOBBY BY THE MOTEL MANAGER, AND HE SAID HE HAD A TELEPHONE CALL.

DR. RADELAT TOOK THE CALL, AND IT WAS FROM LARRY LANE, WHO IS THE CONSUL GENERAL OF MEXICO CITY, AND HE TOLD US TO GO BACK UP TO YOUR ROOMS AND HE'D BE IN TOUCH WITH US.

AND AS WE TURNED TO GO BACK TO THE ELEVATOR TO GO BACK TO OUR ROOMS, A MAN WHO HAD BEEN HELPING DR. RADELAT, WHO WAS AN ATTORNEY IN MEXICO CITY, CAME INTO THE LOBBY OF THE HOTEL AND HE HAD A -- HE HAD A -- THAT DAY'S EDITION OF THE

6-97

1  'INFORMADOR,' AND A BANNER HEADLINE ACROSS THE TOP SAID THAT

2  TWO AMERICANS -- THAT THE TWO AMERICANS WHO HAD BEEN MISSING IN

3  MEXICO, THE BODIES HAD BEEN FOUND THE DAY BEFORE IN

4  GUADALAJARA.  (CRYING.)

5  Q   NOW, AFTER THIS, MRS. WALKER, DO YOU TRAVEL TO THE CITY OF

6  GUADALAJARA?

7  A   YES, SIR.  WE WENT BACK UP TO OUR ROOMS, AND LARRY LANE

8  CALLED.

9            THE COURT:  WELL, MA'AM --

10            THE WITNESS:  OH, I'M SORRY.

11            THE COURT:  -- THE QUESTION WAS:  DID YOU GO TO

12  GUADALAJARA?

13            THE WITNESS:  YES, WE DID.

14            THE COURT:  ALL RIGHT.  THANK YOU.

15  BY MR. MEDRANO:

16  Q   HOW DID YOU GET TO GUADALAJARA, MRS. WALKER?

17  A   WE FLEW.

18  Q   WHO GOES WITH YOU TO GUADALAJARA?

19  A   MY MOTHER-IN-LAW, FLORENCE WALKER; DR. RADELAT; AND ANA

20  RADELAT.

21  Q   IS ANA RADELAT THE WIFE OF THE DOCTOR?

22  A   YES, SHE IS.

23  Q   WHEN YOU ARRIVE AT THE GUADALAJARA AIRPORT, WHERE DO YOU

24  PROCEED NEXT?

25  A   WE FIRST WENT TO THE HOME OF MY LANDLADY.  WE WERE STAYING

6-98

1    AT HER HOUSE?

2    A    HER NAME.

3    Q    ELVIRA CHAVEZ.

4    Q    WHAT HAPPENS NEXT?

5    A    WE LEFT MY MOTHER-IN-LAW THERE, AND THEN DR. RADELAT AND

6    ANA RADELAT AND I STARTED TO GO TO THE MORGUE.  BUT THEN DR.

7    RADELAT REMEMBERED THAT HIS SON ALBERT'S DENTAL X-RAYS WERE IN

8    A LOCKER AT THE AIRPORT.  SO I DROVE BACK TO THE AIRPORT AND HE

9    WENT IN AND GOT HIS SON'S DENTAL X-RAYS, AND THEN WE WENT TO

10   THE CITY MORGUE.

11        MR. NICOLAYSEN:  I'M GOING TO OBJECT TO ANY REFERENCES

12   TO DENTAL RECORDS.

13        THE COURT:  THE OBJECTION IS OVERRULED.

14   BY MR. MEDRANO:

15   Q    WHERE DO YOU GO FROM THE GUADALAJARA AIRPORT THEN?

16   A    WE DROVE DIRECTLY TO THE CITY MORGUE.

17   Q    IS THIS IN THE CITY OF GUADALAJARA?

18   A    YES.

19   Q    WHAT HAPPENS WHEN YOU GET TO THE MORGUE, MRS. WALKER?

20   A    IT WAS DARK BY THIS TIME.  IT WAS EVENING.  AND SO WE

21   WEREN'T SURE IF ANYBODY WOULD BE THERE.

22        DR. RADELAT HAD BEEN THERE BEFORE, SO --

23        THE COURT:  JUST A MOMENT, PLEASE.

24        COUNSEL, THESE QUESTIONS, OF "WHAT HAPPENED," INVITE A

25   NARRATIVE.  CAN YOU MAKE YOUR QUESTIONS --

6-99

1          MR. MEDRANO:  I'LL BE MORE SPECIFIC, YOUR HONOR.

2          THE COURT:  -- SPECIFIC AND GET TO THE POINT?

3          MR. MEDRANO:  I WILL, YOUR HONOR.  THANK YOU.

4    Q    MRS. WALKER, DO YOU ENTER THE MORGUE?

5    A    YES.  (PAUSE.)  YES.

6    Q    AND DO YOU ENTER WITH DR. RADELAT?

7    A    YES?

8    Q    WHEN YOU WENT TO THE MORGUE, DID YOU SEE BODIES OR REMAINS?

9    A    YES.

10   Q    NOW, AT ANY TIME, DO YOU HAVE AN OPPORTUNITY TO IDENTIFY

11   THE REMAINS OF ANYONE?

12         MR. NICOLAYSEN:  OBJECTION TO THE TERM "REMAINS OF

13   ANYONE," YOUR HONOR.  THERE'S BEEN NO FOUNDATION.

14         THE COURT:  WELL, ARE YOU ASKED TO VIEW AND TRY TO

15   IDENTIFY SOME REMAINS?

16         THE WITNESS:  YES, I WAS.

17   BY MR. MEDRANO:

18   Q    ARE THERE REMAINS FOR MORE THAN ONE INDIVIDUAL?

19   A    THERE WERE TWO SKELETONS.

20   Q    ARE THEY ON TABLES?

21   A    YES.

22   Q    ARE THESE TABLES, MRS. WALKER, SIDE-BY-SIDE?

23   A    YES, IN A ROW, GOING DOWN THE ROOM.  (INDICATING.)

24   Q    ARE YOU ASKED TO IDENTIFY THE REMAINS, POSSIBLY, OF JOHN

25   WALKER?

6-100

1    A    YES.

2    Q    ARE YOU ABLE TO DO SO?

3    A    YES.

4    Q    HOW DO YOU KNOW IT'S JOHN WALKER?

5         MR. NICOLAYSEN:  YOUR HONOR, I'M GOING TO OBJECT TO

6    THE LEADING NATURE OF THE QUESTIONS.  I WOULD ASK THAT A MORE

7    FORMAL FOUNDATION BE SET.

8         THE COURT:  OVERRULED.

9    BY MR. MEDRANO:

10   Q    HOW ARE YOU ABLE TO IDENTIFY?

11   A    AS SOON AS I LOOKED -- AS SOON AS I LOOKED AT THEM -- IT

12   WAS ONLY A SKELETON, BUT NOT JUST A SKELETON.

13        THERE WERE -- THERE WERE PARTS OF HIS -- (CRYING.)

14   THERE WERE PARTS OF HIS BODY STILL ON HIM.  THERE WAS ONE OF

15   HIS EYES.  AND ON AL, THERE WAS HIS UPPER LIP CURLED UNDER,

16   WITH HIS MUSTACHE.

17        AND THEY WERE SKELETONS, BUT THERE WAS ABSOLUTELY --

18   IT WAS -- THEY -- IT WAS JOHN.  IT WAS UNMISTAKABLY JOHN.

19   Q    MRS. WALKER, YOU MENTIONED THE TEETH.  WAS THERE ANYTHING

20   CHARACTERISTIC OR UNIQUE ABOUT THE TEETH TO SUGGEST TO YOU THAT

21   IT WAS JOHN WALKER?

22   A    YES, JOHN HAD VERY -- HE HAD VERY GOOD TEETH.  HE HAD --

23   HIS TEETH WERE PERFECT.

24        IN FACT, THE PATHOLOGIST THERE TOLD ME THAT'S WHY SHE

25   THOUGHT HE WAS YOUNGER THAN HE ACTUALLY WAS.  HE HAD VERY

6-101

1   WHITE, VERY EVEN TEETH.

2   Q   WERE THERE --

3   A   AND THEY WERE HIS TEETH.

4   Q   YOU MENTIONED THE EYES OR AN EYE.  WAS THERE ANYTHING

5   CHARACTERISTIC ABOUT THE EYE COLOR?

6   A   (CRYING.)  YES.  HIS EYES WERE BROWN, AND TO ME THEY WERE

7   VERY -- UNMISTAKABLE.  I LOOKED AT THOSE SAME EYES FOR 15

8   YEARS.  I KNEW THAT WAS HIM.

9   Q   YOU MENTIONED BEFORE THAT JOHN HAD A LEG INJURY FROM

10  VIETNAM; CORRECT?

11  A   YES.

12  Q   WAS THERE ANYTHING UNIQUE OR CHARACTERISTIC ABOUT THE

13  REMAINS YOU OBSERVED RELATING TO A LEG INJURY?

14  A   YES.  ON ONE OF HIS LEGS, WHEN HE STEPPED ON THE LAND MINE,

15  IT RIPPED AWAY ALL THE MUSCLE, ALMOST ALL OF THE MUSCLE AND ALL

16  OF THE FLESH IN HIS SHIN.  AND AT ONE POINT, THERE WAS JUST A

17  SMALL LAYER OF SKIN COVERING THE BONE THERE.

18         AND HE WORRIED ABOUT THAT, BECAUSE HE WORRIED ABOUT

19  DAMAGE TO THAT BONE.  AND WE BOTH NOTICED THAT IT SEEMED TO BE

20  THICKER THERE.  AND I NOTICED ON HIS LEG BONE THAT IT WAS; IT

21  WAS -- A LARGE CALCIFICATION HAD DEVELOPED THERE, RIGHT WHERE

22  THAT GOUGED-OUT AREA HAD BEEN.

23  Q   WAS THE HEIGHT OF THE REMAINS CONSISTENT WITH THE HEIGHT OF

24  JOHN WALKER?

25  A   SKELETONS AREN'T -- (CRYING.)  I MEAN -- YES, IT DID; AND

6-102

1    PARTICULARLY WHEN -- IN PROPORTION TO ALBERT.

2    Q    MRS. WALKER, WERE YOU ABLE TO IDENTIFY ANY PERSONAL

3    BELONGINGS OR ITEMS RELATING TO THE REMAINS OF MR. WALKER?

4    A    YES.

5    Q    WERE YOU ABLE TO IDENTIFY ANY PERSONAL BELONGINGS THAT YOU

6    SAW?

7    A    YES.

8    Q    CAN YOU TELL US WHAT YOU WERE ABLE TO IDENTIFY?

9    A    THEY SHOWED ME A BLACK T-SHIRT WITH A SINGLE POCKET.

10   Q    AND WERE YOU FAMILIAR WITH THAT T-SHIRT?

11   A    YES.  HE HAD SEVERAL EXACTLY LIKE THAT.

12   Q    WAS THIS A PULLOVER-TYPE T-SHIRT?

13   A    YES, JUST AN ORDINARY, EVERYDAY T-SHIRT; ONE OF THOSE

14   POCKET T'S, AND LEE JEANS, WHICH HE ALWAYS WORE BECAUSE HE WAS

15   VERY SLENDER, SO HE BOUGHT LEE LEAN JEANS.

16            BUT THE -- THE ITEM THAT WAS MOST UNMISTAKABLE WAS --

17   WERE HIS SHOES.  HE ALWAYS  -- HE WORE NIKE TENNIS SHOES.  AND

18   BECAUSE OF THE WAY THAT HE WALKED, HE SPUN OFF OF HIS HEEL AS

19   HE WALKED, AND HIS HEEL WOULD ALWAYS WEAR A HOLLOWED-OUT PLACE

20   IN THE INSOLE OF HIS SHOES BEFORE THE SHOES WERE HARDLY WORN AT

21   ALL, AND HE WOULD FILL THAT AREA UP WITH LAMB'S WOOL FROM TIME

22   TO TIME.

23            AND SHE SHOWED ME THE SHOES AND THEY -- THEY WERE HIS

24   SHOES.

25   Q    THEY WERE NIKE SHOES?

6-103

1   A   YES.

2   Q   AND WERE THESE WORN OUT IN THE FASHION THAT YOU DESCRIBED?

3   A   YES.

4   Q   WERE YOU ULTIMATELY ALLOWED THE TAKE THE REMAINS BACK TO

5   THE UNITED STATES?

6   A   YES.

7   Q   ON OR ABOUT WHAT DATE, MRS. WALKER?

8   A   I THINK IT WAS 21ST.

9   Q   WAS MR. WALKER BURIED IN SAINT PAUL?

10  A   YES.  SNELLING.  FORT SNELLING NATIONAL CEMETERY.

11  Q   MRS. WALKER, HAS THE D.E.A. PROVIDED YOU WITH ANY TYPE OF

12  FINANCIAL ASSISTANCE?

13  A   IN A SENSE.

14  Q   AND HAVE YOU RECEIVED MONEY FROM THE D.E.A., MRS. WALKER?

15  A   YES.

16  Q   APPROXIMATELY WHAT AMOUNT, DO YOU KNOW?

17  A   I THINK THE TOTAL WAS 4,000 -- 4,500?  AROUND $4,500.00.

18  I'M NOT SURE OF THE EXACT AMOUNT.

19  Q   AND APPROXIMATELY WHAT TIME PERIOD DID YOU RECEIVE THIS

20  MONEY, DO YOU RECALL?

21  A   LATE OCTOBER AND NOVEMBER.

22          THE COURT:  WHAT YEAR?

23          THE WITNESS:  OH, EXCUSE ME.  1989.

24  BY MR. MEDRANO:

25  Q   AND WHAT WAS THE MONEY PROVIDED FOR, MRS. WALKER?

6-104

1    A    TO RELOCATE TO THE UNITED STATES.  I WAS LIVING IN MEXICO

2    JUST PRIOR TO THE ANNOUNCEMENT OF THESE INDICTMENTS AND I WAS

3    ASKED TO RELOCATE TO THE UNITED STATES.

4            MR. MEDRANO:  YOUR HONOR, MAY I HAVE JUST ONE MOMENT.

5            (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

6            MR. MEDRANO:  YOUR HONOR, THAT CONCLUDES DIRECT AT

7    THIS TIME.

8            THE COURT:  YOU MAY CROSS-EXAMINE.

9            MR. NICOLAYSEN:  NO QUESTIONS, YOUR HONOR.

10           (NO OTHER DEFENSE COUNSEL RESPONDS.)

11           THE COURT:  ALL RIGHT, MA'AM.  YOU MAY STEP DOWN.

12   THANK YOU.

13           CALL YOUR NEXT WITNESS.

14           MR. MEDRANO:  YOUR HONOR, PERHAPS I MISTAKENLY FAILED

15   TO ASK TO ADMIT THE PHOTOGRAPH OF MR. WALKER.  WE WOULD DO SO

16   AT THIS TIME.

17           THE COURT:  IT MAY BE ADMITTED.

18           (EXHIBIT 45 # RECEIVED IN EVIDENCE.)

19           MR. MEDRANO:  THE GOVERNMENT CALLS ESTELLA FUENTES NOW

20   TO THE STAND, YOUR HONOR.

21           THE COURT:  WHAT WAS THE NAME?

22           MR. MEDRANO:  ESTELLA FUENTES.

23           MR. NICOLAYSEN:  YOUR HONOR, I WAS NOT GIVEN ANY

24   JENCKS MATERIAL ON THIS PARTICULAR WITNESS DURING --

25           MR. MEDRANO:  THERE IS NONE, YOUR HONOR.

6-105

1          MR. NICOLAYSEN:  AND I WAS TOLD THAT THIS WITNESS

2    WOULD TESTIFY --

3          THE COURT:  COUNSEL, I DON'T WANT THESE STATEMENTS

4    MADE IN THE PRESENCE OF THE JURY.

5          MR. NICOLAYSEN:  I DO HAVE AN OBJECTION TO THE TIMING

6    OF THE WITNESS'S TESTIMONY, YOUR HONOR.

7          THE COURT:  TO THE TIMING OF THE TESTIMONY?

8          MR. NICOLAYSEN:  RIGHT.

9          THE COURT:  WELL, THAT'S HERE -- OVER HERE, PLEASE.

10          (AT SIDEBAR:)

11          THE COURT:  THIS IS THE TYPE OF THING I'M TRYING TO

12    AVOID.

13          MR. NICOLAYSEN:  I DO UNDERSTAND THAT.

14          THE COURT:  DID YOU KNOW THIS WITNESS WAS GOING TO BE

15    CALLED TODAY??

16          MR. NICOLAYSEN:  NO.  THAT'S THE REASON THAT I HAD

17    ASKED YOUR HONOR TO HEAR US AT SIDEBAR.  I WAS GIVEN A LIST OF

18    WITNESSES THAT DID NOT INCLUDE HER.

19          AND JUST SO THE RECORD IS CLEAR, I WAS AWARE THAT SHE

20    WOULD BE CALLED AT SOME POINT AND I HAD ASKED GOVERNMENT

21    COUNSEL IF THEY COULD TELL ME GENERALLY IF IT WOULD BE LATER

22    THIS WEEK OR MAYBE EARLY NEXT WEEK, AND THEY TOLD ME THEY

23    WEREN'T SURE.

24          THEY DID GIVE ME A LIST OF WITNESSES THROUGH TODAY.

25    SHE WAS NOT ON THE LIST.  THE SPECIFIC WITNESS I WAS EXPECTING

1    TO BE CALLED WAS NAMED ENRIQUE PLASCENCIA AGUILAR, AND I'M

2    PREPARED FOR THAT WITNESS, YOUR HONOR.

3          THERE WAS ANOTHER WITNESS THAT THE GOVERNMENT HAD

4    POSSIBLY WANTED TO CALL, BUT THEY STRUCK HIM FROM THE LIST AND

5    THEY NOTIFIED ME.

6          SHE IS A COMPLETE SURPRISE.  I'M NOT PREPARED TO CROSS

7    HER, AND I DO HAVE SOME PRIVILEGE OBJECTIONS THAT I WAS GOING

8    TO FILE BY WRITTEN MOTION.

9          THE COURT:  WELL, LOOK, THEY CAN PUT ON THE DIRECT

10   TESTIMONY.  YOU KNOW, YOU CAN CROSS-EXAMINE TO THE EXTENT THAT

11   YOU CAN.  IF YOU WANT FURTHER CROSS-EXAMINATION AFTER

12   PREPARATION, I'LL PERMIT YOU TO RECALL HER FOR THAT PURPOSE.

13         MR. NICOLAYSEN:  WELL, I APPRECIATE THAT.  I'M ALSO

14   CONCERNED, THOUGH, ABOUT IMPROPER TESTIMONY REGARDING

15   CONFIDENTIAL MARITAL COMMUNICATIONS.  SHE IS THE FORMER SPOUSE

16   OF MY CLIENT.

17         THE COURT:  THE FORMER SPOUSE OF YOUR CLIENT?

18         MR. NICOLAYSEN:  THAT'S CORRECT.

19         THE COURT:  HAVE YOU EVER RAISED THIS ISSUE BEFORE?

20         MR. NICOLAYSEN:  I HAVEN'T NEEDED TO RAISE IT BEFORE.

21   I WAS GOING TO FILE A MOTION IN LIMINE BEFORE HER TESTIMONY,

22   RAISING THAT SPECIFIC ISSUE.  I DON'T KNOW WHAT SHE'S GOING TO

23   TESTIFY ABOUT --

24         THE COURT:  WHAT IS THIS WITNESS GOING TO TESTIFY TO?

25         MR. NICOLAYSEN:  -- BUT I WOULD ASK FOR AN OFFER OF

6-107

1   PROOF.

2          MR. MEDRANO:  COUNSEL HAS KNOWN OF THE EXISTENCE OF

3   THIS WITNESS FOR MONTHS BEFORE THIS TRIAL STARTED.  THERE WAS

4   NO JENCKS MATERIAL FOR THE WITNESS.

5          AND FOR THE RECORD, YESTERDAY WE DID ADVISE CO-DEFENSE

6   COUNSEL OF THE ORDER OF WITNESSES FOR TODAY, AND ESTELLA

7   FUENTES WAS ON THAT LIST, YOUR HONOR.

8          MS. KELLY:  NO, SHE WASN'T, YOUR HONOR.  I'LL VERIFY

9   THAT.

10         MR. NICOLAYSEN:  SHE WAS NOT.  ABSOLUTELY NOT.

11         THE COURT:  LOOK, THE PURPOSE OF NOTIFYING YOU IS SO

12  THAT IF THERE IS JENCKS MATERIAL YOU HAVE AN OPPORTUNITY TO

13  PREPARE ON IT.  THERE IS NO MATERIAL IN THIS CASE, SO WHAT --

14         MR. NICOLAYSEN:  I WOULD SUBMIT THAT THE OTHER PURPOSE

15  OF NOTIFICATION IS SO WE CAN PROPERLY RAISE WRITTEN OBJECTIONS

16  TO THE COURT BEFORE THE JURY IS BROUGHT DOWN IN THE MORNING, AS

17  I DID WITH, FOR EXAMPLE, DR. RADELAT THIS MORNING.

18         THE COURT:  BUT THE JENCKS IS NOT REQUIRED TO BE

19  PROVIDED UNTIL THE WITNESS TESTIFIES.

20         MR. NICOLAYSEN:  I UNDERSTAND, BUT I'M SPEAKING ABOUT

21  OTHER OBJECTIONS; FOR EXAMPLE, LACK OF FOUNDATION.  IN HER CASE

22  ITS WOULD BE PRIVILEGE OBJECTIONS.

23         THE COURT:  WELL, WHY HAVEN'T YOU RAISED THIS BEFORE?

24  HE SAYS YOU'VE KNOWN FOR MONTHS ABOUT THIS.

25         MR. NICOLAYSEN:  BECAUSE -- NO.  I KNEW STARTING

6-108

1  MONDAY THAT SHE WAS GOING TO BE CALLED AS A GOVERNMENT WITNESS.

2  I FOUND OUT THROUGH THE FAMILY.  TODAY IS WEDNESDAY.

3      YESTERDAY I TOLD GOVERNMENT COUNSEL I WAS AWARE THAT

4  SHE MIGHT BE CALLED AND ASKED WHEN SHE WOULD BE CALLED, AND

5  THEY SAID THE END OF THE WEEK MAYBE.

6      THE COURT:  ARE YOU INTENDING TO ELICIT ANY

7  COMMUNICATIONS FROM THIS WITNESS --

8      MR. MEDRANO:  YES, YOUR HONOR.

9      THE COURT:  -- THAT SHE HAD WITH HER HUSBAND DURING

10  THAT MARRIAGE?

11      MR. MEDRANO:  LET ME JUST STATE TO YOU THIS, YOUR

12  HONOR; THAT IN ADDITION, LET ME STATE THAT A SECRETARY OR

13  REPRESENTATIVE OF MR. NICOLAYSEN'S OFFICE HAS SPOKEN IN SPANISH

14  TO MRS. FUENTES PRIOR TO HER APPEARANCE TODAY.  SO MR.

15  NICOLAYSEN IS AWARE OF HER EXISTENCE.

16      THIS IS WALK-IN BUSINESS, YOUR HONOR.  HE KNOWS THAT

17  SHE EXISTED, BECAUSE HIS INVESTIGATOR HAS SPOKEN TO HER --

18      THE COURT:  ALL RIGHT.

19      MR. MEDRANO:  BUT THIS IS THE FIRST TIME HE RAISED IT.

20      MR. NICOLAYSEN:  I HAVE KNOWN OF HER.  I'LL GO ON THE

21  RECORD AND SAY THAT.  I DID NOT KNOW --

22      THE COURT:  HAVE YOU HAD HER INTERVIEWED?

23      MR. NICOLAYSEN:  ON THE PHONE.

24      BUT WHAT I HAVE NOT KNOWN IS THAT SHE WAS GOING TO BE

25  CALLED AS A WITNESS UNTIL MONDAY.

6-109

1       THE COURT:  ALL RIGHT.  YOU'VE SAID THAT ALREADY.

2  LET'S STOP HERE.

3       MR. NICOLAYSEN:  I HAVE NO IDEA WHAT SHE'S GOING --

4       THE COURT:  THE WITNESS MAY TESTIFY.  YOU MAY

5  CROSS-EXAMINE HER; YOU MAY MAKE ANY OBJECTIONS YOU WISH TO HER

6  TESTIMONY.  IF, AFTER YOU'VE CROSS-EXAMINED HER, YOU FEEL YOU

7  NEED ADDITIONAL TIME, I WILL PERMIT YOU TO DEFER FURTHER

8  CROSS-EXAMINATION UNTIL SUCH TIME AS YOU'RE READY TO PROCEED

9  WITH HER.

10      MR. NICOLAYSEN:  VERY WELL.  THANK YOU, YOUR HONOR.

11      (OPEN COURT:)

