IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - - - -

UNITED STATES OF AMERICA,                    )
                                             )
                              PLAINTIFF,      )
                                             )
              VS.                            )   CASE NO: CR 87-422(F)-ER
                                             )
JUAN RAMON MATTA-BALLESTEROS                  )
DEL POZO, RUBEN ZUNO-ARCE,                    )
JUAN JOSE BERNABE-RAMIREZ,                    )
AND JAVIER VASQUEZ-VELASCO,                   )
                                             )
                              DEFENDANTS.     )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THURSDAY, AUGUST 2, 1990; 1:30 P.M.

LOS ANGELES, CALIFORNIA

JULIE CHURCHILL, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 617-8227

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE PLAINTIFF:

 3              GARY A. FEESS,
                UNITED STATES ATTORNEY
 4              BY:  MANUEL A. MEDRANO
                     JOHN L. CARLTON
 5              ASSISTANT U.S. ATTORNEYS
                1200 UNITED STATES COURTHOUSE
 6              312 NORTH SPRING STREET
                LOS ANGELES, CALIFORNIA  90012
 7              (213) 894-0619/894-6682

 8
           FOR DEFENDANT JAVIER VASQUEZ-VELASCO:
 9
                FEDERAL LITIGATORS GROUP
10              BY:  GREGORY NICOLAYSEN, ESQ.
                8530 WILSHIRE BOULEVARD, STE. 404
11              BEVERLY HILLS, CALIFORNIA 90211
                (213) 854-5135
12