12      THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

13

14      ESTELLA FUENTES ORTIZ + PLAINTIFF'S WITNESS, SWORN

15

16      THE CLERK:  YOU MAY BE SEATED.  PLEASE STATE YOUR FULL

17  NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

18      THE WITNESS:  (TESTIFYING THROUGH INTERPRETER:)

19  ESTELLA FUENTES ORTIZ.

20      THE CLERK:  AND SPELL YOUR LAST NAME.

21      THE WITNESS:  O  R  T  I  S -- Z.

22               DIRECT EXAMINATION +

23  BY MR. MEDRANO:

24  Q   GOOD AFTERNOON, MRS. FUENTES.  MRS. FUENTES, I UNDERSTAND

25  YOU DO SPEAK SOME ENGLISH.  IS THAT CORRECT?

6-110

1   A    YES.

2   Q    WOULD YOU PREFER TO GO IN ENGLISH OR WITH THE USE OF THE

3   INTERPRETER?

4   A    WITH THE AID OF THE INTERPRETER.

5   Q    MRS. FUENTES, HOW OLD ARE YOU?

6   A    38 YEARS.

7   Q    WERE YOU BORN IN THE UNITED STATES?

8   A    NO.

9   Q    WHERE WERE YOU BORN?

10  A    I WAS BORN IN LA NORIA, TARIMORO, GUANAJUATO, MEXICO.

11  Q    GUANAJUATO, IS THAT A STATE IN MEXICO?

12  A    YES.

13  Q    DO YOU KNOW JAVIER VASQUEZ VELASCO?

14  A    YES.

15  Q    WHO IS THIS?

16  A    WHO IS JAVIER VASQUEZ?

17  Q    YES, MA'AM.

18  A    HE IS MY HUSBAND.

19  Q    DO YOU HAVE CHILDREN?

20  A    YES.

21  Q    WHAT ARE THEIR AGES?

22  A    14 AND 13.

23  Q    WHERE WERE YOU MARRIED -- ON WHAT DATE DID YOU MARRY JAVIER

24  VASQUEZ VELASCO?

25  A    4TH OF MAY OF 1974.

6-111

1    Q    MRS. FUENTES, IF I CAN ASK YOU, WITH THE COURT'S

2    PERMISSION, TO STAND FOR A MOMENT --

3    A    (COMPLIES.)

4    Q    -- AND IF YOU COULD TELL ME IF YOU SEE JAVIER VASQUEZ

5    VELASCO IN THE COURTROOM TODAY --

6    A    YES.

7    Q    -- CAN I ASK YOU TO POINT HIM OUT AND DESCRIBE SOMETHING

8    HE'S WEARING?

9          MR. NICOLAYSEN:  I'LL STIPULATE IT'S MY CLIENT, YOUR

10   HONOR.

11         THE COURT:  VERY WELL.  THE RECORD WILL INDICATE THAT

12   COUNSEL STIPULATES THAT IT'S HIS CLIENT, AND THE JURY MAY

13   ACCEPT THAT AS A FACT.

14         MR. MEDRANO:  YOU MAY SIT DOWN, MRS. FUENTES.  THANK

15   YOU.

16   Q    MRS. FUENTES, WHEN DID YOU COME TO THE UNITED STATES TO

17   RESIDE PERMANENTLY?

18   A    THE 4TH OF MAY OF 1970.

19   Q    AND WHAT IS YOUR CURRENT IMMIGRATION STATUS HERE IN THE

20   UNITED STATES?

21   A    RESIDENT.

22   Q    WHEN YOU CAME IN 1970, WHERE DID YOU RESIDE INITIALLY IN

23   THE UNITED STATES?

24   A    EAST LOS ANGELES.

25   Q    HOW LONG DID YOU RESIDE IN EAST L.A.?

6-112

1   A   FOUR YEARS.

2   Q   UNTIL 1974?

3   A   YES.

4   Q   AND IS THAT WHEN YOU MARRIED JAVIER VASQUEZ VELASCO?

5   A   YES.

6   Q   THEREAFTER, DID YOU MOVE TO ANOTHER LOCATION?

7   A   YES.

8   Q   WHERE TO, MRS. FUENTES?

9   A   NORWALK.  NORWALK, CALIFORNIA.

10  Q   HOW LONG DID YOU RESIDE THERE?

11  A   SIX YEARS.

12  Q   AS OF TODAY, ARE YOU STILL LEGALLY MARRIED TO JAVIER

13  VASQUEZ VELASCO?

14  A   YES.

15  Q   BUT, ARE YOU SEPARATED FROM HIM PRESENTLY?

16  A   YES.

17  Q   AND HOW LONG HAVE YOU BEEN SEPARATED, APPROXIMATELY?

18          MR. NICOLAYSEN:  YOUR HONOR, I'M GOING TO RENEW MY

19  OBJECTIONS AT THIS TIME.

20          THE COURT:  THE QUESTION OF HOW LONG SHE'S BEEN

21  SEPARATED IS NOT SUBJECT TO OBJECTION.  THAT WAS THE QUESTION.

22          ARE YOU OBJECTING TO THAT QUESTION?

23          MR. NICOLAYSEN:  NO, NOT TO THE QUESTION, BUT RENEWING

24  THE OBJECTION I STATED EARLIER.

25          THE COURT:  WELL, THERE'S NO NEED TO RENEW IT.  YOU

6-113

1   CAN STILL OBJECT TO ANY QUESTION THAT IS ASKED.

2   BY MR. MEDRANO:

3   Q   HOW LONG HAVE YOU BEEN SEPARATED?

4   A   10 YEARS.

5   Q   IN 19 -- AFTER NORWALK, CALIFORNIA, DID YOU MOVE AGAIN?

6   A   YES.

7   Q   WHERE TO?

8   A   HOUSTON, TEXAS.

9   Q   AND IS THAT WHERE YOU RESIDE PRESENTLY?

10  A   YES.

11  Q   IS THAT FROM 1981 TO THE PRESENT?

12  A   YES.

13  Q   MRS. FUENTES, HOW DO YOU SUPPORT YOURSELF?

14  A   I SELL FRUITS AND VEGETABLES.

15      MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

16  (PAUSE.)

17  Q   MRS. FUENTES, I'D LIKE TO DIRECT YOUR ATTENTION, IF I MAY,

18  TO ABOUT DECEMBER OF 1984.  AT THAT TIME, DID YOU HAVE AN

19  OPPORTUNITY TO SEE JAVIER VASQUEZ VELASCO?

20  A   YES.

21  Q   WHEN WAS THIS, MRS. FUENTES?

22  A   DECEMBER OF 84.

23  Q   DO YOU RECALL -- STRIKE THAT.

24      DO YOU ACTUALLY SEE JAVIER VASQUEZ VELASCO IN DECEMBER

25  OF 84?

6-114

1    A    YES.

2    Q    WHERE?

3    A    IN LA NORIA, TARIMORO, GUANAJUATO.

4    Q    WHEN WAS THE DATE, IF YOU RECALL, THAT YOU SAW HIM IN LA

5    NORIA, MEXICO?

6    A    DECEMBER 21ST 1984.

7    Q    DID YOU HAVE YOUR CHILDREN WITH YOU AT THE TIME THAT YOU

8    SAW JAVIER VASQUEZ?

9    A    YES.

10   Q    AND HOW THEN DID YOU  -- STRIKE THAT.

11        DID YOU SPEND A PERIOD OF TIME WITH JAVIER VASQUEZ IN

12   LA NORIA?

13   A    YES.

14   Q    AND THE KIDS WERE WITH YOU THE WHOLE TIME?

15   A    YES.

16   Q    WHEN WAS IT THAT JAVIER VASQUEZ ACTUALLY ARRIVED IN LANORIA

17   TO SEE YOU AFTER YOU HAD ARRIVED?

18   A    ON DECEMBER 21ST.

19   Q    WERE YOU ON VACATION AT THAT TIME, THEN, WITH JAVIER

20   VASQUEZ?

21   A    YES.

22   Q    WHERE DID YOU GO WITH JAVIER VASQUEZ AT THAT TIME, ON

23   VACATION?

24   A    WE WENT TO THE CITY OF QUERETARO, TO MEXICO CITY, TO PUEBLA

25   STATE, TO THE CITY OF TOLUCA, TO SANTA ANA, AND WE WENT TO

1    VISIT SEVERAL FARMS THAT ARE LOCATED IN THOSE AREAS.

2    Q    MRS. FUENTES, DO YOU EVENTUALLY RETURN TO HOUSTON, TEXAS?

3    A    YES.

4    Q    WHEN WAS THAT, MRS. FUENTES?

5    A    JANUARY 2ND 1985.

6    Q    DID JAVIER VASQUEZ GO BACK WITH YOU TO HOUSTON?

7    A    NO.

8    Q    WHERE DID HE GO?

9         MR. NICOLAYSEN:  OBJECTION.  LACK OF FOUNDATION, YOUR

10   HONOR.

11        THE COURT:  YES.  RESTATE YOUR QUESTION.

12   BY MR. MEDRANO:

13   Q    DID JAVIER VASQUEZ ADVISE YOU WHERE HE WAS GOING TO GO?

14        MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.  IT'S HEARSAY,

15   NOT AN ADMISSION.

16        THE COURT:  SUSTAINED.

17        MR. MEDRANO:  801, YOUR HONOR.

18        THE COURT:  PARDON?

19        MR. MEDRANO:  RULE 801 ADMISSION AGAINST THE PARTY.

20        THE COURT:  THE OBJECTION IS SUSTAINED.

21   BY MR. MEDRANO:

22   Q    JAVIER VASQUEZ DID NOT RETURN TO HOUSTON WITH YOU, THOUGH;

23   IS THAT CORRECT?

24   A    CORRECT.

25   Q    HOW ARE YOU SURE -- STRIKE THAT.

6-116

1          HOW DO YOU KNOW IT WAS ON JANUARY 2, 1985, THAT YOU

2    AND YOUR KIDS RETURN TO HOUSTON, TEXAS?

3    A    BECAUSE THEY HAD TO GO BACK TO SCHOOL.

4    Q    I'D LIKE TO DIRECT YOUR ATTENTION NOW, MRS. FUENTES, TO

5    NOVEMBER OF 1989, LAST YEAR.  IN THE MONTH OF NOVEMBER OF 1989,

6    DID YOU EVER RECEIVE ANY CORRESPONDENCE FROM JAVIER VASQUEZ

7    VELASCO?

8    A    YES.

9          MR. NICOLAYSEN:  YOUR HONOR I'M GOING TO OBJECT TO ANY

10   FOLLOW-UP QUESTIONS CONCERNING ANY SUCH CORRESPONDENCE.

11         THE COURT:  WELL, LET'S WAIT FOR THE QUESTION.

12   BY MR. MEDRANO:

13   Q    WHEN YOU GOT THE LETTER, MRS. FUENTES, DO YOU RECALL WHEN

14   IT WAS THAT YOU RECEIVED THE LETTER, APPROXIMATELY?

15   A    NOVEMBER 27TH.

16   Q    OF 1989?

17   A    YES.

18   Q    WHEN YOU GOT THE LETTER, DID YOU RECOGNIZE JAVIER VASQUEZ'S

19   HANDWRITING?

20   A    YES.

21   Q    WAS THERE A SIGNATURE THAT YOU COULD RECOGNIZE ON THAT SAME

22   LETTER?

23   A    YES.

24   Q    WAS THAT FROM JAVIER VASQUEZ?

25   A    YES.

6-117

1    Q    CAN YOU TELL US WHAT IT IS THAT WAS WRITTEN TO YOU IN THIS

2    LETTER, MRS. FUENTES?

3             MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.

4             THE COURT:  THE OBJECTION IS SUSTAINED.

5             MR. MEDRANO:  BRIEFLY, YOUR HONOR, 801 ADMISSION

6    STATEMENTS AGAINST A PARTY IN INTEREST.

7             THE COURT:  THE OBJECTION IS SUSTAINED.

8             MR. MEDRANO:  THANK YOU, YOUR HONOR.

9             YOUR HONOR, THAT CONCLUDES DIRECT AT THIS TIME.

10            MR. NICOLAYSEN:  NO QUESTIONS, YOUR HONOR.

11            THE COURT:  YOU MAY STEP DOWN.

12            CALL YOUR NEXT WITNESS.

13            MR. MEDRANO:  YOUR HONOR, AT THIS TIME, THE GOVERNMENT

14   WOULD CALL ENRIQUE PLASCENCIA AGUILAR TO THE STAND.

15            (WITNESS SUMMONED TO COURTROOM.)

16            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17

18       ENRIQUE PLASCENCIA AGUILAR + PLAINTIFF'S WITNESS, SWORN.

19

20            THE CLERK:  YOU MAY BE SEATED.

21            PLEASE STATE YOUR FULL NAME FOR THE RECORD.

22            THE WITNESS:  (TESTIFYING THROUGH INTERPRETER:)

23   ENRIQUE PLASCENCIA AGUILAR.

24            THE CLERK:  AND SPELL YOUR LAST NAME.

25            THE WITNESS:  P  L  A  S  C  E  N  C  I  A.

6-118

1              MR. MEDRANO:  YOUR HONOR, WITH THE COURT'S PERMISSION,

2       MAY I HAVE SPECIAL AGENT KUEHL PLACE RIGHT IN FRONT OF THE

3       WITNESS THE EXHIBITS, WHICH ARE BEHIND THE INTERPRETER AT THIS

4       POINT?

5              THE COURT:  YES.

6              MR. MEDRANO:  THANK YOU, YOUR HONOR.  AND ALSO AT THIS

7       TIME PUT UP THE DIAGRAM, SO AS NOT TO INTERRUPT THE DIRECT?

8              THE COURT:  YES.

9              MR. MEDRANO:  THANK YOU.

10             (AGENT KUEHL COMPLIES.)