13    ALSO PRESENT:

14              MARK KEMPLE, LAW CLERK
                MARCUS BIRD, LAW CLERK
15              TIM SAITO, COURT CLERK

16

17

18

19

20

21

22

23

24

25
```

3

LOS ANGELES + CALIFORNIA    THURSDAY, AUGUST 2, 1990

+ 1:30 P.M.


(HEARING IN CHAMBERS.)

THE COURT:  HAVE A SEAT.  LET THE RECORD SHOW THE COURT HAS CONVENED IN CHAMBERS WITH COUNSEL ON THE REMAINING DEFENDANT.  THE COUNSEL FOR THE REMAINING DEFENDANT AND COUNSEL FOR THE GOVERNMENT ARE PRESENT.

JUST BEFORE NOON THE REPORTER REPORTED TO ME THAT YESTERDAY WHEN SHE WAS IN THE JURY ROOM SHE OBSERVED A NEWSPAPER WITH, APPARENTLY, A STORY ON THE ZUNO CONVICTION. MAYBE I'LL ASK HER TO TELL YOU EXACTLY WHAT IT WAS SHE OBSERVED.

THE REPORTER:  YOUR HONOR, I CAN'T WRITE AND TALK AT THE SAME TIME.

THE COURT:  CAN YOU TAKE IT OFF THE TAPE?

THE REPORTER:  YES, PROBABLY, IF YOU ALL AGREE --

THE COURT: OKAY.  TELL EVERYBODY WHAT HAPPENED.

(SEE CERTIFIED STATEMENT ATTACHED.)

MR. NICOLAYSEN:  I DISCUSSED THE MATTER THIS MORNING WITH MS. CHURCHILL AND I DISCUSSED MY STRONG PREFERENCE -- AND THAT'S HOW IT WAS BROUGHT TO YOUR ATTENTION.

MS. CHURCHILL MADE IT CLEAR TO ME THAT SHE WANTED SOME GUIDANCE ON HOW TO HANDLE A DILEMMA OF THIS KIND, AND BEFORE BRINGING IT TO YOUR ATTENTION WANTED TO KNOW WHETHER, AS

4

1   A MATTER OF ETHICS, I FELT AS AN OFFICER OF THE COURT THAT THIS

2   CLEARLY HAD TO BE BROUGHT TO THE COURT'S ATTENTION.

3           SHE THOUGHT YES, IT SOUNDS RIGHT TO DO THAT RIGHT

4   AWAY.  AND I WAS IN HER OFFICE --

5           THE COURT:  DID SHE CONTACT YOU?

6           MR. NICOLAYSEN:  I THINK I APPROACHED JULIE CHURCHILL

7   AND JULIE ASKED WHAT I THOUGHT, AS A MATTER OF ETHICS, SHOULD

8   BE DONE.  I TOLD HER I THOUGHT IT WAS SERIOUS.  AND WHEN I TOLD

9   HER THAT THIS MORNING, SHE WENT AHEAD AND TRIED TO REACH ME BY

10  PHONE --

11          THE REPORTER:  THAT'S NOT CORRECT, YOUR HONOR.  I

12  WAS REPORTING IN COURT THIS MORNING AND WAS APPROACHED BY A

13  MESSENGER OF MR. NICOLAYSEN'S THAT HE NEEDED TO SEE ME ABOUT

14  SOMETHING RELATED TO THE CASE.

15          THE COURT:  APPARENTLY YOU CALLED --

16          MR. NICOLAYSEN:  I WAS INFORMED BY CYNTHIA PARKER

17  LAST NIGHT.  SHE TOLD ME THAT APPARENTLY IT SEEMED AS THOUGH

18  THERE WAS A PAPER IN THE JURY ROOM AT THE TIME WHEN JULIE

19  CHURCHILL WAS READING THE AGENT REYNOSO TESTIMONY YESTERDAY

20  AFTERNOON.  I WAS STUNNED, FOR OBVIOUS REASONS.

21          SHE SAID SHE REALLY DIDN'T HAVE DETAILS.

22          THE COURT:  DID SHE TELL YOU WHERE SHE LEARNED OF IT?

23          MR. NICOLAYSEN:  I PUT TWO AND TWO TOGETHER AND

24  ASSUMED SHE HAD SPOKEN WITH SOMEBODY; EITHER JULIE OR ANOTHER

25  LAWYER.

1    SHE MENTIONED THAT MIKE MEZA HAD LEARNED OF IT, AS

2 WELL, AND I THOUGHT PERHAPS SHE HAD LEARNED OF IT FROM HIM.  MY

3 CONCERN WAS TO FIND OUT DIRECTLY FROM MS. CHURCHILL EXACTLY

4 WHAT WENT ON BEFORE I SAID WE HAD TO BRING IT TO YOUR

5 ATTENTION.

6    MS. CHURCHILL TOLD ME THAT IT WAS AN ARTICLE ON THE

7 CAMARENA CASE THAT SEEMED TO HAVE BEEN READ BY ONE OF THE

8 JURORS.  TO ME THAT WAS CLEARLY A PROBLEM, SO I SAID YOU NEED

9 TO KNOW ABOUT IT.

10    MR. MEDRANO:  WHAT IS TROUBLING IS NOW TWO DEFENSE

11 LAWYERS AND AN INTERPRETER KNOW ABOUT THIS EVEN BEFORE YOU DO

12 TODAY.

13    THE COURT:  THAT'S VERY TROUBLING TO ME AND YOU CAN

14 BET THAT I HAVEN'T BEEN SILENT ON THAT SUBJECT.  THAT DOESN'T

15 CHANGE THE FACT THAT APPARENTLY THAT'S WHAT HAPPENED.

16    MR. MEDRANO:  THERE IS A NOTION OR SOME APPEARANCE OF

17 IMPROPRIETY HERE.  I CAN'T PUT MY FINGER ON IT.

18    THE COURT:  IT'S AN ACTUAL IMPROPRIETY.

19    MR. MEDRANO:  IT'S VERY DISCONCERTING TO US.

20    I UNDERSTAND THAT THE INTERPRETER, CYNTHIA PARKER, IS

21 RIGHT OUTSIDE IN THE COURTROOM HERE.  PERHAPS WE SHOULD ASK HER

22 WHAT IS GOING ON.

23    THE COURT:  WE WILL ASK HER, IF SHE IS HERE.

24    MR. NICOLAYSEN:  WHAT IS IMPORTANT TO KEEP IN MIND IS

25 THE FACT THAT THERE WAS A SERIOUS CONCERN, AS I WAS PICKING IT

6

1   UP, THAT YOUR REPORTER WAS BEING PUT IN A VERY DIFFICULT

2   SITUATION AND WAS SEEKING FEEDBACK ON HOW TO HANDLE THIS IN AN

3   ETHICAL AND PROFESSIONAL MANNER.

4        I PICKED THAT UP VERY CLEARLY AND I DID NOT THINK

5   THAT YOUR REPORTER WAS TRYING TO GO BEHIND THE GOVERNMENT'S

6   BACK OR YOUR BACK, BUT SIMPLY WAS GOING THROUGH A DILEMMA THAT

7   SHE HAD NEVER EXPERIENCED BEFORE.  AND QUITE UNDERSTANDABLY,

8   THESE ARE THE TYPES OF JUDGMENT CALLS THAT REPORTERS DO NOT

9   ORDINARILY MAKE.

10        SO IN COMING TO ME, I FELT SHE WAS ASKING FOR MY

11   FEEDBACK AND WANTED TO GET SOME GUIDANCE ON THIS.  THE MOMENT I

12   MADE IT CLEAR THAT IT CLEARLY HAD TO REACH YOUR ATTENTION,

13   THERE WAS NO THOUGHT ABOUT GOING BEHIND THE GOVERNMENT'S BACK.

14   THAT SIMPLY WAS NOT A CONSIDERATION.  IT WAS CLEAR THAT ONCE IT

15   WAS BROUGHT TO YOUR ATTENTION, THE GOVERNMENT CLEARLY WOULD BE

16   BROUGHT IN.

17        SHE EVEN TRIED TO CALL YOU IMMEDIATELY FROM HER

18   OFFICE BUT COULD NOT GET THROUGH TO YOU SO SHE WENT DOWN TO THE

19   SECOND FLOOR TO SEE YOU.

20        THE COURT:  I DON'T BELIEVE THERE WAS ANY EFFORT TO

21   GO BEHIND THE GOVERNMENT'S BACK.  I THINK IT WAS A VERY GREAT

22   LAPSE OF JUDGMENT ON THE PART OF THE REPORTER, TOTALLY BEYOND

23   MY BELIEF.

24        MR. NICOLAYSEN:  IF I MAY JUST SAY THESE ARE

25   DILEMMAS THAT ARE OBVIOUSLY VERY UNIQUE.  I DON'T WANT TO SEE

7

1   THE REPORTER SUDDENLY BEING HIT WITH THE CRITICISM.  I THINK

2   THE REAL PROBLEM IS, OBVIOUSLY, THE NEWSPAPER IN THE ROOM AND

3   WHY THE MARSHAL ALLOWED THAT TO HAPPEN AND WHY THE JURY ALLOWED

4   IT TO HAPPEN.

5           I DON'T WANT TO SEE US DISTRACTED BECAUSE SHE DECIDED

6   TO ASK A COLLEAGUE FOR ADVICE.

7           THE COURT:  THAT'S FOR COURT TO TAKE CARE OF, THE

8   REPORTER'S CONDUCT IN THIS CASE.

9           IS THIS INTERPRETER OUT THERE?

10          MR. KEMPLE  I DIDN'T SEE HER OUT THERE.  I COULD

11  CHECK IN THE HALLWAY.

12          THE COURT:  GO SEE IF SHE IS OUT THERE.

13          MR. MEDRANO:  THIS IS NOT TO DEPRECATE THE

14  SIGNIFICANCE OF THE ISSUE OF THE NEWSPAPER IN JURY ROOM; THAT'S

15  SOMETHING THAT OBVIOUSLY YOU'LL ADDRESS SHORTLY, IS WHO HAS

16  ACCESS TO THE JURY.

17          HOW MANY PEOPLE HAVE BEEN KNOWING ABOUT THIS KIND OF

18  THING BEFORE YOU WERE ADVISED?

19          THE COURT:  YOU'RE GETTING HYSTERICAL.  NOBODY HAS

20  ACCESS TO THE JURY.  THE ONLY REASON THIS CAME OUT IS BECAUSE

21  THE REPORTER WAS THERE READING A TRANSCRIPT.

22          MR. MEDRANO:  I UNDERSTAND.

23          THE COURT:  THE ONLY PROBLEM IS IT SHOULD HAVE BEEN

24  REPORTED TO ME IMMEDIATELY AND IT WAS NOT.

25          MR. MEDRANO:  YES.

8

1          MR. NICOLAYSEN: DOESN'T THE COURT FEEL THAT SOME

2   INQUIRY NEEDS TO BE MADE AS TO WHETHER THIS IS -- I DO SHARE

3   MR. MEDRANO'S CONCERNS --

4          MR. MEDRANO: MAY I JUST INQUIRE, YOUR HONOR. IT WAS

5   THIS MORNING AT SOME POINT IN TIME TODAY THAT YOU WERE ADVISED?

6          THE COURT: I WAS ADVISED ALSO THAT MR. MEZA HAD BEEN

7   TOLD AND THAT MR. NICOLAYSEN KNEW AND HAD SUGGESTED THAT SHE

8   TELL THE COURT ABOUT IT. THAT IS, THE REPORTER.

9          ASSUMING -- WE'LL DEAL WITH HER, IF WE CAN LOCATE

10   HER. WHAT DO YOU THINK SHOULD BE DONE WITH RESPECT TO THIS

11   PROBLEM?

12          MR. NICOLAYSEN: I WOULD ASK THAT WE HAVE A HEARING

13   IN WHICH THE JURORS ARE ASKED ABOUT THE NEWSPAPER. AND I THINK

14   THIS ALSO REFLECTS MR. MEDRANO'S CONCERNS.

15          I THINK WE NEED TO GO BACK IN TIME AND DETERMINE

16   WHETHER OR NOT THIS IS A ONCE ONLY SITUATION OR WHETHER THE

17   JURY HAS HAD SOME KIND OF ONGOING CONTACT WITH THE MEDIA OR

18   NEWSPAPER. WE MUST PRESERVE THE SANCTITY OF THE PROCESS.

19          I ALSO THINK THAT THE MARSHALS NEED TO BE EXAMINED

20   UNDER OATH IN COURT BY THE COURT TO DETERMINE HOW IT IS THAT

21   THEY FAILED IN THEIR SUPERVISORY DUTIES IN ALLOWING THE

22   NEWSPAPER IN THE ROOM.

23          THE COURT: I HAVE ALREADY SPOKEN TO THE MARSHAL. HE

24   APPARENTLY WAS UNAWARE.

25          MR. NICOLAYSEN: I WOULD RESPECTFULLY SUBMIT THAT IT

9

1    WAS --

2            THE COURT:  HE WAS UNAWARE IT WAS A PROBLEM.

3            MR. NICOLAYSEN:  THAT WOULD BE MY SUGGESTION, BUT I

4    WOULD RESPECTFULLY ASK THAT THIS BE DONE IN OPEN COURT ON THE

5    RECORD.

6            THE COURT:  I WANT TO KEEP IT HERE.  I DON'T KNOW WHY

7    WE SHOULD PUT IT IN OPEN COURT YET.  I DON'T WANT ANY COMMENT

8    ABOUT THIS TO ANYBODY WITH THE PRESS.

9            MR. NICOLAYSEN:  I WON'T SPEAK TO THE PRESS ABOUT

10   THIS.

11           MR. MEDRANO:  I THINK, YOUR HONOR, WE WOULD DISAGREE

12   SLIGHTLY WITH MR. NICOLAYSEN.  I THINK SUCH A BROAD HEARING IS