11                      DIRECT EXAMINATION +

12      BY MR. MEDRANO:

13      Q    GOOD AFTERNOON, MR. PLASCENCIA.

14      A    GOOD AFTERNOON.

15      Q    MR. PLASCENCIA, WHERE WERE YOU MARRIED -- WHERE WERE YOU

16      BORN?  I'M SORRY.

17      A    IN IXTAPLAN, JALISCO.

18      Q    ARE YOU A CITIZEN OF THE REPUBLIC OF MEXICO?

19      A    YES.

20      Q    ARE YOU MARRIED?

21      A    YES.

22      Q    CHILDREN?

23      A    YES.

24      Q    HOW MANY?

25      A    SIX.

6-119

1   Q   MR. PLASCENCIA, HOW OLD ARE YOU, SIR?

2   A   40 YEARS.

3   Q   MR. PLASCENCIA, HAVE YOU EVER SERVED IN THE MEXICAN

4   MILITARY?

5   A   YES.

6   Q   WHEN WAS THAT, SIR?

7   A   IN 1981 -- 1988.  EXCUSE ME.

8   Q   I'M SORRY.  WHAT YEAR WAS THAT, AGAIN?

9   A   1968 TO 1971.

10  Q   WHEN YOU WERE IN THE MILITARY, WERE YOU IN A PARTICULAR

11  STATE IN MEXICO?

12  A   YES.

13  Q   WHERE WAS THAT?

14  A   ESPERANZA, SONORA.

15  Q   WHILE IN THE MILITARY, WERE YOU TRAINED IN THE USE OF

16  FIREARMS, MR. PLASCENCIA?

17  A   YES.

18  Q   AFTER 1971, DID YOU EVER SERVE IN ANY LAW ENFORCEMENT

19  AGENCY IN MEXICO?

20  A   YES.

21  Q   WILL YOU TELL US WITH WHO?

22  A   THE STATE PREVENTIVE POLICE.

23  Q   WHEN DID YOU SERVE WITH THEM?

24  A   1973 TO 1976.

25  Q   DID YOU EVER SERVE WITH THE STATE PREVENTIVE POLICE ON

6-120

1    OTHER OCCASIONS, AS WELL?

2    A    YES.

3    Q    DO YOU RECALL THE YEARS OF THAT?

4    A    1980, 1981.

5    Q    WERE THERE OTHER PERIODS OF SERVICE, AS WELL?

6    A    YES.  1976, 1977.

7    Q    ANY OTHER PERIODS?

8    A    1988, 1989.

9    Q    I DIRECT YOUR ATTENTION TO ABOUT 1981, MR. PLASCENCIA.  AT

10   THAT TIME, WHO WERE YOU EMPLOYED BY?

11   A    FOR THE SWAT TEAM.

12   Q    HOW LONG -- IN WHAT CITY WAS THAT?

13   A    GUADALAJARA, JALISCO.

14   Q    AND FROM 1981 UNTIL WHEN WERE YOU WITH THE SWAT TEAM IN

15   GUADALAJARA?

16   A    TO 82.

17   Q    IN THAT SAME TIME PERIOD, 81 AND 82, DID YOU ALSO HAVE

18   ANOTHER JOB AT THE SAME TIME?

19   A    YES.

20   Q    DO YOU KNOW A MAN BY THE NAME OF ANTONIO GARATE?

21   A    YES.

22   Q    IN 1981, DID YOU WORK WITH ANTONIO GARATE?

23   A    YES.

24   Q    IN WHAT CAPACITY?

25   A    AS A DRIVER.

6-121

1  Q    DID YOU ALSO SERVE AS A BODYGUARD FOR HIM?

2  A    YES.

3  Q    MR. PLASCENCIA, LET ME DIRECT YOUR ATTENTION NOW TO ABOUT

4  DECEMBER OF 1984, BEFORE CHRISTMAS.  AT THAT TIME, WERE YOU IN

5  THE CITY OF GUADALAJARA?

6  A    YES.

7  Q    IN DECEMBER OF 1984, DID YOU EVER GO TO A RESIDENCE THAT

8  BELONGED TO ERNESTO FONSECA CARRILLO?

9  A    YES.

10  Q    WAS THERE A PARTICULAR NAME GIVEN TO THIS RESIDENCE OF

11  FONSECA?

12  A    YES.

13  Q    WHAT WAS THAT, MR. PLASCENCIA?

14  A    LA BAJADITA.

15  Q    WHEN YOU GO TO THIS HOUSE, ARE YOU ACCOMPANIED BY ANYBODY?

16  A    YES.

17  Q    WHO WAS THAT?

18  A    ANTONIO GARATE BUSTAMANTE.

19  Q    WHEN YOU GET -- STRIKE THAT.

20         WHEN YOU GO TO LA BAJADITA, FONSECA'S RESIDENCE, DO

21  YOU DRIVE THERE?

22  A    YES.

23  Q    WHO'S DRIVING?

24  A    I DO.

25  Q    WHAT KIND OF CAR IS IT WHEN YOU GOT THERE -- STRIKE THAT.

6-122

1          WHAT KIND OF CAR TO GO IN TO GET TO LA BAJADITA?

2    A    A MALIBU, AMERICAN, BROWN IN COLOR.

3    Q    WHAT HAPPENS WHEN YOU ARRIVE IN THE CAR AT LA BAJADITA?

4    A    MR. ANTONIO GARATE GOT OUT IN ORDER TO ASK IF ERNESTO

5    FONSECA CARRILLO WAS THERE.

6    Q    WHAT'S THE NEXT THING THAT HAPPENS?

7    A    HE GOES AND HE ASKS FOR HIM AND HE IS TOLD THAT HE IS NOT

8    IN.

9    Q    DOES ANTONIO GARATE ENTER THE RESIDENCE CALLED LA BAJADITA?

10   A    YES.

11   Q    DO YOU ENTER WITH HIM INITIALLY?

12   A    NO.

13   Q    WHY IS THIS PLACE CALLED LA BAJADITA?

14         MR. NICOLAYSEN:  OBJECTION.  NO FOUNDATION, YOUR

15   HONOR.

16         MR. STOLAR:  OBJECTION.

17         THE COURT:  SUSTAINED.

18   BY MR. MEDRANO:

19   Q    AFTER ANTONIO GOT TO ENTER THIS RESIDENCE, WHERE DO YOU

20   STAY?

21   A    OUTSIDE IN THE CAR.

22   Q    AT ANY POINT, DOES ANYONE ELSE ARRIVE WHILE YOU WERE

23   OUTSIDE IN THE CAR?

24   A    YES.

25   Q    WHO, MR. PLASCENCIA?

6-123

1   A    MR. ERNESTO FONSECA CARRILLO, MR. SAMUEL RAZO.

2   Q    LET ME STOP YOU THERE.

3           YOUR HONOR MAY I HAVE JUST ONE MOMENT?   (PAUSE.)

4           MAY I ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT 17,

5   WHICH SHOULD BE RIGHT IN FRONT OF YOU, MR. PLASCENCIA.

6   AND THE NUMBER SHOULD BE ON THE LITTLE YELLOW TAG.

7           HAVE YOU FOUND EXHIBIT NO. 17?

8   A    YES.

9   Q    CAN YOU IDENTIFY THAT FOR US?

10  A    YES.

11  Q    WHAT IS IT?

12  A    IT'S MR. ERNESTO FONSECA CARRILLO.

13  Q    YOU CAN PUT THAT DOWN, SIR.   THANK YOU.

14          WHEN FONSECA CARRILLO ARRIVES, DOES HE GET THERE IN A

15  CAR?

16  A    YES.

17  Q    WHAT KIND OF CAR WAS IT?

18  A    IT'S A MERCURY, GRAY IN COLOR, BULLETPROOF.

19          MR. STOLAR:   OBJECT AND MOVE TO STRIKE "BULLETPROOF."

20  NO FOUNDATION.

21          THE COURT:   YES.   SUSTAINED.   STRIKE THAT STATEMENT.

22  BY MR. MEDRANO:

23  Q    DOES ERNESTO FONSECA -- STRIKE THAT.

24          WHEN FONSECA CARRILLO ARRIVES, DO YOU SEE HIM WHEN HE

25  ARRIVES?

6-124

1    A   YES.

2    Q   DO YOU TALK TO HIM?

3    A   YES.

4    Q   WHAT DOES HE SAY TO YOU?

5            MR. STOLAR:  OBJECTION.

6            MS. KELLY:  OBJECTION.

7            MR. STOLAR:  HEARSAY.

8            THE COURT:  SUSTAINED.

9            MR. MEDRANO:  THANK YOU, YOUR HONOR.

10   Q   DOES ERNESTO FONSECA CARRILLO ENTER THE LA BAJADITA

11   RESIDENCE?

12   A   YES.

13   Q   DO YOU DO SO, AS WELL?

14   A   YES.

15   Q   AND WHEN YOU GO IN, I WANT YOU TO DESCRIBE FOR US WHAT

16   EXACTLY IT IS THAT YOU SEE.  WHAT ELSE IS INSIDE THE HOUSE WHEN

17   YOU INITIALLY ENTER, BESIDES FONSECA CARRILLO?

18   A   THE PEOPLE THAT ACCOMPANIED HIM.

19   Q   AND DO YOU KNOW THEIR NAMES?

20   A   JUST ONE OF THEM.

21   Q   AND WHAT WAS HIS NAME?  DO YOU RECALL?

22   A   SAMUEL RAZO.

23   Q   NOW, WHEN YOU'RE INSIDE THE HOUSE, WHO ELSE, IF ANYBODY, DO

24   YOU SEE THERE?

25   A   THERE WERE MANY PEOPLE THERE.

6-125

1  Q    CAN YOU GIVE ME SOME OF THE NAMES, PLEASE?

2  A    YES.

3  Q    WHAT WAS THAT?

4  A    JUAN GILBERTO HERNANDEZ, JORGE SALAZAR, ANTONIO GARATE

5  BUSTAMANTE, AVELARDO FERNANDEZ, RAFAEL CARO QUINTERO, JAVIER

6  QUESADA, ANTONIO VASQUEZ VELASCO, EZEQUIEL CERVANTES, JAVIER

7  VASQUEZ VELASCO, ELISEO VASQUEZ VELASCO.

8          THESE ARE THE PEOPLE I REMEMBER.

9          MR. NICOLAYSEN:  YOUR HONOR, I WOULD ASK FOR A

10  LIMITING INSTRUCTION REGARDING ANY TESTIMONY REGARDING MY

11  CLIENT.  THIS HAS NOTHING TO DO WITH THE COUNTS IN THE

12  INDICTMENT, 1 AND 2, THIS MEETING THAT IS BEING DISCUSSED AT

13  FONSECA'S HOUSE.  IT'S COMPLETELY UNRELATED TO THE --

14          THE COURT:  OVERRULED.

15  BY MR. MEDRANO:

16  Q    YOU MENTIONED JAVIER VASQUEZ VELASCO.

17          YOUR HONOR, WITH YOUR PERMISSION, MAY I HAVE THE

18  WITNESS STAND UP FOR A MOMENT?

19          THE COURT:  YES.

20          THE WITNESS:  YES.

21  BY MR. MEDRANO:

22  Q    CAN YOU TELL ME IF YOU SEE JAVIER VASQUEZ VELASCO IN THIS

23  COURTROOM, SIR?  AND PLEASE STAND.

24          (PAUSE IN PROCEEDINGS AS WITNESS STANDS AND SURVEYS

25  COURTROOM.)

6-126

1       THE WITNESS:  (ADDRESSED TO INTERPRETER:)  NO, MISS, I

2    DON'T RECOGNIZE HIM.

3    BY MR. MEDRANO:

4    Q    DO YOU KNOW A MAN BY THE NAME OF JAVIER BARBA HERNANDEZ?

5    A    YES.

6    Q    ALSO, MR. PLASCENCIA, WOULD IT ASSIST YOU TO WALK AROUND

7    THE COURTROOM?

8            MR. NICOLAYSEN:  I OBJECT TO THAT, YOUR HONOR.

9            MR. MEDRANO:  YOUR HONOR, IT'S A LARGE COURTROOM.

10           THE COURT:  YOU OBJECT TO THE QUESTION OR DO YOU

11   OBJECT TO THE WALKING?

12           COURTROOM:  (LAUGHTER.)

13           MR. NICOLAYSEN:  NEED I ANSWER?

14           I WOULD ASK THE RECORD TO REFLECT THE LENGTH OF TIME

15   THAT WAS GIVEN TO THE WITNESS.

16           MR. MEDRANO:  YOUR HONOR, IT'S UNCLEAR TO ME WHETHER

17   HE EVEN WEARS GLASSES.

18           THE COURT:  WHY DON'T YOU ASK HIM IF THERE'S ANYTHING

19   WRONG WITH HIS VISION.

20   BY MR. MEDRANO:

21   Q    MR. PLASCENCIA, IS ANYTHING WRONG WITH YOUR VISION TO SEE

22   FAR DISTANCES?

23           MR. NICOLAYSEN:  I OBJECT TO THAT AS LEADING, YOUR

24   HONOR.

25           THE COURT:  OVERRULED.

6-127

1          THE WITNESS:  NO.

2          MR. MEDRANO:  THANK YOU.

3    Q    NOW, YOU DO KNOW SOMEBODY BY THE NAME OF JAVIER BARBA

4    HERNANDEZ?

5    A    YES.

6    Q    WAS HE AT THE BAJADITA?

7    A    YES.

8    Q    DO YOU KNOW A MAN BY THE NAME OF JORGE BARBA HERNANDEZ?

9    A    YES.

10   Q    WAS HE THERE?

11   A    YES.

12   Q    IN ADDITION TO THE PEOPLE THAT YOU HAVE NAMED, MR.

13   PLASCENCIA, WERE THERE ANY ARMED PEOPLE AT THE HOUSE WHEN YOU

14   ENTERED IT?

15   A    YES.

16   Q    WERE THESE ARMED BODYGUARDS?

17          MR. STOLAR:  OBJECT TO THE CHARACTERIZATION.

18          THE COURT:  SUSTAINED -- STRIKE THAT.  THE WITNESS MAY

19   ANSWER THAT.

20          THE WITNESS:  YES, THEY WERE ARMED.

21   Q    CAN YOU TELL WHAT KIND OF FIREARMS THAT THEY HAD?

22   A    HANDGUNS.  A FEW OF THEM HAD LONG WEAPONS.

23   Q    ERNESTO FONSECA CARRILLO, DID HE HAVE A GUN ON HIM?

24   A    YES.

25   Q    WHAT KIND?

6-128

1    A    IN A SHOULDER HOLSTER, IT WAS A .357 MAGNUM; AND IN THE

2    WAISTBAND, HE HAD AN AUTOMATIC PISTOL.

3    Q    AFTER ERNESTO FONSECA CARRILLO ENTERS THE HOUSE, DOES HE

4    PROCEED TO A SPECIFIC ROOM AT LA BAJADITA?

5    A    YES.

6    Q    WHERE?

7    A    A LIVING ROOM THAT HAD BEEN TURNED INTO AN OFFICE.

8    Q    NOW, YOU MENTIONED, ALSO, THAT JAVIER VASQUEZ VELASCO WAS

9    AT THE HOUSE WHEN YOU ENTERED.

10   A    YES.

11   Q    WAS HE ARMED?

12   A    YES.

13          MR. NICOLAYSEN:  OBJECTION.  THERE'S BEEN NO

14   IDENTIFICATION.  LACK OF FOUNDATION.

15          MR. MEDRANO:  UNNECESSARY FOR THAT, YOUR HONOR.

16          THE COURT:  THE OBJECTION'S OVERRULED.

17   BY MR. MEDRANO:

18   Q    DO OTHERS, OTHER THAN FONSECA CARRILLO, PROCEED TO THE

19   LIVING ROOM OF THE HOUSE?

20   A    YES.

21   Q    DO THE PEOPLE THAT YOU HAVE JUST NAMED EARLIER GO INTO THE

22   LIVING ROOM, AS WELL?

23   A    THEY WERE ALREADY IN THE LIVING ROOM.

24   Q    NOW, YOU MENTIONED THERE WAS A DESK IN THE LIVING ROOM.

25   A    YES.

6-129

1    Q    DESCRIBE THE DESK.

2    A    THE BASE WAS MADE OUT OF WOOD; AND THE TOP PART, THE PART

3    THAT CONSTITUTED THE DESK, WAS MADE OUT OF GLASS.

4    Q    WHAT ELSE IS IN THE LIVING ROOM, OTHER THAN THE DESK, IN

5    TERMS OF FURNITURE?

6    A    THERE IS A BAR, THERE'S A TELEVISION SET, QUITE A FEW

7    CHAIRS.  THAT'S WHAT'S IN THE LIVING ROOM.

8    Q    WHAT HAPPENS AT THIS MEETING -- -- STRIKE THAT.

9         WHAT HAPPENS NEXT, IN THE LIVING ROOM?

10   A    ERNESTO FONSECA, UPON ARRIVING AT HIS DESK, TAKES A

11   PHOTOGRAPH AND PUSHES IT TO ONE SIDE, WHERE ANTONIO GARATE WAS.

12   Q    NOW, AT THIS TIME, ARE YOU IN CLOSE PROXIMITY TO ANTONIO

13   GARATE?

14   A    YES.  I AM TO HIS LEFT SIDE.

15   Q    AS FONSECA DOES THIS, DOES HE SAY ANYTHING TO ANTONIO

16   GARATE?

17        MR. STOLAR:  OBJECTION.  HEARSAY.

18        THE COURT:  OVERRULED.

19        THE WITNESS:  I DIDN'T UNDERSTAND THE QUESTION.

20   BY MR. MEDRANO:

21   Q    DOES FONSECA SAY ANYTHING TO ANTONIO GARATE AS HE THROWS

22   THE PHOTOGRAPH TO HIM?

23   A    YES.

24   Q    WHAT DOES HE SAY?

25   A    "THE KIND OF FRIENDS YOU HAVE."

6-130

1    Q    DOES ANTONIO GARATE LOOK AT THE PHOTOGRAPH?

2    A    YES.

3    Q    DO YOU, AS WELL?

4    A    YES.

5    Q    TELL US IN DETAIL, WHAT IS DEPICTED IN THIS PHOTOGRAPH?

6    A    THERE ARE TWO PERSONS.  ONE OF THEM IS ANTONIO PADILLA DE

7    LA MORA.

8    Q    IS THERE A SECOND -- IS THERE ANYONE ELSE DEPICTED IN THE

9    PHOTOGRAPH?

10   A    YES.

11         MS. KELLY:  OBJECT, YOUR HONOR.  LACK OF FOUNDATION

12   FOR HIS KNOWLEDGE.

13         THE COURT:  WELL, YOU CAN ASK THE WITNESS IF THE OTHER

14   PERSON IN THE PHOTOGRAPH WAS SOMEONE HE KNEW.

15         MR. MEDRANO:  I'M LAYING THAT FOUNDATION RIGHT NOW,

16   YOUR HONOR.

17         THE COURT:  WELL, THAT SHOULD BE DONE BEFORE THE OTHER

18   QUESTION.

19   BY MR. MEDRANO:

20   Q    IN ADDITION TO ANTONIO PADILLA IN THE PHOTOGRAPH, IS THERE

21   ANOTHER INDIVIDUAL IN THE PHOTOGRAPH?

22   A    YES.

23   Q    ARE YOU ABLE TO IDENTIFY WHO THE SECOND PERSON IN THE

24   PHOTOGRAPH IS, WITH PADILLA?

25         MS. KELLY:  YOUR HONOR, I OBJECT TO THIS QUESTION.

6-131

1    THE COURT:  YOU'RE DOING THE SAME THING, COUNSEL.

2    MS. KELLY:  BASED ON THE GRAND JURY TESTIMONY --

3    THE COURT:  ASK HIM IF THAT IS SOMEONE THAT HE

4  RECOGNIZED --

5    MR. MEDRANO:  VERY WELL, YOUR HONOR.

6    THE COURT:  -- BECAUSE HE KNEW HIM.

7  BY MR. MEDRANO:

8  Q    THE SECOND PERSON DEPICTED IN THE PHOTOGRAPH, IS IT SOMEONE

9  YOU RECOGNIZED?

10  A    AS OF LATE, YES.

11  Q    WHO IS THAT?

12    MR. STOLAR:  OBJECTION.

13    THE COURT:  THE OBJECTION IS SUSTAINED.

14    MR. MEDRANO:  I'LL LAY THE FOUNDATION AT THIS TIME,

15  YOUR HONOR.

16  Q    MR. PLASCENCIA, THE FIRST TIME YOU SAW THAT SECOND PERSON

17  IN THE PHOTOGRAPH, AT THAT TIME YOU DID NOT KNOW THAT PERSON'S

18  NAME?

19  A    NO.

20  Q    SUBSEQUENTLY, DID YOU LATER LEARN THE NAME OF THAT PERSON

21  IN THE PHOTOGRAPH?

22  A    YES.

23  Q    AND WHAT WAS THAT NAME?

24    MR. STOLAR:  OBJECTION.  TIME FRAME.  THE TIME WHEN HE

25  SUBSEQUENTLY LEARNED, AT LEAST.

6-132

1        THE COURT:  IS THAT YOUR OBJECTION?

2        MR. MEZA:  NO FOUNDATION, YOUR HONOR.

3        MS. KELLY:  THERE'S NO FOUNDATION THAT HE'D SEEN HIM

4   BEFORE.

5        THE COURT:  WELL, NEITHER OF THESE OBJECTIONS ARE -- I

6   BELIEVE THE QUESTION'S OBJECTIONABLE, BUT I HAVEN'T HEARD THE

7   RIGHT GROUNDS.

8        MR. NICOLAYSEN:  IT ALSO CALLS FOR SPECULATION, YOUR

9   HONOR.  HE HAS ABSOLUTELY NO FIRSTHAND BASIS BY WHICH TO

10  IDENTIFY.

11       MR. STOLAR:  THE KNOWLEDGE IS THAT HE ACQUIRED HEARSAY

12  INFORMATION.

13       THE COURT:  THAT'S A CORRECT OBJECTION AND IT IS

14  SUSTAINED.

15       COURTROOM:  (LAUGHTER.)

16  BY MR. MEDRANO:

17  Q   MR. PLASCENCIA, CAN YOU ASK I TO LOOK AT GOVERNMENT'S

18  EXHIBIT NO. 5, WHICH IS IN FRONT OF YOU?

19  A   (COMPLIES.)

20  Q   CAN YOU IDENTIFY WHAT THAT IS?

21  A   YES.

22  Q   WHAT IS IT?

23  A   IT'S A PHOTOGRAPH.

24  Q   OF WHO?

25  A   ENRIQUE CAMARENA.

6-133

Q    YOU CAN PUT THAT DOWN NOW.  THANK YOU.

TAKING YOU BACK FOR A MOMENT TO THE PHOTOGRAPH THAT YOU SAW AT LA BAJADITA, CAN YOU IDENTIFY THE NAME OF A SECOND INDIVIDUAL WHO WAS NEXT TO PADILLA?

MR. STOLAR:  SAME OBJECTION.  NOTHING HAS CHANGED.

THE COURT:  THE OBJECTION IS OVERRULED -- ARE YOU ASKING THE WITNESS IF THE PHOTOGRAPH HE JUST LOOKED AT IS THE SAME --

MR. MEDRANO:  YES, YOUR HONOR.

THE COURT:  -- AS THE PERSON HE SAW IN THE OTHER PHOTOGRAPH?

MR. MEDRANO:  WHETHER THAT PERSON IN EXHIBIT 5 IS THE SAME PERSON HE SAW DEPICTED IN THE PHOTOGRAPH AT LA BAJADITA. THAT'S THE QUESTION.

THE COURT:  THE WITNESS MAY ANSWER THAT QUESTION.

THE WITNESS:  YES.

BY MR. MEDRANO:

Q    CAMARENA?

A    YES.

Q    WHAT WERE -- STRIKE THAT.

IN THIS PHOTOGRAPH YOU SAW AT LA BAJADITA, WHAT ARE PADILLA AND CAMARENA DOING, CAN YOU TELL US?

A    CAMARENA HAS HIS ARMS SPREAD.  HE HOLDS A GLASS IN ONE HAND, WITH A DRINK IN IT.  ANTONIO PADILLA HAS ONE ARM AROUND HIS SHOULDER.