13   INAPPROPRIATE.

14           A GOOD STARTING POINT THAT THERE HAS BEEN NO

15   MISCONDUCT BY THE JURY IS FOR US TO IDENTIFY THROUGH

16   MS. CHURCHILL WHICH SPECIFIC JUROR HAD THE NEWSPAPER, BECAUSE

17   EVIDENTLY, WE CAN APPROACH IT THROUGH A PARTICULAR JUROR, AND

18   AS A STARTING POINT HAVE YOU TALK TO THAT JUROR INDIVIDUALLY AT

19   THE BEGINNING AND HAVE A SENSE IF SHE WAS THE ONLY ONE AND IF

20   THIS WAS ONE-TIME INCIDENT, AND THEN GO -- AND THEN GO FROM

21   THERE AS TO WHETHER ANY BROADER TYPE OF INQUIRY WAS NECESSARY.

22           I DON'T THINK IT IS NECESSARY TO POLL AND QUESTION

23   EACH AND EVERY JUROR, BUT MAYBE JUST START WITH THE ONE JUROR

24   THAT WE CAN ATTRIBUTE OWNERSHIP OF THE NEWSPAPER.

25           THE COURT:  CAN YOU IDENTIFY WHICH JUROR IT WAS?

1    THE REPORTER:  THE BLOND WOMAN WHO SAT IN THE FRONT

2    ROW WITH THE SHORT HAIR.

3    THE COURT:  LINDA OVERHOLT.

4    THE REPORTER:  YOUR HONOR, I THOUGHT IF I CAME DOWN

5    IMMEDIATELY AND REPORTED HER, THE JURY WOULD BE HESITANT TO ASK

6    FOR ANY OTHER READ BACKS WHILE THEY WERE DELIBERATING.

7    THE COURT:  WE'LL GET INTO YOUR PROBLEM LATER.  YOU

8    DON'T HAVE TO DEFEND YOURSELF HERE.

9    MR. KEMPLE:  THE INTERPRETER IS ON HER WAY UP FROM

10   SOME OTHER COURT.

11   MR. MEDRANO:  IN ADDITION TO THOSE PRESENT, MAY WE

12   PASS ON TO MISS CYNTHIA PARKER, THE INTERPRETER, AND MR. MEZA

13   THAT THIS IS NOT TO BE DISCUSSED WITH ANYONE UNLESS YOU'VE MADE

14   SOME RESOLUTION OF IT, AT LEAST?

15   THE COURT:  WE COULD PASS THAT ON TO THOSE

16   INDIVIDUALS, AS WELL AS ANYONE ELSE WHO HAS KNOWLEDGE OF THIS,

17   BECAUSE WE DON'T HAVE ALL THE FACTS YET.

18   MR. NICOLAYSEN:  YOUR HONOR, HOW WOULD THE COURT LIKE

19   TO HANDLE THE NOTIFICATION OF MR. MEDVENE AND STOLAR ON THIS OR

20   DOES THE COURT REGARD THAT AS NOT NECESSARY AT THIS TIME?

21   THE COURT:  I DON'T THINK THAT'S NECESSARY.  THEY'LL

22   HEAR ABOUT IT, I'M SURE, IF THEY HAVEN'T ALREADY.

23   MR. NICOLAYSEN:  TO THE EXTENT --

24   THE COURT:  HAVE YOU TOLD THEM?

25   MR. NICOLAYSEN:  NO, I HAVE NOT.  I WAS GOING TO

11

1   AWAIT YOUR FEEDBACK TODAY.

2           THE COURT:  WHAT I'M CONCERNED ABOUT RIGHT NOW DEALS

3   WITH YOUR CLIENT DURING THE DELIBERATIONS IN HIS CASE AND THAT

4   THIS NEWSPAPER WAS SEEN.

5           THAT'S WHAT I'M MAINLY CONCERNED ABOUT SINCE THE JURY

6   IS STILL OUT ON THAT.

7           MR. NICOLAYSEN:  TO THE EXTENT THERE IS A POSSIBILITY

8   THAT THE JURY HAS BEEN VIOLATING YOUR HONOR'S ADMONITIONS GOING

9   BACK IN TIME, COUNSEL MIGHT WISH TO RAISE THAT WITH THE COURT.

10          THE COURT:  THAT'S POSSIBLE.  THEY'RE FREE TO DO SO.

11          MR. KEMPLE:  DO YOU WANT THE BAILIFFS IN HERE?

12          THE COURT:  I SHOULD TELL YOU -- I FORGOT THIS.

13  AFTER THIS INCIDENT WAS REPORTED TO ME, I HAD THE BAILIFF GO UP

14  AND SEE IF THERE WERE ANY OTHER NEWSPAPERS IN THE JURY ROOM,

15  AND THEY BOUGHT THESE DOWN, MOST OF WHICH ARE TODAY'S.

16          MR. NICOLAYSEN:  IS THAT FROM THE DELIBERATION ROOM?

17          THE COURT:  FROM THE JURY ROOM -- WHICH SHOULD BE

18  MARKED AS AN EXHIBIT.

19          I'M TALKING ABOUT THE JURY ROOM.

20          MR. NICOLAYSEN:  WHERE THEY'RE DELIBERATING?

21          THE COURT:  THAT IS RIGHT.  THERE DOESN'T APPEAR TO

22  BE ANYTHING IN THEM.  ONE IS A JULY 31ST PAPER, YESTERDAY'S,

23  WITH THAT PAGE HAVING BEEN CUT OUT, THE PAGE RELATING TO THE

24  CASE HAS BEEN CUT OUT.

25          MR. KEMPLE:  I HAVE THE INTERPRETER HERE.

12

1        THE COURT:  LET'S TALK TO HER FIRST.

2        (CYNTHIA PARKER ENTERS CHAMBERS.)

3        THE COURT:  STATE YOUR NAME, PLEASE, FOR THE RECORD.

4        MS. PARKER:  CYNTHIA PARKER.

5        THE COURT:  MS. PARKER, I UNDERSTAND THAT YOU LEARNED

6    ABOUT A NEWSPAPER BEING IN THE JURY ROOM.

7        MS. PARKER:  I DID.  THAT'S ALL I LEARNED.

8        THE COURT:  WHEN DID YOU FIRST LEARN THAT?

9        MS. PARKER:   AROUND 11:30.

10        THE COURT:  THIS MORNING?

11        MS. PARKER:  YESTERDAY MORNING.

12        THE COURT:  YESTERDAY MORNING?

13        MS. PARKER:  RIGHT.

14        THE COURT:  WHO DID YOU LEARN IT FROM?

15        MS. PARKER:  IT WAS MENTIONED TO ME IN PASSING BY THE

16    COURT REPORTER.

17        THE COURT:  YOU MEAN MS. CHURCHILL?

18        MS. PARKER:  YES.

19        THE COURT:  DO YOU REMEMBER WHAT SHE SAID TO YOU

20    ABOUT THAT?

21        MS. PARKER:  JUST THAT THERE WAS A NEWSPAPER THERE.

22    AND I DIDN'T THINK ANYTHING OF IT AT THE TIME.  I JUST THOUGHT

23    A NEWSPAPER -- AND THEN AS THE DAY WENT ON, TOWARD THE END OF

24    THE DAY, I THOUGHT THAT'S STRANGE.  WHAT WAS IN THAT NEWSPAPER?

25        I STARTED THINKING -- AND I DIDN'T HAVE THE NEWSPAPER

13

1   YESTERDAY, SO WHEN I GOT HOME AND I LOOKED AT MY NEWSPAPER AND

2   I DID SEE AN ARTICLE ABOUT THIS CASE --

3           THE COURT:  DID YOU KNOW WHAT NEWSPAPER IT WAS?

4           MS. PARKER:  I ASSUMED IT WAS THE L.A. TIMES.  I

5   DIDN'T KNOW THOUGH.

6           THE COURT:  YOU DID NOT KNOW.  YOU'RE TALKING ABOUT

7   THE L.A. TIMES THAT YOU LOOKED AT?

8           MS. PARKER:  RIGHT.  THAT'S WHEN I GOT HOME THAT I

9   LOOKED AT MY NEWSPAPER AND DID REALIZE THERE WAS AN ARTICLE AND

10  IT WAS RIGHT ON THE FRONT PAGE, IN FACT.

11          THE COURT:  THAT RELATED TO MR. ZUNO'S CONVICTION?

12          MS. PARKER:  THAT IS CORRECT.

13          THE COURT:  DID YOU THEN MENTION IT TO SOMEONE ELSE

14  THAT YOU HAD HEARD ABOUT A NEWSPAPER?

15          MS. PARKER:  RIGHT.  TO MR. NICOLAYSEN.

16          THE COURT:  ANYONE ELSE?

17          MS. PARKER:  WELL, BEFORE I WENT HOME, I MENTIONED IT

18  TO ONE OF THE OTHER INTERPRETERS.

19          THE COURT:  WHO WAS THAT?

20          MS. PARKER:  MR. OROSCO.  AND, IN FACT, THERE WAS --

21  HE WAS READING A NEWSPAPER AT THE TIME -- THAT'S WHY I

22  MENTIONED IT TO HIM, BUT HE WASN'T READING THE L.A. TIMES.

23          I SAID THERE WAS A NEWSPAPER -- I THINK I SAID IT IN

24  THE SAME WAY SHE HAD SAID -- AND HE WENT ON HIS ASSIGNMENT AND

25  I WENT ON MINE AND NOTHING ELSE WAS SAID.

14

1        THE COURT:  DO YOU HAVE ANY QUESTIONS?

2        MR. MEDRANO:  MAY WE INQUIRE, YOUR HONOR, IF

3   MS. PARKER TOLD ANYONE OTHER THAN MR. NICOLAYSEN AND MR. OROSCO

4   ABOUT THIS?    ANY FAMILY MEMBER, OTHER INTERPRETER,

5   COLLEAGUE -- WHATEVER?

6        MS. PARKER:  WELL, IN THE -- WHEN I LEFT

7   MS. CHURCHILL'S OFFICE, I WENT DOWN TO LOOK FOR MR. NICOLAYSEN

8   IN THE ATTORNEY ROOM AND HE WASN'T THERE AND MR. MEZA WAS THERE

9   AND I DID MENTION IT TO HIM.

10       THE COURT:  YOU MENTIONED IT TO MR. MEZA?

11       MS. PARKER:  RIGHT.

12       THE COURT:  HE WAS THE FIRST ONE YOU MENTIONED IT TO?

13       MS. PARKER:  RIGHT.  UH-HUH.

14       MR. MEDRANO:  ANYONE ELSE OTHER THAN THOSE THREE?

15       MS. PARKER:  NO.  NO.

16       LATER SOMEONE MENTIONED TO ME THAT SOMETIMES THEY CUT

17  OUT ARTICLES ABOUT THE CASE.  SO THAT'S EVEN MORE REASON WHY I

18  THOUGHT I WOULDN'T SAY ANYTHING ELSE AND, IN FACT, I MENTIONED

19  THAT TO MR. NICOLAYSEN, TOO.

20       THE COURT:  WHAT WAS THIS NOW?

21       MS. PARKER:  IN JURY ROOMS SOMETIMES THEY GIVE THEM

22  THE NEWSPAPER AND CUT OUT THE ARTICLE THAT HAS TO DO WITH THE

23  CASE.  AND I DID MENTION THAT TO MR. NICOLAYSEN AND THAT MAYBE

24  THAT'S WHAT IT WAS, SO I DIDN'T THINK ANYTHING ELSE ABOUT IT.

25       THE COURT:  ANYTHING ELSE?

15

1          MR. MEDRANO:  NO.  NOT BY US, YOUR HONOR.

2          THE COURT:  THANK YOU, MS. PARKER.

3          MR. KEMPLE:  DO YOU WANT THE BAILIFFS?

4          THE COURT:  YES.  BRING THEM IN.

5          WOULD YOU STATE YOUR NAMES FOR THE RECORD, PLEASE?

6          MR. MITCHELL:  CLAY MITCHELL.

7          MS. ASHBRENNER:  JAN C. ASHBRENNER.

8          THE COURT:  YOU WERE THE BAILIFFS IN CHARGE OF THIS

9    JURY; IS THAT RIGHT?

10          BOTH BAILIFFS:  YES, SIR.

11          THE COURT:  IT HAS BEEN REPORTED TO THE COURT THERE

12    WAS A NEWSPAPER IN THERE.  IN FACT, THERE HAVE BEEN THESE

13    NEWSPAPERS YOU FOUND IN THERE TODAY, THIS STACK OF PAPERS.  I

14    ASKED YOU TO GO UP THERE AND SEE IF THERE WERE ANY PAPERS UP

15    THERE AND YOU BROUGHT THESE DOWN.

16          BOTH BAILIFFS:  YES, SIR.

17          THE COURT:  DID YOU SEE THESE GOING INTO THE JURY

18    ROOM?

19          MR. MITCHELL:  NO, SIR.

20          THE COURT:  DID YOU?

21          MS. ASHBRENNER:  NO, SIR.

22          THE COURT:  DID YOU AT ANY TIME SEE THEM GOING IN?

23          MS. ASHBRENNER:  ONE OF THE JURORS HAS BEEN BRINGING

24    CROSSWORD PUZZLES TO ME.  NOW, I HAVEN'T NOTICED HIM TAKING THE

25    PAPER IN.  AT TIMES HE WOULD HAND ME THE INSERT.

16

1          THE COURT:  YOU HAVEN'T SEEN ANY JUROR CARRY A