6-134

1    Q    AROUND THE SHOULDER OF WHO?

2    A    PADILLA TOWARDS CAMARENA.

3    Q    PADILLA HAS HIS ARM AROUND CAMARENA?

4    A    YES.

5    Q    ARE BOTH MEN STANDING?

6    A    YES.

7    Q    IS PADILLA -- WELL, STRIKE THAT.

8         WHAT ELSE ABOUT PADILLA CAN YOU TELL US, IN THE

9    PHOTOGRAPH?

10   A    HE HAD HIS LEGS CROSSED AND HIS TONGUE WAS OUT, AND HE WAS

11   STICKING IT INTO HIS NOSTRIL.

12   Q    WAS HE SMILING WHEN HE WAS DOING THAT?

13   A    YES.

14   Q    IS CAMARENA SMILING AT THIS TIME?

15   A    YES.

16   Q    DO YOU RECALL WHAT CAMARENA WAS WEARING IN THAT PHOTOGRAPH

17   THAT YOU SAW AT LA BAJADITA?

18   A    YES.

19   Q    WHAT?

20   A    A NAVY BLUE SUIT, WHITE SHIRT.

21   Q    AS ANTONIO GARATE IS EXAMINING THIS PHOTOGRAPH THAT YOU'VE

22   DESCRIBED, DOES FONSECA CARRILLO SAY ANYTHING ELSE TO HIM?

23   A    YES.

24   Q    WHAT DOES HE SAY?

25   A    HE WANTED ANTONIO GARATE BUSTAMANTE TO KILL ANTONIO PADILLA

6-135

1    DE LA MORA.

2    Q    DOES FONSECA SAY ANYTHING ELSE --

3    A    YES.

4    Q    -- ABOUT THE SECOND INDIVIDUAL IN THE PHOTOGRAPH?

5    A    YES.

6    Q    WHAT IS THAT, MR. PLASCENCIA?

7    A    THAT HE, OR THAT THEY, WOULD TAKE CARE OF ATTORNEY

8    CAMARENA.

9            MR. NICOLAYSEN:  YOUR HONOR, I OBJECT AND ASK FOR A

10   LIMITING INSTRUCTION.

11           MY CLIENT IS THE ONLY DEFENDANT HERE, SO FAR, STATED

12   TO HAVE BEEN AT THAT MEETING.  HE'S NOT CHARGED WITH ANYTHING

13   RELATING TO CAMARENA.

14           THE COURT:  THE OBJECTION IS OVERRULED.

15   BY MR. MEDRANO:

16   Q    AFTER FONSECA STATES THIS TO ANTONIO GARATE, DOES ANTONIO

17   GARATE REPLY ANYTHING?

18           MR. STOLAR:  OBJECTION.

19           THE WITNESS:  YES.

20           MR. STOLAR:  OBJECTION.  GARATE IS NOT A DEFENDANT,

21   NOR HAS THERE BEEN ANY TESTIMONY LAYING A FOUNDATION FOR HIM TO

22   BE ANY PART OF ANY ENTERPRISE.

23           THE COURT:  OVERRULED.

24   BY MR. MEDRANO:

25   Q    WHAT DOES GARATE SAY?

1    A    HE SAYS HE CANNOT DO IT.

2    Q    CAN'T DO WHAT?

3    A    KILL HIM.

4    Q    WHO?

5    A    ANTONIO PADILLA DE LA MORA.

6    Q    DOES HE SAY WHY?

7    A    YES.

8    Q    WHAT DOES HE SAY?

9    A    BECAUSE ANTONIO PADILLA DE LA MORA IS ONE OF MANUEL SALCIDO

10   USUERTA'S PEOPLE, ALSO CALLED "COCHILOCO."

11   Q    IN YOUR PRESENCE AT THIS MEETING, MR. PLASCENCIA, DOES

12   ANYONE ELSE LOOK AT THAT PHOTOGRAPH OF PADILLA AND CAMARENA?

13   A    YES.

14   Q    WELL, WHAT HAPPENS TO THE PHOTOGRAPH?

15   A    IT RETURNS TO THE DESK WHERE ERNESTO FONSECA CARRILLO IS.

16   Q    BEFORE THAT, HOWEVER, DOES ANYONE ELSE LOOK AT THE

17   PHOTOGRAPH?

18   A    YES.

19   Q    WHO?

20   A    THOSE PRESENT IN THE LIVING ROOM.

21   Q    TO EVERYONE PRESENT IN THE LIVING ROOM?

22   A    YES.

23   Q    WHAT EVENTUALLY HAPPENS TO THE PHOTOGRAPH?

24   A    ERNESTO FONSECA TAKES ITS AND PUTS IT FACE DOWN.

25   Q    FACE DOWN WHERE?

6-137

1    A    ON THE DESK.

2    Q    AT ANY TIME DURING THIS MEETING, MR. PLASCENCIA, DOES

3    ANYONE ELSE ARRIVE AT THE MEETING IN THE LIVING ROOM?

4    A    YES.

5    Q    WHO?

6    A    A COLONEL IN THE ARMY.

7    Q    WHAT HAPPENS WHEN THIS MAN OR ARRIVES, THE COLONEL?

8    A    HE CHATS FOR A FEW MOMENTS WITH MR. ERNESTO FONSECA

9    CARRILLO.

10   Q    WHAT HAPPENS NEXT?

11   A    ERNESTO FONSECA CALLS JAVIER BARBA AND TELLS HIM TO SEND

12   ANTONIO VASQUEZ VELASCO TO GO WHERE HE IS.

13   Q    WHAT HAPPENS NEXT, MR. PLASCENCIA?

14   A    ANTONIO VASQUEZ VELASCO RECEIVES ORDERS FROM FONSECA TO GO

15   TO HIS BEDROOM, WHICH IS INSIDE THAT HOUSE.

16   Q    TO DO WHAT?

17   A    HE IS TO OPEN THE SAFE, WHICH IS IN HIS BEDROOM, AND HE

18   SHOULD TAKE OUT APPROXIMATELY 10 CENTIMETERS OF MONEY, AND HE

19   SHOULD BRING THAT TO HIM.

20   Q    DOES ANTONIO VASQUEZ VELASCO THEN GO TO THAT BEDROOM?

21   A    YES.

22   Q    DOES HE GO ALONE?

23   A    HE INDICATED TO ME LATER THAT I SHOULD FOLLOW HIM, THAT I

24   SHOULD ACCOMPANY HIM.

25   Q    WHO TOLD YOU THAT?

1    A    ERNESTO FONSECA CARRILLO DID.

2    Q    DO YOU ACCOMPANY ANTONIO VASQUEZ VELASCO TO THE BEDROOM?

3    A    YES.

4    Q    WHAT HAPPENS THERE?

5    A    WE ARRIVED.  HE OPENED A SAFE THAT WAS THERE.  IT WAS OLIVE

6    GREEN IN COLOR.

7    Q    WHAT IS THE SIZE OR DIMENSION OF THIS SAFE?

8    A    APPROXIMATELY 1.20 BY 60.

9    Q    IS THAT 1.20 METERS' HEIGHT?

10    A    YES.

11    Q    WHAT IS THE WIDTH ON THIS SAFE BOX?

12    A    ABOUT 60 CENTIMETERS.

13    Q    WHO OPENS THE SAFE?

14    A    ANTONIO VASQUEZ VELASCO DOES.

15    Q    DOES HE HAVE TO DO ANYTHING WITH THE COMBINATION, OR IS IT

16    ALREADY OPEN?

17    A    IT IS ALREADY OPEN.

18    Q    WHAT DOES HE DO AFTER HE OPENS THE SAFE?

19    A    HE PULLS AT THE LEVER AND HE OPENS THE DOOR TO THE SAFE.

20    Q    WHAT DOES HE DO NEXT?

21    A    HE PUTS HIS HAND IN AND TAKES OUT APPROXIMATELY 17

22    CENTIMETERS OF MONEY.

23    Q    WHAT ELSE IS IN THE SAFE WHEN HE DOES THAT?

24    A    MONEY.

25    Q    AMERICAN OR MEXICAN?

6-139

1    A    AMERICAN.

2    Q    IS THE SAFE FULL OF UNITED STATES CURRENCY?

3            MR. STOLAR:  FOUNDATION, PLEASE?  OBJECT.

4            THE COURT:  ASK THE WITNESS IF HE OBSERVED WHAT WAS IN

5    THE SAFE.

6    BY MR. MEDRANO:

7    Q    MR. PLASCENCIA, WERE YOU ABLE TO OBSERVE THE CONTENTS OF

8    THE SAFE?

9    A    YES.

10   Q    AND FROM WHAT YOU WERE ABLE TO OBSERVE, WAS THE SAFE FULL?

11   A    YES.

12   Q    AND FROM WHAT YOU WERE ABLE TO OBSERVE, WHAT KIND OF MONEY

13   WAS IT:  AMERICAN OR MEXICAN?

14   A    AMERICAN.

15   Q    AND FROM WHAT YOU WERE ABLE TO SEE, CAN YOU TELL US THE

16   DENOMINATIONS OF THE BILLS IN THE SAFE?

17   A    I SAW 50 AND $100.00 BILLS.

18   Q    AFTER ANTONIO VASQUEZ PULLS OUT THE HANDFUL OF MONEY, DOES

19   ANYONE CLOSE THE DOOR TO THE SAFE?

20   A    ANTONIO VASQUEZ VELASCO DOES.

21   Q    NOW, AT THIS ENTIRE TIME, ARE YOU WITH ANTONIO VASQUEZ

22   VELASCO?

23   A    YES.

24   Q    WHAT DO YOU DO NEXT?

25   A    ANTONIO TELLS ME THAT WE HAVE TO TAKE A BOTTLE OF COGNAC

6-140

1    WITH US THAT WAS DOWN THERE.

2    Q    AND DO YOU DO SO?

3    A    YES.

4    Q    WHO GRABS IT?

5    A    I DO.

6    Q    AFTER DOING THAT, WHAT'S THE NEXT THING THE TWO OF YOU DO?

7    A    HE CLOSES THE DOOR THE WAY IT WAS, THE DOOR TO THE SAFE.

8    WE LEAVE THE BEDROOM WHERE THAT SAME SAFE WAS AND WE WALK

9    TOWARD THE LIVING ROOM WHERE MR. FONSECA CARRILLO WAS.

10    Q    AND WHAT HAPPENS IN THE LIVING ROOM?

11    A    FONSECA CARRILLO SPEAKS WITH THE COLONEL AND HE ASKS HIM

12    WHETHER THIS MONEY IS ENOUGH OR WHETHER HE NEEDS MORE.

13    Q    WHAT DOES THE COLONEL REPLY?

14    A    THAT HE THINKS THAT THAT AMOUNT IS SUFFICIENT.

15    Q    DOES THE MILITARY COLONEL DO ANYTHING WITH THE MONEY HE

16    RECEIVED?

17    A    YES.  HE DIVIDES IT IN TWO.

18    Q    AND THEN WHAT?

19    A    AND HE PUTS ONE HALF INTO EACH OF THE JACKET'S -- OF HIS

20    JACKET POCKETS.

21    Q    AFTER THAT DOES THE COLONEL -- STRIKE THAT.

22         AFTER THAT DOES THE MILITARY COLONEL LEAVE LA

23    BAJADITA?

24    A    YES.

25    Q    SHORTLY AFTER THAT, DO YOU END UP LEAVING THE RESIDENCE AT

6-141

1    LA BAJADITA?

2    A    YES.

3    Q    DO YOU LEAVE ALONE?

4    A    NO.  I GO WITH MR. ANTONIO GARATE.

5         MR. MEDRANO:  YOUR HONOR, I CAN CONTINUE, OR WOULD

6    THIS BE A GOOD TIME TO BREAK?  WHATEVER YOU'D LIKE.

7         THE COURT:  GO AHEAD.

8         MR. MEDRANO:  THANK YOU.

9    Q    LET ME DIRECT YOUR ATTENTION NOW, MR. PLASCENCIA, STILL TO

10   THE YEAR 1984.

11        DO YOU EVER HAVE AN OPPORTUNITY TO GO TO THE AIRPORT

12   AT GUADALAJARA IN THE LATTER PART OF 1984?

13   A    YES.

14   Q    FOR WHAT REASON?

15   A    TO A FUNERAL.

16   Q    WELL, WAS THE ACTUAL FUNERAL HELD AT THE GUADALAJARA

17   AIRPORT?

18   A    IT WAS IN GUADALAJARA, AND IT WAS BEING TRANSFERRED TO THE

19   AIRPORT.

20   Q    WHAT WAS BEING TRANSMITTED TO THE AIRPORT?

21   A    EXCUSE ME?

22   Q    WHAT WAS BEING TAKEN TO THE AIRPORT AT GUADALAJARA?

23   A    THE BODY OF A PERSON.

24   Q    OF WHOM?

25   A    A MR. ELENES.

6-142

1    Q    DO YOU KNOW MR. ELENES'S FIRST NAME?

2    A    HECTOR.

3    Q    WHEN THIS -- -- STRIKE THAT.

4         YOU GO TO THE GUADALAJARA AIRPORT THEN TO TRANSPORT

5    THE BODY?

6    A    YES.

7    Q    ARE YOU ACCOMPANIED BY ANYBODY?

8    A    YES.

9    Q    WHO?

10   A    ANTONIO GARATE BUSTAMANTE.

11   Q    WHY IS THE BODY BEING TAKEN TO THE AIRPORT AT GUADALAJARA?

12   A    BECAUSE THE BODY WAS GOING TO BE BURIED IN CULIACAN,

13   SINALOA.

14   Q    THE BODY, WAS IT GOING TO BE FLOWN FROM GUADALARA TO

15   SINALOA, CULIACAN?

16        MR. NICOLAYSEN:  I OBJECT.  THIS WHOLE LINE IS

17   IRRELEVANT.

18        MR. MEDRANO:  THE RELEVANCE WILL BE ESTABLISHED

19   MOMENTARILY.

20        THE COURT:  RECEIVED, SUBJECT TO MOTION.

21        MS. KELLY:  LACK OF FOUNDATION AS TO WHAT WAS GOING TO

22   HAPPEN.

23        THE COURT:  THAT'S TRUE.  SUSTAINED.

24   BY MR. MEDRANO:

25   Q    HOW DO YOU GET TO THE AIRPORT AT GUADALAJARA?

6-143

1    A    IN A GRAY MERCURY.

2    Q    IS ANYBODY WITH YOU IN THE CAR?

3    A    YES.

4    Q    WHO?

5    A    ANTONIO GARATE BUSTAMANTE, ERNESTO FONSECA CARRILLO, SAMUEL

6    RAZO AND I.

7    Q    WHO DROVE?

8    A    SAMUEL RAZO.

9    Q    WHEN YOU ARRIVE AT THE GUADALAJARA AIRPORT, DO YOU GO TO A

10   PARTICULAR SECTION OR AREA OF THE AIRPORT?

11   A    TO THE HANGARS OF THE CIVIL AIRPORT.

12   Q    WHEN YOU ARRIVE AT THOSE HANGARS, ARE THERE OTHER PEOPLE

13   ALREADY THERE?

14   A    YES.

15   Q    WHEN YOU ARRIVE, ARE THERE OTHER VEHICLES ALREADY THERE, AS

16   WELL?

17   A    YES.

18   Q    APPROXIMATELY HOW MANY OTHER CARS ARE ALREADY THERE BY THE

19   TIME YOU ARRIVE?

20   A    ABOUT 25 TO 30 VEHICLES.

21   Q    AND APPROXIMATELY HOW MANY PEOPLE ARE ALREADY THERE WHEN

22   YOUR GROUP ARRIVES?

23   A    APPROXIMATELY 200 PERSONS.

24           THE COURT:  WE'LL TAKE OUR AFTERNOON RECESS AT THIS

25   TIME.

6-144

1          LADIES AND GENTLEMEN OF THE JURY, I HAVE REPEATEDLY

2   CAUTIONED YOU DURING THE TRIAL NOT TO DISCUSS THIS CASE WITH

3   EACH OTHER OR WITH ANYONE ELSE, NOT TO FORM OR EXPRESS ANY

4   OPINION OR CONCLUSION ABOUT THIS CASE, AND TO AVOID ANY

5   EXPOSURE TO ANY PUBLICITY ABOUT THIS CASE.

6          I ALSO TOLD YOU SOME TIME AGO THAT YOU'RE ABSOLUTELY

7   FORBIDDEN TO CONVERSE WITH ANY OF THE LAWYERS IN THIS CASE OR

8   ANY OF THE WITNESSES OR ANYONE ELSE CONNECTED WITH THIS CASE.

9          NO MATTER HOW INNOCENT IT MIGHT BE, YOU ARE NOT

10  PERMITTED TO SPEAK TO ANY LAWYER THAT IS INVOLVED IN THE CASE,

11  BECAUSE IT LOOKS BAD.  AND THE APPEARANCE OF IMPROPRIETY IS

12  WHAT WE'RE TRYING TO AVOID, AS WELL AS THE ACTUAL IMPROPRIETY.

13         IF YOU SEE ONE OF THE LAWYERS IN THE HALLS OF THIS

14  BUILDING, YOU SHOULD JUST IGNORE THAT PERSON.  YOU DON'T EVEN

15  SAY "GOOD MORNING."

16         THE ONLY EXCEPTION MIGHT BE IF YOU SEE ONE OF THESE

17  LAWYERS ABOUT TO BE RUN OVER BY A TRUCK, YOU MIGHT SAY "WATCH

18  OUT."

19         COURTROOM:  (LAUGHTER.)

20         THE COURT:  AND THAT'S ALL.  AND IF YOU REMEMBER, I

21  TOLD YOU THAT IF YOU'RE NORMALLY A FRIENDLY AND GREGARIOUS

22  PERSON, THAT YOU SHOULD CURB THAT CHARACTERISTIC DURING THIS

23  TRIAL, BECAUSE YOU NEVER KNOW WHAT YOU'RE TALKING TO, AND IT'S

24  BEST NOT TO TALK TO ANYBODY AROUND THIS BUILDING.  IT MIGHT BE

25  A WITNESS OR SOMEONE CONNECTED WITH ONE OF THE PEOPLE IN THE

1    CASE, SO IT CREATES PROBLEMS WHEN THAT HAPPENS.

2         SO I'M SURE YOU'LL REMEMBER THAT.

3         YOU MAY BE EXCUSED NOW.

4         MR. STOLAR:  THANK YOU, JUDGE.

5         THE CLERK:  PLEASE RISE.

6         MR. MEDRANO:  YOUR HONOR, MAY WE SPEAK TO YOU BRIEFLY?

7         THE COURT:  YES.

8         (JURY ABSENT:)