2    NEWSPAPER INTO THE JURY ROOM?

3          MS. ASHBRENNER:  IF I DID, IT DIDN'T REGISTER WHAT

4    THEY WERE DOING.

5          THE COURT:  YOU HAVEN'T SEEN ANY?

6          MR. MITCHELL:  I DIDN'T REALLY NOTICE WHAT THEY WERE

7    CARRYING IN THEIR HANDS.

8          THE COURT:  I THINK IT SHOULD BE LOOKED FOR.  THERE

9    SHOULD BE NO NEWSPAPERS IN THE JURY ROOM AT ALL AND IT'S UP TO

10   YOU TO SEE THAT THAT IS ENFORCED, THAT THEY DON'T GET ANY.

11         MR. MITCHELL:  SOME OF THE WOMEN ARE CARRYING BAGS

12   AND WE HAVEN'T BEEN LOOKING INTO THEIR BAGS.

13         THE COURT:  YES.  WELL, YOU'VE GOT TO SATISFY

14   YOURSELF THERE ARE NO NEWSPAPERS GOING IN.

15         MR. MITCHELL:  YES, SIR.

16         MS. ASHBRENNER:  SURELY.

17         THE COURT:  ANYTHING ELSE?

18         MR. MEDRANO:  NO, YOUR HONOR.

19         MR. NICOLAYSEN:  YOU HAVE NO WAY OF KNOWING HOW THEY

20   MIGHT HAVE -- HOW MANY JURORS MIGHT HAVE READ ANY ARTICLES

21   WHILE THEY'RE HERE IN THE BUILDING CONCERNING THE CAMARENA

22   CASE?

23         MS. ASHBRENNER:  THEY DON'T TAKE BREAKS, THEY DON'T

24   WANDER THROUGHOUT THE BUILDING OR ANYTHING.  THEY'RE ONLY OUT

25   IN THE HALLWAY, SO UNLESS THEY HAVE READ SOMETHING PRIOR TO

17

1    COMING INTO THE COURTHOUSE --

2            THE COURT:  IS IT A REGULAR PRACTICE FOR ANY OF THE

3    JURORS TO BRING BAGS INTO THE JURY DELIBERATION ROOM?

4            MR. MITCHELL:  THEIR PERSONAL BAGS THAT THEY BRING

5    FROM HOME.  WE DON'T -- WE HAVE NEVER WORKED A JURY ROOM; WE

6    DON'T KNOW WHAT THE COMMON PRACTICE IS.

7            MR. NICOLAYSEN:  THANK YOU.

8            MR. MITCHELL:  IS THAT ALL, YOUR HONOR?

9            THE COURT:  HOW IS IT THAT YOU'RE WORKING ON THIS

10   JURY?  WERE YOU ASSIGNED TO DO THAT BY THE PROTECTIVE SERVICE?

11   HOW IS IT THAT -- YOU WERE BROUGHT IN FROM OUTSIDE TO DO THIS;

12   WEREN'T YOU?

13           MR. MITCHELL:  WE WERE PICKED OUT OF THE OFFICE, YES.

14           THE COURT:  ARE YOU ASSIGNED TO THE LOCAL OFFICE?

15           MR. MITCHELL:  YES, SIR.

16           MS. ASHBRENNER:  YES, SIR.

17           THE COURT:  OH.  YOU'RE ALL RIGHT.  WE HAD A TALK AT

18   THE BEGINNING, I REMEMBER, BEFORE -- WHEN THE JURY WENT OUT --

19   YOU AND I -- AND YOU ALSO -- WE DIDN'T TALK ABOUT NEWSPAPERS,

20   THOUGH, DID WE?

21           MR. MITCHELL:  NO, SIR.

22           THE COURT:  MAYBE WE SHOULD HAVE.

23           ALL RIGHT.  THANK YOU.

24           THE COURT:  WELL, I THINK WE SHOULD BRING IN THIS

25   JUROR NUMBER 6.  ASK THE BAILIFF TO SEND HER DOWN, PLEASE.

18

1      MR. NICOLAYSEN: IS THIS SOMETHING THE COURT WANTS TO

2  HANDLE OUTSIDE THE PRESENCE OF COUNSEL SINCE THERE IS STILL A

3  DEFENDANT?

4      MR. MEDRANO: WE WOULD ASK TO BE PRESENT AND LET YOU

5  HANDLE IT.

6      THE COURT: I DON'T KNOW THAT THAT MAKES ANY

7  DIFFERENCE. I THINK YOU NEED TO BE PRESENT. I WANT YOU TO

8  HEAR WHAT SHE HAS TO SAY AND TO ASK ANY QUESTIONS YOU MIGHT

9  WANT.

10      MAYBE IT WOULD BE BETTER IF YOU FELLOWS SAT OVER

11  THERE AND -- NOT LIKE AN INQUISITION. SIT OVER THERE.

12      (COUNSEL MOVE TO ANOTHER LOCATION IN CHAMBERS.)

13      MR. NICOLAYSEN: MY CONCERN WAS I DIDN'T WANT US TO

14  PUT HER ON THE DEFENSIVE.

15      THE COURT: I WANT TO KNOW IF YOU HAVE ANY QUESTIONS.

16  YOU MIGHT GIVE A NOTE TO MY LAW CLERK IF YOU HAVE ANY QUESTIONS

17  THAT YOU WISH TO PURSUE AND HE'LL GIVE IT TO ME.

18      MR. NICOLAYSEN: THANK YOU.

19      THE COURT: WHAT IS HER NAME? OVERHOLT?

20      MR. CARLTON: LINDA OVERHOLT.

21      THE SECRETARY: THAT'S THE JUDGE, THE ONE THAT

22  MR. MEZA IS IN FRONT OF.

23      THE COURT: I DON'T NEED HIM ANYMORE. I THINK WE CAN

24  DISPENSE WITH HIS PRESENCE.

25      (BRIEF INTERRUPTION FOR TELEPHONE CALL)

19

1          (JUROR ENTERS CHAMBERS)

2          THE COURT:  MRS. OVERHOLT?

3          MS. OVERHOLT:  YES.

4          THE COURT:  I'VE BROUGHT YOU DOWN HERE TO ASK YOU

5    ABOUT THIS NEWSPAPER THAT YOU HAD IN THE JURY ROOM.

6          IT HAS BEEN REPORTED TO THE COURT THAT YOU WERE

7    READING A NEWSPAPER THERE THAT CONTAINED AN ARTICLE ABOUT THIS

8    CASE YESTERDAY.

9          NOW, WHAT ABOUT THAT?  IS THAT TRUE?

10          MRS. OVERHOLT:  NO.  WE HAVE HAD NEWSPAPERS IN THE

11    COURTROOM (SIC) ALL ALONG.

12          THE COURT:  YOU MEAN THE JURY ROOM?

13          MRS. OVERHOLT:  IN THE JURY ROOM.  THE PEOPLE WHO

14    COME IN EARLY GENERALLY BRING THEM IN AND PASS THEM AROUND.

15    AND WHEN I GET THERE, I GENERALLY START WITH THE "VIEW"

16    SECTION.  THAT'S WHAT I READ FIRST.

17          THE COURT:  DO THESE NEWSPAPERS CONTAIN STORIES ABOUT

18    THIS CASE?

19          MRS. OVERHOLT:  SOME OF THEM HAVE.  AND IF THEY DO, I

20    JUST DON'T READ THEM.

21          THE COURT:  DID YOU READ A STORY YESTERDAY ABOUT THIS

22    CASE?

23          MRS. OVERHOLT:  YESTERDAY WAS THE STORY ABOUT THE

24    RESULTS OF THE DECISION ON MR. ZUNO.

25          THE COURT:  DID YOU READ THAT?

20

1        MRS. OVERHOLT:  (SHAKING HEAD.)

2        THE COURT:  YOU'RE NOT ANSWERING NOW.

3        MRS. OVERHOLT:  NO.  NO.  I'M SORRY.  NO, I DID NOT.

4        THE COURT:  YOU DID NOT READ IT?

5        MRS. OVERHOLT:  NO.

6        THE COURT:  HAVE YOU EVER READ ANY ARTICLE ABOUT THIS

7   CASE SINCE YOU HAVE BEEN A JUROR?

8        MRS. OVERHOLT:  NO.  EVEN IF I HAVE BEEN LOOKING AT

9   THE PAPER, IF IT SAYS -- IF I STARTED TO READ SOMETHING, IF IT

10  SAYS "CAMARENA", I PUT IT AWAY.

11       AT HOME MY HUSBAND HAS BEEN CUTTING THE ARTICLES OUT

12  AND HE HAS THEM ALL IN A FILE FOLDER FOR ME SO WHEN I GET DONE,

13  I CAN READ THEM ALL BECAUSE, OF COURSE, I'M INTERESTED IN WHAT

14  THE PAPERS HAVE TO SAY.

15       THE COURT:  WELL, OF COURSE, I'M -- I DON'T KNOW HOW

16  MANY TIMES I'VE REMINDED THE JURORS --

17       MRS. OVERHOLT:  JUST ABOUT EVERY TIME.

18       THE COURT:  AND DO YOU THINK, IN GENERAL, THE JURORS

19  HAVE ABIDED BY MY INSTRUCTION?

20       MRS. OVERHOLT:  I DO, YES.  I KNOW WE ALL HEARD THE

21  FIRST DECISION WHEN WE WERE DEALING WITH MR. MATTA WHILE WE

22  WERE GOING HOME ON THE RADIO.  THAT WAS ON JUST ALMOST

23  IMMEDIATELY.

24       BUT AFTER I REALIZED WHAT IT WAS THEY WERE TALKING

25  ABOUT, I TURNED IT OFF.  THEN ONE OF THE OTHER JURORS RIDES

21

1    HOME WITH ME -- OR SHE DID AT THAT TIME --

2            THE COURT:  WHICH ONE IS THAT?

3            MRS. OVERHOLT:  DENISE MC DANIELS.  AND SHE'S NUMBER

4    8, I THINK, OR 9.  WE BOTH LIVE IN FULLERTON.

5            THE COURT:  COUNSEL, DO YOU HAVE ANY OTHER QUESTIONS

6    YOU WISH TO ASK ME OR HAVE ME ASK MRS. OVERHOLT?

7            MR. MEDRANO:  WE DON'T, YOUR HONOR.  NOT THE

8    GOVERNMENT.

9            MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

10            THE COURT:  MRS. OVERHOLT, I'D LIKE YOU TO RETURN TO

11    THE JURY ROOM AND I DON'T WANT YOU TO DISCUSS WITH ANY MEMBER

12    OF THE JURY WHAT TOOK PLACE HERE.

13            MRS. OVERHOLT:  I CAN'T TELL THEM WHY YOU CALLED ME

14    DOWN?

15            THE COURT:  NO, YOU CAN'T.

16            MRS. OVERHOLT:  OKAY.  I'LL TELL THEM YOU SAID SO.

17            THE COURT:  THANK YOU.

18            MR. KEMPLE:  SHALL I ESCORT THE JUROR THROUGH THE

19    COURTROOM OR BACK OUT THROUGH THE HALL?

20            THE COURT:  BACK THROUGH THE COURTROOM AND UPSTAIRS.

21            THANK YOU, MRS. OVERHOLT.

22            MRS. OVERHOLT:  UH-HUH.

23            (JUROR EXCUSED.)

24            THE COURT:  WELL, WHAT NEXT, GENTLEMEN?

25            MR. NICOLAYSEN:  FOR THE RECORD, YOUR HONOR, IT

22

1    APPEARS AS THOUGH THERE MIGHT BE JUST A SLIGHT DISCREPANCY

2    BETWEEN WHAT YOUR REPORTER OBSERVED AND WHAT MRS. OVERHOLT

3    ADVISED THE COURT.

4           I JUST SAY THAT FOR THE RECORD, AND IT CONCERNS ME

5    ENOUGH TO BRING IT TO YOUR ATTENTION.  IT DID SEEM TO ME AT THE

6    TIME I LEARNED OF THIS FROM TALKING TO YOUR REPORTER THAT THERE

7    WAS A GOOD FAITH BASIS FOR BELIEVING THAT THE JUROR MIGHT HAVE

8    BEEN ACTUALLY READING THAT ARTICLE ON CAMARENA.

9           AND I ACKNOWLEDGE WHAT THE JUROR HAS TOLD COURT, SO I

10   WOULD HAVE --

11          MR. CARLTON:  I BELIEVE MS. CHURCHILL HAD SAID TODAY

12   EARLIER THAT SHE COULDN'T TELL WHETHER THE JUROR WAS READING.

13          MR. NICOLAYSEN:  MAYBE IT IS MY ERROR.

14          DO YOU THINK IT WOULD BE PRODUCTIVE TO ADMONISH THE

15   JURY COLLECTIVELY AGAIN AT THIS POINT IN TIME?

16          THE COURT:  I'D BE VERY GLAD TO DO THAT.

17          MR. NICOLAYSEN:  THEY MIGHT BELIEVE THAT JUST BECAUSE

18   ONE CASE IS FINISHED, THAT THAT THING NO LONGER APPLIES.

19          THE COURT:  THAT COULD BE, YES.  I WANT THEM TO

20   UNDERSTAND THAT IT DOES APPLY.

21          MR. NICOLAYSEN:  ON BEHALF OF MY CLIENT, I WOULD