9         THE COURT:  YOU MAY BE SEATED.

10        MR. MEDRANO:  YOUR HONOR, THANK YOU.  THERE ARE TWO

11   THINGS I WANTED TO BRING TO THE COURT'S ATTENTION.

12        MR. STOLAR:  CAN WE EXCUSE THE WITNESS?

13        MR. NICOLAYSEN:  MAY WE EXCUSE THE WITNESS, YOUR

14   HONOR?  I HAVE A MATTER, AS WELL, THAT I'D LIKE TO TAKE UP

15   OUTSIDE THE PRESENCE --

16        THE COURT:  THE WITNESS MAY BE EXCUSED.

17        MR. NICOLAYSEN:  YOUR HONOR, BEFORE WE BEGIN, I WOULD

18   RESPECTFULLY ASK THAT THE GOVERNMENT NOT SPEAK TO THE WITNESS

19   ABOUT ANY MATTER CONCERNING DIRECT EXAMINATION DURING THE

20   RECESS.  I'M CONCERNED ABOUT IMPROPER COACHING.

21        MR. MEDRANO:  YOUR HONOR, THAT IS AN INSULT, YOUR

22   HONOR.

23        MR. NICOLAYSEN:  NO, I'M NOT TRYING TO INSULT THE

24   GOVERNMENT, BUT BECAUSE OF THE PROBLEM THAT OCCURRED DURING

25   DIRECT, IT'S ONLY TOO LIKELY THAT THE AGENTS MIGHT BE TEMPTED

6-146

1    TO TRY AND INSTRUCT THE WITNESS HOW TO IDENTIFY THE DEFENDANT,

2    AND I WANT TO MAKE SURE THAT THERE'S NO POSSIBILITY OF THAT

3    HAPPENING.

4          THE COURT:  I'M NOT GOING TO FORBID THE GOVERNMENT TO

5    TALK TO THEIR OWN WITNESS.

6          YOU WILL HAVE THE OPPORTUNITY TO CROSS-EXAMINE THIS

7    WITNESS AND INQUIRE ABOUT THAT.

8          I'M SURE THAT THE GOVERNMENT KNOWS WHAT THEIR

9    RESPONSIBILITIES ARE.

10         MR. MEDRANO:  YOUR, HONOR THE TWO THINGS I WANT TO --

11   THANK YOU -- BRING TO YOUR ATTENTION ARE THE FOLLOWING:

12         YOU MAY RECALL THE EARLIER WITNESS, ESTELLA FUENTES,

13   THE LEGALLY MARRIED WIFE OF DEFENDANT VASQUEZ VELASCO, BUT

14   THEY'VE BEEN BE SEPARATED FOR 10 YEARS.

15         I'D LIKE TO MAKE A PROFFER OF WHAT TESTIMONY WE WERE

16   GOING TO GET INTO, TO SEE IF YOU'LL BE AMENABLE TO ALLOWING US

17   TO BRING HER BACK, YOUR HONOR.

18         THE COURT:  YES.

19         MR. MEDRANO:  JUST VERY BRIEFLY, SHE WOULD TESTIFY AS

20   FOLLOWS:  THAT IN ABOUT NOVEMBER 27 OF LAST YEAR, 1989, SHE

21   RECEIVED A LETTER FROM DEFENDANT VASQUEZ VELASCO.  SHE

22   RECOGNIZES THE HANDWRITING AND THE SIGNATURE IN THAT LETTER.

23         THE LETTER ESSENTIALLY SAYS THAT, "I'M SORRY I HAVEN'T

24   WRITTEN TO YOU FOR SO LONG, BUT I'VE HAD PROBLEMS.  A LOT HAS

25   HAPPENED IN THE INTERIM, BUT I NEED YOUR HELP."

6-147

1          THE COURT:  LET'S GET TO THE POINT.

2          MR. MEDRANO:  YES, YOUR HONOR.  I'LL TELL YOU

3    SPECIFICALLY.

4          IN THE LETTER, YOUR HONOR, HE TELLS THE WIFE, MRS.

5    FUENTES, THAT -- TO REMIND, YOU THAT -- THAT IS, VASQUEZ IS

6    REMINDING THE WIFE -- THAT THE WIFE AND THE KIDS AND VASQUEZ

7    WERE TOGETHER ON A TRIP IN MEXICO.  AND HE GIVES THE PERTINENT

8    DATES OF THE LA LANGOSTA MURDERS.

9          THE LETTER SAYS:  I JUST WANTED TO REMIND YOU THAT WE

10   WERE TOGETHER ON JANUARY 23, 1985, TO FEBRUARY 7TH 1985.

11         WELL, WE OFFER THAT, YOUR HONOR, BECAUSE THE WITNESS

12   THEN, UPON FURTHER DIRECT, WOULD SAY:  THAT'S WRONG.  AT THAT

13   TIME, WE WEREN'T ON VACATION.

14         YOU MAY RECALL SHE TESTIFIED THAT THEY DID GO ON

15   VACATION, BUT THAT WAS AT CHRISTMASTIME, 1984, AND THAT SHE HAD

16   THE KIDS BACK IN SCHOOL BY JANUARY 2.

17         THE COURT:  SO YOU'RE OFFERING THIS AS EVIDENCE OF AN

18   ATTEMPT TO SET UP AN ALIBI?

19         MR. MEDRANO:  THAT IS CORRECT, YOUR HONOR.  AND THAT'S

20   WHY WE WERE OFFERING THAT.

21         AND I ANTICIPATE NOW THAT MR. NICOLAYSEN WILL RAISE A

22   PANOPLY OF PRIVILEGED COMMUNICATIONS --

23         THE COURT:  WELL, WHAT IS YOUR ANSWER TO THE

24   PRIVILEGED COMMUNICATION?

25         MR. MEDRANO:  WELL, YOUR HONOR, THE WITNESS HAS JUST

6-148

1    INDICATED THAT AS OF NOW, THEY'VE BEEN SEPARATED FOR 10 YEARS,

2    YOUR HONOR.

3            THE COURT:  WELL THEY WEREN'T SEPARATED WHEN THEY WERE

4    IN MEXICO TOGETHER.

5            MR. MEDRANO:  NO, BUT IF SHE'D BEEN PERMITTED, YOUR

6    HONOR, SHE WOULD HAVE SAID THAT THAT WAS AN ATTEMPT AT

7    RECONCILIATION, THAT ONE TIME THEY SPENT TOGETHER; BUT AFTER

8    THAT, THEY HAVEN'T SPENT ANY TIME TOGETHER AND THEY BASICALLY

9    HAVE BEEN APART FOR TEN YEARS, SEPARATED, LIVING IN SEPARATE

10   COUNTRIES.  HE'S BEEN IN MEXICO AND SHE'S --

11           THE COURT:  SO YOU'RE SAYING THAT BECAUSE THERE WAS

12   WHAT IS CALLED A PERMANENT SEPARATION, THAT THE PRIVILEGE

13   SHOULD NOT APPLY.

14           MR. MEDRANO:  THAT IS CORRECT, YOUR HONOR.  AND GOING

15   FURTHER, BEYOND THAT, THERE'S STILL A SECOND GROUND RELATING TO

16   PRIVILEGED INFORMATION OF THAT NATURE.  CLEARLY THERE'S AN

17   EXCEPTION DEALING WITH CRIMINAL CONDUCT, AND IF THE EFFORT HERE

18   IN THIS LETTER BY THE DEFENDANT IS TO SET IN MOTION A POSSIBLE

19   ALIBI DEFENSE, WELL, THAT'S WRONG; THAT'S CRIMINAL; AND

20   ARGUABLY, THAT ALSO WOULD TAKE IT OUTSIDE THE PARAMETERS OF ANY

21   PRIVILEGED COMMUNICATION, YOUR HONOR.

22           SO THAT'S OUR POSITION.  AND FOR THAT REASON, I WANTED

23   TO GIVE YOU WHAT THE PROFFER WOULD BE FOR THIS WITNESS AND

24   STRENUOUSLY SUGGEST THAT IT IS ADMISSIBLE.  WE GET BEYOND THE

25   PRIVILEGE AND --

6-149

1          THE COURT:  BUT -- THIS GROUND WAS NOT RAISED, BUT

2   WHEN THE OBJECTION WAS MADE, I HAD IN MIND THE BEST EVIDENCE

3   RULE, AS WELL, THAT YOU WERE INTRODUCING THE CONTENTS OF A

4   WRITING AS TO AN ORAL STATEMENT.

5          MR. MEDRANO:  YES, AND I WAS GOING TO ADDRESS THAT AS

6   WELL, YOUR HONOR.  THANK YOU FOR BRINGING IT UP.

7          YOU'RE ABSOLUTELY RIGHT, BUT THE WITNESS WILL CONTINUE

8   TO TESTIFY THAT SHE NO LONGER HAS THE LETTER.  SHE MADE EFFORTS

9   TO LOCATE IT, BUT EVIDENTLY SHE HAD THROWN IT OUT.  SO SHE NO

10  LONGER HAS THE LETTER.

11         THE BEST EVIDENCE RULE SAYS, YOUR HONOR, THAT CLEARLY,

12  IF THE LETTER WERE HERE, THAT'S WHAT WE WOULD USE.  BUT SHE

13  DOESN'T HAVE THE LETTER ANY MORE, SO SHE CAN STILL TESTIFY TO

14  ITS CONTENTS.

15         INDEED, YOUR HONOR, IT'S NO DIFFERENT THAN AN ORAL

16  TELEPHONIC COMMUNICATION.  JUST BECAUSE THE CONVERASTION WASN'T

17  TAPED, WELL, THAT DOESN'T MEAN IT'S BARRED, THE ORAL TESTIMONY

18  BY A WITNESS, AS TO WHAT WAS THE CONTENTS OF THE CONVERSATION,

19  WHETHER THAT CONVERSATION WAS ON PAPER OR BY TELEPHONE.

20         SO SHE SHOULD STILL BE PERMITTED TO TESTIFY, YOUR

21  HONOR, BECAUSE THERE'S BEEN NO WRONGDOING BY THE GOVERNMENT.

22  WE DID NOT LOSE THE LETTER, AND SHE INADVERTENTLY THREW IT

23  AWAY.

24         THE COURT:  WELL, IN THIS CIRCUMSTANCE, WHO HAS THE

25  PRIVILEGE?  IS IT THE WITNESS OR IS IT THE DEFENDANT HUSBAND.

6-150

1     MR. MEDRANO:  MY UNDERSTANDING IS AS FOLLOWS; THAT IN

2 THIS CIRCUIT, THE WITNESS -- THE PERSON WHO CAN INVOKE THE

3 PRIVILEGE, AFTER LIKE A 1980 SUPREME COURT CASE, IS THE

4 TESTIFYING SPOUSE.  THE ACCUSED OR DEFINING OF -- OR A

5 DEFENDANT SPOUSE CANNOT PREVENT A SPOUSE FROM TESTIFYING, YOUR

6 HONOR.  THAT'S MODERN LAW.

7     THE COURT:  THAT IS CORRECT.  THAT IS CORRECT, THAT

8 THE DEFENDANT CANNOT PREVENT HIS WIFE FROM TESTIFYING.  BUT

9 THERE'S A SECOND PRIVILEGE, AND THAT IS PRIVILEGE TO PARTAKE

10 IN --

11     MR. MEDRANO:  MARITAL COMMUNICATIONS.

12     THE COURT:  -- MARITAL COMMUNICATIONS, WHICH IS WHAT

13 WE HAVE HERE.

14     MR. MEDRANO:  AND I JUST GAVE AT YOU TWO GROUNDS TO

15 CIRCUMVENT THAT, YOUR HONOR:  ONE, THEY WERE SEPARATED, THOUGH

16 THERE WAS NO FORMAL --

17     THE COURT:  WELL YOU DIDN'T PRESENT MUCH EVIDENCE OF

18 THAT, WHICH SHOULD PRECEDE ANY ATTEMPT TO ELICIT ANY

19 COMMUNICATION MADE DURING A MARRIAGE, BECAUSE IF YOU INTEND TO

20 QUALIFY THAT AS AN EXEMPTION BASED ON A PERMANENT SEPARATION,

21 WHICH THE CASES HAVE HELD, THAT THERE IS A PERMANENT

22 SEPARATION, THIS OBJECTION -- PRIVILEGE DOES NOT APPLY, SINCE

23 THE PURPOSE OF THE PRIVILEGE IS TO PROTECT MATRIMONIAL HARMONY.

24 AND IF PEOPLE ARE SEPARATED ON A PERMANENT BASIS, THAT REASON

25 CEASES TO EXIST.

6-151

1        MR. MEDRANO:  THAT'S CORRECT, YOUR HONOR.  AND WITH

2   FURTHER FOUNDATION, I CAN ESTABLISH THAT, SO I WILL BE MORE

3   THAN HAPPY TO DO THAT WITH THE WITNESS; AND ULTIMATELY, I

4   BELIEVE WE CAN ESTABLISH THE MERITS OF THE COMMUNICATION.

5        THE COURT:  LET'S HEAR --

6        MR. STOLAR:  EXCUSE ME.  MAY MR. MATTA BE EXCUSED

7   DURING THIS LEGAL ARGUMENT TO MAKE A TRIP TO THE MEN'S ROOM?

8        THE COURT:  YES.

9        MR. STOLAR:  THANK YOU.  I'LL STICK AROUND TO COVER.

10       MR. NICOLAYSEN:  THERE IS EVEN MORE SUPPORT FOR THE

11  PERSPECTIVE IN THE OBJECTION TO THE CONFIDENTIAL COMMUNICATION,

12  AND THAT IS THAT WHAT THE GOVERNMENT IS SEEKING TO DO WITH THIS

13  WITNESS IS INTRODUCE IMPROPER REBUTTAL EVIDENCE.

14       THE GOVERNMENT'S PREMISE IS THAT THEY'RE TRYING TO

15  NEGATE THE POSSIBILITY OF AN ALIBI DEFENSE.  WELL, THIS ISN'T

16  AN ALIBI CASE.

17       AND UNDER RULE 12, I HAVEN'T SERVED THE GOVERNMENT

18  WITH A NOTICE OF ALIBI BECAUSE IT HASN'T BEEN MY INTENTION DO

19  PRESENT AN ALIBI DEFENSE.

20       NOW, FOR THE SAKE OF ARGUMENT, SURE --

21       THE COURT:  NO.  BUT WOULDN'T THIS TYPE OF A STATEMENT

22  BE RECEIVABLE ON THE THEORY THAT IT ALSO CONSTITUTES NOT AN

23  ALIBI, BUT A FALSE EXCULPATORY STATEMENT?

24       MR. NICOLAYSEN:  NO.  I DON'T THINK SO AT ALL.  I

25  WOULD LIKE AT LEAST THE OPPORTUNITY TO BRIEF THAT ISSUE SO THAT

6-152

1   I DON'T JUST HAVE TO SPEAK ON THAT AD HOC.

2         BUT A FALSE EXCULPATORY STATEMENT IS TYPICALLY MADE

3   WHERE THE PERSON KNOWS THE STATEMENT TO BE INCORRECT, BUT

4   ATTEMPTS TO MAKE IT ANYWAY IN AN EFFORT TO AVOID BEING HELD

5   RESPONSIBLE.

6         WHEN YOU ARE STOPPED BY A POLICE OFFICER AND ASKED

7   QUESTIONS ABOUT WHAT'S IN A PACKAGE AND YOU KNOW THE PACKAGE

8   CONTAINS NARCOTICS, AND YOU SAY, "NO, THERE'S NOTHING BUT

9   HOUSEHOLD ITEMS IN THAT PACKAGE," THAT'S A FALSE EXCULPATORY

10  STATEMENT, BECAUSE YOU KNOW THAT'S WRONG AND YOU'RE TRYING TO

11  AVOID LAW ENFORCEMENT INQUIRY.

12        THIS IS A VERY DIFFERENT TYPE OF SITUATION.

13        THE COURT:  WELL, WHAT IS YOUR ANSWER TO THE ISSUE

14  THAT THESE PEOPLE WERE IN A STATE OF PERMANENT SEPARATION AND

15  THEREFORE THE PRIVILEGE SHOULD NOT APPLY?

16        MR. NICOLAYSEN:  YOUR HONOR, ONE OF THE REASONS I

17  WANTED TO RAISE THE TIMING OBJECTION IS TO BE BETTER PREPARED

18  TO SPEAK TO THE CURRENT STATE OF 9TH CIRCUIT LAW ON THAT

19  PRIVILEGE.

20        I DON'T KNOW THE EXACT CURRENT STATE OF THE LAW --

21        THE COURT:  WELL --

22        MR. NICOLAYSEN:  BUT I THINK THAT THE REBUTTAL

23  EVIDENCE POINT IS COMPELLING ENOUGH TO WARRANT THE EXCLUSIONS

24  OF THAT EVIDENCE IN ITS ENTIRETY.

25        THE GOVERNMENT IS TRYING TO DO BOTH ITS MAIN CASE AND

6-153

1   ITS REBUTTAL CASE AT THIS POINT IN TIME, AND THAT'S WRONG.

2        IF I CHOOSE THE PUT ON AN ALIBI DEFENSE, THEN THERE

3   MAY BE SOME MERIT IN SOMETHING OF THIS KIND.  BUT THERE IS NO

4   ALIBI THEORY THAT'S BEING PRESENTED, AND THIS IS CLEARLY

5   PREMATURE.

6        TO THE EXTENT THAT YOUR HONOR IS EAGER TO KNOW THE

7   EXACT STATE OF THE LAW ON THE CONFIDENTIAL COMMUNICATION

8   QUESTION, I WILL BRIEF THAT, YOUR HONOR.

9        THE COURT:  WELL, I INTEND TO HAVE YOU BOTH BRIEF IT,

10  BECAUSE THIS IS THE FIRST TIME IT'S BEEN RAISED TO ME, WAS WHEN

11  YOU APPROACHED THE BENCH HERE.

12       MR. MEDRANO:  YOUR HONOR, MAY I REPLY, JUST BRIEFLY?

13  FIRST OF ALL, LET ME JUST STATE THAT IT'S NOT A REBUTTAL ISSUE,

14  BECAUSE THE GOVERNMENT --

15       THE COURT:  WELL, I CAN'T FOLLOW THAT ARGUMENT ABOUT

16  REBUTTAL, SO --

17       MR. NICOLAYSEN:  YOUR HONOR, IT'S AN ALIBI.  COUNSEL

18  SAID IT GOES TO THE ISSUE OF ALIBI.

19       MR. MEDRANO:  WELL, YOUR HONOR, LET ME SPEAK MORE

20  ACCURATELY:  IT GOES TO CONSCIOUSNESS OF GUILT.

21       WE DON'T HAVE TO ANTICIPATE DEFENSE HERE.  IT'S

22  SOMETHING AFFIRMATIVE THAT WE CAN PRESENT IN OUR CASE IN CHIEF.

23  IT'S NO DIFFERENT, YOUR HONOR, JUST TO GIVE YOU AN ANALYSIS --

24       THE COURT:  WELL, YOU'RE GOING TO HAVE TO BRIEF THIS,

25  SO THERE'S NO POINT IN ARGUING IT FURTHER.

6-154

1        MR. MEDRANO:  MAY I MAKE ONE FINAL STATEMENT, YOUR

2    HONOR, ON THE ISSUE OF BRIEFING, BECAUSE I --

3        THE COURT:  YOUR BRIEFING SHOULD CONTAIN AN OFFER OF

4    PROOF CONCERNING NOT ONLY WHAT THE WITNESS WILL TESTIFY TO, BUT

5    CONCERNING ANY BASIS FOR EXEMPTING IT FROM THE PRIVILEGE, OR

6    WHY THIS IS NOT PRIVILEGED.

7        IS THERE ANY ISSUE OF THERE EVERY HAVING BEEN A WAIVER

8    OF THE PRIVILEGE?

9        MR. MEDRANO:  A WAIVER BY WHOM, YOUR HONOR?

10       THE COURT:  BY DISCLOSURE TO A THIRD PERSON OR ANY

11   OTHER --

12       MR. MEDRANO:  OTHER THAN HER CONVERSATIONS IN

13   DEBRIEFINGS BY THE GOVERNMENT AND A CASE AGENT, NO; NOT TO MY

14   KNOWLEDGE, YOUR HONOR.  BUT I CAN LOOK INTO THIS FURTHER.

15       THE COURT:  WELL, WHAT ABOUT -- IS THERE A QUESTION

16   HERE ABOUT WHETHER IT WAS INTENDED TO BE CONFIDENTIAL?  ISN'T

17   THAT A REQUIREMENT OF MARITAL PRIVILEGE, THAT IT BE INTENDED TO

18   BE CONFIDENTIAL?

19       IF THIS IS A HUSBAND WRITING TO HIS WIFE TO ESTABLISH

20   THE EXISTENCE OF DATES, IS IT IMPLICITLY INTENDED FOR FURTHER

21   PUBLICATION TO A THIRD PERSON?

22       MR. STOLAR:  I WILL LOOK INTO THAT ISSUE, YOUR HONOR.

23       THE COURT:  ALL RIGHT.

24       MR. MEDRANO:  I DON'T KNOW THE ANSWER TO THAT OFFHAND.

25       THE COURT:  WELL, THOSE ARE SOME OF THE QUESTIONS --

6-155

1          MR. NICOLAYSEN:  YOUR HONOR, I WOULD RESPECTFULLY

2     ASK --

3          THE COURT:  -- THAT YOU CAN BOUNCE AROUND.

4          MR. NICOLAYSEN:  YOUR HONOR, I WOULD LIKE TO KNOW

5     EXACTLY WHAT THE GOVERNMENT'S FOOTING IS IN OFFERING THIS

6     EVIDENCE.  COUNSEL HAS GONE FROM ONE THEORY TO ANOTHER.

7          THE COURT:  WELL, HE HAS SAID THAT HIS WITNESS WILL

8     SAY YOUR CLIENT STATED IN HIS LETTER THAT -- REMINDING HIS WIFE

9     THAT THEY WERE TOGETHER IN MEXICO ON CERTAIN DATES, WHEN IN

10    FACT THEY WERE NOT.  THIS, HE SAYS, IS EVIDENCE OF

11    CONSCIOUSNESS OF GUILT OR EVIDENCE ATTEMPTING TO ESTABLISH A

12    FALSE ALIBI.

13         MR. NICOLAYSEN:  WELL, AGAIN, AS TO FALSE ALIBI, IT'S

14    PREMATURE.

15         THE COURT:  I WISH YOU PEOPLE WOULD STOP ARGUING.  I'M

16    NOT GOING TO DECIDE IT NOW.  I'VE TOLD YOU TO BRIEF IT.

17         MR. NICOLAYSEN:  ALL RIGHT.

18         THE COURT:  LET'S TAKE CARE OF IT THEN.

19         MR. NICOLAYSEN:  YOUR HONOR, I ALSO WOULD LIKE TO

20    RENEW MY OBJECTION TO ANY REFERENCE ON DIRECT EXAMINATION TO

21    JAVIER VASQUEZ VELASCO BY THIS WITNESS.  THERE'S BEEN NO

22    IDENTIFICATION, AND THEREFORE ANY STATEMENT TO THE EFFECT OF MY

23    CLIENT BEING AT A MEETING LACKS FOUNDATION AND WOULD HAVE TO BE

24    BASED ON HEARSAY.

25         MR. MEDRANO:  MAY I ADDRESS THAT RIGHT NOW, YOUR

6-156

1    HONOR?

2            THE COURT:  WELL, YES.

3            MR. MEDRANO:  CLEARLY, WHEN WE WERE ON THE MEETING IN

4    LA BAJADITA, WE ASKED THE WITNESS TO IDENTIFY JAVIER VASQUEZ IN

5    COURT.  NEEDLESS TO SAY, HE WAS UNABLE TO.

6            BUT I WOULD LIKE TO TELL YOU, HOWEVER, YOUR HONOR, IN

7    SEVERAL MEETINGS WITH GOVERNMENT COUNSEL PRIOR TO HIS TESTIMONY

8    TODAY, HE HAS PICKED OUT OF A PHOTOSPREAD A PHOTOGRAPH OF

9    JAVIER VASQUEZ VELASCO.

10           NOW, TO ADVISE YOU AND DEFENSE COUNSEL WHAT MY NEXT

11   STEP OR MY NEXT CONTEMPLATED STEP IS, YOUR HONOR, TO DEAL WITH

12   THIS ISSUE OF MR. NICOLAYSEN, IT'S TO MARK THIS PHOTOCOPY OF

13   THE PHOTOGRAPH, WHICH IS A VERY GOOD COPY, AND MARK IT AS AN

14   EXHIBIT AND GIVE IT TO WITNESS, BECAUSE THEN I ANTICIPATE --

15           THE COURT:  THIS IS A PHOTOSPREAD THE WITNESS HAS BEEN

16   PREVIOUSLY SHOWN?

17           MR. MEDRANO:  THAT'S CORRECT.

18           MR. STOLAR:  I BELIEVE IT'S UNDULY SUGGESTIVE, YOUR

19   HONOR.  THE GOVERNMENT HAS HAD AMPLE OPPORTUNITY TO SEE IF THE

20   WITNESS CAN MAKE AN IDENTIFICATION IN COURT.

21           MR. MEDRANO:  YOUR HONOR, THAT'S A DIFFERENT ISSUE.

22   THE GOVERNMENT IS NOT PRECLUDED FROM TRYING TO GO FORWARD WITH

23   ITS BEST EVIDENCE.

24           MR. NICOLAYSEN IS TOTALLY ADDRESSING CLOSING ARGUMENT

25   AND --

6-157

1        THE COURT:  I THINK IF THIS WITNESS HAS PREVIOUSLY

2   IDENTIFIED A PHOTOGRAPH FROM A PHOTOSPREAD, THAT THAT EVIDENCE

3   MAY BE PERMITTED.

4        MR. MEDRANO:  AND THAT IS OUR INTENT, YOUR HONOR.  SO

5   I JUST WANTED TO LET YOU KNOW SO THAT WE CAN JUST MOVE SMOOTHLY

6   WITH THE REST OF THE AFTERNOON.

7        MR. NICOLAYSEN:  AND I'D LIKE TO GET A COPY OF THAT

8   PHOTOSPREAD.  THIS IS THE FIRST TIME --

9        THE COURT:  WELL, YOU SHOULD HAVE A COPY OF THAT

10  PHOTOSPREAD.

11       MR. MEDRANO:  THAT CAN BE DONE RIGHT NOW, YOUR HONOR.

12       MR. NICOLAYSEN:  YOUR HONOR, I THINK THE ISSUE SHOULD

13  REMAIN WHERE IT IS.

14       THE WITNESS HAS BEEN GIVEN AMPLE OPPORTUNITY TO MAKE

15  AN IDENTIFICATION.  THE GOVERNMENT IS OBVIOUSLY TRYING TO CLEAN

16  UP ITS CASE TO AVOID HAVING TO DISMISS AGAINST MY CLIENT, AND

17  THEY ARE USING UNDULY SUGGESTIVE MEANS TO ACCOMPLISH THIS.

18       MR. MEDRANO:  YOUR HONOR, THAT'S UNFAIR, AND I'LL TELL

19  YOU WHY.

20       THE COURT:  THEY'RE NOT TRYING TO GET THE WITNESS TO

21  CHANGE HIS TESTIMONY, THEY'RE JUST TRYING TO SHOW THAT ON A

22  PREVIOUS OCCASION HE DID MAKE THIS IDENTIFICATION.

23       MR. MEDRANO:  REPEATEDLY, YOUR HONOR.

24       MR. NICOLAYSEN:  YOUR HONOR, I WOULD ASK THE COURT TO

25  ORDER THE GOVERNMENT TO BRING THE ORIGINAL PHOTOS DOWN TO

6-158

1    COURT.

2          THE COURT:  WELL, YES.  DO YOU HAVE ORIGINAL

3    PHOTOSPREAD THAT WAS SHOWN TO THE WITNESS?

4          MR. NICOLAYSEN:  AND LIKEWISE --

5          THE COURT:  INCIDENTALLY, THIS WITNESS HAS SPENT A

6    GOOD DEAL OF TIME LOOKING AT THE MEMBERS OF THE PRESS WHEN HE

7    WAS --

8          COURTROOM:  (LAUGHTER.)

9          MR. MEDRANO:  YOUR HONOR, JUST FOR YOUR INFORMATION, I

10   NEVER SHOWED -- BECAUSE I'D WORKED WITH THE WITNESS PREVIOUSLY,

11   I NEVER SHOWED HIM ORIGINALS.  I SHOWED HIM A PHOTOSTATIC, COPY

12   AND THIS IS WHAT WE INTENDED TO SHOW HIM.

13         THE COURT:  WHATEVER YOU SHOWED HIM, YOU MAY SHOW HIM

14   HERE.  IF YOU SHOWED HIM SOMETHING OTHER THAN THIS, THEN YOU

15   SHOULD PRODUCE IT.

16         MR. MEDRANO:  THIS IS WHAT I SHOWED HIM, AND I'M GOING

17   TO USE THE PHOTOCOPY, AND I WILL PROVIDE DEFENSE WITH

18   PHOTOCOPIES IMMEDIATELY.

19         MR. NICOLAYSEN:  I WOULD ASK FOR ALL D.E.A.-6'S

20   RELATING THOUGH THOSE THOSE MEETINGS, AS WELL, YOUR HONOR.  I

21   THINK THERE'S A SERIOUS IDENTIFICATION PROBLEM HERE.

22         MR. MEDRANO:  COUNSEL HAS ALL JENCKS, YOUR HONOR.

23         THE COURT:  HE HAS THOSE?  ARE THERE ANY SUCH?

24         MR. STOLAR:  THERE'S NOTHING THAT COVERED THE I.D.

25         MR. MEDRANO:  I WILL CHECK AND SEE IF THERE'S ANYTHING

6-159

1    PERTAINING TO I.D.'S, YOUR HONOR, AND THEN DISCUSS IT WITH MR.

2    NICOLAYSEN.

3            THE COURT:  ALL RIGHT.

4            MR. NICOLAYSEN:  THANK YOU.

5            MR. STOLAR:  THANK YOU, YOUR HONOR.

6            THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN RECESS.

7            (BRIEF RECESS.)

8            (JURY NOT PRESENT.)