22   RESPECTFULLY MOVE THAT WE BRING THE JURY DOWN AND HAVE THE

23   COURT PROVIDE THE STANDARD ADMONITIONS, JUST TO MAKE IT CLEAR

24   THAT THIS IS JUST AS FORMAL AS IT HAS BEEN ALL ALONG.

25          THE COURT:  I WOULD BE GLAD TO DO THAT.

23

1          MR. MEDRANO:  THAT'S FINE WITH US, YOUR HONOR.

2          THE COURT:  LET'S DO THAT THEN.

3          MR. MEDRANO:  ANY THOUGHTS, YOUR HONOR?  MAYBE IT'S

4    MOOT NOW, IN LIGHT OF THE FACT YOU'LL BE ADMONISHING THEM

5    AGAIN.  DO WE NEED TO REACH OUT AND CONTACT MR. MEZA OR THE

6    SECOND INTERPRETER NOT TO DISCUSS THIS WITH THE PRESS, IN

7    PARTICULAR?

8          THE COURT:  I THINK IT WOULD BE A GOOD IDEA.  IF I

9    COULD IMPOSE UPON MR. NICOLAYSEN, BECAUSE HE HAS WORKED CLOSELY

10   WITH MR. OROSCO AND MR. MEZA; WOULD YOU DO THAT?

11         MR. NICOLAYSEN:  I WOULD BE GLAD TO DO THAT.

12         MR. MEDRANO:  WE CAN TAKE IT UPON OURSELVES TO BRING

13   IN MR. MEZA.

14         THE COURT:  I CAN BRING THEM IN HERE AND DIRECT THEM

15   MYSELF.  THAT IS MY INTENTION, THAT THIS MATTER NOT BE

16   DISCUSSED.

17         MR. MEDRANO:  WE WOULD PREFER THAT, YOUR HONOR.

18   PERHAPS IF THEY COULD INFORMALLY JUST MEET WITH YOU AND BE

19   ADMONISHED BY YOU --

20         THE COURT:  MR. MEZA IS BEFORE THIS JUDGE WHO CALLED

21   ME.  THE JUDGE WAS CALLING TO SEE IF -- I FIRST TOLD MY STAFF

22   TO GET MEZA HERE, BUT SINCE WE LEARNED THROUGH MS. PARKER HOW

23   HE LEARNED OF THE MATTER AND THROUGH THE REPORTER, THEN THAT'S

24   THE ONLY REASON I WANTED HIM HERE.

25         MR. NICOLAYSEN:  I BELIEVE CYNTHIA PARKER IS

24

1    AVAILABLE AT THE INTERPRETER'S EXTENSION DOWNSTAIRS, WHICH IS

2    4307.

3            MR. MEDRANO:  AS IS MR. OROSCO.

4            THE COURT:  SEE IF COULD YOU GET THAT INTERPRETER ON

5    THE PHONE.  43 WHAT?

6            MR. NICOLAYSEN:  4307.

7            THE COURT:  I WANT TO SEE SPEAK WITH CYNTHIA PARKER

8    AND JOSE OROSCO ON THE PHONE.

9            MR. MEDRANO:  WOULD IT BE POSSIBLE, PERHAPS, TO HAVE

10   YOUR SECRETARY CALL MR. MEZA, JUDGE, AGAIN TO HAVE -- TO LEAVE

11   A MESSAGE, PERHAPS, TO HAVE MR. MEZA DROP BY AND SEE YOU AFTER

12   HE GETS OUT OF COURT TODAY, OR AT HIS CONVENIENCE?

13           PERHAPS HE WILL TALK TO YOU TELEPHONICALLY, AT A

14   MINIMUM.

15           THE COURT:  WE'LL LEAVE A MESSAGE WITH HIS OFFICE OR

16   BEEPER OR SOMEPLACE.

17           MR. MEDRANO:  THANK YOU, YOUR HONOR.

18           MR. KEMPLE:  HERE'S MS. PARKER.

19           (CYNTHIA PARKER ENTERS CHAMBERS.)

20           THE COURT:  I WANT YOU NOT TO DISCUSS THIS WITH

21   ANYONE, WHAT HAPPENED HERE TODAY OR ANYTHING ABOUT THIS MATTER.

22           MS. PARKER:  ABSOLUTELY.

23           THE COURT:   NO PRESS OR NO ONE ELSE; ALL RIGHT?

24           MS. PARKER:  VERY WELL.

25           THE COURT:  THANK YOU.

25

1          WELL, THEN LET'S BRING THE JURY DOWN.

2          MR. CARLTON:  DID YOU WANT THE OTHER ONE ON THE

3    PHONE?

4          THE SECRETARY:  I'M GETTING HIM.  HE REPLACED HER, SO

5    SHE'S GETTING HIM AND HE'LL BE ON THE PHONE IN JUST A MOMENT.

6          MR. NICOLAYSEN:  FOR THE RECORD, YOUR HONOR, I WOULD

7    ASK THAT THE COURT, IN ADMONISHING THE JURY, ASK THE JURY

8    COLLECTIVELY WHETHER ANYONE HAS NOT COMPLIED WITH THE COURT'S

9    ONGOING ADMONITION AND HAS READ ANY ARTICLES ON THE CAMARENA

10    CASE.

11          I REALIZE THAT PUTS JURORS ON THE DEFENSIVE --

12          THE COURT:  I DON'T LIKE TO DO THAT IN OPEN COURT.

13    IF YOU WANT TO DO THAT, WE'LL DO IT INDIVIDUALLY.

14          MR. NICOLAYSEN:  I CERTAINLY FEEL, AS COUNSEL --

15          THE COURT:  EVEN IF THEY HAD, I'M NOT SURE THAT THAT

16    IS NECESSARY.  MOST OF THESE ARTICLES THAT HAVE APPEARED THAT I

17    HAVE SEEN ARE BASICALLY REPORTING WHAT TOOK PLACE IN COURT.

18          MR. NICOLAYSEN:  I'M NOT INCLINED TO AGREE WITH THAT

19    CHARACTERIZATION -- AT LEAST WITH THE L.A. TIMES.  THERE SEEMS

20    TO BE A FAIR AMOUNT OF SELECTIVE REPORTING AND EMPHASIS ON

21    CERTAIN TESTIMONY; AND OCCASIONALLY, CERTAIN INACCURACIES.

22          I WOULD ASK THAT THERE BE SOME INQUIRY.

23          THE COURT:  I'M NOT GOING TO DO IT IN OPEN COURT.

24          MR. MEDRANO:  ON THAT POINT, YOUR HONOR, JUST SO YOU

25    KNOW WHAT OUR POSITION IS, MAYBE WE CAN DO IT IN OPEN COURT.

26

1    AND THEN IF ANYBODY HAS, WE'LL TALK TO THEM INDIVIDUALLY.

2            THE COURT:  I'M NOT SO SURE THAT THAT IS NECESSARY IN

3    LIGHT OF THE SHOWING WE HAVE HAD THUS FAR.

4            MRS. OVERHOLT ASSURED YOU THAT SHE HAS NOT READ

5    ANYTHING.  SHE HAS ASSURED YOU THAT AS FAR AS SHE KNOWS, NO ONE

6    ELSE HAS READ ANYTHING ABOUT THAT CASE.  I'M NOT SO SURE THERE

7    HAS BEEN ANY MINIMUM SHOWING TO EMBARK ON THIS TYPE OF EFFORT

8    TO TALK TO EVERYONE INDIVIDUALLY, BUT THAT'S BASICALLY OUR

9    POSITION, FOR WHAT IT IS WORTH, YOUR HONOR.

10           THE COURT:  WELL, I THINK WE'LL DO IT THE OTHER WAY.

11   OF COURSE, THAT MAKES IT PUBLIC THEN.

12           MR. MEDRANO:  THEN WE PREFER IT BE DONE IN CHAMBERS.

13           THE COURT:  TO EXCLUDE THE PUBLIC FROM THE COURTROOM

14   WOULD BE THE APPROPRIATE THING TO DO.

15           IT MAKES IT PUBLIC TO THE EXTENT THAT THE OTHER

16   JURORS WILL NOW BE ASKED WHY MRS. OVERHOLT WAS BROUGHT DOWN TO

17   CHAMBERS, BUT WE DON'T NEED TO MADE THE COURTROOM AVAILABLE TO

18   THE MEDIA OR THE PUBLIC FOR PURPOSES OF THIS INQUIRY.

19           I THINK THE ONLY WAY TO HANDLE IT IS TO BRING THEM

20   DOWN ONE AT A TIME.

21           MR. NICOLAYSEN:  TO CHAMBERS?

22           THE COURT:  YES.  I THINK THAT'S THE BEST WAY.

23           MR. CARLTON:  VERY WELL, YOUR HONOR.

24           MR. NICOLAYSEN:  THANK YOU.  I APPRECIATE THE COURT

25   TAKING THE TIME.

1          THE COURT:  YOU GENTLEMEN CAN SIT OVER THERE.  IF YOU

2     HAVE ANY QUESTIONS, I'LL ASK YOU IF YOU HAVE ANY QUESTIONS.

3          WE'RE GOING TO START WITH JUROR NUMBER ONE THERE.

4          I THINK WE'LL MAKE A TRANSCRIPT OF THESE PROCEEDINGS

5     AND HAVE IT AVAILABLE FOR ALL OTHER COUNSEL IN THIS CASE.

6          (JUROR ENTERS CHAMBERS)

7          THE COURT:  THIS IS MYRTLE HINES.  COME IN, MS.

8     HINES.  HAVE A SEAT THERE, WON'T YOU?

9          I JUST WANT TO ASK YOU A FEW QUESTIONS.

10         WOULD YOU STATE YOUR NAME FOR THE RECORD, JUST SO

11    WE'LL HAVE IT?

12         MS. HINES:  MYRTLE HINES.

13         THE COURT:  MS. HINES, IT HAS BEEN REPORTED TO THE

14    COURT THAT THERE WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY

15    CONTAINING A STORY THAT RELATED TO THIS CASE.

16         DID YOU HAPPEN TO SEE IT BY ANY CHANCE?

17         MS. HINES:  DID I SEE A NEWSPAPER IN OUR SECTION OR

18    DID I LOOK AT AN ARTICLE OR WHAT?

19         THE COURT:  DID YOU SEE A NEWSPAPER IN THE JURY ROOM

20    YESTERDAY?

21         MS. HINES:  I NOTICED THAT SOME OF THE JURORS DID

22    HAVE NEWSPAPERS.  THEY BRING THEM IN WITH THEM IN THE MORNING.

23         THE COURT:  DID YOU, YOURSELF -- HAVE YOU DURING THE

24    TIME OF THIS TRIAL READ ANY ARTICLE IN ANY NEWSPAPER AT ANY

25    TIME ABOUT THIS CASE?

28

1          MS. HINES:  NO, I HAVEN'T.

2          THE COURT:  YOU HAVEN'T.  YOU HAVE AVOIDED DOING THAT

3    BECAUSE OF THE COURT'S INSTRUCTION?

4          MS. HINES:  EXACTLY, SIR.

5          THE COURT:  AND YOU HAVE NOT DONE THAT IN THE JURY

6    ROOM?

7          MS. HINES:  NO, I HAVE NOT.  I DID LOOK AT THE SPORTS

8    SECTION, THOUGH.

9          THE COURT:  THAT'S PERMISSIBLE.  BUT IT WON'T BE ANY

10   MORE BECAUSE WE ARE NOT GOING TO LET NEWSPAPERS INTO THE JURY

11   ROOM.  THEY SHOULD NOT BE IN THERE BECAUSE OF THE APPEARANCE OF

12   IT.

13         MS. HINES:  OKAY.

14         THE COURT:  ALL RIGHT.  COUNSEL, DO YOU WISH TO HAVE

15   ME ASK MS. HINES ANYTHING ELSE?

16         MR. NICOLAYSEN:  NOTHING, YOUR HONOR.  THANK YOU.

17         THE COURT:  PLEASE RETURN TO THE JURY ROOM AND DON'T

18   TELL THE OTHER JURORS WHAT THIS WAS ABOUT.  WE'RE GOING TO TALK

19   TO EACH ONE OF THEM INDIVIDUALLY ANYWAY.

20         MS. HINES:  ALL RIGHT, SIR.

21         THE COURT:  THANK YOU VERY MUCH.

22         THE SECRETARY:  THE OTHER INTERPRETER, JOSE OROSCO,

23   IS ON THE LINE.

24         (THE JUDGE SPEAKING ON THE TELEPHONE)

25         THE COURT:  JOSE, MS. PARKER HAS TOLD US ABOUT THIS

1  NEWSPAPER IN THE JURY ROOM THAT SHE TOLD YOU ABOUT.  I JUST

2  WANT TO TELL YOU THAT YOU'RE NOT TO DISCUSS THAT WITH ANYONE.

3  NO NEWSPAPER PEOPLE, NOBODY ELSE.  OKAY?  ALL RIGHT.

4           MR. MEDRANO:  THANK YOU.

5           (JUROR ENTERS CHAMBERS)

6           THE COURT:  MR. WEST, COME IN.  HOW ARE YOU, SIR?

7           MR. WEST:  PRETTY GOOD.

8           THE COURT:  HAVE A SEAT, WON'T YOU?