9            THE COURT:  THE COURT IS CONVENING OUTSIDE THE

10   PRESENCE OF THE JURY.  WHAT IS THE PROBLEM?

11           MR. MEDRANO:  I HAVE JUST SHOWED TO ALL DEFENSE

12   COUNSEL THE ORIGINAL, AS WELL AS GIVEN THEM PHOTOCOPIES, OF THE

13   PHOTOSPREAD THAT DURING MY MEETINGS WITH MR. PLASCENCIA, PRIOR

14   TO HIS TESTIMONY TODAY, I SHOWED HIM.

15           MY PROFFER IS THAT IN EACH OF THOSE MEETINGS WITH MR.

16   PLASCENCIA, IN THE ORIGINAL THAT I HAVE IN MY HAND, WHICH IS A

17   PHOTOCOPY, YOUR HONOR, HE IDENTIFIED PHOTOGRAPHS OF JAVIER

18   VASQUEZ VELASCO.  SO IT IS GOVERNMENT'S INTENT TO MARK THIS

19   NEXT EXHIBIT IN LINE, WHICH IS 171 FOR THE GOVERNMENT, AND TO

20   LAY THAT SAME FOUNDATION FOR THIS WITNESS AND THEN HAVE HIM

21   IDENTIFY THE PHOTOGRAPH IN THAT FASHION.

22           THAT IS THE INTENT OF THE GOVERNMENT, YOUR HONOR.

23           THE COURT:  WHAT IS THE OBJECTION?

24           MR. STOLAR:  FIRST OF ALL, THIS SHOWS A PICTURE OF MY

25   CLIENT IN CUSTODY.  HE'S SITTING THERE -- IT'S CLEARLY A MUG

6-160

1   SHOT WITH A UNITED STATES MARSHAL'S SERVICE, LOS ANGELES,

2   CALIFORNIA PLAQUE SITTING IN FRONT OF HIM.  THAT'S NUMBER ONE

3   FOR MR. MATTA.

4            SECOND, YOUR HONOR, IT IS NOT A FAIR SPREAD.

5            MR. NICOLAYSEN:  YOUR HONOR, SPEAKING ON MY CLIENT'S

6   BEHALF, DEFENDANT VASQUEZ VELASCO, WE'RE NOW IN THE REALM OF

7   POTENTIALLY UNDULY SUGGESTIVE PRETRIAL SHOW UPS, OR

8   PHOTOGRAPHIC SPREAD DISPLAYS.

9            THESE ARE ISSUES THAT SHOULD BE RESOLVED OUTSIDE THE

10  JURY'S PRESENCE, AND I WOULD LIKE TO BRIEF THE ISSUE SO THAT

11  THE COURT CAN HAVE AN ADEQUATE OPPORTUNITY TO ASSESS THE

12  CURRENT STATE OF THE LAW BEFORE IT IS PRESENTED TO THE WITNESS.

13  I'M CONCERNED ABOUT ITS UNDULY SUGGESTIVE CHARACTER.

14           THE COURT:  WHAT IS THE PROBLEM?  I'M A LITTLE

15  FAMILIAR WITH THE CURRENT STATE OF THE LAW.

16           MR. STOLAR:   THE PHOTO SPREAD ITSELF SHOWS PEOPLE

17  WHO ARE NOT AT ALL SIMILAR.

18           THE COURT:  WHY ARE YOU GETTING INTO THIS?  THIS DOES

19  NOT INVOLVE YOUR CLIENT.

20           MR. STOLAR:  NOT YET.

21           MR. NICOLAYSEN:  HIS CLIENT IS ON THE PHOTO SPREAD.

22           THE COURT:  I KNOW HE IS.

23           MR. NICOLAYSEN:  THE LACK OF SIMILARITY IS THE

24  PRINCIPAL CONCERN, YOUR HONOR.  THE FACT THAT THE CLIENT IS

25  ALSO IN CUSTODY IS PREJUDICIAL.

6-161

1          I THINK THAT WHAT WE ARE DEALING WITH HERE IS THE

2     GOVERNMENT'S EFFORT TO CURE AN OBVIOUS DEFECT IN ITS CASE IN A

3     MANNER THAN CAN ONLY ABOUT UNDULY SUGGESTIVE.  THEY'RE SIMPLY

4     GOING TO BE LEADING THE WITNESS INTO THE END RESULT, WHICH IS

5     THE IDENTIFICATION.

6          HE HAS FAILED TO MAKE AN IDENTIFICATION IN COURT.

7     THEY'RE TRYING TO REHABILITATE HIM WITH A PHOTO SPREAD THAT HAS

8     AT LEAST THREE PEOPLE WHO LOOK VERY, VERY DIFFERENT FROM EACH

9     OTHER.

10          MR. MEDRANO:  YOUR HONOR, IN FACT, THE PHOTOS ARE

11     VERY SIMILAR, WE WOULD OFFER.  THAT'S WHY WE GAVE YOU A

12     PHOTOCOPY OF IT.

13          IN ADDITION, YOUR HONOR --

14          THE COURT:  ACTUALLY NOT.  THERE IS ONLY ONE

15     PHOTOGRAPH THAT RESEMBLES THE DEFENDANT; THE OTHERS DO NOT.

16     CERTAINLY DR. MACHAIN DOES NOT.

17          MR. MEDRANO:  THE ISSUE, THOUGH, YOUR HONOR, IS

18     HAVING DONE MANY BANK ROBBERY CASES, I'M FAMILIAR WITH THE LAW

19     IN THIS AREA, YOUR HONOR, I'M AWARE THAT ALL SETS OF

20     PHOTOGRAPHS DO NOT HAVE TO BE IDENTICAL.

21          IN ADDITION, YOUR HONOR, THE SOLE ISSUE THAT THE

22     DISSIMILARITIES, IF THAT'S THE ISSUE, NOT BE SO PROFOUND OR

23     UNDULY SUGGESTIVE THAT EVERYTHING POINTS TO ONLY ONE PHOTOGRAPH

24     FOR IDENTIFICATION.

25          IN ADDITION, YOUR HONOR, THIS SITUATION IS NO

6-162

1   DIFFERENT FROM A BANK ROBBERY CASE THAT ALL OF US IN THIS COURT

2   ROOM HAVE DONE WHERE YOU HAVE A TERRIFIED VICTIM TELLER WHO'S

3   UNABLE TO DO AN EYEBALL IDENTIFICATION IN THE COURTROOM.  AND

4   THEREAFTER, YOUR HONOR -- AND I HAVE DONE THIS REPEATEDLY --

5   YOU GO TO THE PHOTO SPREAD SHOWN BY THE F.B.I. AGENT TO THE

6   VICTIM TELLER AND LAY THE FOUNDATION.  AND IDENTIFICATION CAN

7   COME IN IN THAT FASHION.

8           THE ISSUE RAISED BY MR. NICOLAYSEN GOES TO WEIGHT AND

9   NOT ADMISSIBILITY AND CLOSING ARGUMENT, YOUR HONOR, I WOULD

10  RESPECTFULLY SUBMIT.

11          MR. NICOLAYSEN:  THERE ARE PEOPLE IN THIS LINE-UP

12  DISPLAY WHO ARE WELL-KNOWN PEOPLE.  BY PROCESS OF ELIMINATION,

13  IT IS POSSIBLE THE WITNESS MIGHT HAVE IDENTIFIED JAVIER

14  VASQUEZ.  THE WITNESS MAY HAVE KNOWN AT THE TIME HE WAS SHOWN

15  THIS THAT VASQUEZ IS NOT MATTA BECAUSE MATTA IS A WELL-KNOWN

16  NAME.

17          THE SAME THING WITH RUBEN ZUNO AND THE SAME THING

18  WITH DR. MACHAIN.  WE START WHITTLING DOWN THE OPTIONS TO THE

19  POINT WHERE THE ONLY PERSON LEFT IS JAVIER OR THE PERSON NEXT

20  TO HIM.  THESE ARE ISSUES THAT SHOULD BE EXPLORED BY EXAMINING

21  THE WITNESS OUTSIDE THE JURY'S PRESENCE.

22          MR. MEDRANO:  YOUR HONOR, YOU HAVE OBVIATED THAT

23  WHOLE ISSUE OF PUBLICITY WITH YOUR INTENSIVE VOIR DIRE ON THE

24  ISSUE OF PUBLICITY.  AND YOU HAVE NO ONE IN THIS BOX WHO HAS

25  TOLD YOU THAT THEY KNOW ANYTHING ABOUT THIS CASE.

6-163

1    THE COURT:  GENTLEMEN, THAT'S IT, NO MORE ARGUMENT.

2  THE OBJECTION IS SUSTAINED, AT LEAST FOR NOW.  IF YOU WISH TO

3  HAVE THIS MATTER BRIEFED, I WOULD RECONSIDER IT.

4    BRING THE JURY IN.

5    MR. MEDRANO:  BEFORE YOU DO THAT, LET ME JUST -- MAY

6  I HAVE JUST ONE MOMENT, YOUR HONOR?

7    (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

8    MR. MEDRANO:  I JUST WANTED TO ADVISE YOU THEN WHERE

9  THIS WITNESS IS GOING AND WHAT THE GOVERNMENT'S INTENT IS, TO

10  AVOID OBJECTIONS MIDSTREAM WITH THIS TESTIMONY.

11    THE COURT:  ACTUALLY, YOU MAY INVITE OBJECTIONS.

12    MR. MEDRANO:  I UNDERSTAND, YOUR HONOR.

13  WE ARE GOING TO GET TO THE INCIDENT OF LA LANGOSTA BECAUSE THIS

14  IS THE PRECIPIENT WITNESS WHO WAS PRESENT WHEN THE TWO

15  AMERICANS WERE MURDERED.

16    NOW, AS PART OF HIS DIRECT TESTIMONY, HE WILL STATE

17  THAT ONE OF THE PEOPLE PARTICIPATING IN THE BEATING OF THE

18  AMERICANS IS JAVIER VASQUEZ VELASCO.  I APPRECIATE YOUR RULING.

19  IT IS MY INTENT, HOWEVER, TO CONTINUE WITH DIRECT IN THAT

20  FASHION AND BRIEF THIS ISSUE, AND HOPEFULLY GIVE YOU A CHANCE

21  TO RECONSIDER IT SO AT A LATER TIME WE CAN CONNECT THE NAME

22  FROM THE DIRECT TESTIMONY WITH THE PHOTO SPREAD WE INTEND TO

23  USE AT A LATER TIME.

24    I JUST WANT TO TELL YOU WHERE WE'RE HEADED WITH THIS

25  WITNESS.

6-164

1       THE COURT:  I DON'T BELIEVE THAT EVIDENCE SHOULD BE

2  PRESENTED UNDER THE CIRCUMSTANCES WHERE THE WITNESS HAS FAILED

3  TO IDENTIFY THIS DEFENDANT.

4       MR. MEDRANO:  AT LEAST FOR NOW, YOUR HONOR, IS WHAT

5  YOU'RE SAYING UNTIL THE ISSUE OF THE PHOTO SPREAD IS RESOLVED?

6       THE COURT:  THAT IS CORRECT.

7       MR. MEDRANO:  LET ME JUST CHECK MY NOTES TO SEE WHAT

8  AREAS OUTSIDE OF JAVIER VASQUEZ WE CAN DEAL WITH RIGHT NOW TO

9  CONTINUE USING THE WITNESS.

10      MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

11      THE COURT:  YES.

12      (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

13      MR. MEDRANO:  THE REMAINDER OF THIS DIRECT, WHICH

14 WOULD BE BETWEEN 30 MINUTES AND AN HOUR, WOULD REFERENCE JAVIER

15 VASQUEZ VELASCO.  AND WITH YOUR PERMISSION, WE'LL EXCUSE THIS

16 WITNESS FOR NOW AND GO TO THE NEXT WITNESS.

17      AND JUST I'M JUST ADVISED, HOWEVER, THAT THAT SECOND

18 WITNESS, WHO IS A HECTOR CERVANTES SANTOS, IS UP ON THE 14TH

19 FLOOR AND WE HAVE TO BRING HIM DOWN.

20      WE WERE EXPECTING TO GO NEXT WITH MR. PASCENCIA

21 AGUILAR.

22      MR. NICOLAYSEN:  I STRONGLY OBJECT TO THAT, YOUR

23 HONOR.

24      THE COURT:  TO WHAT?

25      MR. NICOLAYSEN:  TO THE CALLING OF HECTOR CERVANTES

6-165

SANTOS.  THE 48-HOUR RULE ON JENKS HAS NOT BEEN COMPLIED WITH

AS TO THIS WITNESS.  I GOT THE JENKS MATERIAL YESTERDAY

MORNING, I BELIEVE, AND I HAVE THE RECEIPT HERE FOR IT.

            AND WE HAVE AN UNDERSTANDING WITH THE GOVERNMENT THAT

WE'LL GET JENKS AT LEAST 48 HOURS PRIOR.  AND I'M NOT PREPARED

TO CROSS THIS WITNESS, AND THIS IS AN IMPORTANT WITNESS FOR THE

GOVERNMENT AND IMPORTANT FOR ALL OF US AS DEFENSE ATTORNEYS.

            I WOULD ASK THAT THE GOVERNMENT CALL ANOTHER WITNESS

WHO'S ON TODAY'S WITNESS LIST.

            MR. MEDVENE:  OUR UNDERSTANDING IS THAT THEY HAVE A

D.E.A. AGENT READY.  HE'S THE ONLY WITNESS AGAINST MR. ZUNO, AS

WE UNDERSTAND THE GOVERNMENT, ON THE KIDNAPPING.

            THE COURT: WHO IS?

            MR. MEDVENE:   MR. HECTOR CERVANTES SANTOS.  HE'S THE

ONLY WITNESS.  WE JUST GOT THE MATERIAL YESTERDAY MORNING.

            WE THINK THE 48 HOURS -- AND WE DISCUSSED THIS WITH

THE GOVERNMENT -- IS TOMORROW MORNING.  HE'S THE ONLY WITNESS

AGAINST US ON THE KIDNAPPING, AND THEY WANT TO FOLLOW THE 48

HOURS ON THIS WITNESS.

            MR. MEDRANO:   YOUR HONOR, I CAN TELL YOU THAT THE

DIRECT STARTING CERVANTES IS GOING TO TAKE US INTO TOMORROW

MORNING, SO THERE IS NOT GOING TO BE ANY CROSS TODAY, SO WE CAN

AT LEAST GET STARTED WITH THE DIRECT.  THEY DID RECEIVE THE

JENKS YESTERDAY MORNING.

            THE COURT:  WE CAN DO WITH THIS WITNESS WHAT I

6-166

1    OFFERED MR. NICOLAYSEN.    AFTER THE DIRECT EXAMINATION HAS BEEN

2    COMPLETED, YOU MAY CONDUCT WHATEVER CROSS-EXAMINATION YOU WISH

3    AT THAT TIME.

4            AND IF YOU NEED ADDITIONAL TIME OR TO REOPEN THE

5    CROSS-EXAMINATION AFTER YOU HAVE IT PREPARED, I'LL PERMIT YOU

6    TO DO THAT.    OR YOU MAY DEFER YOUR CROSS-EXAMINATION.

7            MR. MEDVENE:    IF WE COULD, YOUR HONOR, IF THE DIRECT

8    IS GOING TO TAKE ANOTHER HOUR, WE'LL BE DONE -- WE COULD GO

9    WITH THE DIRECT, BUT CAN WE RECESS WHEN THE DIRECT IS OVER AT

10    4:30?

11            THE COURT:    IF THE DIRECT IS OVER AT 4:30?

12            MR. MEDVENE:    NO.    IF THE DIRECT IS OVER AT 4:30,

13    WE'D RECESS, I GUESS, AS WE ALWAYS DO.    BUT IF THE DIRECT IS

14    OVER BEFORE 4:30, CAN WE RECESS THEN?

15            THE COURT:    WELL, HE SAID IT'S GOING TO GO INTO

16    TOMORROW MORNING.

17            MR. MEDRANO:    THAT'S CORRECT, YOUR HONOR.

18            MR. MEDVENE:    OH, THAT'S FINE.

19            THE COURT:    WE'LL DO THAT THEN.

20            MR. MEDRANO:    MAY WE CALL THE WITNESS AT THIS TIME,

21    YOUR HONOR?

22            (BRIEF INTERRUPTION.)

23            (JURY PRESENT.)

24            THE COURT:    CALL YOUR NEXT WITNESS.

25            MR. MEDRANO:    THE GOVERNMENT WOULD CALL HECTOR

6-167

1    CERVANTES SANTOS TO THE STAND AT THIS TIME.

2

3         HECTOR CERVANTEZ SANTOS + PLAINTIFF'S WITNESS, SWORN

4    /

5              THE CLERK:   PLEASE STATE YOUR FULL NAME FOR THE

6    RECORD.

7              THE WITNESS:  MY NAME?

8              THE CLERK:  YES.

9              THE COURT: SPEAK UP, PLEASE.

10             THE WITNESS:  MY NAME IS HECTOR MANUEL CERVANTES

11   SANTOS.

12             THE CLERK:  PLEASE SPELL YOUR LAST NAME.

13             THE WITNESS:   C E R V A N T E C (SIC).

14             THE COURT:  C OR S?

15             THE WITNESS:  C.

16             THE COURT:  C.

17             MR. MEDRANO:  MAY I HAVE ONE MOMENT, YOUR HONOR?

18             (BRIEF PAUSE.)

19             MR. MEDRANO:  I'M SORRY, YOUR HONOR.

20

21                   DIRECT EXAMINATION +

22   BY MR. MEDRANO:

23   Q.   GOOD AFTERNOON, MR. CERVANTES.

24   A.   GOOD AFTERNOON.

25   Q.   MR. CERVANTES, HOW OLD ARE YOU, SIR?

6-168

1    A.    I'M 30 YEARS OLD.

2    Q.    WHERE WERE YOU BORN?

3    A.    GUADALAJARA, JALISCO, MEXICO.

4    Q.    ARE YOU A CITIZEN OF THE REPUBLIC OF MEXICO?

5    A.    YES.

6    Q.    ARE YOU MARRIED?

7    A.    YES.

8    Q.    ANY CHILDREN?

9    A.    TWO.

10    Q.    HAVE YOU EVER IN MEXICO, MR. CERVANTES, WORKED WITH ANY

11    LAW ENFORCEMENT AGENTS?

12    A.    YES.

13    Q.    WITH WHO?

14    A.    FOR THE RIOT POLICE.

15    Q.    WHEN DID YOU WORK FOR THE RIOT POLICE?

16    A.    IN '79.

17    Q.    AND HOW LONG DID YOU WORK FOR THE RIOT POLICE?

18    A.    ONE YEAR.

19    Q.    WHAT CITY WERE YOU WORKING IN WHEN YOU WERE WITH THE RIOT

20    POLICE?

21    A.    GUADALAJARA, JALISCO.

22    Q.    WHEN YOU WERE WITH THE RIOT POLICE, DID YOU RECEIVE

23    TRAINING IN THE USE OF FIREARMS?

24    A.    YES.

25    Q.    ALL TYPES OF FIREARMS?

6-169

1   A.   YES.

2   Q.   AFTER YOU WERE WITH THE RIOT POLICE, DID YOU EVER WORK

3   WITH ANY OTHER LAW ENFORCEMENT AGENCY IN MEXICO?

4   A.   YES.

5   Q.   WITH WHO?

6   A.   RADIO PATROLS.

7   Q.   WHEN DID YOU DO THAT?

8   A.   IN 1980.

9   Q.   WHAT CITY WAS THAT IN?

10  A.   GUADALAJARA, JALISCO.

11  Q.   DID YOU EVER WORK WITH ANY LAW ENFORCEMENT AGENCY OUTSIDE

12  OF THE CITY OF GUADALAJARA?

13  A.   YES.

14  Q.   WITH WHOM?

15  A.   FOR THE RURAL POLICE.

16  Q.   WHERE DID YOU DO THAT?

17  A.   IN LA HUERTA (PHONETIC), JALISCO.

18  Q.   HOW LONG WERE YOU WITH THE RURAL POLICE?

19  A.   APPROXIMATELY SIX MONTHS.

20  Q.   WHAT YEAR WAS THAT?

21  A.   '81.

22  Q.   MR. CERVANTES, DO YOU KNOW A MAN BY THE NAME OF JAVIER

23  BARBA HERNANDEZ?

24  A.   YES.

25  Q.   DID YOU EVER WORK FOR JAVIER BARBA HERNANDEZ?

6-170

1    A.    YES.

2    Q.    WHAT CITY?

3    A.    GUADALAJARA, JALISCO.

4    Q.    WHEN DID YOU START WORKING FOR JAVIER BARBA HERNANDEZ?

5              MR. NICOLAYSEN:  YOUR HONOR, I WOULD JUST ASK THAT

6    THE JURY BE ADMONISHED THAT IT IS NOT MY CLIENT THAT HAS THE

7    SAME FIRST NAME, AND THAT THESE NAMES ARE EASILY CONFUSED.

8              THE COURT:  WHICH NAME ARE YOU REFERRING TO?

9              MR. NICOLAYSEN:  JAVIER BARBA HERNANDEZ.  THE

10   GOVERNMENT REPEATEDLY REFERS TO JAVIER IN THE QUESTIONS, AND

11   I'M CONCERNED ABOUT THE POSSIBLE CONFUSION BETWEEN THAT

12   PARTICULAR PERSON AND MY CLIENT.

13             THE COURT:  WHAT IS YOUR CLIENT'S LAST NAME?

14             MR. NICOLAYSEN:  VASQUEZ VELASCO.  IT IS NOT THE

15   PERSON BEING DISCUSSED ON THE STAND, BUT NAMES CAN EASILY BE

16   MISCONSTRUED BECAUSE OF THE SAME FIRST NAME.  AND I WOULD ASK

17   THAT THE JURY BE ADMONISHED.

18             THE COURT:  I THINK THE JURY WOULD BE ABLE TO FOLLOW

19   THAT.

20             GO AHEAD.

21   BY MR. MEDRANO:

22   Q.    MR. CERVANTES, WHEN DID YOU START WORKING FOR JAVIER BARBA

23   HERNANDEZ?

24   A.    IN THE MONTH OF DECEMBER OF 1982.

25   Q.    WHEN YOU WORKED WITH JAVIER BARBA HERNANDEZ WAS HE OLDER

6-171

1   THAN YOU WERE?

2   A.   YES.

3   Q.   HOW MUCH OLDER WAS HE THAN YOU?

4   A.   FOUR YEARS OLDER.

5   Q.   MR. CERVANTES, I'D LIKE TO LOOK AT THE EXHIBITS IN FRONT

6   OF YOU AND LOOK AT THE YELLOW TAGS.  AND I ASK YOU TO PULL OUT

7   GOVERNMENT EXHIBIT 41.

8          THE COURT:   ARE THESE IN ORDER HERE OR NOT?  THEY

9   SHOULD BE IN THE ORDER THAT YOU'RE GOING TO REFER TO THEM.

10         MR. MEDRANO:  THEY WERE SUPPOSED TO BE, YOUR HONOR.

11  I APOLOGIZE.

12         THE COURT:  41?

13         MR. MEDRANO:  41.

14         THE COURT:  WHAT IS YOUR QUESTION?

15  BY MR. MEDRANO:

16  Q.   MR. CERVANTES, COULD YOU TELL ME WHAT GOVERNMENT EXHIBIT

17  41 IS?

18  A.   YES.  IT IS ATTORNEY JAVIER BARBA HERNANDEZ.

19  Q.   THIS IS THE MAN YOU WORKED FOR?

20  A.   YES.

21         MR. MEDRANO:  I MOVE THE ADMISSION OF THIS EXHIBIT AT

22  THIS TIME.

23         THE COURT:  THAT MAY BE RECEIVED.

24         (EXHIBIT # 41 RECEIVED IN EVIDENCE.)

25  BY MR. MEDRANO:

6-172

1    Q.    WHAT DID YOU DO FOR JAVIER BARBA HERNANDEZ?

2    A.    I WAS THE CHIEF OF SECURITY FOR HIS HOUSE.

3    Q.    WHERE WAS HIS HOUSE?

4    A.    IN GUADALAJARA, JALISCO.

5    Q.    I NOW ASK YOU TO LOOK TO EXHIBIT 51-A AND -B, WHICH ARE IN

6    FRONT OF YOU.

7    Q.    HAVE YOU FOUND THOSE TWO, SIR?

8    A.    YES.

9    Q.    COULD YOU TELL ME WHAT THAT IS?

10   A.    THIS IS THE HOUSE WHERE I WORKED FOR ATTORNEY JAVIER BARBA

11   HERNANDEZ.

12            MR. MEDRANO:  WE SEEK ITS ADMISSION, YOUR HONOR.

13            THE COURT:  THEY MAY BE RECEIVED.

14            (EXHIBITS 51-A & -B # RECEIVED IN EVIDENCE.)

15   BY MR. MEDRANO:

16   Q.    MR. CERVANTES, COULD YOU TELL US WHAT YOUR DUTIES WERE AS

17   THE HEAD OF SECURITY?

18   A.    TO CHECK THE HOUSE AND TO SEE WHO ENTERED AND WHO LEFT.

19   Q.    WHEN PEOPLE ARRIVED AT THE HOUSE, WOULD YOU BE THE FIRST

20   ONE TO MEET OR GREET THEM?

21   A.    YES.

22   Q.    DID YOU ACTUALLY RESIDE AT THAT HOUSE OF JAVIER BARBA

23   HERNANDEZ?

24   A.    YES.

25   Q.    DID YOUR FAMILY RESIDE WITH YOU?

6-173

1    A.   NO.

2    Q.   WHERE WAS YOUR FAMILY?

3    A.   AT MY HOUSE.

4    Q.   WOULD YOU SPEND PERIODS OF TIME AT THAT HOUSE OF JAVIER

5    BARBA HERNANDEZ?

6              MR. STOLAR:  OBJECTION TO THE LEADING.

7              MR. NICOLAYSEN:  IT'S VAGUE AS TO TIME.  I HAVE NO

8    IDEA WHAT TIME FRAME WE ARE TALKING ABOUT.

9              MR. MEDRANO:  HE INDICATED DECEMBER OF '82 IS WHEN HE

10   STARTED --

11             THE COURT:  BUT YOUR QUESTION DIDN'T INDICATE THAT.

12             MR. MEDRANO:  I'LL REPHRASE IT.  THANK YOU.

13   BY MR. MEDRANO:

14   Q.   IN CARRYING OUT OUR RESPONSIBILITIES, MR. CERVANTES, DID

15   YOU CARRY A FIREARM?

16   A.   YES.

17   Q.   AND WHO PROVIDED YOU WITH THIS FIREARM?

18   A.   THE ATTORNEY JAVIER BARBA HERNANDEZ.

19   Q.   WHAT KIND OF FIREARM OR FIREARMS WERE YOU PROVIDED?

20   A.   AN AUTOMATIC RIFLE AND AN AUTOMATIC PISTOL.

21   Q.   COULD YOU BE MORE SPECIFIC?  WHAT TYPE OF WEAPON WAS IT?

22   A.   IT WAS AN AR-15, 2.23 CALIBER.

23   Q.   IS THAT .223 CALIBER?

24   A.   YES.

25   Q.   AND DID YOU HAVE A SMALLER HAND GUN AS WELL?

6-174

1   A.   YES.

2   Q.   WHAT TYPE ARE THOSE?

3   A.   A .38 SUPER.

4   Q.   ANY OTHER TYPE?

5   A.   NO, JUST THAT.

6   Q.   THE AR-15, WAS THAT AN AUTOMATIC WEAPON?

7   A.   YES.

8   Q.   WOULD JAVIER BARBA HERNANDEZ RESIDE AT THE HOUSE WITH YOU,

9   MR. CERVANTES?

10  A.   NO.

11  Q.   WHAT WAS THE HOUSE USED FOR THEN?

12  A.   IT WAS ATTORNEY JAVIER BARBA HERNANDEZ'S SAFE HOUSE.

13  Q.   WOULD PEOPLE MEET AT THIS HOUSE?

14  A.   YES.

15  Q.   WOULD SOCIAL GATHERINGS BE HELD AT THE HOUSE?

16  A.   YES.

17  Q.   WHEN YOU WERE AT THE HOUSE, MR. CERVANTES, FOR WHAT

18  PERIODS OF TIME WOULD YOU HAVE TO BE AT THE HOUSE?

19  A.   THERE WERE TIMES WHEN I WOULD BE THERE FOR THREE MONTHS

20  WITHOUT LEAVING.

21  Q.   WITHOUT EVEN SEEING YOUR FAMILY?

22  A.   YES, WITHOUT SEEING IT.

23  Q.   HOW WOULD YOU SUPPORT YOUR FAMILY IF YOU WERE AT THAT

24  HOUSE FOR MONTHS AT A TIME?

25           THE INTERPRETER:  COULD I ASK HIM TO REPEAT THIS A

6-175

1    LITTLE MORE SLOWLY?

2            THE COURT:  YES.  REPEAT YOUR ANSWER SLOWLY.

3            THE WITNESS:  JAVIER BARBA HERNANDEZ'S BODYGUARDS

4    WOULD TAKE THE MONEY TO MY WIFE FOR HER TO HAVE IT DURING THE

5    TIME THAT I WAS GOING TO BE THERE.

6    BY MR. MEDRANO:

7    Q.   MR. CERVANTES, IF I COULD ASK YOU WHEN YOU ANSWER, COULD

8    YOU SPEAK MORE SLOWLY FOR THE INTERPRETER TO DO THE

9    TRANSLATION.  OKAY?

10   A.   YES.

11   Q.   MR. CERVANTES, I'D LIKE TO DIRECT YOUR ATTENTION NOW TO

12   ABOUT SEPTEMBER OF 1984.  IN THE MONTH OF SEPTEMBER '84, DID

13   YOU EVER ATTEND A BAPTISM?

14   A.   YES.

15   Q.   WHERE WAS THIS HELD AT?

16   A.   AT THAT HOUSE, ATTORNEY JAVIER BARBA HERNANDEZ'S HOUSE.

17   Q.   WHO WAS GOING TO BE BAPTIZED?

18   A.   ATTORNEY JAVIER BARBA HERNANDEZ'S CHILD.

19   Q.   WHAT WAS THE NAME OF THE CHILD, IF YOU KNOW?

20   A.   YOREMI.

21   Q.   WHO WAS GOING TO BE THE GODFATHER TO THE CHILD?

22   A.   JAVIER GARCIA PANIAGUA.

23   Q.   IS THERE -- STRIKE THAT.

24           THE BAPTISM EVENT IS HELD AT THE HOUSE OF BARBA

25   HERNANDEZ?

6-176

1   A.   YES.

2   Q.   DO MANY PEOPLE ATTEND?

3   A.   YES.

4   Q.   FOR THIS BAPTISM, WERE YOU PRESENT?

5   A.   YES.

6   Q.   CAN YOU TELL US WHO WAS AT THIS GATHERING IN SEPTEMBER OF

7   1984?