9           MR. WEST, IT HAS BEEN REPORTED TO THE COURT --

10  INCIDENTALLY, YOU'RE JOHN WEST; IS THAT CORRECT, FOR THE

11  RECORD?

12           MR. WEST:  YES.

13           THE COURT:  IT HAS BEEN REPORTED TO THE COURT ABOUT

14  NEWSPAPERS BEING IN THE -- ONE, IN PARTICULAR, WAS OBSERVED IN

15  THE JURY ROOM YESTERDAY, WHICH CONTAINED A STORY ABOUT THIS

16  CASE.

17           MR. WEST:  YES.

18           THE COURT:  WHAT I WANTED TO ASK YOU IS WHETHER OR

19  NOT YOU, YOURSELF, HAVE READ ANY ARTICLES THAT RELATED TO THIS

20  CASE DURING THE TIME THAT THE JURY HAD BEEN DELIBERATING?

21           MR. WEST:  THROUGH THE ENTIRE CASE?

22           THE COURT:  YES.

23           MR. WEST:  NO, SIR.

24           THE COURT:  YOU HAVE NOT?

25           MR. WEST:  NO.

1        THE COURT:  YOU HAVE COMPLIED WITH THE COURT'S ORDER

2   IN THAT RESPECT; IS THAT RIGHT?

3        MR. WEST:  YES.

4        THE COURT:  ANY QUESTIONS, COUNSEL?

5        MR. MEDRANO:  NO, YOUR HONOR. THANK YOU.

6        MR. NICOLAYSEN:  ONLY WHETHER MR. WEST OBSERVED ANY

7   OF THE JURORS READING AN ARTICLE YESTERDAY IN THE JURY ROOM

8   CONCERNING THIS CASE.

9        MR. WEST:  NO.

10        THE COURT:  DID YOU OBSERVE ANYONE?

11        MR. WEST:  NO.

12        THE COURT:  YOU DID NOT?

13        MR. WEST:  NO.

14        THE COURT:  IS IT YOUR IMPRESSION THAT THE JURORS ARE

15   LIVING UP TO THAT ORDER BY THE COURT?

16        MR. WEST:  YES, SIR.

17        THE COURT:  ALL RIGHT, SIR.  THANK YOU.

18        ALL RIGHT.  I'LL ASK YOU NOT TO DISCUSS WHAT TOOK

19   PLACE HERE WITH THE OTHER JURORS.  WE ARE GOING TO TALK TO THEM

20   EACH INDIVIDUALLY ANYWAY.

21        MR. WEST:  THANK YOU, YOUR HONOR.

22        MR. NICOLAYSEN:  WOULD IT MAKE SENSE TO BRING THEM

23   DOWN AS A GROUP AND HAVE THEM WAIT IN YOUR RECEIVING LOUNGE?

24        THE COURT:  THERE IS NOT ENOUGH ROOM.

25        (JUROR ENTERS CHAMBERS.)

31

1      THE COURT:  COME IN, MR. THOMPSON.  HOW ARE YOU?

2      MR. THOMPSON:  JUST FINE.

3      THE COURT:  HAVE A SEAT THERE, WON'T YOU?

4      MR. THOMPSON:  ALL RIGHT.

5      THE COURT:  NATHANIAN THOMPSON?

6      MR. THOMPSON:  RIGHT.

7      THE COURT:   MR. THOMPSON, THE REASON I CALLED YOU

8  DOWN HERE IS BECAUSE IT HAS BEEN REPORTED TO THE COURT THAT

9  THERE WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY WITH A STORY

10 ABOUT THIS CASE AND I WANT TO KNOW IF YOU READ ANY ARTICLE

11 ABOUT THIS CASE?

12     MR. THOMPSON:  NO, I DON'T READ THE PAPERS.

13     THE COURT:  YOU DON'T READ THE PAPER AT ALL?

14     MR. THOMPSON:  ONLY THE SPORTS.

15     THE COURT:  ONLY THE SPORTS?

16     MR. THOMPSON:  YEP.

17     THE COURT:  SO YOU HAVE NOT READ ANY ARTICLE ABOUT

18 THIS CASE IN THE JURY ROOM?

19     MR. THOMPSON:  NO, I HAVE NOT.

20     THE COURT:  ALL RIGHT.  ANY QUESTIONS?

21     MR. MEDRANO:  NO, YOUR HONOR.

22     MR. NICOLAYSEN:  NO, YOUR HONOR.  THANK YOU.

23     THE COURT:  ALL RIGHT, MR. THOMPSON.  I APPRECIATE

24 YOUR COMING DOWN.  DON'T DISCUSS WHAT TOOK PLACE HERE WITH THE

25 OTHER JURORS.  WE'RE GOING TO TALK TO EACH OF THEM

1   INDIVIDUALLY.

2       MR. THOMPSON: ALL RIGHT.

3       THE COURT: THANK YOU, SIR.

4       MR. NICOLAYSEN: I WOULD ASK IF THE COURT COULD, AS A

5   STANDARD QUESTION, ASK IF THEY HAVE -- HE OR SHE -- OBSERVED

6   ANYONE ELSE READING ARTICLES ON THIS CASE.

7       (JUROR ENTERS CHAMBERS)

8       THE COURT: MR. MARQUEZ, COME IN. HAVE A SEAT THERE,

9   WON'T YOU?

10      THIS IS JUROR FRANK MARQUEZ. MR. MARQUEZ, IT HAS

11  BEEN REPORTED TO THE COURT THAT THERE WAS A NEWSPAPER IN THE

12  JURY ROOM YESTERDAY CONTAINING AN ARTICLE RELATING TO THIS

13  CASE.

14      WERE YOU AWARE OF THAT?

15      MR. MARQUEZ: I KNOW THERE WAS NEWSPAPERS, BUT I

16  DON'T READ IT. I READ THE SPORTS AND THAT'S ABOUT IT.

17      THE COURT: YOU DID NOT READ ANY ARTICLE RELATING TO

18  THIS CASE?

19      MR. MARQUEZ: THAT'S NOT MY PAPER. I JUST GET

20  WHATEVER IS LEFT -- THE SPORTS PAGE.

21      THE COURT: DID YOU SEE ANYONE ELSE READING ANY

22  ARTICLE RELATING TO THIS CASE?

23      MR. MARQUEZ: I DIDN'T SEE NOBODY READING IT. LIKE I

24  SAID, WE TAKE BREAKS EVERY HOUR, A FIVE-MINUTE BREAK, AND WE

25  JUST SKIM THROUGH THE SPORTS PAGE.

1          THE COURT:  SO YOU, YOURSELF, HAVE NOT READ ANYTHING

2    ABOUT THIS CASE AT ANY TIME; IS THAT RIGHT?

3          MR. MARQUEZ:  NO.  NO.

4          THE COURT:  YOU KNOW IT IS STILL THE RULE.  EVEN

5    THOUGH SOME OF THE CASE IS OVER WITH, NO ONE IS TO READ

6    ANYTHING ABOUT THE CASE.

7          MR. MARQUEZ:  I UNDERSTAND.

8          THE COURT:  ALL RIGHT, SIR.

9          ANYTHING FURTHER?

10          MR. MEDRANO:  NOTHING, YOUR HONOR.

11          THE COURT:  THAT'S ALL WE NEED, MR. MARQUEZ.  DON'T

12    DISCUSS IT WITH THE OTHER JURORS.  WE'RE GOING TO TALK TO EACH

13    OF THEM ANYWAY.

14          MR. MARQUEZ:  RIGHT.

15          THE COURT:  THANK YOU.

16          (JUROR ENTERS CHAMBERS)

17          THE COURT:  MR. PARRIS.  COME IN AND SIT DOWN, WON'T

18    YOU?  THIS IS JUROR WILLIAM PARRIS.

19          MR. PARRIS, IT HAS BEEN REPORTED TO THE COURT THAT IN

20    THE JURY ROOM YESTERDAY THERE WAS A NEWSPAPER CONTAINING AN

21    ARTICLE RELATING TO THIS CASE.

22          DID YOU SEE THAT NEWSPAPER BY ANY CHANCE?

23          MR. PARRIS:  I SAW THE NEWSPAPER, YES, SIR.

24          THE COURT:  DID YOU READ THE ARTICLE?

25          MR. PARRIS:  NO, SIR.

34

1    THE COURT:  DID YOU SEE ANYONE ELSE READ THE ARTICLE?

2    MR. PARRIS:  NOT THE ARTICLE, NO.

3    THE COURT:  IS IT YOUR IMPRESSION THAT THE JURORS ARE

4  COMPLYING WITH THE COURT'S ORDER ABOUT NOT READING ANYTHING

5  RELATING TO THIS CASE?

6    MR. PARRIS:  IT IS MY IMPRESSION THAT THERE ARE

7  JURORS WHO HAVE READ THE NEWSPAPER.  IT APPEARS TO ME -- IT IS

8  NOT STATED THAT ANYONE GETS UP AND SAYS "I READ THE NEWSPAPER

9  AND THIS IS WHAT IT SAYS", BUT IN THE PAST ON A NUMBER OF

10  OCCASIONS, THERE SEEMED TO BE DISCUSSIONS ABOUT THINGS THAT

11  APPEAR TO HAVE COME FROM SOMEPLACE OTHER THAN WHAT WE HEARD.

12    AND WHETHER IT CAME FROM THE NEWS OR THE NEWSPAPER, I

13  COULDN'T SAY, BUT I HAVE TO SAY THAT I FEEL THAT SOME JURORS

14  SOMEHOW -- WHETHER IT IS BEING TOLD TO THEM BY SOMEBODY OR

15  SOMETHING -- THERE IS INFORMATION BEING BROUGHT IN, YES.

16    THE COURT:  WHAT KIND OF INFORMATION?

17    MR. PARRIS:  IT JUST SEEMS LIKE WHATEVER WE'VE DONE,

18  ESPECIALLY AFTER THE -- AFTER WE HAVE GIVEN OUR VERDICTS, THERE

19  IS A LOT OF DISCUSSION ABOUT THAT THE NEXT DAY.

20    THE COURT:  WHAT KIND OF DISCUSSION?

21    MR. PARRIS:  THERE WAS DISCUSSION ABOUT THE JURORS

22  BEING STUPID AND THAT THE MEDIA THOUGHT THAT THE JURORS WERE

23  STUPID, AND THAT WAS STATED AND WE HAD A DISCUSSION ABOUT THAT.

24    THE COURT:  WHAT WAS SAID ABOUT IT?

25    MR. PARRIS:  IT WAS -- I BELIEVE ONE PERSON STATED

35

1    THAT SYLVIA LOPEZ HAD MADE A COMMENT THAT WE WERE STUPID OR

2    CONFUSED OR SOMETHING LIKE THAT.

3            THE COURT:  WHO'S SYLVIA LOPEZ?  DO YOU UNDERSTAND

4    WHO THAT IS?

5            MR. PARRIS:  I DON'T HAVE A TELEVISION AT MY HOUSE SO

6    I DON'T KNOW WHO SHE WAS, BUT THAT WAS ASKED.  AND SHE SAID SHE

7    WAS A NEWS REPORTER ON THE T.V.

8            THE COURT:  WELL, WERE YOU IN ANY WAY AFFECTED IN THE

9    WAY YOU HAVE MADE YOUR DECISIONS IN THIS CASE BY ANY SUCH

10    DISCUSSIONS?

11            MR. PARRIS: THE ONLY WAY I WAS AFFECTED IS I WENT

12    BACK AND READ THE INSTRUCTIONS AGAIN TO SEE IF I HAVE, IN

13    FACT -- IF I HAD BEEN STUPID.

14            AND WAS I AFFECTED IN MY DECISION; NO, I DON'T THINK

15    I WAS.

16            THE COURT:  YOU MADE YOUR DECISION BASED ON YOUR

17    CONSCIENTIOUS BELIEF THAT THEY WERE THE RIGHT DECISION?

18            MR. PARRIS:  ABSOLUTELY.  ABSOLUTELY.

19            THE COURT:  DO YOU THINK THAT'S THE CASE WITH THE

20    OTHER JURORS, AS WELL?

21            MR. PARRIS:  I THINK SO.  IF ANYTHING, THE

22    CONVERSATION MADE EVERYONE JUST KIND OF SLOW DOWN AND GO BACK.

23    LIKE I SAID, WE REREAD THE INSTRUCTIONS AGAIN AND WE DISCUSSED

24    THE INSTRUCTIONS A LITTLE BIT CLEARER.

25            WE DON'T SEE ANY REASON WHY WE'RE STUPID.  IT SEEMS

1    WE DID THE RIGHT THING AND THEN WE WENT ON.

2              THE COURT:  OF COURSE.  THAT'S RIGHT, SIR.

3              ANY QUESTIONS HERE?

4              MR. MEDRANO:  NO, YOUR HONOR.  THANK YOU.

5              THE COURT:  ALL RIGHT, MR. PARRIS.  THANK YOU VERY

6    MUCH.

7              MR. NICOLAYSEN:  I WANTED TO JUST ASK -- I HAD A

8    QUESTION FOR YOUR CLERK.

9              THE COURT:  JUST A MOMENT.

10             (PAPER HANDED TO THE JUDGE.)

11             THE COURT:  DO YOU BELIEVE ANY OF THE JURORS HAVE