8   A.   MR. DON RUBEN ZUNO ARCE WAS THERE.   THERE WAS JAVIER

9   GARCIA PANIAGUA, HIS BROTHER MARCELINO, RAFAEL CARO QUINTERO,

10  ERNESTO FONSECA CARRILLO.

11         THOSE WERE THE HIGHEST OFFICIALS PRESENT THERE AT THE

12  BAPTISM.

13  Q.   WAS YOUR BOSS JAVIER BARBA HERNANDEZ PRESENT?

14  A.   YES.

15  Q.   DID JAVIER BARBA HERNANDEZ HAVE A BOTHER?

16  A.   YES.

17  Q.   DO YOU RECALL HIS NAME?

18  A.   YES.

19  Q.   WHAT WAS THAT?

20  A.   JORGE BARBA HERNANDEZ.

21  Q.   WAS JORGE BARBA HERNANDEZ AT THIS GATHERING?

22  A.   YES.

23  Q.   DO YOU KNOW A MAN BY THE NAME OF MANUEL SALCIDO USUERTA?

24  A.   YES.

25  Q.   WAS MANUEL SALCIDO AT THIS GATHERING?

6-177

1   A.   YES.

2   Q.   NOW, MR. CERVANTES, DO YOU KNOW TWO MEN BY THE NAME OF

3   MIGUEL ALDANA IBARRA AND MANUEL IBARRA HERRERA?

4   A.   YES.

5   Q.   AND WERE EITHER OF THESE TWO MEN AT THIS BAPTISM

6   GATHERING?

7   A.   NO.

8   Q.   YOU MENTIONED THAT RUBEN ZUNO ARCE WAS AT THIS GATHERING

9   AS WELL?

10  A.   YES.

11  Q.   DID HE COME WITH -- WELL, DID ANYONE COME WITH HIM; DO YOU

12  RECALL?

13  A.   YES.

14  Q.   WHO WAS THAT?

15  A.   DAVID MACIAS.

16  Q.   WHO IS DAVID MACIAS?

17  A.   HE USED TO BE HIS DRIVER BACK THEN.

18  Q.   NOW, CAN I ASK YOU TO LOOK AT THE EXHIBIT IN FRONT OF YOU,

19  GOVERNMENT EXHIBIT 55.  CAN YOU PULL THAT OUT?

20          HAVE YOU FOUND THAT EXHIBIT, SIR?

21  A.   YES.

22  Q.   COULD YOU TELL ME WHO THAT IS?

23  A.   YES.

24  Q.   WHO IS IT?

25  A.   JAVIER GARCIA PANIAGUA.

6-178

1    Q.    HE WAS AT THE BAPTISM?

2    A.    YES.

3         MR. MEDRANO:    YOUR HONOR, WE SEEK ADMISSION OF

4    EXHIBIT 55 AT THIS TIME.

5         THE COURT:  THAT MAY BE RECEIVED.

6         MR. STOLAR:  SUBJECT TO CONNECTION, I WOULD ASK.

7         MR. MEDRANO:  IT WILL BE CONNECTED, YOUR HONOR.

8         THE COURT:  ALL RIGHT.

9         (EXHIBIT # 55 RECEIVED IN EVIDENCE.)

10   BY MR. MEDRANO:

11   Q.   NOW, MR. CERVANTES, WITH THE COURT'S PERMISSION, I'D LIKE

12   YOU TO STAND AND TELL ME IF YOU SEE RUBEN ZUNO ARCE IN THE

13   COURTROOM TODAY, SIR.

14        YOU MAY STAND, MR. CERVANTES.

15        THE WITNESS:  COULD I GET A LITTLE CLOSER?  I CAN'T

16   SEE WELL.

17        THE COURT:  WHAT DO YOU WANT TO DO:  STEP DOWN?

18        THE WITNESS:  YES, TO SEE BETTER

19        THE COURT:  YOU MAY STEP INTO THE WELL AREA THERE.

20        MR. MEDRANO:  YOUR HONOR, MAY I ASK THE WITNESS IF HE

21   WEARS GLASSES; AND IF SO, IT HE'D LIKE TO PUT THEM ON.

22        THE COURT:  YOU MAY ASK.

23        THE WITNESS:  NO.

24   BY MR. MEDRANO::

25   Q.   DO YOU SEE RUBEN ZUNO-ARCE?

6-179

1    A.    YES.

2    Q.    COULD I ASK YOU TO IDENTIFY HIM?

3    A.    YES.

4    Q.    PLEASE POINT HIM OUT.

5    A.    YES.  IT IS THE MAN IN THE GRAY JACKET AND THE BLACK TIE.

6              MR. MEDRANO:  YOUR HONOR, WE'D LIKE THE RECORD TO

7    REFLECT AN IDENTIFICATION.

8              THE COURT:  WELL, THERE ARE TWO GENTLEMEN THERE.  I

9    THINK YOU NEED SOME FURTHER --

10             MR. MEDRANO:  HE SAID GRAY HAIR, YOUR HONOR, DARK TIE

11   AND GRAY SUIT.

12             MAY WE HAVE THEN THE WITNESS WALK DIRECTLY UP TO THE

13   DEFENDANT?

14             THE COURT:  HE CAN POINT.

15             MR. MEDRANO:  CAN YOU POINT TO MR. ZUNO ARCE,

16   MR. CERVANTES?

17             THE WITNESS:  YES.

18             THE COURT:  YOUR HONOR, MAY THE RECORD REFLECT AN

19   IDENTIFICATION OF MR. ZUNO ARCE?

20             THE COURT:  YES.  THE WITNESS MAY RETURN TO THE

21   STAND.

22             (WITNESS RESUMED THE STAND).

23   BY MR. MEDRANO:

24   Q.   MR. CERVANTES, IF I CAN ASK YOU TO GET CLOSER TO THE

25   MICROPHONE SO WE CAN HEAR YOU -- MR. CERVANTES, THERE WERE

6-180

1    OTHER -- WERE THERE OTHER PEOPLE AT THIS BAPTISM PARTY, AS

2    WELL?

3    A.    YES.

4    Q.    WERE THERE BODYGUARDS?

5    A.    YES.

6    Q.    WERE THESE BODYGUARDS ARMED?

7    A.    YES.

8    Q.    ANYONE THAT WOULD ARRIVE AT THE PARTY AND ENTER THE HOUSE,

9    WOULD YOU BE ONE OF THE FIRST PEOPLE TO GREET THEM?

10   A.    YES.

11   Q.    AND WAS THAT PART OF YOUR RESPONSIBILITIES AS HEAD OF

12   SECURITY OF THE HOUSE?

13   A.    YES.

14   Q.    ARE YOU FAMILIAR WITH A FAMILY WITH THE LAST NAME OF

15   VASQUEZ VELASCO, MR. CERVANTES?

16   A.    YES.

17   Q.    WAS ANYBODY AT THAT PARTY BY THE NAME OF VASQUEZ VELASCO?

18   A.    YES.

19   Q.    CAN YOU GIVE ME THE NAMES OF THE PEOPLE THAT WERE THERE

20   THAT WERE NAMED VASQUEZ VELASCO?

21   A.    JAVIER VASQUEZ VELASCO, ELISIO VASQUEZ VELASCO, AND

22   RICARDO VASQUEZ VELASCO.

23   Q.    DO YOU KNOW A MAN BY THE NAME OF ANTONIO VASQUEZ VELASCO?

24   A.    YES.

25   Q.    IS HE ALSO PART OF THIS FAMILY?

6-181

1    A.   YES.

2    Q.   WAS ANTONIO VASQUEZ AT THE PARTY?

3    A.   YES.

4            MR. MEDRANO:  YOUR HONOR, WITH THE COURT'S

5    PERMISSION, MAY WE ASK THE WITNESS TO STEP DOWN BECAUSE I'D

6    LIKE TO SEE IF HE CAN IDENTIFY JAVIER VASQUEZ VELASCO IN THE

7    COURTROOM?

8            THE COURT:  YES, YOU MAY DO THAT.

9            (WITNESS WALKING INTO THE WELL.)

10           THE WITNESS:  YES.

11           MR. MEDRANO:  CAN I ASK YOU TO POINT HIM OUT AND TO

12   DESCRIBE AN ARTICLE OF CLOTHING THAT HE'S WEARING?

13           THE WITNESS:   HE HAS A BLUE JACKET ON AND A TIE WITH

14   THE BLUE STRIPES.

15           THE COURT:

16           MR. NICOLAYSEN:  I'LL STIPULATE THAT'S MY CLIENT.

17           THE COURT:  INDICATING THE DEFENDANT ANTONIO VASQUEZ

18   VELASCO.

19           MR. MEDRANO:  MAY THE WITNESS RETURN TO THE WITNESS

20   STAND, YOUR HONOR?

21           THE COURT:  YOUR HONOR, YOU SAID ANTONIO.  YOU

22   MISSPOKE AND SAID ANTONIO.

23           THE COURT:  JAVIER, IS IT?

24           MR. MEDRANO:  YES, YOUR HONOR.

25           MR. NICOLAYSEN:  THAT IS CORRECT.

6-182

1    MR. MEDRANO:   MAY WE ASK THE WITNESS TO RETURN TO

2    THE BOX, YOUR HONOR?

3         THE COURT:   THE WITNESS POINTED OUT FOR THE RECORD

4    JAVIER VASQUEZ VELASCO.

5    BY MR. MEDRANO:

6    Q.   MR. CERVANTES, THE VASQUEZ VELASCO BROTHERS, WERE THEY

7    ARMED WITH GUNS?

8         MR. NICOLAYSEN:   OBJECTION, YOUR HONOR, IRRELEVANT

9    AND PREJUDICIAL.

10        MR. MEDRANO:   THIS WILL BE CONNECTED UP, YOUR HONOR.

11        THE COURT:   SUSTAINED.

12        MR. NICOLAYSEN:   I WOULD ASK THAT THE JURY BE

13   ADMONISHED TO DISREGARD --

14        THE COURT:   I WILL PERMIT THE ANSWER.

15        MR. MEDRANO:   MAY I ASK THE QUESTION AGAIN THEN,

16   YOUR HONOR?

17        THE COURT:   YES, YOU MAY.

18   BY MR. MEDRANO:

19   Q.   MR. CERVANTES, THE VASQUES VELASCO BROTHERS, WERE THEY

20   ARMED WITH GUNS?

21   A.   YES.

22   Q.   JAVIER VASQUEZ VELASCO, WAS HE ARMED, SIR?

23        MR. NICOLAYSEN:   OBJECTION, YOUR HONOR, IRRELEVANT.

24        THE COURT:   OVERRULED.

25   A.   YES.

6-183

Q.   BESIDES THE VASQUEZ VELASCO BROTHERS, WERE THERE OTHER
PEOPLE AT THE PARTY ARMED WITH GUNS?

A.   YES.  THE BODYGUARDS OF THE PEOPLE WHO CAME.  EVERYBODY
HAD A BODYGUARD.

Q.   MR. CERVANTES, AT ANY POINT IS A MEETING HELD DURING THE
BAPTISM GET TOGETHER AT THIS HOUSE BELONGING TO BARBA
HERNANDEZ?

A.   YES.

Q.   WHERE IS THIS MEETING HELD AT WITHIN THE HOUSE?

A.   IN THE LIVING ROOM.

Q.   HOW MANY ENTRANCES ARE THERE TO THIS LIVING ROOM IN THE
HOUSE?

A.   JUST ONE.

Q.   DID YOU SET UP A POSITION FOR YOURSELF ANYWHERE IN THE
VICINITY OF THE LIVING ROOM?

        MR. STOLAR:  I'M GOING TO OBJECT TO THE LEADING AND
ASK THAT THE WITNESS BE PERMITTED TO TESTIFY.

        THE COURT:  RESTATE YOUR QUESTION.

BY MR. MEDRANO:

Q.   DID YOU TAKE ANY POSITION -- STRIKE THAT.

        WHO WAS PRESENT IN THE LIVING ROOM FOR THE MEETING?

A.   THERE WAS DON RUBEN ZUNO ARCE, JAVIER GARCIA PANIAGUA,
MARCELINO, HIS BROTHER, COCHILOCO, MANUEL SALCIDO.  THAT'S ALL
I REMEMBER.

Q.   WAS ERNESTO FONSECA CARRILLO AT THE MEETING?

6-184

1    A.    NOT AT THAT MEETING.

2    Q.    RAFAEL CARO QUINTERO?

3    A.    NO.

4    Q.    WAS YOUR BOSS, BARBA HERNANDEZ, PRESENT FOR IT?

5          MR. NICOLAYSEN:  I'M GOING TO OBJECT.  THIS IS

6    LEADING.  HE HAS STATED THAT'S ALL HE CAN REMEMBER.

7          MR. MEDRANO:  YOUR HONOR, THE GOVERNMENT IS ENTITLED

8    TO REFRESH HIS MEMORY.

9          THE COURT:  YES.  OVERRULED.

10   BY MR. MEDRANO:

11   Q.    BARBA HERNANDEZ, WAS HE ALSO PRESENT AT THE MEETING?

12   A.    YES.

13   Q.    DURING THE MEETING, WHERE WERE YOU LOCATED?

14   A.    I WAS TO ONE SIDE OF ATTORNEY BARBA HERNANDEZ.

15   Q.    WERE YOU PRESENT FOR THE MEETING, MR. CERVANTES?

16   A.    YES.

17   Q.    WERE YOU PRESENT -- STRIKE THAT.

18         COULD YOU HEAR WHAT WAS BEING DISCUSSED AT THE

19   MEETING?

20   A.    YES.

21   Q.    COULD YOU TELL US WHAT WAS SAID AT THIS MEETING?

22         MR. STOLAR:  FOR THE RECORD, DID OBJECTION IS TO

23   HEARSAY.

24         THE COURT:  SUSTAINED -- STRIKE THAT.  OVERRULED

25   FOR THE SAME REASONS PREVIOUSLY STATED.

6-185

BY MR. MEDRANO:

Q.    WHAT WAS SAID AT THE MEETING?

A.    IT DEALT WITH A D.E.A. AGENT WHO WAS CAUSING TROUBLE.

Q.    WHAT TROUBLE WAS BEING CAUSED BY THIS D.E.A. AGENT?

A.    THEY ONLY SAID THAT HE WAS CAUSING TROUBLE AND THAT THEY

WANTED TO KNOW WHO THE PERSON WAS WHO WAS CAUSING TROUBLE.

Q.    DID EVERYONE -- STRIKE THAT.  EVERYONE WHO WAS PRESENT AT

THIS MEETING, DID THEY ALL PARTICIPATE IN THIS DISCUSSION?

            MR. MEDVENE:  OBJECTION; LEADING AND SUGGESTIVE, YOUR

HONOR.

            THE COURT:  SUSTAINED.

BY MR. MEDRANO:

Q.    HOW LONG WOULD YOU ESTIMATE THAT THIS MEETING LASTED?  HOW

LONG?

A.    A COUPLE OF HOURS.

Q.    RUBEN ZUNO ARCE, DID YOU HEAR HIM SPEAK AT THIS MEETING?

A.    THE ONLY THING I FOUND OUT WAS THAT EVERYBODY WAS IN

AGREEMENT.  EVERYBODY AGREED.

            MR. MEDVENE:  OBJECTION, YOUR HONOR, AND MOVE TO

STRIKE.

            MR. STOLAR:  SAME OBJECTION.

            THE COURT:  THE ANSWER IS STRICKEN AS NONRESPONSIVE

TO THE QUESTION.

            RESTATE THE QUESTION.

BY MR. MEDRANO:

6-186

1   Q.   MR. CERVANTES, I NEED TO DIRECT YOU TO ZUNO ARCE FOR A

2   MINUTE.

3        AT THIS MEETING IN THE LIVING ROOM, DID RUBEN ZUNO

4   ARCE STATE ANYTHING?

5   A.   THAT THE PERSON SHOULD BE PICKED UP.

6   Q.   WHAT PERSON WAS BEING REFERRED TO?

7        MR. MEDVENE:   OBJECTION AS TO FOUNDATION, YOUR HONOR.

8        MR. MEDRANO:   YOUR HONOR, THE WITNESS CAN INDICATE --

9        THE COURT:   YOU MAY ASK THE WITNESS IF ANYBODY

10  MENTIONED THE PERSON.   YOU'RE ASKING HIM WITHOUT LAYING ANY

11  FOUNDATION.

12       MR. MEDRANO:   VERY WELL, YOUR HONOR.

13  BY MR. MEDRANO:

14  Q.   DID RUBEN ZUNO ARCE INDICATE WHO HE WAS REFERRING TO WHEN

15  HE STATED THIS?

16  A.   THE D.E.A. AGENT.

17  Q.   MR. CERVANTES, HOW LONG WOULD YOU ESTIMATE THAT THIS

18  SOCIAL GATHERING FOR THE BAPTISM WENT ON?   UNTIL WHAT TIME?

19  A.   IT WENT ON UNTIL DAWN.

20  Q.   MR. CERVANTES, FROM BARBA'S RESIDENCE, DID ANYONE LEAVE

21  FOR THE GUADALAJARA AIRPORT?

22  A.   YES.

23  Q.   WHO WAS THAT, MR. CERVANTES?

24  A.   DON JAVIER GARCIA PANIAGUA AND HIS BROTHER.

25  Q.   WHERE DID JAVIER VASQUES VELASCO STAY AFTER THE CONCLUSION

6-187

1   OF THE PARTY?

2            MR. NICOLAYSEN:  OBJECTION.  LACK OF FOUNDATION.

3            MR. MEDRANO:   THE WITNESS WILL DESCRIBE THAT, YOUR

4   HONOR.

5            THE COURT:  OVERRULED.

6            THE WITNESS:  COULD YOU REPEAT IT, PLEASE?

7   BY MR. MEDRANO:

8   Q.   DO YOU KNOW WHERE JAVIER VASQUEZ VELASCO STAYED AFTER THE

9   CONCLUSION OF THE PARTY?

10  A.   YES.

11  Q.   WHERE WAS THAT?

12  A.   THERE, WITH US, AT THE HOUSE.

13  Q.   AT ANY TIME, SIR, DO YOU SEE JAVIER BARBA HERNANDEZ LEAVE

14  THE HOUSE?

15  A.   YES.

16  Q.   DID HE ADVISE YOU WHERE HE WAS GOING?

17  A.   YES.

18  Q.   WHERE WAS THAT?

19           MR. NICOLAYSEN:  OBJECTION, HEARSAY.

20           MR. MEDRANO:  CO-CONSPIRATOR'S STATEMENT, YOUR HONOR.

21           THE COURT:  OVERRULED.

22  BY MR. MEDRANO:

23  Q.   DID BARBA TELL YOU WHERE HE WAS GOING, MR. CERVANTES?

24  A.   YES.

25  Q.   WHERE?

6-188

1    A.   TO OLCOLTAN.

2    Q.   DID YOU SEE ANYONE LEAVE FROM THE HOUSE WITH BARBA

3    HERNANDEZ TO OCOLTAN?

4    A.   YES.

5    Q.   IS THIS THE DAY AFTER THE PARTY?

6    A.   YES.

7    Q.   WHO GOES WITH BARBA HERNANDEZ?

8    A.   DON RUBEN ZUNO ARCE AND JAVIER VASQUEZ VELASCO.

9    Q.   I'D LIKE TO DIRECT YOUR ATTENTION NOW, MR. CERVANTES,

10   STILL TO 1984.  AND IN 1984, ARE YOU STILL EMPLOYED BY BARBA

11   HERNANDEZ?

12   A.   YES.

13   Q.   AS THE HEAD OF SECURITY OF THE HOUSEHOLD?

14   A.   YES.

15   Q.   IN THE HOUSE THAT YOU WORKED AT, DID-- STRIKE THAT.

16        IN THE HOUSE THAT YOU WORKED AT, MR. CERVANTES, WERE

17   FIREARMS KEPT THERE?

18   A.   YES.

19   Q.   DID BARBA KEEP GUNS THERE?

20   A.   YES.

21   Q.   WHAT KIND OF WEAPONS DID HE HAVE THERE?

22        MR. STOLAR:  OBJECTION.  RELEVANCY.

23        THE COURT:  OVERRULED.

24        THE WITNESS:  HE HAD LONG WEAPONS AND HANDS GUNS,

25   GRENADES, BAZOOKAS, AND THE THOMPSON THAT HE HAD.  IT WAS A

6-189

COLLECTOR'S ITEM.

Q.   WHAT IS A THOMPSON?

A.   IT'S A LONG AUTOMATIC WEAPON.  IT'S AN ANTIQUE.  IT'S AN OLD, OLD WEAPON.

Q.   IS THAT A MACHINE GUN?

A.   YES.

Q.   NOW, YOU MENTIONED LONG GUNS.  ARE THESE RIFLES THAT YOU'RE REFERRING TO?

A.   YES.

Q.   WHAT KIND OF RIFLES WERE KEPT AT THE HOUSE?

A.   AUTOMATIC ONES.

Q.   GIVE ME THE CALIBER.

A.   THERE WAS AK-14 CALIBER, AR-15, THERE WAS AN UZI, INGRAM, THERE WERE SHOTGUNS, JUST LONG WEAPONS.  THAT'S ALL.

Q.   AND FINALLY, WHAT TYPES OF HAND GUNS WERE KEPT AT THE HOUSE?

A.   .38'S, 9 MILLIMETER, .45'S, .357'S, 32.20'S -- THOSE ARE TARGET SHOOTING GUNS.

Q.   NOW, MR. CERVANTES, DID RUBEN ZUNO-ARCE GO TO THAT HOUSE AGAIN BELONGING TO BARBA?

A.   YES.

Q.   WHAT DID HE DO WHEN HE WENT THERE?

A.   HE ENTERED AND HE SPOKE WITH ATTORNEY JAVIER BARBA HERNANDEZ.

Q.   WAS THERE ANY DISCUSSION AT THIS MEETING, SIR, WITH REGARD

6-190

1   TO FIREARMS?

2   A.   WELL, THEY WERE LOOKING AT THE FIREARMS.

3   Q.   DID SOMETHING HAPPEN?

4   A.   YES.

5   Q.   WHAT?

6   A.   WHILE THE ATTORNEY BARBA WAS SHOWING THE WEAPONS TO DON

7   RUBEN, HE LIKED ONE OF THE RIFLES THAT WAS THERE.

8   Q.   ZUNO LIKED ONE OF THE WEAPONS?

9   A.   YES.

10  Q.   WHICH ONE, MR. CERVANTES?

11  A.   THE THOMPSON.

12  Q.   DOES ANYTHING HAPPEN?

13  A.   DON RUBEN TOLD THE ATTORNEY THAT HE LIKED THAT WEAPON AND

14  THE ATTORNEY TOLD HIM THAT IT WAS HIS.

15  Q.   WHAT HAPPENS TO THE THOMPSON MACHINE GUN?

16  A.   THE ATTORNEY GIVES TO IT DON RUBEN, AND DON RUBEN GIVES IT

17  TO HIS ASSISTANT FOR HIM TO PUT IT IN THE CAR.

18  Q.   DO YOU RECALL THE NAME OF ZUNO'S ASSISTANT, MR. CERVANTES?

19  A.   HE IDENTIFIED HIMSELF AS DAVID MACIAS.

20           MR. MEDRANO:  YOUR HONOR, I'M GOING TO GO INTO A

21  DIFFERENT SUBJECT AREA.  I CAN PROCEED AT THIS TIME OR CAN WE

22  RECESS?  WHATEVER YOU'D LIKE.

23           THE COURT:  IT'S ALMOST TIME TO ADJOURN, SO WE CAN

24  ADJOURN AT THIS TIME.  WE'LL RECONVENE THIS CASE TOMORROW

25  MORNING AT 9:30.

6-191

1        GOOD EVENING.

2        (JURY EXCUSED.)