12   BEEN INFLUENCED -- BECAUSE OF INFORMATION -- INFLUENCED TO VOTE

13   IN A CERTAIN WAY BECAUSE OF INFORMATION BROUGHT IN FROM THE

14   OUTSIDE?

15             MR. PARRIS:  NO, I DON'T.

16             THE COURT:  ALL RIGHT, SIR.  THANK YOU.

17             MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

18             (JUROR ENTERS CHAMBERS)

19             THE COURT:  COME IN, MR. ESPINOZA.  PLEASE SIT DOWN

20   THERE, WON'T YOU, MR. ESPINOZA.

21             I CALLED YOU HERE TO ASK YOU ABOUT A REPORT THAT THE

22   COURT RECEIVED THAT THERE WAS A NEWSPAPER IN THE JURY ROOM

23   YESTERDAY WHICH CONTAINED A STORY ABOUT THIS CASE.

24             I WANTED TO KNOW IF YOU HAD -- DID YOU, YOURSELF, SEE

25   IT?

37

1    MR. ESPINOZA:  NO, I DIDN'T.

2    THE COURT:  DID YOU READ ANY STORY YOURSELF IN THE

3 JURY ROOM ABOUT THIS CASE?

4    MR. ESPINOZA:  NO, I DIDN'T.

5    THE COURT:  DO YOU KNOW -- DID YOU SEE ANY OTHER

6 JUROR READING ANYTHING ABOUT THIS CASE?

7    MR. ESPINOZA:  NO.

8    THE COURT:  IS IT YOUR GENERAL IMPRESSION THAT THE

9 JURORS ARE AVOIDING READING AND LISTENING TO ANYTHING ABOUT THE

10 CASE?

11    MR. ESPINOZA:  I THINK THEY ARE.

12    THE COURT:  YOU THINK THEY ARE?

13    MR. ESPINOZA:  THAT'S MY OPINION.

14    THE COURT:  ALL RIGHT.  AND YOU, YOURSELF, HAVE NOT?

15 YOU FOLLOWED THE COURT'S INSTRUCTION IN THAT REGARD; IS THAT

16 RIGHT?

17    MR. ESPINOZA:  YES, I HAVE.  I MEAN I AM ONE OF THE

18 PEOPLE THAT BRINGS IN A NEWSPAPER IN THE MORNING, BUT I WAS

19 NEVER UNDER THE IMPRESSION THEY WERE NOT ALLOWED IN THE ROOM.

20    WE DON'T READ THE ARTICLES -- ANYTHING THAT PERTAINS

21 TO THE TRIAL.  WE STAY AWAY FROM THAT, BUT I WAS NEVER UNDER

22 THE IMPRESSION THAT WE WERE ALLOWED NOT TO BRING THEM IN.

23    THE COURT:  THAT'S OUR FAULT, NOT YOURS.

24    MR. ESPINOZA:  WE ALWAYS HAD BROUGHT THEM IN.

25    THE COURT:  DURING THE TRIAL?

38

1          MR. ESPINOZA:  YES, AND WE WOULD READ -- LIKE NOW

2    THEY GO IN THERE, IT'S BASICALLY NOBODY READS THEM BECAUSE AS

3    SOON AS EVERYBODY IS IN THERE, WE START DELIBERATING AND NOBODY

4    HAS TIME TO, BECAUSE BASICALLY WE REALLY DON'T STOP ENOUGH FOR

5    ANYBODY TO EVEN READ THE NEWSPAPER IN THERE.

6          THE COURT:  DO YOU BELIEVE ANY INFORMATION ABOUT THE

7    CASE FROM SOURCES OTHER THAN THE TRIAL HAVE BEEN CONSIDERED

8    DURING THE DELIBERATION?

9          DO YOU UNDERSTAND WHAT I MEAN BY THAT QUESTION?  IT

10   IS NOT A VERY GOOD QUESTION.

11         MR. ESPINOZA:  FROM OTHER PEOPLE?

12         THE COURT:  IS IT YOUR IMPRESSION THAT THE JURY IS

13   BASING IT'S CONSIDERATION ON OTHER INFORMATION BESIDES THE

14   EVIDENCE -- BESIDES THE EVIDENCE IN THE CASE?

15         MR. ESPINOZA:  NO, NO, NO.

16         THE COURT:  STRICTLY ON THE EVIDENCE?

17         MR. ESPINOZA:  NO.  THAT'S ALL WE ARE CONSIDERING.  I

18   THINK WE'VE DONE A GOOD JOB OF IT MYSELF.  THAT'S MY OPINION.

19         THE COURT:  I THINK YOU HAVE BEEN VERY DILIGENT.

20         MR. ESPINOZA:  I THINK WE HAVE GIVEN EVERYBODY MORE

21   THAN FAIR CHANCE, AND THAT'S MY HONEST OPINION.  I DON'T -- I

22   WOULD HOPE SOMEBODY WOULD DO THE SAME FOR ME IF I WAS EVER IN

23   THE SITUATION.

24         THE COURT:  WE APPRECIATE THAT.  THANK YOU.

25         MR. NICOLAYSEN:  MAY WE ASK THAT SAME QUESTION,

39

1    PERHAPS REWORDED, TO EACH OF THE REMAINING JURORS?

2                (JUROR ENTERS CHAMBERS)

3                THE COURT:  COME IN, SIR.  MR. WOOD?

4                MR. WOOD:  RIGHT.  HAVE A SEAT, WON'T YOU, MR. WOOD?

5    WE ARE NOT GOING TO KEEP YOU LONG.

6                IT WAS REPORTED TO THE COURT YESTERDAY THAT THERE WAS

7    A NEWSPAPER IN THE JURY ROOM CONTAINING AN ARTICLE RELATING TO

8    THIS CASE.

9                MR. WOOD:  THERE HAS BEEN A NEWSPAPER IN THERE EVERY

10   DAY, YOUR HONOR.  I READ THE NEWSPAPER.  I READ THE BUSINESS

11   SECTION AND THE "VIEW" EVERY MORNING.  I BUY A PAPER BECAUSE

12   I'VE GOT A LOT OF STOCKS, AND THE ONLY WAY I CAN KEEP UP ON

13   THEM IS WHAT IS GOING ON IN THE NEWSPAPER.

14                I HAVE READ, YOU KNOW, THE PAPER, BUT THAT'S JUST

15   THE TWO SECTIONS I READ OUT OF IT EVERY DAY IS THE BUSINESS

16   SECTION AND "VIEW" SECTION.

17                THE COURT:  YOU PERSONALLY HAVE NOT READ ANYTHING

18   ABOUT THIS CASE?

19                MR. WOOD:   NO, NOT ON THE CAMARENA CASE.

20                THE COURT:  ARE YOU AWARE OF ANYONE ELSE HAVING DONE

21   SO?

22                MR. WOOD:  NOT THAT I KNOW OF.  IF I SEE IT, I JUST

23   GO ON TO THE NEXT PAGE.  IF YOU'RE LOOKING AT THE NEWSPAPER --

24   THERE IS ALWAYS SOMETHING IN THE NEWSPAPER -- YOU -- WHAT DID

25   YOU TELL US?  IF YOU SEE IT, JUST PASS IT.  THAT'S WHAT I DID.

40

1        THE COURT:  IS IT YOUR IMPRESSION THE JURY HAS

2   FAITHFULLY FOLLOWED THE COURT'S INSTRUCTION?

3        MR. WOOD:  AS FAR AS I KNOW.  NOBODY IS TELLING ME IF

4   THEY HAVEN'T.

5        THE COURT:  IS THERE ANY INFORMATION THAT HAS COME TO

6   THE JURY FROM SOURCES OTHER THAN EVIDENCE THAT YOU BELIEVE HAS

7   BEEN CONSIDERED IN THIS CASE?

8        MR. WOOD:  NO, NOTHING.  WE ARE SCRUTINIZING

9   EVERYTHING.  I'LL PUT IT THAT WAY.  WE'VE REALLY TAKEN A LOT OF

10  TIME AND PRO AND CON IT BACK AND FORTH.  WE HAVE LOOKED AT

11  EVERY PIECE A MILLION TIMES, I'D SAY, BECAUSE -- LIKE WE SAY,

12  THIS IS --

13       THE COURT:  DON'T THINK WE DON'T APPRECIATE THAT.  WE

14  KNOW YOU'RE WORKING VERY HARD UP THERE BECAUSE OF THE LENGTH OF

15  THE DELIBERATIONS.

16       I'M GOING TO HAVE SOMETHING TO SAY TO YOU ALL ABOUT

17  THAT EVENTUALLY, BUT THANK YOU VERY MUCH, MR. WOOD.

18       (JUROR ENTERS CHAMBERS)

19       THE COURT:  MS. DOLAN, COME ON IN.

20       MS. DOLAN:  HI.

21       THE COURT:  COME IN AND HAVE A SEAT THERE, WON'T YOU.

22       MS. DOLAN:  THANK YOU.

23       THE COURT:  I JUST WANT TO ASK YOU A FEW QUESTIONS

24  BECAUSE OF SOMETHING THAT WAS REPORTED TO THE COURT YESTERDAY

25  THAT THERE WAS A NEWSPAPER IN THE JURY ROOM THAT CONTAINED A

41

1   STORY RELATING TO THIS CASE.

2           AND I'M TRYING TO FIND OUT, IF ANY -- IF YOU KNOW

3   WHETHER ANYONE IN THE JURY ROOM HAS READ THAT STORY OR WHETHER

4   YOU, YOURSELF, HAVE READ IT.

5           MS. DOLAN:  I DON'T BELIEVE ANYONE READ IT.  I KNOW I

6   DIDN'T AND I DIDN'T SEE ANYONE READING IT, BUT --

7           THE COURT:  WE'RE GOING TO MAKE SURE THERE IS NO

8   DOUBT, BECAUSE WE ARE NOT GOING TO LET NEWSPAPERS IN THERE.  I

9   WASN'T AWARE THEY WERE GOING IN THERE.  THEY SHOULD NOT HAVE

10  BEEN.  THERE SHOULDN'T HAVE BEEN ANY NEWSPAPERS, BECAUSE IT

11  DOESN'T LOOK RIGHT.

12          IS IT YOUR IMPRESSION THAT THE JURORS HAVE LIVED UP

13  TO THE INSTRUCTIONS THAT THE COURT HAS GIVEN NOT TO READ ABOUT

14  THE CASE?

15          MS. DOLAN:  THAT'S A DIFFICULT QUESTION.  I'LL TELL

16  YOU THE TRUTH:  I BELIEVE THAT SOME PEOPLE HAVE READ DIFFERENT

17  ARTICLES --

18          THE COURT:  YOU DO?

19          MS. DOLAN:  -- SINCE WE STARTED DELIBERATION.

20          THE COURT:  WHAT MAKES YOU SAY THAT?

21          MS. DOLAN:  THERE WAS SOME DISCUSSION IN THE JURY

22  ROOM.

23          THE COURT:  ABOUT THE ARTICLES?

24          MS. DOLAN:  ON FRIDAY.

25          THE COURT:  IS THIS THE ONLY TIME THERE HAS BEEN ANY

42

1    DISCUSSION?   CAN YOU TELL ME THE NATURE OF THE DISCUSSION?

2              MS. DOLAN:   THAT MR. STOLAR HAD SAID SOME THINGS

3    ABOUT THE JURY, THAT WE WERE CONFUSED.

4              THE COURT:   AND THAT CAUSED SOME CONCERN TO THE

5    JURORS?

6              SOMEBODY HAD HEARD THAT ON THE TELEVISION OR

7    SOMETHING?

8              MS. DOLAN:   I DON'T KNOW IF IT WAS TELEVISION OR THE

9    NEWSPAPER.   I DON'T RECALL HOW THEY CAME TO THAT PIECE OF

10   INFORMATION.

11             THE COURT:   WHAT RESULTED FROM THAT THEN?

12             MS. DOLAN:   WE SPENT SOME TIME TALKING ABOUT IT.   AND

13   AS THE FOREPERSON, I TOOK THE LEAD AND I SAID THAT THAT IS

14   HISTORY.   LET'S GET TO WORK, IT DOESN'T MATTER WHAT ANYBODY

15   THINKS, AND THEN WE WENT BACK TO DELIBERATION.

16             THE COURT:   DO YOU THINK THE JURY'S DELIBERATION

17   BECAME MORE SCRUPULOUS AND METICULOUS AFTER THAT BECAUSE OF

18   THAT DISCUSSION?

19             MS. DOLAN:   NO.   I DON'T THINK WE COULD WORK ANY

20   HARDER THAN WE HAD BEEN PRIOR TO THAT POINT -- OR SINCE.

21             THE COURT:   LET ME ASK YOU:   DO YOU THINK THAT ANY

22   JUROR HAS BEEN INFLUENCED BY ANY INFORMATION OBTAINED FROM

23   OUTSIDE THE COURT OTHER THAN WHAT IS OBTAINED THROUGH EVIDENCE?

24             MS. DOLAN:   NO, I DON'T BELIEVE SO.

25             THE COURT:   OKAY.   THANK YOU.   YOU'RE GOING A GOOD

43