3        THE COURT:  THE WITNESS IS EXCUSED.

4        (WITNESS EXCUSED.)

5        THE COURT:  YOU MAY BE SEATED.

6        THE COURT:  COUNSEL, WHEN YOU WISH TO TAKE UP

7    SOMETHING WITH THE COURT, INDICATE THAT TO THE CLERK IN A

8    DISCREET WAY AND SHE WILL NOTIFY ME.

9        NOW, DO YOU WISH TO TAKE UP SOMETHING WITH THE COURT?

10       MR. STOLAR:  YES.  THE RECORD SHOULD REFLECT, AND I'D

11   LIKE THE COURT TO BE ADVISED, THAT OF THE 3500 MATERIAL THAT WE

12   HAVE RECEIVED ON THIS WITNESS, THE VERY FIRST D.E.A. 6 REPORT

13   OF THE INVESTIGATION ON HIM DEALING WITH A NOVEMBER 30, 1989

14   DEBRIEFING OF THE WITNESS.

15       THE FIRST GRAND JURY TESTIMONY THAT WE HAVE IS

16   NOVEMBER 30, 1989.  THEN THERE IS ONLY ONE OTHER 6 ON THE

17   WITNESS AND THAT DEALS WITH A DISCUSSION WITH THE WITNESS ON

18   JANUARY 2, 1990.

19       HE THEN TESTIFIES TO THE GRAND JURY ON JANUARY 17,

20   1990 AND JANUARY 24, 1990.  THE SUBJECT MATTERS OF EACH OF

21   THESE ITEMS ARE -- AT LEAST OF THE LAST GRAND JURY, IS SO

22   DIFFERENT FROM ANYTHING ELSE THAT IS DISCUSSED IN HERE THAT

23   THERE MUST BE SOME OTHER REPORTS OR DEBRIEFINGS.

24       PLUS, THAT THIS WITNESS COMES UP AND IS DEBRIEFED AND

25   PUT INTO THE GRAND JURY ON THE SAME DAY STRIKES ME AS SOMEWHAT

6-192

1   UNUSUAL.  AND THERE MUST BE SOME PRIOR DISCUSSIONS WITH THIS

2   WITNESS THAT WE HAVE NOT RECEIVED.

3           AND JUST THE PAUCITY OF MATERIAL ON THE MAN, GIVEN

4   THE NATURE OF THE TESTIMONY AND THE TESTIMONY HE'S ABOUT TO

5   OFFER -- HE'S GOING TO BASICALLY IMPLICATE EVERYBODY IN THE

6   ROOM -- TELLS ME THERE MUST BE SOME OTHER MATERIAL THAT IN THE

7   ORDINARY COURSE OF EVENTS HAD TO BE DONE BY THIS WITNESS.

8           MR. MEDRANO:  ALL EXISTING JENKS MATERIAL HAS BEEN

9   TURNED OVER.  EVERYTHING THAT I HAVE, THEY HAVE NOW.

10          THERE IS NO OTHER JENKS MATERIAL AT ALL, YOUR HONOR.

11  SO THERE IS NOTHING ELSE TO TURN OVER.

12          MR. MEDVENE:  IF THE COURT PLEASE, MAY I ADDRESS YOU

13  FOR A MOMENT?

14          THE COURT:  YES.

15          MR. MEDVENE:  SO WE DON'T GET HUNG UP ON THE WORD

16  "JENKS" OR ANY OTHER WORD, I THINK THE ISSUE IS WHETHER THEY

17  HAVE AND ARE WE ENTITLED TO IT.

18          MR. MEDRANO:  THERE HAS BEEN NO REDACTIONS.

19          MR. MEDVENE:  EXCUSE ME, MR. MEDRANO.

20          THE FACTS ESTABLISHED AT THE KASTIGAR HEARING WERE

21  THAT MR. BERRELLEZ AND MR. SALAZAR, TWO D.E.A. AGENTS,

22  QUESTIONED THIS MAN ON OR ABOUT NOVEMBER 24TH FOR A PERIOD OF

23  TIME.

24          IT'S THEN UNCLEAR WHETHER HE ALSO SPOKE TO THE U.S.

25  ATTORNEY'S OFFICE.  HE THEN CAME BACK ON OR ABOUT DECEMBER 30.

1    THE TESTIMONY IS HE WAS AGAIN SPOKEN TO BY THE D.E.A. AGENTS

2    TAKEN TO MR. MEDRANO AND PLACED BEFORE THE GRAND JURY.

3            I GUESS THE INITIAL ISSUE IS THE ONLY D.E.A. REPORT

4    WE HAVE UP TO THE NOVEMBER 30 GRAND JURY IS A NOVEMBER 30

5    D.E.A.

6            IS IT THE GOVERNMENT'S POSITION THAT THE AGENTS WROTE

7    DOWN NOTHING WHEN THEY FIRST SPOKE TO THIS MAN ON OR ABOUT

8    NOVEMBER 24TH?  IF WE COULD CLARIFY THAT -- IF THEIR POSITION

9    IS THEY WROTE SOMETHING BUT WE'RE NOT ENTITLED TO IT, AT LEAST

10   WE COULD FOCUS ON IT AND YOUR HONOR COULD LOOK AT IT AND WE

11   COULD FREEZE IT.

12           SO I WOULD ASK YOUR HONOR TO ADDRESS THE GOVERNMENT.

13   IS THERE ANYTHING WRITTEN ON OR ABOUT NOVEMBER 24 AND IS THERE

14   ANYTHING ELSE ON NOVEMBER 30?

15           MR. MEDRANO:  I CAN ADDRESS THAT, YOUR HONOR.  TO MY

16   KNOWLEDGE, THERE IS NONE, BUT WHEN WE RETIRE THIS EVENING I'LL

17   JUST CONFIRM THAT WITHIN OUR FILES.  BUT THERE IS NO OTHER

18   MATERIALS, TO MY KNOWLEDGE, AND EVERYTHING HAS GONE OVER TO THE

19   DEFENSE AS THE JENKS MATERIAL.

20           THERE IS NOTHING ELSE, YOUR HONOR, BUT I'LL FIRM IT

21   UP TONIGHT.  IF INADVERTENTLY ANYTHING WAS LEFT OUT, WE WOULD

22   IMMEDIATELY GIVE THAT TO THE DEFENSE, YOUR HONOR, BUT IT IS MY

23   UNDERSTANDING EVERYTHING ELSE HAS GONE OVER.  WE ARE NOT

24   HOLDING ANYTHING BACK.

25           MR. MEDVENE:  IS THE GOVERNMENT REPRESENTING TO YOUR

6-194

1    HONOR THAT THE AGENTS THAT SAW HIM NOVEMBER 24TH OR 25TH TOOK

2    NO NOTES OF ANY KIND?

3           AND IS THE GOVERNMENT REPRESENTING THAT WHEN THE MAN

4    CAME BACK A WEEK LATER, THE AGENTS TOOK NO NOTES OF ANY KIND.

5    I'M NOT ADDRESSING NOW THE ISSUE OF WHETHER WE SHOULD GET THEM,

6    BUT WHAT IS THE GOVERNMENT'S POSITION?

7           MR. MEDRANO:  I'M NOT EVEN SURE ANY NOTES EXISTED,

8    AND THAT THE ONLY THING GENERATED WAS THE 6'S, WHICH COUNSEL

9    NOW HAS.

10           THE COURT:  AT THE PRESENT TIME, YOU DO NOT KNOW

11    WHETHER NOTES WERE TAKEN OR NOT DURING THESE INTERVIEWS?

12           MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

13           THE COURT:  YES.

14           MR. MEDRANO:  I'M ADVISED BY CASE AGENT BERRELLEZ,

15    YOUR HONOR, THAT NO HANDWRITTEN NOTES WERE KEPT OR GENERATED.

16           THE COURT:  NO REPORTS WERE MADE OF THE INTERVIEW?

17           MR. MEDRANO:  YES, YOUR HONOR, AND DEFENSE COUNSEL

18    HAS THE REPORTS.

19           THE COURT:  OTHER THAN NOTES?

20           MR. MEDRANO:  THAT'S CORRECT, YOUR HONOR.

21           MR. MEDVENE:  MY UNDERSTANDING -- WE'LL HAVE IT FOR

22    YOUR HONOR IN THE MORNING -- IS THAT KASTIGAR, I BELIEVE -- I

23    DON'T WANT TO MISSTATE -- BUT THAT MR. BERRELLEZ SAID THAT

24    NOTES WERE TAKEN I BELIEVE BY MR. SALAZAR.

25           BUT MAYBE BOTH COUNSEL CAN LOOK AT THE KASTIGAR, BUT

6-195

1    I BELIEVE HE SAID NOTES WERE TAKEN.

2            THE COURT:  IS THERE A TRANSCRIPT OF THAT?

3            MR. MEDVENE:  YES, SIR.

4            THE COURT:  I SUGGEST YOU REVIEW THAT.

5            MR. MEDRANO:  YES, YOUR HONOR.  WE'LL CHECK IT

6    TONIGHT.  IF ANYTHING WAS IN INADVERTENTLY OMITTED, WE'LL

7    IMMEDIATELY GIVE IT TO THEM.

8            BUT IT IS MY UNDERSTANDING THAT EVERYTHING WAS GIVEN

9    TO THEM, BUT WE'LL CHECK IT TONIGHT JUST TO MAKE SURE.

10            MR. STOLAR:  IN THE GIGLIO MATERIAL WE GOT, ALL WE

11    GOT WAS SOME INFORMANT PAYMENT RECORDS.  WITH OTHER WITNESSES

12    OF THIS NATURE, THERE HAS BEEN INDICATIONS THAT THE WITNESS HAS

13    BEEN BASICALLY MOVED TO THE U.S., HE HAS BEEN PROMISED HE WON'T

14    BE DEPORTED, HE HAS BEEN GIVEN IMMUNITY, OR HE HAS SOME

15    CRIMINAL PROBLEMS IN MEXICO.

16            I DON'T SEE ANY OF THAT WITH RESPECT TO THIS WITNESS.

17            MR. MEDRANO:  HE HAS THE GIGLIO, YOUR HONOR.   THE

18    C.I. PAYMENT SHEETS HE HAS.  THERE IS NO FORMAL PLEA AGREEMENT,

19    THERE IS NO IMMUNITY AGREEMENT.

20            WHAT I HAVE, HE HAS NOW.

21            MR. STOLAR:  ARE YOU KEEPING HIM IN THE UNITED STATES

22    TO PROTECT HIM?

23            MR. MEDRANO:  THIS CAN BE ELICITED ON

24    CROSS-EXAMINATION.  HE WAS RELOCATED AND THAT MONEY IS

25    INDICATED ON THE PAYMENT SHEETS, WHICH MR. STOLAR HAS.

6-196

1         MR. STOLAR:  WITH OTHER WITNESSES, THERE HAVE BEEN

2  INDICATIONS -- WITNESSES WHO ARE MEXICAN CITIZENS -- THAT THEIR

3  STATUS HERE AS IMMIGRANTS IS BEING TAKEN CARE OF BY THE

4  GOVERNMENT, THAT THEY'RE NOT BEING DEPORTED.

5         THE COURT:  IS THAT THE CASE WITH THIS WITNESS?

6         MR. MEDRANO:  HE IS HERE ON A TEMPORARY LEGAL BASIS,

7  YOUR HONOR.  AND -- WELL, I'LL NEED TO CONFIRM, BUT THERE IS NO

8  DOCUMENTATION REFLECTING ANY AGREEMENT WITH THE WITNESS.  THERE

9  IS NOTHING TO TURN OVER; I DON'T HAVE ANYTHING TO TURN OVER,

10  YOUR HONOR.

11         MR. STOLAR:  WE WERE GIVEN SUMMARIES, DISCUSSIONS OF

12  GIGLIO ON SOME OF THE WITNESSES.

13         THE COURT:  IS HE SUBJECT TO DEPORTATION IF THE

14  I.N.S. FINDS OUT HE'S HERE?

15         MR. MEDRANO:  MAYBE I DIDN'T UNDERSTAND YOUR

16  QUESTION.  NOW, IT IS MY UNDERSTANDING THAT HE'LL BE ALLOWED TO

17  STAY IN THE UNITED STATES, AND THAT WAS COMING OUT AS PART OF

18  THE GOVERNMENT'S DIRECT.  BUT THERE IS NO DOCUMENTATION

19  ALLUDING TO THAT, YOUR HONOR.  THAT'S ALL I'M SAYING.

20         MR. STOLAR:  ON OTHER WITNESSES, WE RECEIVED

21  STATEMENTS TO THAT EFFECT.

22         THE COURT:  YOU INDICATED THAT WITH OTHER WITNESSES

23  BUT NOT WITH RESPECT TO THIS WITNESS?

24         MR. STOLAR:  RIGHT.

25         MR. MEDRANO:  IF THAT HAPPENED, YOUR HONOR, THEN IT

6-197

1    WAS AN OVERSIGHT AND I APOLOGIZE FOR THAT.  BUT THERE IS

2    NOTHING WRITTEN, IS WHAT I'M TRYING TO TELL YOU.

3            THE COURT:  IF HE HAS BEEN ASSURED THAT HE CAN REMAIN

4    IN THE UNITED STATES, THAT SHOULD BE TOLD TO COUNSEL AS PART OF

5    THE GIGLIO MATERIAL.

6            MR. MEDRANO:  VERY WELL, YOUR HONOR.  I UNDERSTAND.

7    THANK YOU.

8            MR. STOLAR:  CONSIDER IT TOLD.

9            MR. NICOLAYSEN:  YOUR HONOR, ON THE NARROW

10   COMMUNICATIONS BRIEFING THAT WE'LL BE SUBMITTING TO THE COURT,

11   IS IT NECESSARY TO HAVE THAT BEFORE THE COURT TOMORROW?  I WAS

12   HOPING WE MIGHT HAVE UNTIL FRIDAY.

13           THERE IS A GREAT DEAL OF OTHER PREPARATORY WORK THAT

14   I HAVE FOR TOMORROW'S WITNESS, AND I WANTED TO CHECK WITH THE

15   COURT ON THAT.

16           THE COURT:  FRIDAY IS FINE.

17           MR. NICOLAYSEN:  THANK YOU.

18           MR. MEDRANO:  THANK YOU, YOUR HONOR.

19           THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN

20   RECESS.

21           (COURT STANDS IN RECESS UNTIL THURSDAY, MAY 24, 1990

22   AT 9:30 A.M.)

23                        ---0---

24

25

INDEX:  U.S.A. V. MATTA BALLESTEROS   `6-198

|  |  |  | PG | LN |
|---|---|---|---|---|
| (EXHIBIT | # | 47 RECEIVED IN EVIDENCE.) | 55 | 14 |
| (EXHIBIT 49-B AND C | # | RECEIVED IN EVIDENCE.)    BY | 69 | 5 |
| (EXHIBIT B | # | MARKED FOR IDENTIFICATION.) | 77 | 2 |
| (EXHIBIT 45 | # | RECEIVED IN EVIDENCE.) | 104 | 18 |
| (EXHIBIT | # | 41 RECEIVED IN EVIDENCE.) | 171 | 24 |
| (EXHIBITS 51-A & -B | # | RECEIVED IN EVIDENCE.)   BY | 172 | 14 |
| (EXHIBIT | # | 55 RECEIVED IN EVIDENCE.) | 178 | 9 |

| | | | PG | LN |
|---|---|---|---|---|
| LOS ANGELES | + | CALIFORNIA    WEDNESDAY, | 4 | 1 |
| MAY 23, 1990 | + | 9:30 A.M. | 4 | 2 |
| CESARIO GARCIA BUENO | + | PLAINTIFFS WITNESS, | 19 | 3 |
| DIRECT EXAMINATION | + | BY MR. CARLTON:      Q. | 19 | 4 |
| CROSS-EXAMINATION | + | BY MR. STOLAR:    Q. | 21 | 24 |
| CROSS-EXAMINATION | + | BY MR. MEZA:      Q.    MR. | 24 | 14 |
| THOMAS GOMEZ | + | PLAINTIFFS WITNESS, SWORN | 25 | 20 |
| DIRECT EXAMINATION | + | BY MR. CARLTON:    Q. | 26 | 1 |
| CROSS-EXAMINATION | + | BY MR. STOLAR:      Q. | 35 | 10 |
| CROSS-EXAMINATION | + | BY MR. NICOLAYSEN:      Q. | 37 | 23 |
| CROSS-EXAMINATION | + | BY MS. KELLY:      Q. | 38 | 9 |
| REDIRECT EXAMINATION | + | BY MR. CARLTON:    Q. | 43 | 22 |
| RADELAT, M.D., | + | PLAINTIFFS WITNESS, SWORN | 44 | 16 |
| DIRECT EXAMINATION | + | BY MR. MEDRANO:    Q. | 44 | 24 |
| CROSS-EXAMINATION | + | BY MR. NICOLAYSEN:    Q | 72 | 23 |
| MARY EVELYN WALKER | + | PLAINTIFF'S WITNESS, SWORN | 79 | 9 |
| DIRECT EXAMINATION | + | BY MR. MEDRANO:    Q | 79 | 14 |
| LOS ANGELES | + | CALIFORNIA, WEDNESDAY, MAY | 92 | 1 |
| MAY 23, 1990 | + | 1:30 P.M.              (JURY | 92 | 2 |
| MARY EVELYN WALKER | + | PLAINTIFF'S WITNESS, | 95 | 5 |
| DIRECT EXAMINATION | + | (RESUMED)   BY MR. MEDRANO: | 95 | 7 |
| ESTELLA FUENTES ORTIZ | + | PLAINTIFF'S WITNESS, SWORN | 109 | 14 |
| DIRECT EXAMINATION | + | BY MR. MEDRANO:    Q | 109 | 22 |
| PLASCENCIA AGUILAR | + | PLAINTIFF'S WITNESS, SWORN. | 117 | 18 |
| DIRECT EXAMINATION | + | BY MR. MEDRANO:    Q | 118 | 11 |
| CERVANTEZ SANTOS | + | PLAINTIFF'S WITNESS, SWORN | 167 | 3 |
| DIRECT EXAMINATION | + | BY MR. MEDRANO:      Q. | 167 | 21 |

| | | | PG | LN |
|---|---|---|---|---|
| WHICH IS GOVERNMENT | EXHIBIT | 15.              DO | 28 | 22 |
| AS GOVERNMENT | EXHIBIT | 46.              DO | 46 | 10 |
| LOOK AT GOVERNMENT | EXHIBIT | 47, DR. RADELAT. | 55 | 7 |
| ( | EXHIBIT | # 47 RECEIVED IN | 55 | 14 |
| TO LOOK AT GOVERNMENT | EXHIBIT | 48-C, WHICH IS IN | 67 | 13 |
| YELLOW TAG HAS THE | EXHIBIT | NUMBER. | 67 | 25 |
| ( | EXHIBIT | 49-B AND C # RECEIVED | 69 | 5 |
| WOULD MARK AS DEFENSE | EXHIBIT | A.          THE | 76 | 18 |
| B. ( | EXHIBIT | B # MARKED FOR | 77 | 2 |
| THE COURT:  (EXAMINES | EXHIBIT | .)  ALL RIGHT. | 77 | 3 |

INDEX:   U.S.A. V. MATTA BALLESTEROS      6-198

|  |  |  | PG | LN |
|---|---|---|---|---|
| RIGHT.                      ( | EXHIBIT | PLACED BEFORE | 77 | 4 |
| MARKED AS DEFENSE | EXHIBIT | B.  DO YOU RECOGNIZE | 77 | 7 |
|                             ( | EXHIBIT | 45 # RECEIVED IN | 104 | 18 |
| OF THE WITNESS THE | EXHIBIT | S, WHICH ARE BEHIND | 118 | 3 |
| LOOK AT GOVERNMENT'S | EXHIBIT | 17, WHICH SHOULD BE | 123 | 4 |
| HAVE YOU FOUND | EXHIBIT | NO. 17?   A   YES. | 123 | 7 |
| LOOK AT GOVERNMENT'S | EXHIBIT | NO. 5, WHICH IS IN | 132 | 18 |
| THAT PERSON IN | EXHIBIT | 5 IS THE SAME PERSON | 133 | 12 |
| AND MARK IT AS AN | EXHIBIT | AND GIVE IT TO | 156 | 14 |
| TO MARK THIS NEXT | EXHIBIT | IN LINE, WHICH IS 171 | 159 | 19 |
| LIKE TO LOOK AT THE | EXHIBIT | S IN FRONT OF YOU AND | 171 | 5 |
| PULL OUT GOVERNMENT | EXHIBIT | 41.                  THE | 171 | 7 |
| ME WHAT GOVERNMENT | EXHIBIT | 41 IS?   A.   YES. | 171 | 16 |
| THE ADMISSION OF THIS | EXHIBIT | AT THIS TIME. | 171 | 21 |
|                             ( | EXHIBIT | # 41 RECEIVED IN | 171 | 24 |
| ASK YOU TO LOOK TO | EXHIBIT | 51-A AND -B, WHICH | 172 | 5 |
|                             ( | EXHIBIT | S 51-A & -B # | 172 | 14 |
| YOU TO LOOK AT THE | EXHIBIT | IN FRONT OF YOU, | 177 | 18 |
| OF YOU, GOVERNMENT | EXHIBIT | 55.  CAN YOU PULL | 177 | 19 |
| HAVE YOU FOUND THAT | EXHIBIT | , SIR?   A.   YES. | 177 | 20 |
| WE SEEK ADMISSION OF | EXHIBIT | 55 AT THIS TIME. | 178 | 4 |
| RIGHT.                      ( | EXHIBIT | # 55 RECEIVED IN | 178 | 9 |

## REPORTERS' CERTIFICATION

WE, THE UNDERSIGNED REPORTERS, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


*Julie A. Churchill*                    DATED: *June 2, 1990*
JULIE A. CHURCHILL, CSR
OFFICIAL COURT REPORTER


*Susan A Lee*                    DATED: *June 2, 1990*
SUSAN A. LEE, CSR
OFFICIAL COURT REPORTER