1   JOB OF LEADING THE JURY AND WE APPRECIATE THE TIME AND EFFORT

2   THAT YOU'VE ALL PUT IN UP THERE.

3          THANK YOU.

4          MS. DOLAN:  THANK YOU.

5          (JUROR EXCUSED.)

6          MR. NICOLAYSEN:   IF I MAY, YOUR HONOR -- AND I SAY

7   THIS WITH GREAT RESPECT TO THE COURT -- I WOULD ASK THAT NO

8   JUROR BE COMPLIMENTED FOR THE JOB THEY'RE DOING, ONLY BECAUSE

9   IT MIGHT SUGGEST THAT THE GUILTY VERDICTS --

10         THE COURT:  COUNSEL, I DON'T NEED THAT.

11         (JUROR ENTERS THE CHAMBERS)

12         THE COURT:  MS. MC DANIELS?

13         MS. MC DANIELS:  YES.

14         THE COURT:  HAVE A SEAT, WON'T YOU.

15         IT WAS REPORTED TO THE COURT THIS MORNING THAT THERE

16  WAS A NEWSPAPER IN THE JURY ROOM YESTERDAY CONTAINING A STORY

17  THAT PERTAINED TO THIS CASE.

18         MS. MC DANIELS:  YES.

19         THE COURT:  AND I WANT TO FIND OUT IF YOU HAD SEEN IT

20  YOURSELF?

21         MS. MC DANIELS:  DUANE AND BOB BRING PAPERS IN EVERY

22  MORNING AND THEY TELL ME -- IF AN ARTICLE IS THERE, I FOLD IT

23  UP AND PUT IT IN MY PURSE.  I TAKE IT HOME AND HAND IT TO MY

24  SON AND HE CUTS IT OUT ON PUTS IT ON HIS DESK, AND AT THE END

25  OF THE TRIAL, I TOLD HIM I WOULD GO WITH HIM AND READ THE

44

1   ARTICLES, SO --

2           THE COURT:  YOU HAVE NOT READ ANYTHING?

3           MS. MC DANIELS:  I HAVEN'T READ IT, NO.

4           THE COURT:  HAVE YOU SEEN ANY ONE ELSE READ ANY

5   ARTICLES?

6           MS. MC DANIELS:  NO.

7           THE COURT:  DO YOU FEEL THAT ANYONE HAS BEEN

8   INFLUENCED BY SOMETHING THEY MAY HAVE READ OR SEEN OUTSIDE THE

9   COURTROOM?

10          MS. MC DANIELS:  NO.

11          THE COURT:  DO YOU BELIEVE THAT THE JURY IS

12  CONCENTRATING AND DECIDING THIS CASE ON THE EVIDENCE IN THE

13  CASE AND THE LAW?

14          MS. MC DANIELS:  YES, I DO.

15          THE COURT:  ALL RIGHT.  THANK YOU.

16          WE HAVE TWO TO GO.

17          (JUROR ENTERS CHAMBERS)

18          MS. FREDERICK:  GOOD AFTERNOON, JUDGE.  HOW ARE YOU?

19          THE COURT:  HELLO, MS. FREDERICK.  HOW ARE YOU?

20          MS. FREDERICK:  JUST FINE, JUDGE.  THANK YOU.

21          THE COURT:  I'M JUST GOING TO KEEP YOU A MINUTE.  I

22  WANT TO ASK YOU A FEW QUESTIONS.

23          IT WAS REPORTED TO THE COURT THAT THERE WAS A

24  NEWSPAPER IN THE JURY ROOM YESTERDAY THAT CONTAINED AN ARTICLE

25  RELATING TO THIS CASE, AND I WANTED TO KNOW IF YOU HAD READ IT.

45

1            MS. FREDERICK:  NO, SIR.

2            THE COURT:  DO YOU KNOW OF ANYONE ELSE WHO HAD READ

3    IT?

4            MS. FREDERICK:  NO, SIR.

5            THE COURT:  DO YOU BELIEVE THE JURY HAS TRIED TO

6    AVOID READING ANYTHING ABOUT THIS CASE?

7            MS. FREDERICK:  I CERTAINLY DO.  I SURE DO.  I KNOW I

8    HAVE.

9            THE COURT:  AND DO YOU THINK THE JURY IN ANY WAY HAS

10   BEEN INFLUENCED BY ANYTHING ANYBODY HAS HEARD OUTSIDE THE

11   COURTROOM, OUTSIDE OF THE EVIDENCE IN THE CASE?

12           MS. FREDERICK:  NO, I REALLY DON'T.  NOBODY HAS SAID

13   ANYTHING TO ME, AT LEAST IN MY PRESENCE.  I HAVE HEARD NOTHING.

14           THE COURT:  THANK YOU VERY MUCH.

15           MS. FREDERICK:  YOUR VERY WELCOME.

16           (JUROR ENTERS CHAMBERS)

17           THE COURT:  COME IN, MRS. MC LANE.

18           MRS. MC LANE:  HELLO.

19           THE COURT:  HOW ARE YOU?  PLEASE HAVE A SEAT THERE,

20   WON'T YOU?

21           THIS IS IRENE MC LANE.

22           I WANT TO ASK YOU A COUPLE OF QUESTIONS,

23   MRS. MC LANE.  IT WAS REPORTED TO THE COURT YESTERDAY THAT

24   THERE WAS A NEWSPAPER UP IN THE JURY ROOM CONTAINING AN ARTICLE

25   RELATING TO THIS CASE, AND I WANTED TO KNOW IF YOU HAD READ IT

46

1   YOURSELF?

2            MRS. MC LANE:  OH, NO.

3            THE COURT:  DID YOU SEE ANYONE ELSE READ SUCH AN

4   ARTICLE?

5            MRS. MC LANE:  NO.

6            THE COURT:  DO YOU BELIEVE THE JURORS HAVE AVOIDED

7   READING ANYTHING ABOUT THIS CASE IN ACCORDANCE WITH THE

8   INSTRUCTIONS OF THE COURT?

9            MRS. MC LANE:  I HAVE NEVER SEEN THAT THEY HAD.

10  THERE ARE NEWSPAPERS ON THE DESK -- ON THE TABLE, AND THEY'D

11  SAY, "WELL, YOU CAN'T READ THIS ARTICLE."

12           THE COURT:  THAT HAS BEEN OPENLY DISCUSSED?

13           MRS. MC LANE:  ABSOLUTELY.  "WE CANNOT READ THIS

14  ARTICLE."

15           THE COURT:  DO YOU THINK THAT THE JURY HAS BEEN

16  INFLUENCED IN ANY WAY BY ANYTHING BROUGHT IN FROM THE OUTSIDE;

17  THAT IS, OTHER THAN EVIDENCE IN THE CASE THAT WAS PRESENTED AT

18  THE TRIAL?

19           MRS. MC LANE:  NO, I -- NO, I HAVEN'T.  I HAVEN'T

20  SEEN ANYTHING.

21           THE COURT:  ALL RIGHT.  WELL, THANK YOU.

22           (JUROR EXCUSED.)

23           THE COURT:  WELL, COUNSEL, YOU'VE HEARD IT.

24           MR. NICOLAYSEN:  YOUR HONOR, AT THIS TIME I WOULD

25  SIMPLY ASK THAT THERE BE CLOSER SUPERVISION, PERHAPS, IN THE

47

1   REMAINING STAGE OF THE DELIBERATIONS.

2          THE COURT:   WHAT DO YOU MEAN BY THAT?

3          MR. NICOLAYSEN:   THE BAILIFFS PERHAPS SHOULD MAKE AN

4   EFFORT TO BE MORE OBSERVANT THAN PERHAPS THEY HAVE BEEN ALL

5   ALONG, JUST FOR SAKE OF --

6          THE COURT:   THERE ARE NOT GOING TO BE ANY NEWSPAPERS

7   IN THAT JURY ROOM, YOU CAN BET ON THAT.

8          MR. NICOLAYSEN:   THAT'S THE APPROPRIATE RULING, AND I

9   THANK THE COURT FOR IT.  I WOULD JUST ASK THAT THE BAILIFFS BE

10  REMINDED TO REMEMBER THEIR SUPERVISORY DUTIES.

11         THE COURT:   I'M GOING TO PROBABLY CONVENE THE JURY

12  TONIGHT AND TELL THEM SO COLLECTIVELY BEFORE THEY ADJOURN.

13         ALL RIGHT.

14         MR. NICOLAYSEN:   AT THIS TIME, I WOULD THANK THE

15  COURT VERY MUCH FOR TAKING THE TIME TO CONDUCT THE INQUIRY.  I

16  THINK IT WAS PRODUCTIVE.  I THINK A REPEATED ADMONITION BEFORE

17  RECESS IS APPROPRIATE, AND LET'S JUST TRUST THAT WE HAVE DONE

18  WHAT WE CAN TO MONITOR THE SITUATION.

19         THE COURT:   THIS IS A VERY CONSCIENTIOUS JURY, IN MY

20  VIEW, AND IT'S UNFORTUNATE THAT MR. STOLAR HAS SUCH A BIG MOUTH

21  AND HAS SUCH A PENCHANT FOR GETTING IN FRONT OF THE T.V.

22  CAMERA.  I PUT THAT IN THE RECORD SO HE CAN READ IT.

23         HE'S THE REASON I MADE THAT ORDER, BECAUSE IN MY

24  VIEW, HE'S NOT CONDUCTING HIMSELF RESPONSIBLY.  IT APPEARS THAT

25  THAT DISCUSSION ON THE PART OF THE JURY THAT THEY HAVE

48

1   DISCUSSED SOME OF THE CRITICAL THINGS THAT HE HAS SAID ABOUT

2   THEM HAS APPARENTLY ENHANCED THEIR SCRUPULOUSNESS ABOUT THIS

3   CASE AND PROBABLY WORKED TO THE BEST INTEREST OF YOUR CLIENT.

4           SO ON THE BASIS OF WHAT I'VE HEARD, I THINK THAT WE

5   JUST SHOULD GO ON AND SEE WHAT HAPPENS.

6           MR. NICOLAYSEN:  JUST SO THE RECORD IS PROPERLY

7   PRESERVED, MAY I ASK THAT THE STACK OF PAPERS ON YOUR

8   CONFERENCE TABLE BE MARKED AS AN EXHIBIT AND MAINTAINED.

9           THE COURT:  THEY WILL BE, AND THEY'LL BE MARKED AS AN

10  EXHIBIT -- THESE NEWSPAPERS -- AND YOU'RE FREE TO LOOK AT THEM,

11  IF YOU WANT.  THEY'LL BE MARKED AS AN EXHIBIT.

12          MR. NICOLAYSEN:  AND PRESERVED IN THE RECORD.

13          THE COURT:  AND PRESERVED AS PART OF THE RECORD FOR

14  THE COURT BUT MARKED FOR IDENTIFICATION ONLY.

15          MR. MEDRANO:  THANK YOU, YOUR HONOR.

16          MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

17          MR. MEDRANO:  MAY WE TAKE JUST A COUPLE MINUTES TO

18  EXAMINE THESE?

19          THE COURT:  DO IT OUTSIDE OR SOMEPLACE.

20          (WHICH WERE ALL THE PROCEEDINGS HAD IN THE

21  ABOVE-ENTITLED MATTER AT THE DATE AND TIME AFORESAID.)

22                    ---0---

    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
23  STENOGRAPHIC RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
    MATTER.
24
    _____      DATED:_____
25  JULIE A. CHURCHILL, CSR NO. 6155

49

## CERTIFIED STATEMENT OF COURT REPORTER

I CERTIFY THAT WHEN I ATTEMPTED TO USE THE TAPE TO TRANSCRIBE THE OFF-THE-RECORD PORTION WHERE I DESCRIBED WHAT I SAW IN THE JURY ROOM, I LEARNED THAT THE TAPE MACHINE DID NOT OPERATE FOR THE ENTIRE PROCEEDING.

TO THE BEST OF MY RECOLLECTION, IN SUBSTANCE, THIS IS WHAT I REPORTED TO THE JUDGE, COUNSEL AND LAW CLERKS PRESENT IN CHAMBERS.

"WHEN I WENT UPSTAIRS YESTERDAY TO READ BACK THE REQUESTED TESTIMONY OF ABEL REYNOSO, I NOTICED A PAPER ON THE TABLE IN FRONT OF THE JURORS.

IT WAS OPENED TO THE PAGE OF THE ARTICLE ABOUT THE CASE WHICH HAD THE ARTIST'S SKETCH AND SOMETHING ABOUT "CAMARENA" HEADLINED ABOVE THE SKETCH.

THE JUROR PUT THE PAPER DOWN AS SOON AS I WALKED IN THE ROOM TO READ BACK THE TESTIMONY, AND SHE MAY HAVE ONLY BEEN LOOKING AT THE SKETCH RATHER THAN READING THE ARTICLE.  I COULDN'T TELL BECAUSE SHE ONLY HAD IT IN HER HANDS FOR A SECOND AFTER I ENTERED THE ROOM."

-oOo-

_____    _____

JULIE A. CHURCHILL, C.S.R. DATED: